**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

CITIZENS FOR RESPONSIBILITY AND
ETHICS IN WASHINGTON
P.O. Box 14596
Washington, DC 20044,

      Plaintiff,

      v.

U.S. DEPARTMENT OF JUSTICE
950 Pennsylvania Avenue NW
Washington, DC 20530,

TODD BLANCHE, in his official capacity as
Acting Attorney General
950 Pennsylvania Avenue NW
Washington, DC 20530,

U.S. DEPARTMENT OF THE TREASURY
1500 Pennsylvania Avenue NW
Washington, DC 20220,

SCOTT BESSENT, in his official capacity as
Secretary of the Treasury
1500 Pennsylvania Avenue NW
Washington, DC 20220,

INTERNAL REVENUE SERVICE
1111 Constitution Avenue NW
Washington, DC 20224,

FRANK BISIGNANO, in his official
capacity as Chief Executive Officer of the
Internal Revenue Service
1111 Constitution Avenue NW
Washington, DC 20224,

THE ANTI-WEAPONIZATION FUND
c/o U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530,

J. DOES 1–5, in their official capacities as
Members of the Anti-Weaponization Fund
c/o U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530,

      Defendants.

Case No. 26-cv-1789

**COMPLAINT FOR
INJUNCTIVE AND
DECLARATORY RELIEF**

**INTRODUCTION**

1.     On May 18, President Trump executed a collusive settlement of *Trump v. IRS*, No. 26-cv-20609 (S.D. Fla.), a lawsuit he filed against two federal agencies he controls. Engineered by the President's political appointees, the sham settlement created a new slush fund designed to funnel $1.776 billion in taxpayer dollars from the Treasury's Judgment Fund to purported victims of what the President considers "lawfare" and government "weaponization" ("the Slush Fund" or "the Fund").

2.     The Slush Fund is a jaw-dropping act of presidential corruption. And it is brazenly illegal. Unlike prior victim compensation funds, it was not authorized by Congress. Nor was the Fund the product of a judicially approved, arm's length legal settlement. It was created solely by Executive fiat, an unconstitutional taxpayer-funded giveaway to the President's allies that is wholly untethered from the claims asserted in *Trump v. IRS*. Among the Fund's expected beneficiaries are throngs of insurrectionists who brutally attacked police officers and stormed the U.S. Capitol to halt the transfer of presidential power on January 6, 2021, and who were later pardoned by President Trump.

3.     The Fund's charter documents—a May 18 settlement agreement and incorporated order of the Acting Attorney General (together, "the Slush Fund Order")—instruct that the $1.776 billion in taxpayer funds will be doled out by five "Members" appointed by the Attorney General and removable solely by President Trump. *See* Ex. 1, May 18 Settlement Agreement; Ex. 2, May 18 AG Order. The Fund's members shall have final, unreviewable authority to "issue monetary relief" that they alone decide is "owed to claimants." Ex. 1, May 18 Settlement Agreement ¶ IV.D.

4.     The Slush Fund Order plainly lacks statutory authorization. And by purporting to create and fund a powerful new agency—answerable only to the President—with unlimited

authority to disburse $1.776 billion in taxpayer dollars to whomever it chooses, Defendants usurped Congress's authority in violation of the separation of powers.

5. The Fund's opaque structure also defies bedrock transparency and accountability statutes. Indeed, the Fund was *purpose-built* to insulate the administration from public scrutiny. The Slush Fund Order empowers the Fund's members to make their "procedures public in whole or in part, *in [their] discretion*." Ex. 1, May 18 Settlement Agreement ¶ IV.C (emphasis added). And the Fund will provide only "confidential" quarterly reports to the Attorney General including "the name and address of each claimant who has received any relief and if so, [the] nature of such relief." *Id.* ¶ IV.E.

6. The Slush Fund Order's secrecy provisions enable Defendants to circumvent the Judgment Fund statute's public disclosure requirements. And they allow Defendants to evade public scorn for awarding taxpayer funds to, for example, a pardoned January 6 insurrectionist later convicted and sentenced to life in prison for child sex abuse crimes,[1] a pardoned insurrectionist and threatened assassin,[2] and numerous other convicted felons pardoned by President Trump who are now clamoring for taxpayer-funded "restitution" from Defendants' illegal Slush Fund.

7. By its terms, the Slush Fund Order purports to exempt the Fund from the Freedom of Information Act ("FOIA"), the Federal Records Act ("FRA"), and the Administrative Procedure Act ("APA"). But these statutory guardrails cannot be so easily evaded. Rather, "determining whether an [executive branch] entity fits the agency definition" under these statutes "demands" a

---

[1] Tom Dreisbach, *A Jan. 6 rioter pardoned by Trump was sentenced to life in prison for child sex abuse*, NPR (Mar. 5, 2026), https://perma.cc/YLH5-CMDH.

[2] Linnaea Honl-Stunkel, Sophia Barriga Hernandez & Alyssa Meiman, *At least 33 pardoned insurrectionists face other criminal charges-but many are now going free*, CREW (Dec. 18, 2025), https://tinyurl.com/y52ekaeb.

"functional approach," *Cotton v. Heyman*, 63 F.3d 1115, 1121 (D.C. Cir. 1995), which asks whether the entity "exercises substantial independent authority," *CREW v. Off. of Admin.*, 566 F.3d 219, 222 (D.C. Cir. 2009). Here, the Fund's unfettered, unreviewable power to disburse $1.776 billion in federal money unquestionably is "substantial independent authority," making it a de facto "agency." Insofar as the Slush Fund Order erroneously treats the Fund as a *non-agency* exempt from FOIA, the FRA, and the APA, the Order is contrary to law.

8.      Defendants structured the Slush Fund to operate with maximum secrecy in order to suppress First-Amendment-protected speech they disfavor. Defendants have settled similar claims with those this Administration believes were unfairly targeted, but the Judgment Fund statute required those settlements to be made public, *see* 31 U.S.C. § 1304(d), facilitating speech critical of the payments. Unlawfully establishing and routing settlements through this secretive Slush Fund, however, deprives Plaintiff and the public of facts necessary to support critical speech and thus suppresses speech that Defendants disfavor.

9.      Defendants also created the Slush Fund without public input, flouting the APA's notice-and-comment procedures and depriving Plaintiff and the public of any opportunity to surface concerns about its clear illegality. And Defendants failed to engage in reasoned, non-arbitrary decisionmaking.

10.     This suit seeks to hold unlawful, vacate, and set aside Defendants' Slush Fund Order under the APA, and enjoin Defendants' unlawful and *ultra vires* actions under the Court's inherent equitable power.

11.     Plaintiff Citizens for Responsibility and Ethics in Washington ("CREW") is a non-profit government watchdog organization whose core mission entails monitoring Executive Branch spending of appropriated funds, shining a light on abuses of taxpayer money, and widely

disseminating federal records to the public on those subjects. As a frequent requester of federal records that has sought and intends to seek records from the Fund, CREW is directly harmed by Defendants' constitutional violations and defiance of federal records preservation and access laws. CREW is further harmed by Defendants' failure to follow notice-and-comment procedures *before* creating the Fund and deciding to transfer $1.776 billion in taxpayer funds to an undisclosed "Designated Account."

12.     Time is of the essence. The Fund is set to receive the transfer of $1.776 billion from the Treasury by no later than July 17, 2026. Ex. 2, May 18 AG Order ¶ C. If the Fund continues operating under the false premise that it is not an "agency" subject to the FRA and FOIA, it is virtually certain to fail to create and preserve essential records required by the FRA, forever and irreparably depriving CREW and the public of access to those records through FOIA. CREW is also suffering irreparable constitutional harms from Defendants' separation-of-powers and First Amendment violations. To prevent these and other irreparable injuries, CREW intends to promptly seek preliminary relief.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction under 28 U.S.C. § 1331 because this action arises under the laws of the United States. This Court has further remedial authority under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, and the APA, 5 U.S.C. §§ 701 *et seq.*

14.     The Court further has jurisdiction pursuant to 28 U.S.C. § 1361, which grants original jurisdiction to the district courts of "any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."

15.    Venue lies in this District under 28 U.S.C. § 1391(e)(1)(C) because Defendants include officers and agencies of the United States headquartered in this District.

**PARTIES**

16.    Plaintiff CREW is a non-partisan, non-profit government watchdog organization committed to protecting the rights of citizens to be informed about the activities of government officials and agencies and to ensuring ethics, transparency, and integrity in government. To advance its mission, CREW uses a combination of research, litigation, and advocacy. As part of its research, CREW routinely uses government records made available to it under FOIA, the Federal Advisory Committee Act, and other federal laws, and widely disseminates those records to the public.

17.    Defendant U.S. Department of Justice ("DOJ") is an executive department of the United States and an agency within the meaning of FOIA, 5 U.S.C. § 552(f)(1), the APA, 5 U.S.C.§ 551(1), and the FRA, 44 U.S.C. § 2901(14). The DOJ executed the Slush Fund Order purporting to establish the Fund.

18.    Defendant Todd Blanche is the Acting Attorney General of the United States and is sued in his official capacity. Blanche directed the transfer of $1.776 billion from the Judgment Fund. Blanche previously served as President Trump's personal criminal defense counsel, including in federal prosecutions which underlie some of President Trump's claims which were settled by the Slush Fund Order. Blanche retains continuing authority to appoint the Fund's members, audit its operations, and receive its confidential quarterly reports. Blanche has not been nominated for, nor confirmed by the Senate to, the office of Attorney General, and continues to serve only in an acting capacity.

19.     Defendant U.S. Department of the Treasury ("Treasury") is an executive department of the United States and an "agency" within the meaning of 5 U.S.C. § 552(f)(1), 5 U.S.C.§ 551(1), and 44 U.S.C. § 2901(14). Treasury administers the Judgment Fund, 31 U.S.C. § 1304, from which Defendants purport to draw the $1.776 billion to capitalize the Fund, and is statutorily required to disclose the recipients, amounts, and bases of Judgment Fund payments. Treasury was a named defendant in *Trump v. IRS*, the suit whose voluntary dismissal and contemporaneous settlement Defendants used as the vehicle to establish the Fund.

20.     Defendant Scott Bessent is the Secretary of the Treasury and is sued in his official capacity. Secretary Bessent is responsible for the administration of the Judgment Fund and for effectuating the transfer of $1.776 billion from the Judgment Fund to the Designated Account.

21.     Defendant Internal Revenue Service ("IRS") is a bureau within Defendant Treasury and an "agency" within the meaning of 5 U.S.C. § 552(f)(1), 5 U.S.C.§ 551(1), and 44 U.S.C. § 2901(14). IRS was the principal defendant in *Trump v. IRS*.

22.     Defendant Frank Bisignano is the Chief Executive Officer ("CEO") of the IRS and is sued in his official capacity. Bisignano, who concurrently serves as Commissioner of the Social Security Administration, was installed in this newly created, non-Senate-confirmed supervisory position by Defendant Bessent on October 6, 2025. The position vests him with day-to-day management authority over the agency. The Senate-confirmed Commissioner of Internal Revenue position remains vacant and Defendant Bessent's own tenure as Acting Commissioner expired under the Federal Vacancies Reform Act.

23.     Defendant "Anti-Weaponization Fund" ("the Slush Fund" or "the Fund") is the entity established by the Slush Fund Order and is functioning as a de facto "agency" within the meaning of 5 U.S.C. § 552(f)(1), 5 U.S.C.§ 551(1), and 44 U.S.C. § 2901(14). The Slush Fund

Order purportedly empowers the Fund to set its own procedures, evaluate and approve claims, and receive and disburse up to $1.776 billion in federal funds—all without statutory authorization, public disclosure, or congressional oversight. The Fund is led by five Members appointed by the Attorney General and removable at will by the President. The Fund may consult with federal agencies, may be audited by DOJ, and reports quarterly to the Attorney General. Any balance in the Fund's account would revert to the United States near the end of President Trump's term.

24.     Defendants J. Does 1–5 are the Members of the Fund, appointed by the Acting Attorney General, and are sued in their official capacities. The Members hold final, unreviewable authority over the Fund's procedures, the evaluation and approval of claims, and the disbursement of taxpayer funds, and serve at the pleasure of the President, who may remove any Member without cause.

## FACTUAL ALLEGATIONS

### *Origins of President Trump's claims of "lawfare" and "weaponization"*

25.     On January 6, 2021, a violent mob incited by then-President Trump attacked the U.S. Capitol to stop the constitutionally mandated transfer of presidential power following the 2020 election. The attack injured more than 100 law enforcement officers, killed at least one, and forced the Vice President and other lawmakers to flee for their lives. The mob temporarily stopped the counting of electoral votes mandated by the Twelfth Amendment. *See Anderson v. Griswold*, 543 P.3d 283, 329 (Colo. 2023), *rev'd on other grounds sub nom. Trump v. Anderson*, 601 U.S. 100 (2024) (per curiam). "Courts have found or described the attack on the Capitol as an insurrection."[3]

---

[3] DOJ, *Final Report on the Special Counsel's Investigations and Prosecutions*, Special Counsel Jack Smith, at 62 (Jan. 7, 2025), https://perma.cc/9WA9-DSUM. (citing *Anderson*, 543 P.3d at 329); *see also New Mexico ex rel. White v. Griffin*, 2022 WL 4295619, at *17 (N.M. Dist. Ct. Sept.

26.    Trump had motivated the mob to come to Washington D.C. by lying about election fraud over the course of the 2020 election cycle and incited the crowd to violence during a speech at the White House Ellipse that afternoon, knowing that many in the crowd were armed and prepared for violence. *See Anderson*, 543 P.3d at 329. He continued to incite the mob even after learning that the Capitol was under violent attack and refused repeated calls to send reinforcements to the Capitol or to call off the mob. *See id*.

27.    Approximately 140 police officers were injured in the attack, with injuries including cracked ribs, smashed spinal disks, and brain injuries.[4]

28.    For example, Officer Michael Fanone was dragged out by the neck down the stairs of the Capitol's Lower West Terrace tunnel and quickly swallowed by the mob, severely beaten and tased several times in the neck while people shouted that they should "kill him with his own gun." Fanone suffered both a heart attack and a traumatic brain injury, injuries that ultimately ended his police career.[5]

29.    The FBI classified the attack as an act of domestic terrorism.[6]

30.    Federal prosecutors obtained convictions in 100% of jury trials held for January 6 defendants. More than 1,500 defendants were charged, and most opted to plead guilty.

---

6, 2022) ("The Court concludes that the January 6, 2021 attack on the United States Capitol and the surrounding planning, mobilization, and incitement constituted an 'insurrection' within the meaning of Section Three of the Fourteenth Amendment."), *cert. denied*. No. 23-279 (U.S. Mar. 18, 2024).

[4] *See* Michael S. Schmidt & Luke Broadwater, *Officers' Injuries, Including Concussions, Show Scope of Violence at Capitol Riot*, N.Y. Times (Feb. 11, 2021), https://tinyurl.com/6u8wsnzv.

[5] *See* Statement of Offense, *United States v. Head*, 21-cr-291 (D.D.C. May 6, 2022), ECF 124; Michael Kunzelman, *Man Who Dragged Officer Into 1/6 Mob Gets More Than 7 Years*, AP News (Oct. 27, 2022), https://tinyurl.com/45k9vkx3.

[6] *See* Tom Dreisbach, *Donald Trump Calls Jan. 6 a "Day of Love." Here Are the Facts.*, NPR (Oct. 29, 2024), https://perma.cc/5EQH-A3HD.

31.    Trump nonetheless characterized the prosecutions as illegitimate, claiming in a Fox News interview that "most of the people were absolutely innocent,"[7] a claim contradicted by defendants' own guilty pleas and the government's trial conviction record.

32.    On January 20, 2021, Trump begrudgingly left office after failing to thwart the constitutional transfer of power to his successor.

33.    Upon leaving office, Trump had cardboard boxes full of highly sensitive classified documents transported to his Mar-a-Lago Club in Florida. He had the documents stored in various unsecured locations around the club, including in a ballroom and a bathroom. *See* Superseding Indictment, *United States v. Trump, et al.*, No. 9:23-cr-80101-AMC (S.D. Fla. July 27, 2023).

34.    Trump's engagement in insurrection and mishandling of classified information triggered multiple criminal investigations by DOJ and FBI.

35.    As early as September 1, 2022, Trump, when commenting on convicted January 6 insurrectionists and a future term in office, stated: "We'll be looking very, very seriously at full pardons . . . I mean full pardons with an apology to many."[8]

36.    In 2022, then-Attorney General Merrick Garland appointed a Special Counsel to oversee these investigations and prosecute any individual found to have committed federal crimes. *See* Off. of the Att'y Gen., Order No. 5559-2022, Appointment of John L. Smith as Special Counsel (Nov. 18, 2022).

37.    The Special Counsel's investigations led two grand juries to find probable cause for indictments, charging President Trump with 44 criminal counts. The charges included

---

[7] *See* Tara Suter, *Trump Lists 'Number of Reasons' for Pardoning Violent Jan. 6 Rioters*, The Hill (Jan. 23, 2025), https://tinyurl.com/2uswaaxs.

[8] *See* Mariana Alfaro, *Trump Vows Pardons, Government Apology to Capitol Rioters If Elected*, Wash. Post (Sept. 1, 2022), https://tinyurl.com/ydrucpjr.

conspiracy to defraud the United States, obstructing an official proceeding, conspiracy against rights, willful retention of national security material, and obstruction of justice. *See* Superseding Indictment, *United States v. Trump, et al.*, No. 9:23-cr-80101-AMC (S.D. Fla. July 27, 2023); Indictment, *United States v. Trump*, No. l:23-cr-00257-TSC (D.D.C. August 1, 2023).

38.     President Trump won re-election to the Office of the President in the November 5, 2024 presidential election.

39.     On November 25, 2024, after consulting the Department's Office of Legal Counsel, the Special Counsel moved to drop all charges against Donald Trump, citing DOJ policy that it does not prosecute sitting presidents of the United States. *See* Gov'ts Mot. to Dismiss, *United States v. Trump*, No. l:23-cr-00257-TSC (D.D.C. Nov. 25, 2024); Gov'ts Mot. to Dismiss Appeal, *United States v. Trump*, No. 24-12311-J (11th Cir. Nov. 25, 2024).

40.     Throughout his post-presidency, Trump repeatedly and publicly characterized these federal law enforcement activities as unlawful "weaponization" and "lawfare" directed at him personally.[9]

41.     As early as January 29, 2022, Trump declared: "If I run and I win, we will treat those people from Jan. 6 fairly . . . and if it requires pardons, we will give them pardons, because they are being treated so unfairly."[10]

---

[9] *See, e.g.*, Rebecca Jacobs, *Trump Has Threatened Dozens of Times to Use the Government to Target Political Enemies*, CREW (May 22, 2024), https://tinyurl.com/4ax422fr; Derrick Hawkins et al., *How Trump Has Become Angrier and More Isolated on Truth Social*, Wash. Post (Apr. 22, 2024), https://tinyurl.com/5ay66htw; Emma Colton, *Trump Blasts Ongoing 'Lawfare' in 1st Public Remarks Since Congress Certified his Election*, Fox News (Jan. 7, 2025), https://tinyurl.com/4t7j78a4.

[10] *See* J. David Goodman & Emily Cochrane, *Trump Says He Would Consider Pardons for Jan. 6 Defendants if Elected*, N.Y. Times (Jan. 30, 2022), https://tinyurl.com/jvy27yha.

42.     In 2023 and 2024, Trump filed two administrative claims with the DOJ seeking damages for purported violations of his rights relating to investigations of his potentially criminal conduct.[11]

43.     In March 2023, at the opening rally of his 2024 Presidential campaign held in Waco, Texas, Trump stood with hand over heart as a recording of the "J6 Prison Choir," a group of individuals incarcerated in the Washington, D.C. jail for their involvement in the January 6, 2021, played.[12]

44.     In the same speech, Trump explicitly framed his potential return to power as a vehicle to redress the grievances of those who shared his victimhood narrative, declaring: "For those who have been wronged and betrayed . . . I am your retribution."[13]

45.     Trump repeatedly labeled January 6 defendants "hostages" at campaign rallies.[14]

46.     Trump publicly characterized January 6 as a "day of love" and the insurrectionists as "patriots," and compared his own legal jeopardy to that of January 6 defendants in campaign speeches, referring to himself as a "proud political dissident" and "public enemy of a rogue regime."[15]

---

[11] Devlin Barrett & Tyler Pager, *Trump Said to Demand Justice Dept. Pay Him $230 Million for Past Cases*, N.Y. Times (Oct. 21, 2025), https://tinyurl.com/mtzzhzcf.

[12] *See* Isaac Arnsdorf et al., *Behind Trump's Musical Tribute to Some of the Most Violent Jan. 6 Rioters*, Wash. Post (May 4, 2023), https://tinyurl.com/3xvf3hcn.

[13] *See* Peter Eisler et al., *Trump's Campaign of Retribution: At least 470 Targets and Counting*, Reuters (Nov. 26, 2025), https://tinyurl.com/m5c2vxbd.

[14] *See* Marianne LeVine et al., *Trump Escalates Solidarity with Jan. 6 Rioters As His Own Trials Close In*, Wash. Post (Mar. 23, 2024), https://tinyurl.com/4dx96p65; Ryan J. Reilly, *Meet Some of the Violent Jan. 6 Rioters Donald Trump Keeps Calling 'Hostages'*, NBC News (Apr. 4, 2024), https://tinyurl.com/sxxyef26.

[15] *See* Amber Phillips, *Takeaways from the Fifth Anniversary of Jan. 6*, Wash. Post (Jan. 6, 2026), https://tinyurl.com/49s6c939; *see* LeVine et al., *supra* n.14.

12

47.    Within hours of taking the oath of office, Trump granted pardons and clemency to more than 1,500 people who had been convicted of or charged with crimes, including violent crimes, related to the January 6 Capitol attack.[16]

48.    Federal judges had ordered hundreds of January 6 defendants to pay restitution to the federal government for Capitol damage, but as of June 2024 only approximately 15 percent of the money had been paid. After the pardons, taxpayers were left responsible for the remaining costs of the insurrection.[17]

49.    In a March 25, 2025 interview, Trump publicly confirmed his administration was discussing a compensation fund for pardoned January 6 rioters, stating: "A lot of people that are in government now talk about it because a lot of the people in government really like that group of people."[18]

***Trump funnels millions of dollars to January 6 defendants through political committees and fundraisers.***

50.    Prior to the creation of the Fund, Trump and political committees affiliated with him expended millions of dollars to pay legal fees for individuals connected to investigations of the January 6 Capitol attack.[19]

---

[16] *See Proclamation No. 10887 of January 20, 2025,Granting Pardons and Commutation of Sentences for Certain Offenses Relating to the Events at or Near the United States Capitol on January 6, 2021*, 90 Fed. Reg. 8331 (Jan. 29, 2025); *see* Jason Breslow, *Trump Defends His Decision to Pardon January 6 Rioters*, NPR (Jan. 21, 2025), https://tinyurl.com/yjttmyfu.

[17] *See* Scott MacFarlane, *Jan. 6 Offenders Have Paid Only a Fraction of Restitution Owed for Damage to U.S. Capitol During Riot*, CBS News (June 13, 2024), https://tinyurl.com/5n78p8t5.

[18] *See* Susan Carpenter, *Trump Says Government is Talking About Compensation Fund for Jan. 6 Rioters*, Spectrum News NY1 (Mar. 26, 2025), https://tinyurl.com/ywc8m5b2.

[19] *See* Fredreka Schouten et al., *Trump PAC Paid $2 Million This Year to Law Firms Representing January 6 Witnesses*, CNN (July 21, 2022), https://tinyurl.com/5btbsjxd.

51.     According to Federal Election Commission disclosures, President Trump's Save America PAC and related political committees directed in excess of $2 million to law firms representing individuals subpoenaed by the United States House Select Committee to Investigate the January 6th Attack on the United States Capitol.[20]

52.     In June 2023, Trump personally appeared and spoke at a fundraiser at his Bedminster, New Jersey golf club organized to raise funds for January 6 defendants and their families.[21]

53.     At the Bedminster fundraiser, Trump publicly pledged a personal financial contribution, stating, "I'm going to make a contribution."[22]

54.     At the same event, Trump characterized January 6 defendants collectively as "great people" who had "been made to pay a price."[23]

55.     In or about December 2022, Trump participated via a pre-recorded video in the Patriot Freedom Project's annual fundraising benefit. Trump praised founder Cynthia Hughes and claimed January 6 defendants were being treated "very unfairly."[24]

***The administration funnels millions of taxpayer dollars to Trump's allies through legal settlements.***

56.     In May 2025, the Trump administration agreed to pay nearly $5 million in taxpayer funds to settle the wrongful death lawsuit brought by the family of Ashli Babbitt, who was shot by

---

[20] *See id.*

[21] *See* Alayna Treene, *Trump Spoke at Fundraiser on Behalf of January 6 Defendants*, CNN (Jun. 23, 2023), https://tinyurl.com/547atjy4.

[22] *See* Vaughn Hillyard & Ryan J. Reilly, *Trump Spoke at a Fundraiser for Jan. 6 Defendants*, NBC News (Jun. 23, 2023), https://tinyurl.com/mpza2457.

[23] *See id.*

[24] *See* Right Side Broadcasting Network, *LIVE: 'Patriot Freedom Project' feat. Steve Bannon, Rep. Greene and Rep. Nehls 12/1/22*, Rumble, at 43:31 (Dec. 1, 2022), https://tinyurl.com/4y5vhykj.

a U.S. Capitol Police officer on January 6 as she attempted to climb through a shattered glass panel leading into the Speaker's Lobby, where lawmakers were actively being evacuated.[25] The officer had been cleared of wrongdoing by a Capitol Police investigation and a DOJ investigation found no violation of law.[26]

57.    Capitol Police Chief Tom Manger publicly stated: "I am extremely disappointed and disagree with this settlement . . . This settlement sends a chilling message to law enforcement nationwide."[27]

58.    The Trump DOJ also reached a $1.25 million settlement with Michael Flynn, the former Trump administration official who pleaded guilty to a felony count of making false statements to the FBI and was pardoned by Trump in 2020.[28] The settlement led to public condemnation.[29]

59.    In late 2025, Mark McCloskey, a Trump-aligned attorney, proposed to the Justice Department a "voluntary nonjudicial resolution committee" to determine financial damages

---

[25] *See* Holmes Lybrand & Whitney Wild, *Trump Administration to Settle Ashli Babbitt Wrongful Death Suit for $5 Million, Source Says*, CNN (May 19, 2025), https://tinyurl.com/52cs5s26 ; *see* Nicholas Wu, *Outgoing Capitol Police Chief Blasts Reported Settlement in Jan. 6 Shooting*, Politico (May 19, 2025), https://tinyurl.com/bdrrszzj.

[26] *Id.*; Press Release, Department of Justice Closes Investigation into the Death of Ashli Babbitt, U.S. Att'y's Off., D.D.C. (Apr. 14, 2021), https://tinyurl.com/4x794vkk.

[27] *Id.*

[28] *See* Andrew Goudsward, *US DOJ Settles Lawsuit from Trump Ally Flynn for $1.25 Million, Source Says*, Reuters (Mar. 25, 2026), https://tinyurl.com/reresfyn.

[29] *See, e.g.*, Press Release, Ranking Member Raskin Launches Investigation Into $1.25 Million Taxpayer Payout for Disgraced Former Trump Official Michael Flynn, House Committee on the Judiciary (Apr. 6, 2026), https://tinyurl.com/ws4s2web; Mary McCord, *Trump's settlement to Michael Flynn could set a dangerous precedent*, MS NOW (Mar. 27, 2026), https://tinyurl.com/mry6bw6m.

payable by the government to pardoned January 6 defendants without requiring them to go through the judicial process.[30]

***Trump and his family file a meritless lawsuit against the administration he controls.***

60. On January 29, 2026, Trump, his sons, and the Trump Organization filed suit in the U.S. District Court for the Southern District of Florida against the IRS and the Treasury, seeking at least $10 billion in damages based on the unauthorized disclosure of Trump's tax returns by former government contractor Charles Littlejohn.[31]

61. At no point did any attorney from the DOJ enter an appearance on behalf of Defendants in *Trump v. IRS*.

62. President Trump's claims—seeking a jaw-dropping $10 billion in damages for the leaking of his tax returns—were subject to formidable threshold defenses that the United States has vigorously litigated in similar cases concerning Littlejohn's leaks, including cases litigated during President Trump's current term.[32]

63. Recognizing the extraordinary posture of a sitting President suing federal agencies under his control, the court in *Trump v. IRS* sua sponte ordered briefing by the parties on whether the case presented a justiciable "Case" or "Controversy" under Article III.

---

[30] *See* William Vaillancourt, *J6 Rioters Received Pardons—Now They Want Money*, Daily Beast (Sept. 1, 2025), https://tinyurl.com/mrne9amd.

[31] *See* Complaint, *Trump v. IRS*, 26-cv-20609, ECF 1 at ¶¶ 1-5 (S.D. Fla Jan. 29, 2026); *see* Andrew Duehren & Chris Cameron, *Trump Sues I.R.S. Over Tax Data Leak, Demanding $10 Billion*, N.Y. Times (Jan. 29, 2026), https://tinyurl.com/68vbfvdk.

[32] *See, e.g.*, U.S. Mot. to Dismiss 2d Am. Compl. at 1-2, *Griffin v. IRS*, 22-cv-24023, ECF 58 (S.D. Fla. Nov. 27, 2023) (seeking dismissal because, among other things, Littlejohn was not a government employee); U.S. Mot. to Dismiss at 1, *Safe Harbor Int'l, LLC v. IRS*, 25-cv-139, ECF 31 (D. Md. July 23, 2025) (same). Yet President Trump's administration chose to forgo raising any defenses in *Trump v. IRS*.

64.    The Court granted leave to CREW, and CREW filed, an amicus brief in the case urging the court to stay the case and enjoin any settlement because the suit raised grave separation-of-powers and ethical concerns, DOJ attorneys faced an unavoidable conflict of interest, and any monetary settlement would violate the Domestic Emoluments Clause.[33]

65.    The court also appointed amici to submit arguments to assist the court in deciding whether the case was justiciable under Article III. Court-appointed amici submitted their brief on May 14, 2025, stating that "[t]his case is unprecedented: A sitting president seeks monetary damages for alleged harm to his personal interests from an executive agency that he controls. That presents significant Article III subject matter jurisdiction concerns."[34]

66.    Prior to the Court's May 27 hearing scheduled to address these jurisdictional concerns, Plaintiffs filed a Notice of Voluntary Dismissal with Prejudice on May 18, 2026, thus preventing judicial review of the constitutional defects the court and court-appointed amici had identified.[35]

67.    The same day, the DOJ, led by Acting Attorney General Todd Blanche who previously served as Trump's criminal defense attorney, entered into a settlement agreement with President Trump, his sons, and his business conglomerate. No DOJ attorney signed the agreement as counsel of record for the Defendant agencies in the underlying case.

***Establishment and terms of the Slush Fund***

68.    The May 18 settlement agreement in *Trump v. IRS* and corresponding order of the Acting Attorney General incorporating and purporting to effectuate its terms (together, the "Slush

---

[33] Br. of Amici Curiae CREW & Pub. Citizen, *Trump v. IRS*, 26-cv-20609 (S.D. Fla. Feb. 12, 2026), ECF 15.

[34] Br. of Court Appointed Amici Curiae, *Trump v. IRS*, 26-cv-20609 (S.D. Fla. May 18, 2026), ECF 45.

[35] Not. of Vol. Dismissal, *Trump v. IRS*, 26-cv-20609 (S.D. Fla. May 18, 2026), ECF 52.

Fund Order"), purport to create a $1.776 billion "Anti-Weaponization Fund." Ex. 1, May 18 Settlement Agreement ¶ III.C; Ex. 2, May 18 AG Order ¶ C.

69. The Fund is not authorized, established, or funded by any Act of Congress. It was created entirely by the Slush Fund Order. Ex. 2, May 18 AG Order ¶¶ A–H.

70. The Slush Fund's non-statutory status distinguishes it from legitimate victim compensation funds, which are statutorily authorized and subject to FOIA and the FRA. This includes the Crime Victims Fund and September 11th Victim Compensation Fund.[36]

71. The dollar amount $1.776 billion deliberately invokes the year 1776, framing the fund as a patriotic and revolutionary enterprise and echoing a rallying call among January 6 participants.[37]

72. The Slush Fund Order adopts Trump's and the January 6 insurrectionists victimhood narrative as formal United States policy, claiming that lawful law enforcement actions were in fact "representative of the sustained use of the levers of government power by Democrat elected officials, political and career federal employees, contractors, and agents." Ex. 1, May 18 Settlement Agreement ¶ II.C.

73. The Slush Fund Order identifies the Judgment Fund, 31 U.S.C. § 1304, as the source of the Fund's corpus. Ex. 2, May 18 AG Order ¶ G.

74. Under the Slush Fund Order, "[w]ithin 60 days of the Effective Date, the United States shall provide the U.S. Department of the Treasury with all necessary forms and

---

[36] *See* 9/11 Victim Compensation Fund ("VCF"), *About the Victim Compensation Fund*, https://www.vcf.gov/about; 9/11 VCF, *FOIA Request Guidelines*, https://tinyurl.com/2whah42x; Office of Justice Programs, *OJP FOIA Act* (Nov. 22, 2023), https://tinyurl.com/dhs79js7.

[37] *See* Marc Fisher et al., *The Four-Hour Insurrection*, Wash. Post (Jan. 7, 2021), https://tinyurl.com/ycx32kt8.

documentation to direct a payment of $1,776,000,000 to an account for the sole use by the Anti-Weaponization Fund ("Designated Account")." Ex. 2, May 18 AG Order ¶ C.

75.    The Slush Fund Order states that "[o]nce the funds are deposited into the Designated Account, the United States has no liability whatsoever for the protection or safeguarding of those funds, regardless of bank failure, fraudulent transfers, or any other fraud or misuse of the funds." Ex. 2, May 18 AG Order ¶ D.

76.    The Slush Fund Order does not indicate whether the account and the funds deposited within it will be owned and controlled by the federal government.

77.    The Slush Fund Order further provides that "[n]one of the funds deposited or claimed shall be deemed to qualify for reimbursement by the Department of Justice to the Treasury or to the judgment fund." Ex. 2, May 18 AG Order ¶ F.

78.    The Slush Fund Order provides that any balance remaining in the Fund's account after December 15, 2028 "shall transfer such balance before January 1, 2029, to . . . [any] appropriate federal government account as designated by the President." Ex. 1, May 18 Settlement Agreement ¶ IV.H. The reversion thus places any unspent corpus at the unilateral direction of the President without the required congressional authorization.

79.    The Slush Fund Order also asserts that the Fund's corpus "does not represent the value of any claim by Plaintiffs, but rather is based on the projected valuation of future claimants' claims." Ex. 2, May 18 AG Order ¶ C. Defendants offered no explanation of how they arrived at this projected valuation.

80.    The Fund is not designed to pay any "actual or imminent" judgment, settlement, or compromise of any pending litigation against the United States. By the Defendants' own terms,

the Fund is reserved for future, hypothetical, third-party claimants who were not parties to *Trump v. IRS* and have agreed to forgo other relief.

81. The Fund consists of five Members "appointed by the Attorney General" within 30 days of the effective date of the settlement agreement. Ex. 1, May 18 Settlement Agreement ¶ IV.B. The Members "serve until [the Fund] is concluded . . . unless they resign or are removed by the President, who can remove any Member without cause." *Id.*

82. The Fund would also pay for "per diems, administrative services, funds, facilities, staff, travel, and other support services as may be necessary to carry out the mission of the Anti-Weaponization Fund," including without limitation Members' "travel expenses, including per diem(s)." Ex. 2, May 18 AG Order ¶ E.

83. The Attorney General also designates the Fund's Chair, may unilaterally change the Fund's name by order, and may direct the Fund's audits. Ex. 1, May 18 Settlement Agreement ¶¶ IV.A, IV.B, IV.F.

84. The Slush Fund Order provides that "[t]he Anti-Weaponization Fund shall have the power to determine its own procedures for submitting, receiving, processing, and granting or denying claims." Ex. 1, May 18 Settlement Agreement ¶ IV.C.

85. Disclosure of those procedures is purely discretionary: "The Anti-Weaponization Fund may make those procedures public in whole or in part, in its discretion." Ex. 1, May 18 Settlement Agreement ¶ IV.C.

86. As currently documented, oversight of the Fund may only be conducted by the DOJ and will be shielded from public disclosure. The Fund must submit "[o]n a quarterly basis, or otherwise as directed by the Attorney General, . . . a *confidential* written report" to the Attorney

General "that includes the name and address of each claimant who has received any relief and . . . [the] nature of such relief." Ex. 1, May 18 Settlement Agreement ¶ IV.E (emphasis added).

87.    The DOJ may also conduct a discretionary audit to be overseen by the DOJ or DOJ-designated contractors. Ex. 1, May 18 Settlement Agreement ¶ IV.F.

88.    The Slush Fund Order contains no requirement that the Fund publicly disclose the identities of claimants, the amounts paid to any claimant, the bases for any award, the criteria applied to any decision, or the reasons for any denial.

89.    On May 19, 2026, in testimony before the United States Senate, Acting Attorney General Blanche acknowledged that, even if the DOJ opted to make some information public as a matter of discretion, unnamed "laws that exist around privacy . . . may prevent some of the information that [the Fund] takes in from being fully public."[38]

90.    Defendants did not conduct notice-and-comment rulemaking under the APA, 5 U.S.C. § 553, before creating the Fund, before establishing its eligibility criteria, or before authorizing it to set its own claim-processing rules. No notice of proposed rulemaking was published in the Federal Register; no opportunity for public comment was afforded; and no final rule was promulgated.

91.    To be eligible for relief from the Fund, "a claimant must assert at least one legal claim stating that the claimant was a victim of Lawfare and/or Weaponization." Ex. 1, May 18 Settlement Agreement ¶ V.C.

92.    The terms "Lawfare" and "Weaponization" are not defined by any statute or regulation. They are only defined in the Settlement Agreement, which describes them only by

---

[38] *See* Christina Santucci, *Blanche Defends Nearly $1.8 Billion 'Anti-Weaponization' Fund in Senate Testimony*, Spectrum News 1 (May 19, 2026), https://tinyurl.com/axa2r4vt.

21

reference to "the sustained use of the levers of government power by Democrat elected officials, political and career federal employees, contractors, and agents in order to target individuals, groups, and entities for improper and unlawful political, personal, and/or ideological reasons." Ex. 1, May 18 Settlement Agreement ¶ II.C.

93.    The Slush Fund Order imposes no burden of proof, no standard of review, no evidentiary threshold, and no legal standard governing the Fund's determinations. A claimant need only "assert" victim status; the Fund "shall consider the totality of the circumstances," weighing factors that include "[o]ther factors The Anti-Weaponization Fund deems just and appropriate." Ex. 1, May 18 Settlement Agreement ¶ V.D.

94.    The Slush Fund Order provides that the Fund's determinations are unreviewable: "[T]here shall be no appeal, arbitration, or judicial review of claims, offers, or other determinations made by The Anti-Weaponization Fund." Ex. 1, May 18 Settlement Agreement ¶ VI.B.

95.    The Slush Fund Order is wholly silent as to the Fund's compliance with the FRA, 44 U.S.C. ¶¶ 2101 *et seq.*, 3101 *et seq.*, 3301 *et seq.*, and imposes no affirmative obligation to create, maintain, schedule, or preserve federal records documenting the Fund's operations, personnel, claims, awards, or expenditures.

96.    Defendants did not appear to have consulted with the Archivist of the United States or NARA before creating the Fund, did not promulgate or adopt any records schedule for the Fund's records, and did not adopt any policy governing the creation, capture, or preservation of Fund records.

97.    The Slush Fund Order requires any claimant who accepts a payment from the Fund to forgo all other relief, including judicial relief. Ex. 1, May 18 Settlement Agreement ¶ V.B. By offering claimants compensation through a non-public, unreviewable process, the Fund channels

would-be claimants away from statutory avenues that produce records subject to FOIA, FRA, court docketing, and other public-records regimes.

98.     The Fund will cease processing claims by December 15, 2028, weeks before Trump's term in office expires. Ex. 1, May 18 Settlement Agreement ¶ IV.G.

99.     The Fund has already reportedly received its first claim from Former Trump administration official Michael Caputo, requesting $2.7 million in restitution and reimbursement.[39]

### Insurrectionists, sex offenders, and violent militia leaders seek taxpayer-funded payouts from the Slush Fund.

100.     Following the Fund's announcement, convicted January 6 defendants, participants in Trump's 2020 scheme to subvert the Electoral College process and install fake GOP electors in seven swing states, and prominent purveyors of election-related misinformation said they are hoping to tap the massive fund,[40] with one convicted defendant stating that news of the Fund was "all over Twitter [and] our group chats."[41]

101.     Mike Lindell, MyPillow CEO and one of Trump's most prominent allies and purveyors of 2020 election misinformation, has announced he plans to seek roughly $400 million from the Fund.[42]

102.     Lawyers representing pardoned January 6 insurrectionists confirmed they expected their clients to apply for awards through the Fund, which they otherwise would have had to seek

---

[39] Jenna Monnin, *Trump's Anti-Weaponization Fund Gets Its First Applicant*, NOTUS (May 19, 2026), https://tinyurl.com/mvujzbnv.

[40] *See* Marshall Cohen et al., *'This is Long Overdue': Jan. 6 Rioters and Election Deniers Celebrate Trump's $1.8 Billion Compensation Fund*, CNN (May 21, 2026), https://tinyurl.com/25bp9v2v.

[41] *See* Gabe Kaminsky, *Trump's $1.7+ Billion Fund Sparks Rush to Capitalize: "All J6ers Will Apply"*, CBS News (May 19, 2026), https://tinyurl.com/mhh82eke.

[42] Ashleigh Fields, *Lindell Says He'll File 'Anti-Weaponization' Fund Claim*, The Hill (May 21, 2026), https://tinyurl.com/3xwwtszt.

through pending or future litigation.[43] Peter Ticktin, an attorney representing more than 400 January 6 defendants, said the fund may not be enough.[44]

103.    As described above, prior to the establishment of the Fund, the DOJ already possessed and exercised authority to settle administrative tort claims and civil suits alleging law-enforcement misconduct, including claims by Trump.

104.    Settlements under these existing authorities generate public records, including filed court documents where suit had been brought, settlement records preserved by the FRA and producible under FOIA, and Treasury disbursement records publicly available under 31 U.S.C. § 1304(d).

105.    The DOJ has thus far not settled large claims brought by some of the most violent January 6 defendants and militia groups. However, the Fund purports to enable the administration to pay out these defendants at an order of magnitude more than the combined publicly disclosed settlements the administration has made to date, with no equivalent public record.

106.    For example, on June 6, 2025, five leaders of the violent militia group the Proud Boys filed suit in the U.S. District Court for the Middle District of Florida seeking at least $100 million in damages from the DOJ, FBI, and an individually named FBI Special Agent.

107.    The complaint, which the DOJ moved to dismiss, alleges "egregious and systemic abuse" by federal law enforcement "to punish and oppress political allies of President Trump."[45]

108.    The plaintiffs in that case include Enrique Tarrio, the Proud Boys leader convicted and sentenced to 22 years' imprisonment for seditious conspiracy for his role in the January 6

---

[43] *See* Kaminsky, *supra* n.41.

[44] Dan Rosenzweig-Ziff, *'I'm Not Greedy': January 6 Rioters and Trump Allies Eye $1.8 Billion 'Weaponization' Fund*, Reuters (May 20, 2026), https://tinyurl.com/bdebre4x.

[45] *See* Complaint, *Tarrio v. United States*, 25-cv-998, ECF 1 at ¶¶ 1-2 (M.D. Fla.).

insurrection, and Dominic Pezzola, who used a stolen Capitol Police riot shield to smash the Senate-wing window through which rioters first entered the U.S. Capitol on January 6, and who was convicted and sentenced to 10 years' imprisonment for obstruction of an official proceeding and conspiracy to prevent members of Congress or federal officers from discharging their duties.[46]

109.    Tarrio reportedly plans to apply to the Fund seeking between $2 and $5 million.[47]

110.    Other eligible claimants would include the at least 33 individuals pardoned by President Trump for January 6 conduct who have faced additional criminal charges or convictions. Of those 33, six have faced child sex crime charges, two have faced charges of rape, at least five have faced illegal-weapons charges, and five have faced charges related to driving under the influence, two involving fatalities.[48]

111.    This includes Andrew Paul Johnson, who was pardoned by President Trump on January 20, 2025 for his January 6 conduct. He was subsequently convicted and sentenced to life in prison for the sexual conduct involving two middle-school-age children.[49] Johnson has publicly stated his intent to seek restitution from the Trump administration related to his conduct on January 6.[50]

---

[46] Press Release, Proud Boys Leader Sentenced to 22 Years in Prison on Seditious Conspiracy and Other Charges Related to U.S. Capitol Breach, U.S. Att'y's Off., D.D.C. (Sept. 5, 2023), https://tinyurl.com/yr9wept3; Press Release, Proud Boys Leaders Sentenced to Prison for Roles in Jan. 6 Capitol Breach, U.S. Att'y's Off., D.D.C. (Sept. 1, 2023), https://tinyurl.com/3d4j9kav.

[47] *See* Rosenzweig-Ziff, *supra* n.44.

[48] *See* Honl-Stuenkel et al., *supra* n.2.

[49] *See* Dreisbach, *supra* n.1.

[50] *See id.*

112.    At a May 19, 2026 Senate hearing, Senator Chris Van Hollen asked Acting Attorney General Blanche whether Johnson could receive Fund disbursements; Acting Attorney General Blanche declined to exclude that possibility.[51]

113.    Zachary Alam was sentenced to eight years' imprisonment for his January 6 conduct, which the sentencing judge characterized as among the loudest, most combative, and most violent of any January 6 rioter. Alam smashed the glass of the Speaker's Lobby door through which Ashli Babbitt was shot. He was pardoned by President Trump on January 20, 2025 and was rearrested in May 2025 on charges of felony residential burglary arising from a home invasion.[52]

114.    Christopher Moynihan was pardoned by President Trump for his January 6 obstruction conviction. In October 2025, Moynihan was arrested and charged with a felony terroristic threat against House Minority Leader Hakeem Jeffries, having stated his intent to kill Representative Jeffries.[53]

115.    Shane Jason Woods, who assaulted a police officer and a press photographer on January 6, was separately convicted of reckless homicide, aggravated driving under the influence, and aggravated fleeing and eluding arising from a 2022 fatal collision.[54]

116.    Defendants have not categorically excluded any of the individuals described in the foregoing paragraphs from the Fund's eligibility.

---

[51] *See* Elaine Mallon, *WATCH: Dem Senator Snaps After Acting AG Blanche Accuses Him of 'Obviously Lying' in Heated Exchange*, Fox News (May 19, 2026), https://tinyurl.com/d5h4w28j.

[52] Richard Luscombe, *January 6 Rioter Who Was Pardoned by Trump Arrested for Burglary*, Guardian (May 20, 2025), https://tinyurl.com/yu6nr532.

[53] *See* Scott MacFarlane, *Pardoned Capitol Rioter Charged With Threatening to Kill Hakeem Jeffries at NYC Event This Week*, CBS News (Oct. 25, 2025), https://tinyurl.com/239zuj7s.

[54] David Harris, *'Millions of People Hated Me': Jan. 6 Defendant Kills Woman in Drunken Highway Crash But Avoids Murder Conviction*, Law and Crime (May 1, 2025), https://tinyurl.com/46ke3ztk.

117.    When asked by reporters whether taxpayer money should go to January 6 defendants, Trump confirmed their eligibility for payment from the fund by stating: "This is reimbursing people that were horribly treated . . . They've been weaponized. They've been, in some cases, imprisoned wrongly . . . Their lives have been destroyed, and they turned out to be right."[55]

118.    When asked whether he would "be OK with people who were convicted of hurting police getting taxpayer money," Blanche said "just to be clear, people that hurt police get money all the time."[56]

***Injuries to CREW***

119.    As a watchdog organization dedicated to government transparency and oversight that routinely requests federal records and relies on them to perform its mission-critical functions, CREW is concretely harmed by the Slush Fund's unlawfully opaque and unconstitutional structure.

120.    As part of its mission-critical functions, CREW routinely requests and utilizes government records made available to it under FOIA, the Ethics in Government Act, the Federal Advisory Committee Act, the Federal Election Campaign Act, and other federal transparency laws. CREW uses that information to create public-facing reports, draft administrative complaints, requests for investigation, and public testimony and letters to Congress regarding oversight matters, and craft targeted FOIA requests for additional information. CREW widely disseminates

---

[55] *See* Meredith Kile, *Trump Sued His Own Government, Then Settled for Nearly $2B and a 'Forever' Ban on Auditing His Family or Businesses*, People (May 19, 2026), https://tinyurl.com/2wcrkdd3.

[56] Acyn (@Acyn), X (May 20, 2026, 7:24 PM), https://tinyurl.com/4y68xfnm.

these materials to the public through its website, which receives hundreds of thousands of page views every month.

121.   Because the Fund's eligibility decisions, claimant identities, award amounts, supporting records, and internal procedures are not publicly disclosed and the Slush Fund Order does not require them to be preserved as federal records, the Slush Fund Order prevents CREW from obtaining and disseminating critical information to the public that CREW would seek and otherwise be able to obtain through FOIA requests, judicial dockets, information published in the Federal Register, and other public-records channels.

122.   CREW has several pending FOIA requests for records relating to the Fund, including a request to the Fund itself concerning the Fund's composition, structure, and operations. CREW plans to submit additional requests relating to the Fund in the future. CREW has additional FOIA requests pending with Defendants DOJ, Treasury, and IRS concerning the creation of the Fund and President Trump's and January 6 defendants' Federal Tort Claims Act claims seeking damages from the United States. CREW thus has a strong operational interest in the Fund's compliance with its recordkeeping obligations under the FRA. The unlawful destruction, alienation, or removal of federal records relevant to CREW's work impedes its ability to fulfill its mission and its informational rights under FOIA.

123.   CREW currently maintains and operates a tracking project documenting post-January 6 recidivism among pardoned defendants,[57] which has been widely cited in congressional

---

[57] *See* Honl-Stuenkel et al., *supra* n.2.

reports,[58] and by major media outlets.[59] The information the Fund will generate is essential to this preexisting and ongoing CREW project. With access to information about claimants, awards, and procedures, CREW would add a field to CREW's existing public tracker of pardoned January 6 defendants charged with or convicted of additional crimes, identifying whether and in what amount each recipient has been compensated by the Fund, so that the public can see, in a single source, what taxpayer dollars are flowing to individuals who participated in the January 6 attack and have since been re-arrested, re-charged, or convicted of subsequent offenses. CREW cannot take these actions because of the Fund's secretive structure and evasion of transparency laws.

124.    CREW currently maintains and operates a public tracker of the President's conflicts of interest and maintains a program tracking the conflicts of interest of Executive Branch officials across the administration.[60] The information the Fund will generate is essential to this preexisting and ongoing project. With access to information about claimants, awards, and procedures, CREW would (i) identify claimants who have a financial relationship with the President or his family and who have obtained Fund disbursements; and (ii) analyze how the Fund's Members exercise their discretion in evaluating, approving, and denying applications across cases, with particular attention to whether claimants with financial or political ties to the Members, the President, or administration officials fare better than similarly situated claimants without such ties.

---

[58] *See* House Committee on the Judiciary, *One Year Later: Assessing the Public Safety Implications of President Trump's Mass Pardons of 1,600 January 6th Rioters and Insurrectionists*, (Jan. 2026), https://tinyurl.com/df4jwxy4.

[59] *See, e.g.*, The Editorial Board, *The People Trump Pardoned Are on a Crime Spree*, N.Y. Times (Mar. 31, 2026), https://tinyurl.com/5n98bj8r; Matt K. Lewis, *Freed by Trump, the Jan. 6 Criminals Are Preying on Children and Others*, L.A. Times (May 15, 2026), https://tinyurl.com/mtw2xkd7.

[60] CREW, *Tracking Trump's visits to his properties and other conflicts of interest*, (updated May 21, 2026), https://tinyurl.com/mry26wpr.

125. CREW regularly provides testimony, briefings, and technical assistance to Congressional committees conducting oversight of federal spending, and conducts ongoing advocacy for legislative reforms to strengthen Congress's appropriations powers and to prevent Executive Branch end-runs around the appropriations process. Information about claimants, awards, and procedures would inform CREW's established advocacy programs, including by allowing CREW to publish reports comparing Fund expenditures against Judgment Fund payments and appropriations Congress provided for the DOJ, and report on the diversion of taxpayer money from congressionally authorized purposes.

126. The Slush Fund Order and Defendants' resulting unlawful Fund structure will directly impair CREW's ability to perform its mission-critical functions and will deprive it of unique, highly valuable government records to which it is statutorily entitled. And insofar as the Fund fails to create, capture, preserve, and retain such records as required by the FRA, the loss of that information irreparably harms CREW.

127. The Slush Fund Order further infringes on CREW's First Amendment rights to speak on matters of public concern. CREW uses government disclosures, including releases required for settlement payments from the Judgment Fund, to facilitate its own protected speech regarding corrupt abuses of the government. By paying settlements through the Slush Fund rather than the Judgment Fund, Defendants will deprive CREW and others of facts necessary to support critical speech that Defendants disfavor. Indeed, as Defendants could already settle any legitimate claim and authorize a payment from the Judgment Fund subject to public disclosure, the sole benefit of the Slush Fund to them is the ability to make such payments without transparency and to limit speech they disfavor.

**CLAIMS FOR RELIEF**

**Count I**
**Equitable Cause of Action**
**(Against All Defendants)**

128.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

129.    This Court has inherent equitable power to enjoin unlawful Executive Branch conduct. *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010); *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326-27 (2015).

130.    The Constitution vests in Congress alone the power to create and fund agencies and to set or delegate the power to set rules for their operation.

131.    Article I of the Constitution gives Congress power to "establish[] . . . offices, [and] the determination of their functions and jurisdiction." *Myers v. United States*, 272 U.S. 52, 129 (1926). Congress "has plenary control over the salary, duties, and even existence of executive offices." *Free Enter. Fund*, 561 U.S. at 500. Because "[f]ederal agencies are creatures of statute," they "possess only those powers that Congress confers upon them." *Judge Rotenburg Educ. Cntr., Inc. v. FDA*, 3 F.4th 390, 399 (D.C. Cir. 2021).

132.    Congress's powers are at their apex when it comes to spending money, as the Constitution "exclusively grants the power of the purse to Congress, not the President." *City and County of San Francisco v. Trump,* 897 F.3d 1225, 1231 (9th Cir. 2018); *see* U.S. Const., art. I, § 8, cl. 1 (Spending Clause); *id.*, § 9, cl. 7 (Appropriations Clause, providing that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law").

133.    The Constitution's "straightforward and explicit command" means "that no money can be paid out of the Treasury unless it has been appropriated by an act of Congress." *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 424 (1990).

31

134.   No statute authorizes the creation of, or appropriates funding for, the Slush Fund.

135.   In violation of the constitutional separation of powers, Defendants have unilaterally created and funded a new government agency to secretly redirect and pay out significant settlements of appropriated funds, a function Congress allocated to DOJ and the Treasury and one over which Congress statutorily mandated public oversight.

136.   Through the Settlement Agreement, Defendants created a Slush Fund that will be controlled by Fund Members appointed by the Attorney General, one appointed with consultation of Congress, and all removable by the President "without cause." Ex. 1, May 18 Settlement Agreement ¶ IV.B. The Settlement Agreement directs the Attorney General to "establish funding" for the Slush Fund. *Id.* ¶ IV.A. The Slush Fund is empowered to "determine its own procedures," and "may make those procedures public in whole or in part, in its discretion." *Id.*  ¶ IV.C. The Fund is empowered to grant claims for relief subject to its own rules and judgments.  *Id.* ¶ IV.D. The Fund is to provide the Attorney General "[o]n a quarterly basis, or otherwise as directed" by him, a report with the names of each claimant and the nature of the relief offered, but the report is to be "confidential." *Id.* ¶ IV.E. The DOJ may audit claims, *id.* ¶ IV.F, and the Fund will transfer any funds remaining to an "appropriate federal government account as designated by the President" no later than January 1, 2029, *id.* ¶ IV.H.

137.   The Attorney General then issued an order directing the transfer of nearly $1.8 billion to this new agency from the Judgment Fund. Ex. 2, May 18 AG Order ¶¶ C, G.

138.   Although the Slush Fund is purportedly created to settle claims brought by President Trump, the Settlement Agreement provides that no "monetary payment or damages of any kind" are to be paid to him, and the amount transferred to it "does not represent the value of any current claim by" the President or his businesses and family, but rather "is based on the

projected valuable of future claimants' claims." Ex. 1, May 18 Settlement Agreement ¶¶ III.A., IV.A. Accordingly, the transfer of federal funds from the Judgment Fund to the Slush Fund does not operate as a settlement to the Plaintiffs in the *Trump v. IRS* lawsuit, but instead operates to create a new, non-statutory alternative to the Judgment Fund to pay out other claimants for purported injuries who "state that they incurred harm from … Lawfare and Weaponization." *Id.* ¶ III.C.

139.    Congress, however, created the Judgment Fund to, in relevant part, pay out "compromise settlements" for actual legal injuries. 31 U.S.C. § 1304(a). Congress regulated those payouts by, among other things, requiring the Secretary of the Treasury to publicly disclose any payments, including providing the "name of the plaintiff or claimant," their counsel, the amount paid broken down into principal and ancillary liabilities, and a "brief description of the facts that gave rise to the claim." *Id.* §1304(d).

140.    Congress further provided that the Secretary of the Treasury may pay for "compromise settlements" only in limited situations, such as to settle legitimate lawsuits against the United States and in a manner similar to judgments in like causes. 28 U.S.C. § 2414; *see also* 28 C.F.R. § 50.23 ("It is the policy of the Department of Justice that, in any civil matter in which the Department is representing the interests of the United States or its agencies, it will not enter into final settlement agreements or consent decrees that are subject to confidentiality provisions . . ."). Both the Secretary of the Treasury and the Attorney General hold their positions and exercise their powers by reason of congressional enactment and subject to the Constitution's provision for the appointment of officers.

141.    The agency created by Defendants, however, is not authorized by any statute. Its Members, who will wield considerable final authority over the disbursement of nearly $1.8 billion

in taxpayer funds, will hold no position authorized by Congress, will be seated without confirmation, and will spend funds neither appropriated for the Slush Fund nor subject to the regulation Congress provided for true non-collusive settlements.

142.    CREW is injured by Defendants' usurpation of the powers the Constitution vests in Congress. By establishing and transferring funding to a new agency without congressional authorization, the Defendants have unilaterally shifted the powers Congress directed to be executed by the Secretary of the Treasury and the Attorney General—who are, in turn, required by law to disclose the rules for Judgment Fund procedures, the certification of the benefit of any settlement, and the amounts, beneficiaries, and purposes of any payments—to a secretive and wholly unauthorized entity that has unbridled discretion over the publication of its rules and is only to report its payments to the Attorney General in "confiden[ce]." Indeed, the possibility the Defendants could already pay any legitimate claims to worthy claimants from the Judgment Fund directly, subject to statutory disclosure requirements, demonstrates that the primary purpose of the Slush Fund is to make such payments without having to comply with statutory disclosure requirements.

143.    CREW is entitled to relief under this Court's inherent authority to enjoin unlawful Executive Branch conduct. Without such relief, CREW will continue to suffer injury.

### Count II
### Violation of the Administrative Procedure Act
### Failure to Follow Notice-and-Comment Procedures
### (Against Defendants DOJ, Blanche, Treasury, Bessent, IRS, and Bisignano)

144.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

145.    The APA requires courts to "hold unlawful and set aside agency action" that is "not in accordance with law" or "without observance of procedure required by law." 5 U.S.C. §§ 706(2)(a), (D).

146.    The May 18 Settlement Agreement and Order (together, "the Slush Fund Order") are "final agency action[s] for which there is no other adequate remedy in a court," within the meaning of the APA. 5 U.S.C. § 704.

147.    To carry out their responsibilities under the Judgment Fund, both Treasury and DOJ have issued regulations. *See* 31 C.F.R. § 256.0–256.2; 28 C.F.R. §§ 0.160–0.172. None of these regulations contemplate the respective departments creating a new agency to process claims and issue monetary relief using taxpayer funds as contemplated by the Slush Fund Order.

148.    DOJ's, Treasury's, and IRS's creation of a new government agency and the endowment of that agency with final authority over the distribution of nearly $1.8 billion subject to new and potentially secret rules, per the Slush Fund Order, is a legislative rule for which notice and comment was required under 5 U.S.C. § 553.

149.    If the agencies had followed the APA's notice-and-comment procedures, CREW would have submitted a comment opposing the creation of the Slush Fund and, in particular, opposing the non-disclosure of the Slush Fund's procedures and the details of its payments. By creating a Slush Fund without complying with the APA's notice-and-comment requirements, the Defendants have injured and continue to injure CREW's concrete interests.

150.    By failing to comply with their notice-and-comment obligations, the Defendants have acted "not in accordance with law" and "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (E). Accordingly, this Court must "hold unlawful and set aside" the Slush Fund Order. *Id.*

### Count III
### Violation of the Administrative Procedure Act
### Agency Action Not in Accordance with Law or in Excess of Statutory Authority
### (Against Defendants DOJ, Blanche, Treasury, Bessent, IRS and Bisignano)

151.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

35

152.    The APA requires courts to "hold unlawful and set aside agency action" that is "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

153.    DOJ and Treasury created and empowered the Slush Fund through the May 18 Settlement Agreement and Order. The Slush Fund has complete discretion to "determine its own procedures," Ex. 1, May 18 Settlement Agreement ¶ IV.C., including procedures related to the preservation and production of the Slush Fund's records. The Slush Fund may publicly disclose its rules and final actions at its discretion. *Id.* Further, the Slush Fund reports its payments only to the Attorney General on a quarterly basis, or as otherwise ordered by him, but only in a "confidential written report." *Id.* ¶ IV.E. The Slush Fund has complete discretion to award payments to anyone it deems is a victim of "Lawfare and Weaponization." *Id.* ¶¶ III.C, IV.D.

154.    The Slush Fund's creation and organization under the Slush Fund Order are contrary to law and in excess of the agencies' statutory authority in multiple respects.

***The Judgment Fund statute***

155.    The Slush Fund was created to settle claims brought by President Trump, as well as his business and his family, against the United States. *See* Ex. 1, May 18 Settlement Agreement ¶¶ III.A–C. It drew on funds in the Judgment Fund. *Id.* ¶ IV.A; Ex. 2, May 18 AG Order ¶ G. In relevant part, the Judgment Fund, however, only authorizes payment of judgments and "compromise settlements." 31 U.S.C. § 1304; *accord* 28 U.S.C. § 2414. Compromise settlements require "actual or imminent litigation," 31 C.F.R. § 256.1, in other words, a "legitimate dispute over either a liability or an amount" U.S. Gov't Accountability Off., *GAO-08-978SP, Principles of Federal Appropriations Law* 14-35 (3d ed., Vol. III, Sept. 2008), *available at* https://tinyurl.com/f5y9snye; *see also* Availability of Judgment Fund in Cases Not Involving a

36

Money Judgment Claim, 13 Op. OLC 98, 103 (1989), *available at* https://tinyurl.com/ybahrkfp (settlements may only be paid if the "underlying 'cause[]' of a settlement could have led to a money judgment, had no settlement been reached").

156.   The claims settled through the May 18 Settlement Agreement could not, however, have led to a monetary judgment, because the underlying lawsuit consisted of meritless collusive litigation over which federal courts had no jurisdiction, partly due to a lack of adversity between the parties. Settlement of the suit, therefore, could not serve as a legitimate basis for invoking payment from the Judgment Fund.

157.   Accordingly, the Judgment Fund statute did not authorize Defendants to draw $1.8 billion from the Judgment Fund to capitalize the Slush Fund.

*Transparency statutes*

158.   In addition to its unlawful capitalization, the Slush Fund's establishment under the Slush Fund Order directly contravenes multiple statutes designed to promote federal agency transparency and accountability.

159.   Under the Slush Fund Order, the Slush Fund is functioning as a de facto "agency" within the meaning of FOIA, 5 U.S.C. § 552(f)(1), and the FRA, 44 U.S.C. § 2901(14), because it is an "establishment in the executive branch" that wields "substantial independent authority." *See CREW*, 566 F.3d at 222 (cleaned up).

160.   Contrary to the Slush Fund Order's vesting of complete discretion in the Fund over its records preservation and disclosure procedures, the FRA mandates that "[t]he head of each Federal agency shall make and preserve records containing adequate and proper documentation of the organization, functions, policies, decisions, procedures, and essential transactions of the agency and designed to furnish the information necessary to protect the legal and financial rights

37

of the Government and of persons directly affected by the agency's activities," 44 U.S.C. § 3101, and "shall" also "establish and maintain an active, continuing program for the economical and efficient management of the records of the agency," *id.* § 3102; *see also id.* §§ 3103-3107; 36 C.F.R. Pt. 1220. Further, FOIA requires agencies to "make . . . records promptly available to any person" who makes a "request for records which (i) reasonably describes such records and (ii) is made in accordance with published rules stating the time, place, fees (if any), and procedures to be followed." *Id.* § 552(a)(3)(A).

161.　Contrary to the Slush Fund Order's vesting of complete discretion in the Fund to publish its "procedures," FOIA mandates that agencies proactively "publish in the Federal Register" information about itself, "the nature and requirements of all formal and informal procedures available," its "rules of procedure" and "substantive rules of general applicability" and "statements of general policy." 5 U.S.C. § 552(a)(1). FOIA also requires agencies to proactively make available "in an electronic format" all "final opinions" and "orders," "statements of policy and interpretations," "administrative staff manuals," and certain frequently requested records. *Id.* § 552(a)(2). And FOIA further requires agencies to "promulgate regulations, pursuant to notice and receipt of public comment, specifying the schedule of fees applicable to the processing of requests under this section and establishing procedures and guidelines for determining when such fees should be waived or reduced." 5 U.S.C. § 552(a)(4)(i). The APA separately requires that any substantive rules the Slush Fund issues be first published in the Federal Register for comment, and then published with an explanation if adopted. *See* 5 U.S.C. § 553.

162.　Contrary to the Slush Fund Order's provision of "confidential written report[s]" to the Attorney General providing the "name and address" of any payee, the Judgment Fund statute requires, that no later than 30 days after any payment, the public disclosure of any payments,

38

including the "name of the plaintiff or claimant," their counsel, the amount paid broken out by liability, and a "brief description of the facts that gave rise to the claim." 31 U.S.C. § 1304(d).

### Funding statutes

163. The funding scheme for the Slush Fund also violates federal law.

164. Congress holds the power of the purse, U.S. Const. art. I, § 9, cl. 7, and has exercised this power by passing permanent, government-wide restrictions on the use of funds, *see, e.g.*, *Harrington v. Bush*, 553 F.2d 190, 194 (D.C. Cir. 1977) (explaining that "Congress has plenary power to give meaning to" the Appropriations Clause).

165. The Purpose Statute ensures that the Executive may spend funds only for the purposes for which they were appropriated, stating that "[a]ppropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law." 31 U.S.C. § 1301(a).

166. Relatedly, the Transfer Statute prohibits the transfer of funds between agencies or accounts unless it is "authorized by law." 31 U.S.C. § 1532.

167. The Miscellaneous Receipts Act codifies the principle that an agency may not augment the amount Congress appropriates without specific statutory authority, U.S. Gov't Accountability Off., *GAO-06-382SP, Principles of Federal Appropriations Law* 6-166 (3d ed., Vol. II, Feb. 2006), available at https://tinyurl.com/ycxmkmsx, requiring that "an official or agent of the Government receiving money for the Government from any source shall deposit the money in the Treasury as soon as practicable without deduction for any charge or claim," 31 U.S.C. § 3302(b).

168. The Antideficiency Act gives additional force to these provisions and their constitutional underpinnings by explicitly prohibiting agency officials from obligating or

39

expending more than Congress has appropriated and from accepting voluntary services. 31 U.S.C. §§ 1341-1342. Violations of the Act are subject to administrative and potential criminal penalties. 31 U.S.C. §§ 1341-1342, 1349-1350.

169. By attempting to "establish funding" for the Slush Fund without authorization or an appropriation from Congress and use amounts from the Judgment Fund to both award monetary relief from the Fund and provide for the Fund's operations, Defendants have violated these laws. *See* Ex. 1, May 18 Settlement Agreement ¶ IV.A; *see also* Ex. 2, May 18 AG Order ¶¶ C, G.

170. Specifically, the Transfer Statute prohibits withdrawing $1.776 billion from the Judgment Fund and crediting that amount to a new agency without statutory authorization.

171. The Purpose Statute likewise prohibits the use of the Judgment Fund for Slush Fund operations and payments. As a threshold matter, the Judgment Fund is not available to cover Defendants' collusive settlement with the President. *See supra* ¶¶ 155-157. And even if it were, amounts in the Judgment Fund are not available to cover the operational expenses of a new agency. *Supra* ¶ 82 (explaining that the Fund would also pay for "per diems, administrative services, funds, facilities, staff, travel, and other support services as may be necessary to carry out the mission of the Anti-Weaponization Fund," including without limitation Members' "travel expenses, including per diem(s)"); *see also, e.g.*, U.S. Gov't Accountability Off., *GAO-17-797SP, Principles of Federal Appropriations Law* 3-14 (4th ed. 2017), *available at* https://tinyurl.com/hpc54x2s (describing the necessary expense rule).

172. The Miscellaneous Receipts Act prohibits the Slush Fund from retaining any amounts transferred and requires the Fund to deposit any money received in the Treasury "as soon as practicable." 31 U.S.C. § 3302(b); *see id.* § 3302(c)(1) (providing that receipts generally must be deposited within three days of receipt).

173.    Because no funds are legally available for Slush Fund operations or payments, obligating or expending amounts for these purposes violates the Antideficiency Act.

174.    By creating the Slush Fund and empowering it to act in violation of multiple federal statutes through the Slush Fund Order, the agencies acted "not in accordance with law," and "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. §§ 705(2)(A), (C). Accordingly, the Court must "hold unlawful and set aside" the Slush Fund Order. *Id.* § 706(2).

### Count IV
### Violation of the Administrative Procedure Act
### Agency Action Contrary to Constitutional Right or Power
### (Against All Defendants)

175.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

176.    The APA requires courts to "hold unlawful and set aside agency action . . . found to be . . . contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

177.    As alleged above in Count I, Defendants usurped the powers vested in Congress and violated the separation of powers in creating, empowering, and financing the Slush Fund through the Slush Fund Order.

178.    Defendants further acted in violation of CREW's First Amendment rights by redirecting settlement payments from the Judgment Fund, an entity subject to public reporting, to the Slush Fund, a secretive entity that has discretion over the publication of its procedures and only reports its payments in a "confidential written report" to the Attorney General.

179.    Defendants created the Slush Fund to deprive the public, including CREW, of information necessary to facilitate speech on matters of public concern, including on the actions of the current administration. CREW has made numerous public statements with respect to the likely recipients of these funds and previous government benefits conveyed to them. It has also

41

made numerous public statements regarding this Administration's misuse of government resources for corrupt purposes.

180. Prior to the creation of this Slush Fund, Defendants already possessed authority to settle any viable claim brought by any purported victim of an unlawful act by the United States. Doing so under existing authorities, however, would trigger disclosure that the Defendants could anticipate would result in speech critical of their actions and the individual payouts.

181. To suppress that speech, including by CREW, Defendants have declined to exercise their lawful powers under statute and have instead sought to illegally create an opaque Slush Fund.

182. "[T]he government violates the First Amendment when it denies" a speaker a benefit in order to "suppress the point of view [a speaker] espouses." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 806  (1985); *see also Sorrell v. IMS Health Inc.*, 564 U.S. 552, 574 (2011) (state's limit on otherwise mandated disclosures was unconstitutional where purpose was to burden resulting disfavored speech); *Citizens United v. FEC*, 558 U.S. 310, 339 (2010) (government may not act so as to "reduce[] the quantity of expression").

183. By acting in violation of CREW's First Amendment rights and its structural right to the separation of powers pursuant to the Slush Fund Order, Defendants have acted "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B). Accordingly, the Court must "hold unlawful and set aside" the Slush Fund Order. *Id.* § 706(2).

### Count V
### Violation of the Administrative Procedure Act
### Arbitrary and Capricious Agency Action
### (Against Defendants DOJ, Blanche, Treasury, Bessent, IRS and Bisignano)

184. Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

185. The APA requires courts to "hold unlawful and set aside agency action" that is "arbitrary" and "capricious." 5 U.S.C. § 706(2)(A).

186.    In adopting the Slush Fund Order authorizing payment from the Judgment Fund to the Slush Fund and authorizing further payments to third parties without required disclosures in order to settle various claims brought by President Trump and his associates, DOJ, Treasury, and IRS determined that these transactions comport with the legal requirements governing payments from the Judgment Fund, including that the payments for compromise settlements be made only to resolve legitimate claims against the United States and in a manner similar to judgments issued in like causes. *See* 31 U.S.C. § 1304(a); 28 U.S.C. § 2414. The agencies, however, failed to consider important aspects of the litigation that would have made any payment, nevermind a secret $1.8 billion slush fund, unreasonable.

187.    First, because the President controls DOJ and the federal defendants in the underlying lawsuit, *Trump v. IRS*, No. 26-cv-20609 (S.D. Fla), the suit lacked adversity and the district court thus lacked subject-matter jurisdiction. Adversity is required to establish a justiciable "Case" or "Controversy" over which courts have jurisdiction under Article III of the Constitution, and to ensure that any results, including settlements, are not the result of collusion. Accordingly, as there was no and could be no viable litigation, there was no risk of a monetary judgment that could justify a settlement.

188.    Second, the claims *Trump v. IRS* were subject to other obvious, threshold defenses that the United States has vigorously litigated in similar cases concerning the unauthorized leaking of taxpayer information by government contractor Charles Littlejohn. For instance, sovereign immunity barred the *Trump* plaintiffs' claims because Littlejohn was not a government employee. *See, e.g.*, U.S. Mot. to Dismiss 2d Am. Compl. at 1-2, *Griffin v. IRS*, 22-cv-24023, ECF 58 (S.D. Fla. Nov. 27, 2023) (so arguing); U.S. Mot. to Dismiss at 1, *Safe Harbor Int'l, LLC v. IRS*, 25-cv-139, ECF 31 (D. Md. July 23, 2025) (same). Moreover, the *Trump* plaintiffs' claims were time-

barred as the plaintiffs had notice of the leak of their tax filings more than two years before bringing suit. *See* 5 U.S.C. § 552a(g)(5). And the plaintiffs failed to adequately plead any damages, let alone anything approaching $1.776 billion. *See* 26 U.S.C. § 7431(c) (authorizing suit for release of tax returns to seek greater of $1,000 or "actual damages"); *FAA v. Cooper*, 566 U.S. 284, 295, 297-98 (2012) (privacy act requires proof of actual damages). The other claims the Settlement Agreement purported to settle were similarly meritless.

189. Notwithstanding these known, significant defenses to the claims in *Trump v. IRS*, and without addressing them, DOJ, Treasury, and IRS authorized the payment of $1.8 billion to the Slush Fund to settle the claims. They expressly concede that the $1.8 billion amount is entirely unrelated to the claims being settled by admitting that the amount "does not represent the value of any current claim by Plaintiffs" in the underlying litigation. *See* Ex. 1, May 18 Settlement Agreement ¶ IV.A. Instead, the amount is based on their "projected valuation of future claimants' claims." *Id.* The agencies have not required that the newly created Slush Fund disclose the identity of those "future claimants" or disclose information that would shed light on the valuation analysis that Defendants purportedly conducted to arrive at a dollar amount deliberately invoking the year 1776.

190. Defendants also failed to consider that any settlement of *Trump v. IRS* in excess of actual proven damages would violate the Constitution's Domestic Emoluments Clause by conferring a benefit, gain, or advantage on the sitting President. *See* U.S. Const. art. II, § 1, cl. 7.

191. In structuring the Slush Fund to funnel taxpayer money to, among others, criminally convicted participants in the January 6 insurrection later pardoned by President Trump, Defendants failed to consider Section Four of the Fourteenth Amendment, which provides that "the United States . . . shall [not] assume or pay any debt or obligation incurred in aid of insurrection or

rebellion against the United States." U.S. Const. amend. XIV, § 4.

192. In adopting the Slush Fund Order's secrecy provisions, DOJ also disregarded, without explanation, its own policies governing settlements. *See, e.g.*, 28 C.F.R. § 50.23.

193. Authorizing the financing of the Slush Fund injures CREW by depriving CREW of information about the capitalization of the Slush Fund and the eventual payments made from the Slush Fund, which would have otherwise been reported under the Judgment Fund statute, 31 U.S.C. § 1304(d).

194. For these reasons and others that may be revealed by the administrative record, Defendants' actions were neither reasonable nor reasonably explained, and thus were arbitrary and capricious. 5 U.S.C. § 706(2)(A). Accordingly, the Court must "hold unlawful and set aside" the Slush Fund Order. *Id.* § 706(2).

### Count VI
### *Ultra Vires*
### (Against All Defendants)

195. Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

196. Plaintiff has a non-statutory right of action to challenge a federal official's *ultra vires* violations of, or actions in excess of their authority under, federal statutes when an official's *ultra vires* actions are a "clear departure" from a "statutory mandate" and are "blatantly lawless" violations of statutory requirements. *Fed. Express Corp. v. Dep't of Com.*, 39 F.4th 756, 764 (D.C. Cir. 2022).

197. The Judgment Fund statute, FOIA, the FRA, and the APA impose binding legal mandates and prohibitions on the Defendants. No statute, constitutional provision, or other source of law authorizes the Defendants' non-compliance with these laws.

198. Defendants' actions in contravention of these clear legal mandates injure CREW

by depriving it of information to which it is statutorily entitled and that it requires to fulfill its mission-critical functions.

199.    The existence and operations of Defendants "Anti-Weaponization Fund" and J. Does 1–5 are entirely *ultra vires*. They have no statutory authority of any kind. They are purely a creation of the Slush Fund Order.

200.    This Court should exercise its inherent equitable power to enjoin Defendants' *ultra vires* conduct.

## Count VII
### Policy or Practice of Violating FOIA
### (Against Defendant "Anti-Weaponization Fund")

201.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

202.    A plaintiff "may challenge an agency's 'policy or practice'" of violating FOIA "where it 'will impair the party's lawful access to information in the future.'" *CREW v. DOJ*, 846 F.3d 1235, 1242 (D.C. Cir. 2017) (quoting *Newport Aeronautical Sales v. Air Force*, 684 F.3d 160, 164 (D.C. Cir. 2012)).

203.    Defendant "Anti-Weaponization Fund" is functioning as a de facto "agency" within the meaning of FOIA, 5 U.S.C. § 552(f)(1), and the FRA, 44 U.S.C. § 2901(14).

204.    Defendant "Anti-Weaponization Fund" has engaged and is engaging in a policy or practice of total non-compliance with FOIA's mandatory provisions, including by:

    a.    failing to publish in the Federal Register the disclosures required by 5 U.S.C. § 552(a)(1), including a description of "the methods whereby, the public may obtain information, make submittals or requests, or obtain decisions" from the Fund and about its activities; "statements of the general course and method by which its functions are channeled and determined, including the nature and requirements of all formal and

46

informal procedures available"; and "substantive rules of general applicability adopted as authorized by law, and statements of general policy or interpretations of general applicability formulated and adopted by the agency;"

b. failing to proactively make available "in an electronic format" all "final opinions" and "orders," "statements of policy and interpretations," "administrative staff manuals," and certain frequently requested records, *id.* § 552(a)(2);

c. failing to "promulgate regulations, pursuant to notice and receipt of public comment, specifying the schedule of fees applicable to the processing of requests under this section and establishing procedures and guidelines for determining when such fees should be waived or reduced," *id.* § 552(a)(4)(i);

d. failing to "establish a system to assign an individualized tracking number for each request received" and "a telephone line or Internet service that provides information about the status of a request to the person making the request using the assigned tracking number," for requests to the Fund, *id.* § 552(a)(7);

e. failing to prepare and make available all up-to-date reference material or "a guide for requesting records" from the Fund, *id.* § 552(g); and

f. failing to "designate a Chief FOIA Officer who shall be a senior official of such agency," *id.* § 552(j)(1).

205. CREW is, and intends to remain, a frequent FOIA requester. CREW has already submitted FOIA requests to Defendants seeking records concerning the Fund's creation, structure, and procedures, and CREW intends to submit additional FOIA requests as the Fund commences operations and processes claims. CREW's requests will be met with the same systemic defects pleaded above. This is currently and will continue to impair CREW's lawful access to information

47

concerning the Slush Fund's activities and impact CREW's ability to conduct its mission-critical activities detailed above.

**Count VIII**
**Mandamus**
**(Against Defendants "Anti-Weaponization Fund" and J. Does 1–5)**

206.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

207.    The Mandamus Act, 28 U.S.C. § 1361, vests this Court with original jurisdiction over "any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."

208.    The All Writs Act, 28 U.S.C. § 1651, authorizes this Court to issue all writs "necessary or appropriate" in aid of its jurisdiction.

209.    Defendants "Anti-Weaponization Fund" and J. Does 1–5 (together, the "Fund Defendants") have clear, non-discretionary duties under the FRA, 44 U.S.C. § 3101 *et seq.* Among other things, they "shall make and preserve records containing adequate and proper documentation of the organization, functions, policies, decisions, procedures, and essential transactions of the agency and designed to furnish the information necessary to protect the legal and financial rights of the Government and of persons directly affected by the agency's activities." 44 U.S.C. § 3101. They "shall" also "establish and maintain an active, continuing program for the economical and efficient management of the records of the agency." *Id.* § 3102;

210.    As alleged above in Count VII, Defendant "Anti-Weaponization Fund" has clear, non-discretionary duties under FOIA.

211.    The Fund Defendants have failed entirely to comply with these clear, non-discretionary duties.

48

212.   CREW has a clear and indisputable right to relief from, and is injured by, the Fund Defendants' wholesale failure to comply with these non-discretionary duties.

213.   It is necessary and appropriate for this Court to issue a writ of mandamus pursuant to 28 U.S.C. §§ 1361 and 1651 under this Court's equitable authority to compel Defendants to comply with their non-discretionary duties under federal law.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

(1)   Declare that Defendant "Anti-Weaponization Fund" ("the Fund") is functioning as an "agency" under 5 U.S.C. § 552(f)(1), 5 U.S.C. § 551(1), and 44 U.S.C. § 2901(14);

(2)   Declare that the May 18 Settlement and Order are unlawful, unconstitutional, *ultra vires*, and arbitrary and capricious;

(3)   Hold unlawful, set aside, and vacate the May 18 Settlement and Order;

(4)   Enjoin the Fund from continuing to operate without statutory authorization and without complying with the Judgment Fund statute, the FRA, FOIA, and the APA;

(5)   Enjoin Treasury from transferring funds to the "Designated Account" referenced in the May 18 Order;

(6)   Enjoin the Fund from disbursing any award payments;

(7)   Order Defendants to immediately rescind the May 18 Settlement and Order and issue revised guidance compliant with their mandatory duties under the FRA, FOIA, and the APA in relation to the Fund;

(8)   Provide for expeditious proceedings in this action;

(9)   Retain jurisdiction of this action to ensure compliance with this Court's orders;

(10)   Award Plaintiff its costs and reasonable attorneys' fees in this action; and

(11)   Grant such other relief as the Court may deem just and proper.

Dated: May 22, 2026

Respectfully submitted,

*/s/ Kayvan Farchadi*
Kayvan Farchadi (D.C. Bar No. 1672753)
Nikhel S. Sus (D.C. Bar No. 1017937)
Stuart C. McPhail (D.C. Bar No. 1032529)
Stephen J. Buckingham (D.C. Bar No. 1562756)*
CITIZENS FOR RESPONSIBILITY AND
ETHICS IN WASHINGTON
P.O. Box 14596
Washington, DC 20044
(202) 408-5565
kfarchadi@citizensforethics.org
nsus@citizensforethics.org
smcphail@citizensforethics.org
sbuckingham@citizensforethics.org

* *Pro hac vice* motion forthcoming

*Counsel for Plaintiff*