**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, <br><br> Plaintiff, <br><br> v. <br><br> U.S. DEPARTMENT OF JUSTICE, *et al*., <br><br> Defendants. | Case No. 26-cv-1789-RJL <br><br> **HEARING REQUESTED** |

**MEMORANDUM IN SUPPORT OF
PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER, OR, IN THE
ALTERNATIVE, A STAY UNDER 5 U.S.C. § 705 AND PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ iii

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................. 2

I.      Origins of the President's claims of "lawfare" and "weaponization." ............................... 2

II.     The President files a meritless lawsuit against agencies he controls. ............................... 4

III.   Defendants orchestrate a sham settlement of *Trump v. IRS* diverting nearly $1.8 billion in taxpayer dollars to a slush fund for "victims" of "lawfare" and "weaponization." ............ 6

IV.   Defendants establish and structure the Fund to evade federal transparency and accountability statutes. .......................................................................................... 6

V.    Defendants fail to provide sufficient assurances of legal compliance. .............................. 8

LEGAL STANDARD ....................................................................................................... 8

ARGUMENT .................................................................................................................. 9

I.      CREW is likely to succeed on the merits. ............................................................... 9

      A.  CREW has standing. ................................................................................. 9

          1. The May 18 Order inflicts informational injuries on CREW. ............................ 10

          2. The May 18 Order inflicts First Amendment injuries on CREW. ....................... 14

          3. The May 18 Order inflicts procedural injuries on CREW. ............................... 14

          4. CREW's injuries are caused by the May 18 Order and redressable by this Court ........................................................................................................... 15

      B.  The May 18 Order violates the separation of powers (Counts I and IV). ................. 15

      C.  Defendants adopted the May 18 Order in violation of the APA's notice-and-comment requirements (Count II). ........................................................... 20

      D.  The May 18 Order is contrary to law and exceeds Defendants' authority (Counts III and VI). .......................................................................................... 22

          1. The May 18 Order exceeds Defendants' authority under the Judgment Fund statute. .............................................................................................. 23

          2. The May 18 Order is contrary to federal transparency statutes. ...................... 26

          3. The May 18 Order is contrary to federal funding statutes. ............................. 29

      E.  The May 18 Order is arbitrary and capricious (Count V). ................................. 33

      F.  The May 18 Order violates CREW's First Amendment rights. ............................ 39

II.     CREW will suffer irreparable injury absent preliminary relief. ................................. 40

i

A. Irreparable loss of federal records. .......................................................................... 40

B. Irreparable loss of notice-and-comment opportunities........................................... 42

C. Irreparable constitutional harms. ........................................................................... 43

III. The balance of equities and public interest strongly favor preliminary relief. ................. 44

IV. The Court should issue an immediate TRO and subsequently, or in the alternative, stay and preliminarily enjoin Defendants' May 18 Order. ....................................................... 45

CONCLUSION ............................................................................................................................... 45

## TABLE OF AUTHORITIES

**Cases**

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
570 U.S. 205 (2013)..........................................................................................................39

*Am. Fed. of Gov't Emps. v. Block*,
655 F.2d 1153 (D.C. Cir. 1981)........................................................................................42

*Am. First Legal Found. v. Becerra*,
2024 WL 3741402 (D.D.C. Aug. 9, 2024) ..............................................................10, 41

*Am. Hist. Ass'n v. Trump*,
2026 WL 1412395 (D.D.C. May 20, 2026).................................................11, 13, 41

*Armstrong v. Bush*,
807 F. Supp. 816 (D.D.C. 1992).......................................................................................41

*Association of Cmty. Cancer Ctrs. v. Azar*,
509 F. Supp. 3d 482 (D. Md. 2020)..................................................................................42

*Biden v. Nebraska*,
600 U.S. 477 (2023)..........................................................................................................24

*Bond v. United States*,
564 U.S. 211 (2011)...............................................................................................14, 43

*Bridgeport Hosp. v. Becerra*,
108 F.4th 882 (D.C. Cir. 2024).........................................................................................20

*Buckley v. Valeo*,
424 U.S. 1 (1964)..............................................................................................................39

*Campaign for Accountability v. DOJ*,
155 F.4th 724 (D.C. Cir. 2025).........................................................................................14

*Carlson v. Postal Regul. Comm'n*,
938 F.3d 337 (D.C. Cir. 2019)..........................................................................................33

*Chaplaincy of Full Gospel Churches v. England*,
454 F.3d 290 (D.C. Cir. 2006)............................................................................................8

*Chapman v. Hou. Welfare Rts. Org.*,
441 U.S. 600 (1979)..........................................................................................................22

*City and County of San Francisco v. Trump*,
897 F.3d 1225 (9th Cir. 2018) ..........................................................................................16

*City of Billings v. TSA*,
153 F.4th 46 (D.C. Cir. 2025)....................................................................................20, 21

*Coal. for Humane Immigrant Rts. v. Noem*,
805 F. Supp. 3d 48 (D.D.C. 2025)....................................................................................45

*Consumers' Rsch. v. Consumer Prod. Safety Comm'n*,
91 F.4th 342 (5th Cir. 2024) .............................................................................................13

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*,
473 U.S. 788 (1985)..........................................................................................................40

**Cases—Cont.**

*Cotton v. Heyman*,
 63 F.3d 1115 (D.C. Cir. 1995) ..................................................................................27

*County of Suffolk v. Sebelius*,
 605 F.3d 135 (2d Cir. 2010)......................................................................................31

*CREW v. Cheney*,
 577 F. Supp. 2d 328 (D.D.C. 2008) ..........................................................................41

*CREW v. Cheney*,
 593 F. Supp. 2d 194 (D.D.C. 2009) ..........................................................................12

*CREW v. DOJ*,
 2026 WL 472589 (D.D.C. Feb. 19, 2026) ................................................................43

*CREW v. DOJ*,
 846 F.3d 1235 (D.C. Cir. 2017) ................................................................................10

*CREW v. EOP*,
 587 F. Supp. 2d 48 (D.D.C. 2008) ............................................................................12

*CREW v. Off. of Admin.*,
 565 F. Supp. 2d 23 (D.D.C. 2008) ............................................................................42

*CREW v. Off. of Admin.*,
 566 F.3d 219 (D.C. Cir. 2009)...................................................................................27

*CREW v. OMB*,
 791 F. Supp. 3d 29 (D.D.C. 2025), *appeal docketed*, No. 25-5266 (D.C. Cir.) ..........11, 13, 43

*CREW v. U.S. DOGE Serv.*,
 769 F. Supp. 3d 8 (D.D.C. 2025)...............................................................................28

*Ctr. for Biological Diversity v. U.S. Int'l Dev. Fin. Corp.*,
 77 F.4th 679 (D.C. Cir. 2023).......................................................................9, 10, 11, 12

*Dep't of Army v. Fed. Lab. Rels. Auth.*,
 56 F.3d 273 (D.C. Cir. 1995).................................................................................31, 32

*Dep't of Com. v. New York*,
 588 U.S. 752 (2019)..............................................................................................9, 15

*Dep't of Def. v. FLRA*,
 510 U.S. 487 (1994)..................................................................................................12

*Diamond Alt. Energy, LLC v. EPA*,
 606 U.S. 100 (2025)..................................................................................................15

*District of Columbia v. Trump*,
 315 F. Supp. 3d 875 (D. Md. 2018), *vacated as moot*, 141 S. Ct. 1262 (2021) ................34, 35

*District of Columbia v. USDA*,
 444 F. Supp. 3d 1 (D.D.C. 2020)............................................................................8, 44

*Dorsey v. U.S. Dep't of Lab.*,
 41 F.3d 1551 (D.C. Cir. 1994)...................................................................................31

*Drs. for Am. v. OPM*,
 793 F. Supp. 3d 112 (D.D.C. 2025)...........................................................................22

iv

**Cases—Cont.**

*E. Tenn. V. & G. R. Co. v. S. Tel. Co.*,
125 U.S. 695 (1888)............................................................................................24

*Elrod v. Burns*,
427 U.S. 347 (1976)......................................................................................14, 43

*Env't Def. Fund v. EPA*,
922 F.3d 446 (D.C. Cir. 2019)..........................................................................13

*F.D.I.C. v. Meyer*,
510 U.S. 471 (1994)...........................................................................................31

*FAA v. Cooper*,
566 U.S. 284 (2012)..............................................................................................6

*FDA v. Wages & White Lion Invs.*,
604 U.S. 542 (2025)...........................................................................................33

*FEC v. Cruz*,
596 U.S. 289 (2022)...........................................................................................22

*Firearms Regul. Accountability Coal., Inc. v. Garland*,
112 F.4th 507 (8th Cir. 2024) ..........................................................................20

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
561 U.S. 477 (2010)......................................................................................16, 18

*Freytag v. Comm'r*,
501 U.S. 868 (1991)...........................................................................................16

*Friends of Animals v. Jewell*,
824 F.3d 1033 (D.C. Cir. 2016).............................................................13, 15, 16

*Griffin v. IRS*,
22-cv-24023, ECF 58 (S.D. Fla. Nov. 27, 2023)..............................................5, 26

*Hall v. Johnson*,
599 F. Supp. 2d 1 (D.D.C. 2009)..........................................................................8

*Harrington v. Bush*,
553 F.2d 190 (D.C. Cir. 1977)..........................................................................29

*John Doe Co. v. CFPB*,
849 F.3d 1129 (D.C. Cir. 2017)........................................................................43

*Las Ams. Immigrant Advoc. Ctr. v. DHS*,
783 F. Supp. 3d 200 (D.D.C. 2025)..................................................................20

*League of Women Voters of the United States v. Newby*,
838 F.3d 1 (D.C. Cir. 2016)..........................................................................40, 44

*Learning Res., Inc. v. Trump*,
146 S. Ct. 628 (2026)....................................................................................16, 19

*Lucia v. SEC*,
585 U.S. 237 (2018)......................................................................................17, 18

*Make the Rd. N.Y. v. Noem*,
2025 WL 3563313 (D.C. Cir. Nov. 22, 2025) ...................................................45

**Cases—Cont.**

*Marin Audubon Soc'y v. FAA*,
121 F.4th 902 (D.C. Cir. 2024)..................................................................................22

*Massachusetts v. EPA*,
549 U.S. 497 (2007)....................................................................................................15

*Mendoza v. Perez*,
754 F.3d 1002 (D.C. Cir. 2014).............................................................14, 15, 20, 21

*Meredith Corp. v. FCC*,
809 F.2d 863 (D.C. Cir. 1987)....................................................................................34

*Monsanto Co. v. Geertson Seed Farms*,
561 U.S. 139 (2010)....................................................................................................20

*Myers v. United States*,
272 U.S. 52 (1926)......................................................................................................16

*N. Mariana Islands v. United States*,
686 F. Supp. 2d 7 (D.D.C. 2009)...............................................................................42

*NARA v. Favish*,
541 U.S. 157 (2004)....................................................................................................12

*Nat'l Fed'n of Indep. Bus. v. Dep't of Lab.*,
595 U.S. 109 (2022) (per curiam)..............................................................................20

*Nat'l Tr. for Historic Pres. v. Nat'l Park Serv.*,
2026 WL 877779 (D.D.C. Mar. 31, 2026) (RJL) .......................................17, 43, 44

*Neguse v. ICE*,
813 F. Supp. 3d 45 (D.D.C. 2025)........................................................................43, 44

*Neguse v. U.S. Immigr. & Customs Enf't*,
No. 25-CV-2463 (JMC), 2026 WL 575509 (D.D.C. Mar. 2, 2026)........................30

*New Jersey v. EPA*,
626 F.2d 1038 (D.C. Cir. 1980)..................................................................................42

*New Mexico v. Musk*,
784 F. Supp. 3d 174 (D.D.C. 2025)............................................................................16

*Nken v. Holder*,
556 U.S. 418 (2009)....................................................................................................44

*Ohio v. EPA*,
603 U.S. 279 (2024)....................................................................................................33

*OPM v. Richmond*,
496 U.S. 414 (1990)..............................................................................................16, 30

*Payne Enterps. v. United States*,
837 F.2d 486 (D.C. Cir. 1988)....................................................................................43

*Pursuing Am.'s Greatness v. FEC*,
831 F.3d 500 (D.C. Cir. 2016)...............................................................................43, 44

*Robertson v. Cartinhour*,
429 F. App'x 1 (D.C. Cir. 2011)..................................................................................45

**Cases—Cont.**

*Rosenberger v. Rector & Visitors of the Univ. of Va.*,
515 U.S. 819 (1995)..................................................................................................39

*Safe Harbor Int'l, LLC v. IRS*,
25-cv-139, ECF 31 (D. Md. July 23, 2025).........................................................5, 26

*Seila L. LLC v. CFPB*,
591 U.S. 197 (2020) (Kagan, J., concurring in part and dissenting in part)............16

*Sorrell v. IMS Health Inc.*,
564 U.S. 552 (2011)........................................................................................14, 39, 40

*Sullivan v. United States*,
26-cv-00220 (M.D. Fla. Mar. 27, 2026) ................................................................38

*Tarrio v. United States*,
25-cv-998 (M.D. Fla. June 6, 2025).......................................................................38

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021)................................................................................................9, 25

*Trump v. IRS*,
No. 26-cv-20609 (S.D. Fla.) .......................................1, 4, 5, 6, 22, 23, 24, 25, 26

*Trump v. United States*,
603 U.S. 593 (2024) (Thomas, J., concurring) .........................................1, 16, 18

*U.S. Dep't of Navy v. FLRA*,
665 F.3d 1339 (D.C. Cir. 2012) (Kavanaugh, J.)...................................17, 18, 30, 31

*U.S. Sugar Corp. v. EPA*,
113 F.4th 984 (D.C. Cir. 2024)................................................................................22

*United States v. Arthrex, Inc.*,
594 U.S. 1 (2021)......................................................................................................17

*United States v. Trump*,
No. 9:23-cr-80101-AMC (S.D. Fla. July 27, 2023)................................................3

*United States v. Trump*,
No. l:23-cr-00257-TSC (D.D.C. August 1, 2023) ...............................................3

*Waterkeeper All. v. EPA*,
853 F.3d 527 (D.C. Cir. 2017)................................................................................11

*West Virginia v. EPA*,
597 U.S. 697 (2022)................................................................................................19

*New Mexico ex rel. White v. Griffin*,
2022 WL 4295619 (N.M. Dist. Ct. Sept. 6, 2022) *cert. denied.* No. 23-279
(U.S. Mar. 18, 2024) ............................................................................................36

**Constitutional Provisions**

U.S. Const. amend. XIV, § 4 ....................................................................................35

U.S. Const., art. I, § 8, cl. 1.......................................................................................16

U.S. Const., art. I, § 9, cl. 7.......................................................................................16

**Constitutional Provisions—Cont.**

U.S. Const. art. II, § 1, cl. 7 ..............................................................................34

U.S. Const. art. II, § 2, cl. 2 ..............................................................................17

**Statutes, Rules, and Regulations**

5 U.S.C.

    § 552(a)(1) .................................................................................................29

    § 552(a)(1)(A) ...........................................................................................11

    § 552(a)(2) .................................................................................................29

    § 552(a)(3)(A) ...........................................................................................29

    § 552(a)(4)(i) .............................................................................................29

    § 552(f)(1) ..................................................................................................27

    § 552a(g)(5) .................................................................................................5

    § 553(b) .....................................................................................................20

    § 553(c) .....................................................................................................42

    § 705..............................................................................................1, 2, 8, 45

    § 705(2)(A) ................................................................................................33

    § 705(2)(C) ................................................................................................33

    § 706(2) .........................................................................................20, 22, 33

    § 706(2)(B) ................................................................................................20

    § 706(2)(D) ................................................................................................22

26 U.S.C. § 7431(c) ..............................................................................................5

28 U.S.C. § 2414..............................................................................23, 25, 26, 30

31 U.S.C.

    § 1301(a) ..............................................................................................29, 30

    § 1304(a) .....................................................................................................23

    § 1304(a)(3)(A) ...........................................................................................30

    § 1304(d).................................................................................10, 13, 27, 37

    § 1341.........................................................................................................32

    §§ 1341–1342.............................................................................................29

    § 1532...........................................................................................29, 30, 31

    § 3302(b) ..............................................................................................29, 32

44 U.S.C.

    § 2901(14) ..................................................................................................27

    § 3101.........................................................................................................28

    § 3102.........................................................................................................28

    §§ 3103-3107 .............................................................................................28

28 C.F.R.

    § 50.23........................................................................................................37

    § 50.23(a)-(b) .............................................................................................21

31 C.F.R. § 256.1(a)......................................................................................23, 38

36 C.F.R. Pt. 1220............................................................................................28

John D. Dingell, Jr. Conservation, Management, and Recreation Act, Pub. L. 116-
    9, Title IV, § 4201(b), 133 Stat. 580, 764 (Mar. 12, 2019)......................12

## Other Authorities and Materials

165 Cong. Rec. E241-04 (daily ed. Mar. 5, 2019)..........................................................12

9/11 Victim Compensation Fund, *About the Victim Compensation Fund*......................................19

Andrew Goudsward, *US DOJ Settles Lawsuit from Trump Ally Flynn for $1.25 Million, Source Says*, Reuters (Mar. 25, 2026)..........................................................38

*Applicability of Emoluments Clause to Employment of Government Employees by Foreign Public Universities*, 18 Op. O.L.C. 13 (1994) ..........................................................34

*Availability of Judgment Fund in Cases Not Involving a Money Judgment Claim*, 13 Op. OLC 98 (1989)..........................................................24

Dep't of Treasury, Bureau of Fiscal Service, *About the Judgment Fund*......................................19

Dep't of the Treasury, Bureau of Fiscal Service, *Bi-Weekly Payment Report* (last updated May 20, 2026) ..........................................................27

Derrick Hawkins et al., *How Trump Has Become Angrier and More Isolated on Truth Social*, Wash. Post (Apr. 22, 2024)..........................................................3

DOJ, Office for the Victims of Crime, *Crime Victims Fund* ..........................................................19

DOJ, *Final Report on the Special Counsel's Investigations and Prosecutions*, Special Counsel Jack Smith (Jan. 7, 2025)..........................................................36

Emma Colton, *Trump Blasts Ongoing 'Lawfare' in 1st Public Remarks Since Congress Certified his Election*, Fox News (Jan. 7, 2025)..........................................................3

Exec. Order No. 14215, § 7, 90 Fed. Reg. 10447, 10448 (Feb. 24, 2025) ..........................................................25

Forbes Breaking News, *'I'm Supposed To Work Out A Settlement With Myself': Trump Addresses Lawsuit Against IRS* (YouTube Feb. 1, 2026) ..........................................................25

Gabe Kaminsky, *Trump's $1.7+ billion fund sparks rush to capitalize: "All J6ers will apply,"* CBS News (May 19, 2026)..........................................................35

Holmes Lybrand & Whitney Wild, *Trump Administration to Settle Ashli Babbitt Wrongful Death Suit for $5 Million, Source Says*, CNN (May 19, 2025) ..........................................................38

J. David Goodman & Emily Cochrane, *Trump Says He Would Consider Pardons for Jan. 6 Defendants if Elected*, N.Y. Times (Jan. 30, 2022)..........................................................3

Linnaea Honl-Stunkel, Sophia Barriga Hernandez & Alyssa Meiman, *At least 33 pardoned insurrectionists face other criminal charges-but many are now going free*, CREW (Dec. 18, 2025)..........................................................37

Liz Lander, *Ex-Proud Boys leader Enrique Tarrio tells PBS News he believes he's owed tens of millions from DOJ fund*, PBS News (May 22, 2026) ..........................................................35

Marianne LeVine et al., *Trump Escalates Solidarity with Jan. 6 Rioters As His Own Trials Close In*, Wash. Post (Mar. 23, 2024)..........................................................4

Memorandum from the Attorney General, *Reinstating the Prohibition on Improper Third-Party Settlements* (Feb. 5, 2025) ..........................................................21, 38

Off. of the Att'y Gen., Order No. 5559-2022, Appointment of John L. Smith as Special Counsel (Nov. 18, 2022) ..........................................................3

**Other Authorities and Materials—Cont.**

Press Release, DOJ, *Attorney General Jeff Sessions Ends Third Party Settlement Practice* (June 7, 2017) ...................................................................................................21

*Proclamation No. 10887 of January 20, 2025, Granting Pardons and Commutation of Sentences for Certain Offenses Relating to the Events at or Near the United States Capitol on January 6, 2021*, 90 Fed. Reg. 8331 (Jan. 29, 2025) .........................................................................................................................4

Rebecca Jacobs, *Trump Has Threatened Dozens of Times to Use the Government to Target Political Enemies*, CREW (May 22, 2024)...............................................3

Steven T. Dennis, *Jan. 6 Rioters Who Beat Police May Get Payouts, Blanche Says*, Bloomberg Law (May 19, 2026) ...................................................................35

Susan Carpenter, *Trump Says Government is Talking About Compensation Fund for Jan. 6 Rioters*, Spectrum News NY1 (Mar. 26, 2025) ......................................4, 36

Tara Suter, *Trump Lists 'Number of Reasons' for Pardoning Violent Jan. 6 Rioters*, The Hill (Jan. 23, 2025)......................................................................................4

Tom Dreisbach, *A Jan. 6 rioter pardoned by Trump was sentenced to life in prison for child sex abuse*, NPR (Mar. 5, 2026) ...............................................35, 37

U.S. Gov't Accountability Off., *GAO-06-382SP, Principles of Federal Appropriations Law* 6-79, 6-83 (3d ed., Vol. II, Feb. 2006) .............................................32, 33

U.S. Gov't Accountability Off., *GAO-08-978SP, Principles of Federal Appropriations Law* 14-33 (3d ed., Vol. III, Sept. 2008) .........................................................30

U.S. Gov't Accountability Off., GAO-08-978SP, Principles of Federal Appropriations Law 14-35 (3d ed., Vol. III, Sept. 2008) .........................................................24

U.S. Gov't Accountability Off., *GAO-17-797SP, Principles of Federal Appropriations Law* 3-16 (4th ed. 2017) ...............................................................................30

William Vaillancourt, *J6 Rioters Received Pardons-Now They Want Money*, Daily Beast (Sept. 1, 2025)...............................................................................................36

**INTRODUCTION**

Our Constitution entrusts Congress, not the Executive, with the power to create and fund federal agencies. "By keeping the ability to create offices out of the President's hands, the Founders ensured that no President could unilaterally create an army of officer positions to then fill with his supporters. Instead, our Constitution leaves it in the hands of the people's elected representatives [in Congress] to determine whether new executive offices should exist." *Trump v. United States*, 603 U.S. 593, 646 (2024) (Thomas, J., concurring).

Ignoring this foundational principle, the Department of Justice ("DOJ") and the Department of the Treasury ("Treasury") have created—with no statutory authorization—a powerful new federal agency infused with $1.776 billion in taxpayer dollars drawn from the Treasury's Judgment Fund, to serve as a slush fund for massive payouts to the President's supporters ("the Fund"). Defendants illegally created this slush fund through a sham "settlement" of a lawsuit the President filed against agencies he controls, *Trump v. IRS*, No. 26-cv-20609 (S.D. Fla.), which Defendants consummated in a May 18 agreement and incorporated order of the Acting Attorney General (together, "the May 18 Order" or "the Order"). The Order provides that the Fund will consist of five "Members" appointed by the Attorney General and removable by the President alone. And it vests the Fund with final, unreviewable power to dole out nearly $1.8 billion in federal funds under a shroud of secrecy, contrary to the transparency and accountability requirements of the Judgment Fund statute, the Federal Records Act ("FRA"), and the Freedom of Information Act ("FOIA").

To prevent irreparable harm caused by the Fund's pervasively unconstitutional and secretive structure, Plaintiff Citizens for Responsibility and Ethics in Washington ("CREW") now seeks a temporary restraining order ("TRO") or, alternatively, a § 705 stay and preliminary injunction blocking the May 18 Order, including its imminent transfer of $1.776 billion to an

unidentified "Designated Account." CREW—a non-profit government watchdog dedicated to monitoring Executive Branch spending, shining a light on abuses of taxpayer funds, and publicly disseminating federal records on those subjects—is uniquely and irreparably injured by the Fund's unlawfully opaque structure and operations. CREW will likewise be irreparably harmed if Defendants complete their impending transfer of nearly $1.8 billion *before* conducting notice-and-comment rulemaking as required by the Administrative Procedure Act ("APA"). And CREW will suffer irreparable constitutional harms to its First Amendment rights if Defendants' tactics—which are designed to suppress speech critical of the government's actions—continue unabated.

Time is of the essence. The Treasury is set to illegally transfer nearly $1.8 billion in taxpayer dollars to the Fund by no later than July 17, 2026, but could do so at any time before then. And the Fund could begin disbursing payments at any point after the transfer. In conferring about this motion, counsel for Defendants could not provide basic information such as *when* the $1.776 billion will be transferred outside of the Treasury, whether the "Designated Account" to which the funds will be deposited is a private or government account, whether the Fund has started operating, or whether the Fund will create and preserve federal records as the FRA mandates. CREW thus respectfully asks this Court to immediately, temporarily restrain Defendants from effectuating the May 18 Order. Subsequently, or in the alternative, CREW requests that the Court stay the Order under 5 U.S.C. § 705 and preliminarily enjoin its implementation.

## BACKGROUND

### I.    Origins of the President's claims of "lawfare" and "weaponization."

The Fund's charter documents make clear that the Fund's primary purpose is "[t]o provide a systematic process to hear and redress claims" made by persons who "state that they incurred harm from similar Lawfare and Weaponization" that the President claims to have suffered.

Sherman Decl. Ex. E, May 18 Agreement, ¶ III.C.[1] For years, particularly during the period of federal investigations into the January 6, 2021 attack on the U.S. Capitol, President Trump has fixated on promoting a narrative that Democratic officials engaged in "lawfare" or "weaponization" to target him and his supporters.

This narrative largely arises from DOJ's appointment in 2022 of a Special Counsel to oversee investigations into the January 6 attack and the mishandling of classified documents transported to Trump's Mar-a-Lago Club in Florida. *See* Off. of the Att'y Gen., Order No. 5559-2022, Appointment of John L. Smith as Special Counsel (Nov. 18, 2022). The Special Counsel's investigations led two grand juries to charge Trump with 44 criminal counts, including conspiracy to defraud the United States, obstructing an official proceeding, conspiracy against rights, willful retention of national security material, and obstruction of justice. *See* Superseding Indictment, *United States v. Trump*, et al., No. 9:23-cr-80101-AMC (S.D. Fla. July 27, 2023); Indictment, *United States v. Trump*, No. l:23-cr-00257-TSC (D.D.C. August 1, 2023).

President Trump has repeatedly characterized these federal law enforcement activities as unlawful "weaponization" and "lawfare,"[2] and he has pledged to seek restitution for the more than 1,500 defendants who were charged in connection with the January 6 attacks, most of whom opted to plead guilty.[3] Despite their admissions of guilt and criminal convictions, Trump has claimed

---

[1] Unless otherwise noted, all exhibits cited in this memorandum are attached to the Sherman Declaration.

[2] *See, e.g.*, Rebecca Jacobs, *Trump Has Threatened Dozens of Times to Use the Government to Target Political Enemies*, CREW (May 22, 2024), https://tinyurl.com/4ax422fr; Derrick Hawkins et al., *How Trump Has Become Angrier and More Isolated on Truth Social*, Wash. Post (Apr. 22, 2024), https://tinyurl.com/5ay66htw; Emma Colton, Trump Blasts Ongoing 'Lawfare' in 1st Public Remarks Since Congress Certified his Election, Fox News (Jan. 7, 2025), https://tinyurl.com/4t7j78a4.

[3] *See* J. David Goodman & Emily Cochrane, *Trump Says He Would Consider Pardons for Jan. 6 Defendants if Elected*, N.Y. Times (Jan. 30, 2022), https://tinyurl.com/jvy27yha.

that "most of the people" involved in the January 6 attacks "were absolutely innocent,"[4] that they were "patriots," and that the legal jeopardy they faced was akin to Trump's own treatment as a "public enemy of a rogue regime."[5]

Immediately upon taking office for his second term on January 20, 2025, President Trump granted pardons and clemency to more than 1,500 people who had been convicted of or charged with crimes, including brutal crimes of violence against police officers, related to the January 6 attacks.[6] In March of 2025, President Trump publicly confirmed his administration was discussing creating a compensation fund for pardoned January 6 participants (even though Congress has never authorized such a fund), stating: "A lot of people that are in government now talk about [a January 6 compensation fund] because a lot of the people in government really like that group of people."[7]

## II.    The President files a meritless lawsuit against agencies he controls.

On January 29, 2026, President Trump, his sons Donald and Eric Trump, and the Trump Organization, filed a federal lawsuit against the Internal Revenue Service ("IRS") and the Treasury, seeking at least $10 billion in damages arising from the 2019 unauthorized disclosure of Trump's tax returns by a former government contractor named Charles Littlejohn. Compl., *Trump v. IRS*, No. 26-cv-20609, ECF 1 (S.D. Fla. Jan. 26, 2026). Due to the highly unusual posture of the suit—brought by a sitting President against Executive Branch agencies under his control—the Court *sua sponte* ordered briefing on whether the matter presented a "Case" or "Controversy"

---

[4] *See* Tara Suter, *Trump Lists 'Number of Reasons' for Pardoning Violent Jan. 6 Rioters*, The Hill (Jan. 23, 2025), https://tinyurl.com/2uswaaxs.

[5] *See* Marianne LeVine et al., *Trump Escalates Solidarity with Jan. 6 Rioters As His Own Trials Close In*, Wash. Post (Mar. 23, 2024), https://tinyurl.com/4dx96p65.

[6] *See Proclamation No. 10887 of January 20, 2025, Granting Pardons and Commutation of Sentences for Certain Offenses Relating to the Events at or Near the United States Capitol on January 6, 2021*, 90 Fed. Reg. 8331 (Jan. 29, 2025).

[7] *See* Susan Carpenter, *Trump Says Government is Talking About Compensation Fund for Jan. 6 Rioters*, Spectrum News NY1 (Mar. 26, 2025), https://tinyurl.com/ywc8m5b2.

under Article III of the Constitution. Ex. A, Order. To help resolve that question, the Court appointed amici to submit arguments on the justiciability of the suit, and it scheduled a May 27 hearing to address these threshold issues. The Court also granted CREW leave to file an amicus brief.

Amici identified numerous threshold justiciability issues that would prevent the suit from advancing. The court-appointed amici advised that the suit presented "significant Article III subject matter jurisdiction concerns" due to a lack of adversity between a sitting president seeking monetary damages for alleged harm to his personal interests "from an executive agency that he controls." Br. of Court Appointed Amici Curiae, *Trump v. IRS*, 26-cv-20609, ECF 45 (S.D. Fla. May 18, 2026). CREW also raised numerous threshold issues, including that the suit posed grave separation-of-powers and ethical concerns, that government attorneys seeking to defend the suit would face unavoidable conflicts of interest, and that any monetary settlement would violate the Constitution's Domestic Emoluments Clause. Br. of Amici Curiae CREW & Pub. Citizen, *Trump v. IRS*, 26-cv-20609, ECF 15 (S.D. Fla. Feb. 12, 2026).

Beyond these basic issues, the claims asserted in *Trump v. IRS* were subject to numerous other obvious threshold defenses, many of which DOJ had raised in similar cases involving tax returns leaked by Charles Littlejohn. For example, because Littlejohn was not a government employee, the *Trump* plaintiffs' claims were barred by sovereign immunity. *See, e.g.*, Ex. C, U.S. Mot. to Dismiss 2d Am. Compl. at 1-2, *Griffin v. IRS*, 22-cv-24023, ECF 58 (S.D. Fla. Nov. 27, 2023) (so arguing); Ex. D, U.S. Mot. to Dismiss at 1, *Safe Harbor Int'l, LLC v. IRS*, 25-cv-139, ECF 31 (D. Md. July 23, 2025) (same). The *Trump* plaintiffs' claims were also time barred because they had notice of the leaked returns more than two years before the filing of the suit. *See* 5 U.S.C. § 552a(g)(5). And they failed to adequately plead actual damages. *See* 26 U.S.C. § 7431(c)

(authorizing suit for release of tax returns to seek greater of $1,000 or "actual damages"); *FAA v. Cooper*, 566 U.S. 284, 295, 297-98 (2012) (Privacy Act requires proof of actual damages).

III.  **Defendants orchestrate a sham settlement of *Trump v. IRS* diverting nearly $1.8 billion in taxpayer dollars to a slush fund for "victims" of "lawfare" and "weaponization."**

Despite the obvious legal flaws with the *Trump* plaintiffs' claims, DOJ never presented a single argument in defense of the United States; indeed, no DOJ attorney even made an appearance in the case. Instead, days prior to the scheduled May 27 hearing on justiciability, DOJ, led by President Trump's former personal criminal defense attorney, executed a "settlement" agreement with the *Trump* plaintiffs, committing to provide an astounding $1.776 billion in taxpayer money drawn from the Treasury's Judgment Fund to a so-called "Anti-Weaponization Fund" aimed at compensating an ill-defined population of persons who had been targeted "by Democrat elected officials, political and career federal employees, contractors, and agents" for "unlawful political, personal, and/or ideological reasons." Ex. E, May 18 Agreement, ¶ II.C. In a later addendum to the Agreement, the Acting Attorney General also agreed to release President Trump, his family, and his affiliates from liability for any wrongdoing, "whether known or unknown," relating to any tax filings that were made prior to the purported settlement.  Ex. I, May 19 AG Order, ¶ C.

IV.  **Defendants establish and structure the Fund to evade federal transparency and accountability statutes.**

The May 18 Agreement and a corresponding Order issued by the Acting Attorney General (together, "the May 18 Order" or "the Order") establish the Fund and set out the parameters of its operations. *See* Ex. E, May 18 Agreement; Ex. F, May 18 AG Order. A subsequently issued "Overview" document provides some limited additional details about the intended purpose and operation of the Fund.  Ex. G, DOJ, *Overview of the Department of Justice's Anti-Weaponization Fund* ("DOJ Overview"). These documents reveal certain key features of the Fund and confirm

6

that it lacks even basic transparency requirements, let alone the robust requirements mandated by federal law. Specifically:

- The Fund shall consist of five "Members" appointed by the Attorney General and removeable "without cause" by President Trump alone. However, only three Members are needed for a quorum, and a majority of a quorum (*i.e.*, as few as two Members) is authorized to act on behalf of the Fund. *See* Ex. E, May 18 Agreement ¶ IV.B;

- The Fund "shall have the power to determine its own [claims] procedures" and unfettered "discretion" to decide whether to make those "procedures public," *id.* ¶ IV.C;

- The "Fund shall have the power to issue formal apologies, issue monetary relief owed to claimants as a result of their legal rights, grant claims in whole or in part, deny claims in whole or in part, defer review of claims, and receive and request evidence or other support for claims, including requesting information from, or consulting with, federal agencies," *id.* ¶ IV.D;

- The Fund will provide the Attorney General, each quarter, a non-public "confidential written report" containing certain basic claim information, *id*. ¶ IV.E;

- The Fund's award determinations are final and not appealable or subject to judicial review, *id.* ¶ VI.B;

- Capitalization of the Fund will "come from the judgment fund, which is a perpetual appropriation created by Congress in 1956" and administered by the Treasury. Ex. G, DOJ Overview at 1; Ex. F, May 18 AG Order ¶¶ C, G. To effectuate that capitalization, "[w]ithin 60 days" of May 18 (*i.e.*, July 17), "the United States shall provide the U.S. Department of the Treasury with all necessary forms and documentation to direct a payment of $1,776,000,000" to a "Designated Account" housed at an unspecified location for "sole use" by the Fund, Ex. F, May 18 AG Order ¶ C;

- Once the $1.776 billion in taxpayer funds is transferred from the Judgment Fund to the "Designated Account," the United States foreswears any "liability whatsoever for the protection or safeguarding of those funds, regardless of bank failure, fraudulent transfers, or any other fraud or misuse of the funds," Ex. F, May 18 AG Order ¶ D;

- The Fund will use the $1.776 billion in taxpayer money not only to issue awards to claimants, but also to pay for all functions that "may be necessary to carry out the mission of" the Fund, including, but not limited to, paying for "per diems, administrative services, funds, facilities, staff, travel, and other support services," *id.* ¶ E; and

- If any is any balance remaining of the $1.776 billion after December 15, 2028, the Fund "shall transfer such balance before January 1, 2029, to the Department of Commerce, Interior, or another appropriate federal government account as designated by the President," Ex. E, May 18 Agreement ¶ IV.H.

7

**V.    Defendants fail to provide sufficient assurances of legal compliance.**

Prior to filing this motion, counsel for the parties conferred in an effort to narrow the issues in dispute and obviate the need for seeking emergency relief. Counsel for CREW contacted counsel for Defendants on Tuesday, May 26, provided them a copy of the Complaint, and requested basic information about the Fund's secretive structure and operations. However, counsel for Defendants could not timely provide CREW with that basic information or any assurances that would mitigate the threat of irreparable harm. For instance, Defendants' counsel could not clarify *when* the nearly $1.8 billion will be transferred outside of the Treasury, whether the "Designated Account" in which the nearly $1.8 billion will be deposited is a private or government account, whether the government retains control of the assets after transfer, whether the Fund has started operating and accepting claims, and whether it is creating and preserving records as required by the FRA.

## LEGAL STANDARD

To obtain a temporary restraining order, "the moving party must show: (1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the [temporary restraining order] were not granted, (3) that [such an order] would not substantially injure other interested parties, and (4) that the public interest would be furthered" by the order. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (cleaned up); *see also Hall v. Johnson*, 599 F. Supp. 2d 1, 3 n.2 (D.D.C. 2009) ("[T]he same standard applies to both temporary restraining orders and to preliminary injunctions.") (cleaned up).

Section 705 of the APA authorizes "the reviewing court" to stay "the effective date of an agency action" pending judicial review "[o]n such conditions as may be required and to the extent necessary to prevent irreparable injury." 5 U.S.C. § 705. "The factors governing issuance of a preliminary injunction also govern issuance of a § 705 stay." *District of Columbia v. USDA*, 444 F. Supp. 3d 1, 15 (D.D.C. 2020) (citing cases).

8

**ARGUMENT**

**I.    CREW is likely to succeed on the merits.**

CREW is likely to succeed on its claims that the May 18 Order violates the separation of powers, *see* Compl. ¶¶ 128-34 (Count I); *id.* ¶¶ 175-177, 188 (Count IV); violates the APA's notice-and-comment requirements, *id.* ¶¶ 144-150 (Count II); is contrary to law and exceeds Defendants' lawful authority, *id.* ¶¶ 151-174 (Count III); *id.* ¶¶ 195-200 (Count VI); is arbitrary and capricious, *id.* ¶¶ 184-94 (Count V); and violates CREW's First Amendment rights, *id.* ¶¶ 178-83 (Count IV); *id.* ¶ 142 (Count I).

**A.    CREW has standing.**

As a government watchdog whose mission-critical functions entail monitoring Executive Branch spending and routinely requesting, utilizing, and publicly disseminating federal records on topics relevant to the Fund's operations, CREW has standing to challenge the Fund's unlawfully opaque and unconstitutional structure.

To establish Article III standing, a plaintiff must show (1) "injury in fact that is concrete, particularized, and actual or imminent," (2) "that the injury was likely caused by the defendant," and (3) "that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). "[F]uture injuries" satisfy standing where the threat of harm is "certainly impending, or there is a substantial risk that the harm will occur." *Dep't of Com. v. New York*, 588 U.S. 752, 767 (2019). "For purposes of standing," the Court must "assume the merits in favor of the plaintiff." *Ctr. for Biological Diversity v. U.S. Int'l Dev. Fin. Corp.*, 77 F.4th 679, 685 (D.C. Cir. 2023) ("*CBD*"). Here, CREW has demonstrated cognizable informational, constitutional, and procedural injuries traceable to Defendants' unlawful May 18 Order.

**1.   The May 18 Order inflicts informational injuries on CREW.**

"[T]he Supreme Court" has "held informational injury sufficient to satisfy standing." *CBD*, 77 F.4th at 685 (citing, among others, *FEC v. Akins*, 524 U.S. 11, 24 (1998)). "To prove an informational injury, a plaintiff must show that (1) it has been deprived of information that, on its interpretation, a statute requires the government or a third party to disclose to it, and (2) it suffers, by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure." *Id.* (cleaned up). A plaintiff "need not receive a specific denial" of information from an agency "to sustain an informational injury." *Id.* at 685. Rather, "a plaintiff suffers an informational injury when an agency . . . adopts a rule that places a legally unsupported limit on its statutory reporting requirements," *id.* (citing *Waterkeeper All. v. EPA*, 853 F.3d 527, 533 (D.C. Cir. 2017)), or otherwise adopts a "'policy or practice' [that] 'will impair the [plaintiff's] lawful access to information in the future,'" *CREW v. DOJ*, 846 F.3d 1235, 1242 (D.C. Cir. 2017). CREW easily meets the two-part test for informational standing.

*First*, as explained below, the May 18 Order unlawfully structures the Fund to categorically evade disclosure and records preservation obligations under the Judgment Fund statute, the FRA, and FOIA. *See infra* Argument § I(D)(2). This will significantly impair CREW's "lawful access to information in the future" in multiple respects. *CREW*, 846 F.3d at 124.

The Judgment Fund statute mandates that the "Secretary of the Treasury shall make available to the public on a website, as soon as practicable, but not later than 30 days after the date on which a payment" is made pursuant to any "compromise settlement" the "name of the specific agency or entity whose actions gave rise to the claim or judgment," the "name of the plaintiff or claimant" and their "counsel," the "amount[s] paid," and a "brief description of the facts that gave rise to the claim," among other things. 31 U.S.C. § 1304(d). By illegally drawing nearly $1.8 billion from the Judgment Fund as one lump sum and then routing payments to individual

claimants through a secretive slush fund, Defendants have entirely circumvented § 1304(d)'s disclosure mandates. Defendants have effectively created an alternative, shadow Judgment Fund that places a "legally unsupported limit on [Treasury's] statutory reporting requirements." *CBD*, 77 F.4th at 686. This inflicts cognizable injury on CREW. *See Waterkeeper All.*, 853 F.3d at 534 (plaintiff had informational standing to challenge agency rule that "had the automatic effect of cutting back on [statutory] reporting and disclosure requirements" and thus "deprive[d] [the plaintiff] of information, the public disclosure of which would otherwise be required by [statute]"); *CREW v. OMB*, 791 F. Supp. 3d 29, 51 (D.D.C. 2025) (CREW had informational standing to challenge agency's takedown of statutorily required public website disclosing federal spending allocations), *appeal docketed*, No. 25-5266 (D.C. Cir.).

The May 18 Order likewise impairs CREW's informational rights under FOIA and the FRA. The Order erroneously treats the Fund as a non-agency wholly exempt from FOIA and the FRA. *See infra* Argument § I(D)(2). CREW routinely submits FOIA requests to agencies, has several pending FOIA requests relating to the Fund, and has attempted to and will continue to submit FOIA requests to the Fund itself to help shed light on its secretive structure and operations. Sherman Decl. ¶¶ 3, 14-17; Ex. H, May 22 FOIA Request. But submitting FOIA requests to the Fund is futile because it has failed in the first instance to establish any "method[]" for accepting requests as the statute requires, *see* 5 U.S.C. § 552(a)(1)(A), let alone complied with FOIA's numerous other mandatory obligations. *See* Ex. E, May 18 Agreement; Ex. F, May 18 AG Order. Moreover, CREW's statutory right to access the Fund's records is imperiled by the substantial risk they will be lost or destroyed, since the May 18 Order does not treat the Fund as an FRA-covered agency and is entirely silent as to its records preservation obligations. These are cognizable injuries to CREW. *See, e.g.*, *Am. Hist. Ass'n v. Trump*, 2026 WL 1412395, at *9 (D.D.C. May 20, 2026)

11

("*AHA*") (CREW and other plaintiffs "likely established a substantial risk of [informational] injury" where White House records policy was "silent" and did "not speak" to statutory preservation and disposal obligations); *CREW v. EOP*, 587 F. Supp. 2d 48, 61 (D.D.C. 2008) (CREW had standing to challenge "[in]adequate preservation guidelines" that risked records being "lost in the future, further shrinking the pool of records [it could] use in [its] work"); *CREW v. Cheney*, 593 F. Supp. 2d 194, 226-27 (D.D.C. 2009) (similar); *see also infra* Argument § II.

***Second***, CREW "suffers, by being denied access to [the Fund's] information," precisely the "type of harm[s] Congress sought to prevent by requiring disclosure" in the Judgment Fund statute and FOIA. *See CBD*, 77 F.4th at 685. Congress adopted the Judgment Fund statute's disclosure requirements in 2019 with the express purpose of ensuring "Judgment Fund Transparency." *See* John D. Dingell, Jr. Conservation, Management, and Recreation Act, Pub. L. 116-9, Title IV, § 4201(b), 133 Stat. 580, 764 (Mar. 12, 2019); 165 Cong. Rec. E241-04 (daily ed. Mar. 5, 2019) (statement of Rep. Doug Collins) ("This legislation ensures appropriate protections are in place, while facilitating critical public and Congressional oversight."). Similarly, FOIA's "core purpose" is to "contribute significantly to public understanding of the operations or activities of the government." *Dep't of Def. v. FLRA,* 510 U.S. 487, 495 (1994). This "basic policy . . . focuses on the citizens' right to be informed about what their government is up to," *id.*, which is "a structural necessity in a real democracy," *NARA v. Favish*, 541 U.S. 157, 172 (2004).

Both disclosure statues were designed to prevent exactly the types of harm that the May 18 Order inflicts on CREW. As part of its mission-critical functions, CREW routinely requests and utilizes government records made available to it under federal transparency laws and widely disseminates that information to the public. Sherman Decl. ¶¶ 3-4. Deprivation of the disclosures required by the Judgment Fund statute—including disclosure of award decisions, claimant and

12

counsel identities, award amounts, and descriptions of the basis of claims, "not later than 30 days after" payments are made, *see* 31 U.S.C. § 1304(d)—will directly impair CREW's core government oversight functions. Sherman Decl. ¶¶ 13-24. Indeed, well before Defendants announced the $1.776 billion Fund on May 18, CREW was operating (and it continues to operate) two public-facing tracking projects that will be materially impaired by the Fund's evasion of statutory disclosure requirements. *Id.* ¶¶ 20-21. One of those tracking projects documents recidivism among pardoned January 6 defendants, and the other tracks the President's conflicts of interest. *Id.* CREW would have utilized the statutorily required disclosures about the Fund extensively in connection with these projects had Defendants not unlawfully structured the Fund to evade transparency requirements. *Id*. ¶¶ 20-23.

CREW's planned use and dissemination of information about the Fund "is in furtherance of the purpose[s] for which Congress enacted" FOIA and the Judgment Fund statute's transparency provisions, and "fit[] squarely within Congress's goal[s] of providing increased transparency into the Executive Branch's [spending] decisions" and other operations. *See CREW v. OMB*, 791 F. Supp. 3d at 47-48. CREW has therefore demonstrated a "quintessential" case of "informational standing." *Env't Def. Fund v. EPA*, 922 F.3d 446, 452 (D.C. Cir. 2019).

***Finally***, because CREW's informational injuries are the direct result of Defendants' usurpation of Congress's exclusive powers to create, structure, and fund federal agencies, *see infra* Argument § I(B), these injuries enable CREW to pursue its constitutional claims challenging the Fund's establishment and structure. *See Friends of Animals v. Jewell*, 824 F.3d 1033, 1040 (D.C. Cir. 2016) (plaintiff's informational standing allowed it to pursue constitutional separation of powers claim); *Consumers' Rsch. v. Consumer Prod. Safety Comm'n*, 91 F.4th 342, 350 (5th Cir. 2024) (same); *AHA*, 2026 WL 1412395, at *5-*12 (same, where CREW was a plaintiff). As the

13

Supreme Court has made clear, "[i]f the constitutional structure of our Government that protects individual liberty is compromised, individuals who suffer otherwise justiciable injury may object." *Bond v. United States*, 564 U.S. 211, 223 (2011).

### 2.   The May 18 Order inflicts First Amendment injuries on CREW.

As explained below, *see infra* § Argument § I(F), the Fund is designed to channel politically unpopular payments from the Fund—which would generate speech critical of the government by CREW and others, Sherman Decl. ¶ 23—into a secretive process that deprives CREW of facts to enable its speech. The May 18 Order's apparent "purpose to suppress speech" by limiting access to "facts" that are otherwise published "in compliance with a legal mandate" "render[s] [it] unconstitutional." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 566, 567-68, 570 (2011); *see also infra* Argument § I(F) (citing cases). CREW's "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury" for purposes of both standing and irreparable harm. *Elrod v. Burns*, 427 U.S. 347, 373 (1976).[8]

### 3.   The May 18 Order inflicts procedural injuries on CREW.

While a procedural violation alone cannot confer standing, a plaintiff has standing to "challenge an action taken without required procedural safeguards" if it can show that "the agency action affects [its] concrete interests in a personal way." *Mendoza v. Perez*, 754 F.3d 1002, 1010, 1013 (D.C. Cir. 2014). As outlined above, the May 18 Order inflicts "concrete" informational and constitutional injuries to CREW. Based on these "injuri[es] to [its] concrete interests," *Mendoza*,

---

[8] That all speakers will be deprived of facts concerning the Fund's settlements does not minimize the particularized harm to CREW, which is based on the impact of Defendants' unlawful actions on CREW's specific, mission-critical functions. *See Campaign for Accountability v. DOJ*, 155 F.4th 724, 735 (D.C. Cir. 2025) ("Where a harm is concrete, though widely shared, the Court has found injury in fact." (quoting *Akins*, 524 U.S. at 11)).

754 F.3d at 1011, CREW likewise has standing to challenge Defendants' notice-and-comment violations. *See infra* Argument § I(C).

### 4. CREW's injuries are caused by the May 18 Order and redressable by this Court.

But for the May 18 Order's unlawful creation of a powerful new agency to dole out $1.776 billion in taxpayer funds while evading statutory disclosure and records preservation obligations, CREW would not be suffering any of the injuries outlined above. "Because Article III 'requires no more than *de facto* causality,' traceability is satisfied here." *Dep't of Com.*, 588 U.S. at 768 (cleaned up). And vacating the May 18 Order and enjoining the Fund's continued operations would redress CREW's injuries. *See Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 114 (2025) (plaintiff need only show requested relief would "likely" redress injury at least partially); *Massachusetts v. EPA*, 549 U.S. 497, 526 (2007) (finding standing where "the risk [of harm] would be reduced to some extent if petitioners received the relief they seek"). With respect to CREW's notice-and-comment claim, "the normal standards for immediacy and redressability are relaxed"; CREW "need not show the agency action would have been different had it been consummated in a procedurally valid manner—the courts will assume this portion of the causal link." *Mendoza*, 754 F.3d at 1010, 1012.

### B.      The May 18 Order violates the separation of powers (Counts I and IV).

CREW is likely to succeed on its claim that the May 18 Order violates the separation of powers. *See* Compl. ¶¶ 128-34, 175-177, 188. Indeed, Defendants' creation of the Fund is a flagrant power grab that makes a mockery of our constitutional structure.

**1.** "The United States Constitution 'enumerates and separates the powers of the three branches of Government in Articles I, II, and III, and it is this very structure of the Constitution that exemplifies the concept of separation of powers." *Friends of Animals*, 824 F.3d at 1042

(quoting *Miller v. French*, 530 U.S. 327, 341 (2000)). "[T]he Constitution prohibits one branch from encroaching on the central prerogatives of another." *Id.* (quoting *Miller*, 530 U.S. at 341-42). And the "federal judiciary" is duty bound to "maintain[] the constitutional plan of separation of powers." *Freytag v. Comm'r*, 501 U.S. 868, 879 (1991).

The Constitution vests in Congress alone the power to create and fund Executive Branch agencies and to establish or delegate the power to set rules for their operation. Under Article I of the Constitution, "Congress has *plenary control* over the salary, duties, and even *existence of* executive offices." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 500 (2010) (emphasis added); *accord Myers v. United States*, 272 U.S. 52, 129 (1926). "By keeping the ability to create offices out of the President's hands, the Founders ensured that no President could unilaterally create an army of officer positions to then fill with his supporters. Instead, our Constitution leaves it in the hands of the people's elected representatives [in Congress] to determine whether new executive offices should exist." *Trump*, 603 U.S. at 646 (Thomas, J., concurring); *accord Seila L. LLC v. CFPB*, 591 U.S. 197, 266 (2020) (Kagan, J., concurring in part and dissenting in part); *New Mexico v. Musk*, 784 F. Supp. 3d 174, 202 (D.D.C. 2025).

Moreover, the Constitution "exclusively grants the power of the purse to Congress, not the President." *City and County of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018); *Learning Res., Inc. v. Trump*, 146 S. Ct. 628, 639 (2026) (referring to the "core congressional power of the purse"); *see* U.S. Const., art. I, § 8, cl. 1 (Spending Clause); *id.*, § 9, cl. 7 (Appropriations Clause). The Appropriations Clause's "straightforward and explicit command" means "that no money can be paid out of the Treasury unless it has been appropriated by an act of Congress." *OPM v. Richmond*, 496 U.S. 414, 424 (1990). "It is particularly important as a restraint on Executive Branch officers: If not for the Appropriations Clause, 'the executive would possess

an unbounded power over the public purse of the nation; and might apply all its monied resources at his pleasure.'" *U.S. Dep't of Navy v. FLRA*, 665 F.3d 1339, 1347 (D.C. Cir. 2012) (Kavanaugh, J.). It is Congress's "'most complete and effectual weapon' to ensure that the other branches do not exceed or abuse their authority." *Nat'l Tr. for Historic Pres. v. Nat'l Park Serv.*, 2026 WL 877779, at *5 (D.D.C. Mar. 31, 2026) (RJL) (cleaned up).

Here, Defendants have arrogated Congress's exclusive powers to themselves. They have done so by unilaterally creating and funding—with no statutory authorization—a powerful new Executive Branch agency led by members who answer only to the President and have final authority to, among other things, secretly redirect and award up to $1.776 billion in appropriated funds from the Judgment Fund to whomever they decide is a purported "victim" of "Lawfare and/or Weaponization." *See supra* Background §§ III-IV.

By its plain terms, the May 18 Order purports to vest the Fund's members with authority reserved for "officers of the United States" who must be appointed in accordance with the Constitution's Appointments Clause. *See* U.S. Const. art. II, § 2, cl. 2. Indeed, the Fund's members are vested with "the power to render a final decision on behalf of the United States without any . . . review by their nominal superior or any other principal officer in the Executive Branch." *United States v. Arthrex, Inc.*, 594 U.S. 1, 14 (2021). "Only an officer properly appointed to a principal office" may wield such "'significant authority' in adjudicating the public rights of private parties." *Id.* at 23.[9] And, most critical here, "*[b]efore* the President or a Department Head can appoint any

---

[9] The Appointments Clause creates two classes of "officers of the United States": "principal" and "inferior" officers. "Only the President, with the advice and consent of the Senate, can appoint a principal officer; but Congress (instead of relying on that method) may authorize the President alone, a court, or a department head to appoint an inferior officer." *Lucia v. SEC*, 585 U.S. 237, 244 n.3 (2018). For present purposes, it is immaterial whether the Fund's members wield powers of a "principal" or "inferior" office. Since the May 18 Order vests the Members with "significant

17

officer, . . . the Constitution requires that the underlying office be 'established by Law'"—that is, established by "the Constitution" or "by statute." *Trump*, 603 U.S. at 644-45 (Thomas, J., concurring) (quoting U.S. Const. art. II, § 2, cl. 2) (emphasis added). The Fund, however, was not "established by" any constitutional provision or statute; it was purely a creation of Executive fiat. By unilaterally creating and infusing the Fund with nearly $1.8 billion in appropriated funds with no statutory authorization, Defendants usurped Congress's "plenary control over" the "duties" and "existence of executive offices," *Free Enter. Fund*, 561 U.S. at 500, and its "exclusive power over the federal purse," *U.S. Dep't of Navy*, 665 F.3d at 1346, in violation of the separation of powers.

    **2.** The only statute that Defendants cite as authority for their creation of the Fund is the Judgment Fund statute. Ex. F, May 18 AG Order ¶ G (citing 31 U.S.C. § 1304 and 28 U.S.C. § 2414). As explained below, *see infra* Argument § I(D)(1), nothing in that statute authorizes the creation and funding of Defendants' $1.776 billion Fund. For purposes of CREW's separation-of-powers claim, however, the dispositive point is that the Judgment Fund statute does not "establish[] by Law" any "office" pursuant to which the Fund's members could conceivably exercise the "significant authority" that the May 18 Order purports to vest in them. *See Trump*, 603 U.S. at 644-45 (Thomas, J., concurring). At most, the statute authorizes the payment of individual "compromise settlements" from the Judgment Fund if certain conditions are met. *See infra* Argument § I(D)(1). Not even Defendants have claimed that the Judgment Fund statute permits them to create a freestanding entity within the Executive Branch, answerable only to President Trump, with unlimited power to dole out $1.776 billion in taxpayer funds to purported "victims" of "Lawfare and/or Weaponization."

---

authority pursuant to the laws of the United States," *id.*, at a minimum they are inferior officers, and Congress has not authorized their appointment.

Any such expansive reading of the Judgment Fund statute would run headlong into the Supreme Court's "major questions" line of cases. *See, e.g.*, *West Virginia v. EPA*, 597 U.S. 697, 716, 723-724 (2022). Congress created the Judgment Fund 70 years ago in 1956.[10] Never before have Defendants claimed that the Judgment Fund statute implicitly authorizes them to create independent Executive Branch entities empowered to make final decisions to disburse billions of taxpayer dollars to unidentified future claimants against the United States. To the contrary, legitimate victim compensation funds historically have been created by statute, such as the Crime Victims Fund and the September 11th Victim Compensation Fund.[11]

Where, as here, federal agencies "claim to discover in a long-extant statute an unheralded power" of "vast economic and political significance" that extends "beyond what Congress could reasonably be understood to have granted," "both separation of powers principles and a practical understanding of legislative intent" should make courts "reluctant to read into ambiguous statutory text the delegation claimed to be lurking there." *West Virginia*, 597 U.S. at 716, 723-724 (cleaned up). In such cases, an agency "must point to clear congressional authorization for the power it claims." *Id.* And "[t]hese considerations apply with particular force where, as here, the purported delegation involves the core congressional power of the purse." *Learning Res.*, 146 S. Ct. at 639 (opinion of Roberts, C.J.). Surely if Congress intended to "relinquish that [power] to another branch, a reasonable interpreter would expect it to do so clearly." *Id.* (cleaned up). Congress has done no such thing. The indisputable "'lack of historical precedent'" for Defendants' actions, "coupled with the breadth of authority that [they] now claim[], is a 'telling indication'" that they

---

[10]   *See* Dep't of Treasury, Bureau of Fiscal Service, *About the Judgment Fund*, https://tinyurl.com/3pmcvm8t.

[11]   *See* 9/11 Victim Compensation Fund, *About the Victim Compensation Fund*, https://www.vcf.gov/about; DOJ, Office for the Victims of Crime, *Crime Victims Fund*, https://ovc.ojp.gov/about/crime-victims-fund.

"extend[] beyond the [agencies'] legitimate reach." *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab.*, 595 U.S. 109, 119 (2022) (per curiam).

For all these reasons, the May 18 Order violates the separation of powers and thus is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B). The Court "shall" therefore hold it "unlawful and set [it] aside" under the APA, *id.* § 706(2), and, if deemed necessary, enjoin its enforcement.[12]

### C.    Defendants adopted the May 18 Order in violation of the APA's notice-and-comment requirements (Count II).

CREW is likely to succeed on its claim challenging Defendants' failure to follow the APA's notice-and-comment procedures in adopting the May 18 Order. *See* Compl. ¶¶ 144-150. "[I]n determining whether a rule is subject to the APA's notice-and-comment" requirements under 5 U.S.C. § 553(b), courts "ordinarily ask whether the rule is a legislative rule (which generally must go through notice-and-comment procedures) or an interpretive rule (which need not)." *City of Billings v. TSA*, 153 F.4th 46, 51 (D.C. Cir. 2025). "Legislative rules have the 'force and effect of law,' and usually bring about 'a substantive change in existing law or policy.'" *Id.*

Here, the May 18 Order is plainly "legislative" because it "supplements a statute, adopts a new position inconsistent with existing regulations, [and] otherwise effects a substantive change in existing law or policy." *Mendoza*, 754 F.3d at 1021. Indeed, the May 18 Order reflects a seismic

---

[12] Vacatur is the default remedy for APA violations, *see Bridgeport Hosp. v. Becerra*, 108 F.4th 882, 890 (D.C. Cir. 2024), and it requires an agency to "re-establish the status quo absent the unlawful agency action," *Las Ams. Immigrant Advoc. Ctr. v. DHS*, 783 F. Supp. 3d 200, 233 (D.D.C. 2025). Although an injunction is inappropriate where it would "not have any meaningful practical effect independent of" vacatur under the APA, *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010), "an injunction may be warranted if vacatur does not sufficiently redress the plaintiff's injury," *Firearms Regul. Accountability Coal., Inc. v. Garland*, 112 F.4th 507, 526 (8th Cir. 2024). Thus, this Court may supplement vacatur with injunctive relief to the extent that it deems it necessary to fully remedy CREW's injuries.

shift in how DOJ and Treasury execute compromise settlements out of the Judgment Fund. Never before have DOJ and Treasury approved drawing a lump sum of anything close to a $1.8 billion payment from the Judgment Fund and then created—with no statutory authorization—a freestanding entity in the Executive Branch composed of members removable only by the President with the unfettered final authority to disburse those funds however they wish to persons entirely unconnected to the underlying action that was the subject of the settlement. By all accounts, this is "a substantive change in existing law or policy." *See id.* And insofar as the May 18 Order purports to authorize this massive transfer and repurposing of appropriated funds notwithstanding the web of funding statutes restricting such transfers, *see infra* Argument § I(D)(3), it has the "force and effect of law." *City of Billings*, 153 F.4th at 51.

The May 18 Order also directly conflicts with existing DOJ policy in two respects. First, the Order's secrecy provisions—which give the Fund Members unlimited discretion on whether to make the Fund's "procedures" public and provide only for a "confidential" report to the Attorney General on claim awards, *see supra* Background § IV—are a clear departure from DOJ regulations establishing that it "is the policy of the Department of Justice that, in any civil matter in which the Department is representing the interests of the United States or its agencies, it will not enter into final settlement agreements . . . that are subject to confidentiality provisions," absent "rare circumstances" not present here. 28 C.F.R. §§ 50.23(a)-(b). Second, a DOJ policy issued in 2017 and reinstated in 2025 generally prohibits DOJ from executing settlements that require payments to "non-governmental third parties . . . that were neither victims nor parties to the lawsuit[]" being settled. Memorandum from the Attorney General, Reinstating the Prohibition on Improper Third-Party Settlements (Feb. 5, 2025), https://perma.cc/UQR3-QVBF; Press Release, DOJ, *Attorney General Jeff Sessions Ends Third Party Settlement Practice* (June 7, 2017),

https://bit.ly/4dv4qeg. Yet that is precisely what the Fund is: a $1.776 billion pot of taxpayer money reserved for "non-governmental third parties" who were neither parties nor have any connection to the claims asserted in *Trump v. IRS*. *See supra* Background § IV.

Accordingly, the May 18 Order was a legislative rule requiring notice and comment under the APA. Because Defendants adopted the Order "without observance of procedure required by law," 5 U.S.C. § 706(2)(D), the Court "shall" hold it "unlawful and set [it] aside," *id.* § 706(2).

**D.     The May 18 Order is contrary to law and exceeds Defendants' authority (Counts III and VI).**

Plaintiffs are likely to succeed on their claim that the May 18 Order is contrary to law and vastly exceeds Defendants' lawful authority. *See* Compl. ¶¶ 151-174, 195-200. An "agency . . . literally has no power to act . . . unless and until Congress authorizes it to do so by statute." *FEC v. Cruz*, 596 U.S. 289, 301 (2022) (cleaned up); *accord Marin Audubon Soc'y v. FAA*, 121 F.4th 902, 912 (D.C. Cir. 2024). "And if an agency acts without statutory authority, then a court must set that action aside" under the APA. *Drs. for Am. v. OPM*, 793 F. Supp. 3d 112, 143 (D.D.C. 2025). "To determine 'whether an agency has acted within its statutory authority,' [courts] use 'the traditional tools of statutory construction.'" *U.S. Sugar Corp. v. EPA*, 113 F.4th 984, 997 (D.C. Cir. 2024) (quoting *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 403 (2024)). At all times, the Court must "interpret the words of . . . statutes in light of the purposes Congress sought to serve." *Chapman v. Hou. Welfare Rts. Org.*, 441 U.S. 600, 608 (1979).

Here, the May 18 Order far exceeds Defendants' authority under the Judgment Fund statute and affirmatively violates a host of transparency and funding statutes that Congress enacted specifically to rein in Executive Branch abuse and to protect its own constitutional prerogatives.

22

### 1. The May 18 Order exceeds Defendants' authority under the Judgment Fund statute.

Defendants invoke the Judgment Fund statute as their sole authority for the May 18 Order. *See* Ex. F, May 18 AG Order ¶ G. But that statute plainly does not authorize the Fund. Pertinent here, the Judgment Fund statute authorizes the payment of "compromise settlements of claims referred to the Attorney General for defense of imminent litigation or suits against the United States" or its "its agencies or officials," when they are "settled and paid in a manner similar to judgments in like causes." 28 U.S.C. § 2414; *see also* 31 U.S.C. § 1304(a). The statute thus requires "settlement of claims arising under *actual or imminent litigation*." 31 C.F.R. § 256.1(a) (emphasis added).

Here, the only "actual or imminent" claims that the May 18 Agreement could conceivably have settled are those asserted in *Trump v. IRS*. But the Agreement *expressly disavows* that the transfer of $1.776 billion from the Treasury to the Fund operates as a settlement of the *Trump* plaintiffs' claims. Indeed, it states that the *Trump* plaintiffs "will *not* receive any monetary payment or damages of any kind," and the $1.776 billion transferred out of the Judgment Fund "does *not* represent the value of any current claim by" the *Trump* plaintiffs, but rather "is based on the projected valuation of *future claimants' claims*." Ex. E, May 18 Agreement ¶¶ III.A, IV.A (emphasis added).

No plausible reading of the Judgment Fund statute empowers DOJ and the Treasury to draw nearly $1.8 billion funds from the Judgment Fund for purposes of executing a "compromise settlement" of a pending case that operates as a settlement of *wholly unrelated* "future" claims by *unidentified* "future claimants" who are not even parties to the suit being settled. Moreover, no provision of the Judgment Fund statute authorizes paying the day-to-day operational expenses of a new federal agency, as the May 18 Order provides. *See* Ex. F, May 18 AG Order ¶ E (providing

23

that the Fund will use the $1.776 billion from the Judgment Fund for all functions that "may be necessary to carry out the mission of" the Fund, including, but not limited to, paying for "per diems, administrative services, funds, facilities, staff, travel, and other support services"). Such a boundless reading of the Judgment Fund statute would give Executive Branch officials a blank check to redirect and give away billions in taxpayer funds however they wish, merely by establishing sham "compensation funds" through collusive legal settlements. "This would effec[t] a fundamental revision of the statute, changing it from [one sort of] scheme . . . into an entirely different kind." *Biden v. Nebraska*, 600 U.S. 477, 502 (2023) (quoting *West Virginia*, 597 U.S. at 735) (cleaned up). Surely if Congress meant to confer that remarkable authority on Defendants, it would have provided a "clear delegation" to that effect in the Judgment Fund statute. *See Biden*, 600 U.S. at 504; *supra* Argument § I(B). Congress did no such thing.

Even assuming the May 18 Order did operate as a settlement of the *Trump* plaintiffs' claims (which it expressly did not), it still would have vastly exceeded Defendants' authority under the Judgment Fund statute for two reasons.

First, the *Trump* plaintiffs' claims were facially meritless and subject to dismissal for lack of adversity. *See Availability of Judgment Fund in Cases Not Involving a Money Judgment Claim*, 13 Op. OLC 98, 103 (1989), https://tinyurl.com/ybahrkfp (settlements may only be paid if the "underlying 'cause[]' of a settlement could have led to a money judgment, had no settlement been reached"); U.S. Gov't Accountability Off., GAO-08-978SP, Principles of Federal Appropriations Law 14-35 (3d ed., Vol. III, Sept. 2008), https://tinyurl.com/f5y9snye (there must be a "legitimate dispute over either a liability or an amount"). Because President Trump controls DOJ and the agency defendants in *Trump v. IRS*, he was on both sides of the case. As a result, there was no adversity and thus no Article III case or controversy sufficient to confer jurisdiction. *See E. Tenn.*

24

*V. & G. R. Co. v. S. Tel. Co.,* 125 U.S. 695, 695 (1888) ("[T]here is no longer any real controversy" when one party is "practically both plaintiff and defendant"); *TransUnion*, 594 U.S. at 423-24 (courts are limited to deciding "a real controversy with real impact on real persons").

Indeed, the President confirmed the lack of adversity in statements to the press, noting it was "interesting" being on "both sides of a lawsuit," and that he intended to "work out a settlement with myself."[13] And his administration has repeatedly taken the position that the President alone controls the entire Executive Branch, which would include the agency defendants (and their DOJ counsel) in *Trump v. IRS*. *See, e.g.*, Exec. Order No. 14215, § 7, 90 Fed. Reg. 10447, 10448 (Feb. 24, 2025). The lack of adversity in *Trump v. IRS* was so obvious that the court raised it *sua sponte* and scheduled a May 27 hearing for the parties to address it, but the parties hastily executed the May 18 Agreement before the hearing could took place. *See* Ex. A, Order, *Trump v. IRS*, 26-cv-20609-KMW, ECF No. 41 (April 24, 2026); Ex. B, Order Closing Case, *Trump v. IRS*, 26-cv-20609-KMW, ECF No. 62 (May 18, 2026).

Second, the Judgment Fund statute only authorizes compromise settlements that are "settled and paid in *a manner similar to judgments in like causes*." 28 U.S.C. § 2414 (emphasis added). But the *Trump v. IRS* settlement was a highly unusual departure from how Defendants have handled "like causes." Defendants consciously chose to *forgo* asserting formidable, threshold defenses that the United States had vigorously litigated in similar cases about the unauthorized leaking of taxpayer information by government contractor Charles Littlejohn. *See supra* Background § II. Most notably, DOJ has consistently argued in other cases that sovereign immunity bars claims like the *Trump* plaintiffs' because Littlejohn was not a government

---

[13] Forbes Breaking News, *'I'm Supposed To Work Out A Settlement With Myself': Trump Addresses Lawsuit Against IRS*, at 00:20 (YouTube Feb. 1, 2026), https://tinyurl.com/4p324c59.

employee. *See* Ex. C, U.S. Mot. to Dismiss 2d Am. Compl. at 1-2, *Griffin v. IRS*, 22-cv-24023, ECF 58 (S.D. Fla. Nov. 27, 2023) (so arguing); Ex. D, U.S. Mot. to Dismiss at 1, *Safe Harbor Int'l, LLC v. IRS*, 25-cv-139, ECF 31 (D. Md. July 23, 2025) (same).

But Defendants chose to handle *Trump v. IRS* differently, deciding not to assert strong threshold defenses in response to the President's claims. No attorney for the government even made an appearance in the case. Rather, President Trump's personal attorneys filed a notice of voluntary dismissal of the case with prejudice, signed only by them, on May 18, the same day Defendants executed the collusive "settlement" agreement. By no stretch did Defendants settle *Trump v. IRS* in a "manner similar to . . . like causes." 28 U.S.C. § 2414. The sham settlement instead reflects a clear departure from agency practice and a clear dereliction of Defendants' duties to guard the public fisc against readily refutable legal claims.[14]

### 2.  The May 18 Order is contrary to federal transparency statutes.

The May 18 Order's establishment of the Fund also directly contravenes multiple statutes designed to promote federal agency transparency and accountability.

**The Judgment Fund statute's transparency provision.** Congress amended the Judgment Fund statute in 2019 to provide that the "Secretary of the Treasury shall make available to the public on a website, as soon as practicable, but not later than 30 days after the date on which a payment" is made pursuant to any "compromise settlement" the "name of the specific agency or entity whose actions gave rise to the claim or judgment," the "name of the plaintiff or claimant"

---

[14] The May 18 Agreement notes that the *Trump* plaintiffs "will receive a formal apology from the United States, but will not receive any monetary payment or damages of any kind," and cites a similar government "apology" provided in another case about the Littlejohn leaks. *See* Ex. E, May 18 Agreement ¶¶ III.A (citing *Griffin v. IRS*, 22-cv-24023 (S.D. Fla.)). However, Defendants did not establish any $1.776 billion taxpayer-funded slush fund in connection with the plaintiff's claims in *Griffin*. So the disposition of *Griffin* is not any precedent for Defendants' May 18 Order.

and their "counsel," the "amount[s] paid," and a "brief description of the facts that gave rise to the claim," among other things. 31 U.S.C. § 1304(d). To comply with this requirement, "data is posted every 2 weeks" on the Treasury's Bureau of Fiscal Service's "Judgment Fund website."[15]

The May 18 Order unlawfully structures the Fund to categorically evade § 1304(d)'s 30-day public disclosure mandate. By illegally drawing nearly $1.8 billion from the Judgment Fund in one lump sum and then routing payments to individual claimants through a secretive slush fund, the Order *wholly circumvents* § 1304(d)'s disclosure requirements for the Fund's claimants. In place of complying with § 1304(d), the Order instructs that the Fund shall provide "*confidential* written report[s]" to the "Attorney General" alone, including "the name and address of each claimant who has received any relief and if so, nature of such relief. [sic]" Ex. E, May 18 Agreement ¶ IV.E (emphasis added). Defendants have in effect created an alternative, shadow Judgment Fund subject to no transparency, no public oversight, no judicial review, and no accountability. Construing the Judgment Fund statute as *authorizing* such a shadow slush fund— as Defendants urge—would subvert the plain text and purpose of 31 U.S.C. § 1304(d).

**FOIA and the FRA.** As a threshold matter, the Fund is a de facto "agency" covered by FOIA's disclosure requirements and the FRA's records management requirements, because it is an "establishment in the executive branch" that wields "substantial independent authority." *See CREW v. Off. of Admin.*, 566 F.3d 219, 222 (D.C. Cir. 2009); *see* 5 U.S.C. § 552(f)(1) (FOIA definition of agency); 44 U.S.C. § 2901(14) (FRA definition of agency). The test for agency status requires a "functional approach," *Cotton v. Heyman*, 63 F.3d 1115, 1121 (D.C. Cir. 1995), that examines the entity's "authority and operations." *CREW v. Off. Of Admin*, 566 F.3d at 225; *see*

---

[15] Dep't of the Treasury, Bureau of Fiscal Service, *Bi-Weekly Payment Report* (last updated May 20, 2026), https://tinyurl.com/48bkb25b.

*also CREW v. U.S. DOGE Serv.*, 769 F. Supp. 3d 8, 25 (D.D.C. 2025) (holding that U.S. DOGE Service "is likely exercising substantial independent authority" and thus subject to FOIA and the FRA based on the powers vested in it by executive orders, public statements of DOGE leaders, and reports that DOGE had authority to "identify and terminate federal employees, federal programs, and federal contracts"). Here, the Fund's unfettered final authority to secretly dispense $1.776 billion in taxpayer dollars is "authority much greater than other EOP components held to be covered by FOIA." *Id.* (citing *Soucie v. David*, 448 F.2d 1067, 1073-75 (D.C. Cir. 1971) (Office of Science and Technology), and *Pac. Legal Found. v. Council on Env't Quality*, 636 F.2d 1259, 1262–63 (D.C. Cir. 1980) (Council on Environmental Quality)). The Fund plainly qualifies as an "agency" under controlling D.C. Circuit precedent.

Once the Court concludes that the Fund is operating as an agency covered by FOIA and the FRA, it necessarily follows that the Fund is structurally non-compliant with both statutes. For starters, the FRA mandates that "[t]he head of each Federal agency shall make and preserve records containing adequate and proper documentation of the organization, functions, policies, decisions, procedures, and essential transactions of the agency and designed to furnish the information necessary to protect the legal and financial rights of the Government and of persons directly affected by the agency's activities," 44 U.S.C. § 3101, and "shall" also "establish and maintain an active, continuing program for the economical and efficient management of the records of the agency," *id.* § 3102; *see also id.* §§ 3103-3107; 36 C.F.R. Pt. 1220. Contrary to these requirements, the May 18 Order is entirely silent on records preservation obligations and provides no guidance in compliance with the FRA's mandates. *See* Ex. E, May 18 Agreement ¶ IV.C.

Separately, FOIA mandates that an agency proactively "publish in the Federal Register" information about itself including how the public "may obtain information, make submittals or

28

requests, or obtain decisions," its "rules of procedure" and "substantive rules of general applicability," and its "statements of general policy." 5 U.S.C. § 552(a)(1). FOIA also requires agencies to proactively make available "in an electronic format" all "final opinions" and "orders," "statements of policy and interpretations," "administrative staff manuals," and certain frequently requested records. *Id.* § 552(a)(2). FOIA also requires agencies to "make . . . records promptly available to any person" who makes a "request for records which (i) reasonably describes such records and (ii) is made in accordance with published rules stating the time, place, fees (if any), and procedures to be followed." *Id.* § 552(a)(3)(A). And FOIA requires agencies to "promulgate regulations, pursuant to notice and receipt of public comment, specifying the schedule of fees applicable to the processing of requests under this section and establishing procedures and guidelines for determining when such fees should be waived or reduced." 5 U.S.C. § 552(a)(4)(i). Here again, the May 18 Order facially defies these non-discretionary requirements by giving the Fund total discretion over disclosure of its "procedures," and imposing no public disclosure obligations of any kind. *See* Ex. E, May 18 Agreement ¶ IV.C.

### 3. The May 18 Order is contrary to federal funding statutes.

To protect its exclusive power of the purse, Congress has enacted a web of statutes that restrict federal agencies' use of appropriated funds. *See, e.g.*, 31 U.S.C. § 1532 (Transfer Statute); 31 U.S.C. § 1301(a) (Purpose Statute); 31 U.S.C. §§ 1341–1342 (Antideficiency Act); 31 U.S.C. § 3302(b) (Miscellaneous Receipts Act); *see also Harrington v. Bush*, 553 F.2d 190, 194 (D.C. Cir. 1977) (Congress has "plenary power to give meaning to" the Appropriations Clause). These laws ensure that agencies use appropriated funds only for the purposes intended and within the levels set by Congress. By attempting to "establish funding" for the Fund without an appropriation from Congress and to draw money from the Judgment Fund both to award monetary relief to the

29

Fund's claimants and to pay for the Fund's operations, *see* Ex. E, May 18 Agreement ¶ IV.A; Ex. F, May 18 AG Order ¶¶ C, E, G, Defendants have acted contrary to each of these statutes.

Specifically, the Transfer and Purpose Statutes prohibit Defendants from withdrawing $1.8 billion from the Judgment Fund and crediting that amount to a new agency. First, the Transfer Statute prohibits the transfer of funds between agencies or accounts unless "authorized by law," 31 U.S.C. § 1532, and, as outlined above, no law permits such transfer here. Moreover, the Purpose Statute prohibits Defendants from using amounts in the Judgment Fund for the $1.776 billion Fund. *See* 31 U.S.C. § 1301(a) (providing that "[a]ppropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law"). Absent language explicitly authorizing an expenditure, which is lacking here, under the necessary expense doctrine an appropriation is available for the purpose of an expenditure only if it (1) bears a logical relationship to the appropriation sought to be charged, (2) is not prohibited by law, and (3) is not otherwise provided for by another appropriation. U.S. Gov't Accountability Off., *GAO-17-797SP, Principles of Federal Appropriations Law* 3-16 (4th ed. 2017), https://tinyurl.com/hpc54x2s; *U.S. Dep't of Navy*, 665 F.3d at 1349; *Neguse v. U.S. Immigr. & Customs Enf't*, No. 25-CV-2463 (JMC), 2026 WL 575509, at *13 (D.D.C. Mar. 2, 2026).

In establishing the Judgment Fund as a permanent, indefinite appropriation to pay judgments against the United States, Congress imposed strict controls on the purposes for which those amounts can be used. 31 U.S.C. § 1304(a)(3)(A); 28 U.S.C. § 2414; U.S. Gov't Accountability Off., *GAO-08-978SP, Principles of Federal Appropriations Law* 14-33 (3d ed., Vol. III, Sept. 2008), https://tinyurl.com/f5y9snye; ("[T]he legal availability of the Judgment Fund to pay each award depends upon whether the award satisfies these conditions."); *see also id.* at 14-35 ("There must be a legitimate dispute over either liability or amount."); *see also OPM v.*

*Richmond*, 496 U.S. 414, 432 (1990) (explaining that Congress did "not create an all-purpose fund for judicial disbursement"). Because Defendants' use of the Judgment Fund here does not satisfy the plain language of the Judgment Fund statute, any use of those amounts for the $1.776 billion Fund violates the Purpose Statute. *See supra* Argument § I(D)(1); *see also Dep't of Navy*, 665 F.3d at 1348 ("[A]ll uses of appropriated funds must be affirmatively approved by Congress; the mere absence of a prohibition is not sufficient.").

Even if $1.8 billion could be transferred from the Judgment Fund to Defendants' Fund, the Purpose Statute also would prohibit the Fund from using any amounts to award monetary relief to claimants or pay for the Fund's operations. *Cf.* 31 U.S.C. § 1532 ("[A]n amount authorized to be withdrawn and credited is available for the same purpose and subject to the same limitations provided by the law appropriating the amount."). For one thing, the Judgment Fund statute does not explicitly or implicitly authorize payments to claimants. *See supra* Argument § I(D)(1).

Additionally, since Congress has not waived sovereign immunity for the new "lawfare" and "weaponization" claims the Fund purports to cover, the payment of any such claims is also prohibited by law. *See Dep't of Army v. Fed. Lab. Rels. Auth.*, 56 F.3d 273, 275 (D.C. Cir. 1995) ("[O]fficers of the United States possess no power through their actions to waive an immunity of the United States or to confer jurisdiction on a court in the absence of some express provision of Congress." (quoting *United States v. N.Y. Rayon Importing Co.*, 329 U.S. 654, 660 (1947))); *see also County of Suffolk v. Sebelius,* 605 F.3d 135, 143 (2d Cir. 2010) ("[T]he Judgment Fund does not waive the government's sovereign immunity."). Any waiver of the federal government's immunity must be "'unequivocally expressed[,]' and the statutory provision containing the expression must 'establish unambiguously that the waiver extends to monetary claims.'" *F.D.I.C. v. Meyer*, 510 U.S. 471, 475 (1994); *Dorsey v. U.S. Dep't of Lab.*, 41 F.3d 1551, 1555 (D.C. Cir.

31

1994). No law unequivocally "waives the immunity of the United States to liability for money damages" for the new claims Defendants have created here. *Dep't of Army*, 56 F.3d at 276; Ex. G, Overview (asserting that the Slush Fund will redress claims from individuals "who suffered from lawfare and weaponization," create guidelines for applying to the Fund, and decide which claims will be paid out).

Further, the Judgment Fund neither explicitly nor implicitly provides funding for the operations of an agency established by the Executive without congressional authorization. The Purpose Statute thus prohibits the use of the Judgment Fund to pay for the Slush Fund's "per diems, administrative services, funds, facilities, staff, travel, and other support services as may be necessary to carry out the mission" of the Fund. *See* Ex. F, May 18 AG Order ¶ E; *see supra* Argument § I(D)(1). Critically, because no funds are legally available for the Fund's payments to claimants or its operations, obligating or expending any amounts for these purposes also violates the Antideficiency Act. *See* 31 U.S.C. § 1341; U.S. Gov't Accountability Off., *GAO-06-382SP, Principles of Federal Appropriations Law* 6-79, 6-83 (3d ed., Vol. II, Feb. 2006), https://tinyurl.com/ycxmkmsx.

These statutes collectively support the principle that an agency may not augment its appropriation—which for the Fund is $0—without statutory authority. *Id.* at 6-163 to -164. And the Miscellaneous Receipts Act ("MRA") explicitly requires that a government official who receives money for the government "from any source" deposit the money in the Treasury, 31 U.S.C. § 3302(b). The MRA applies to an agency official who—as with the Fund—receives money from another federal agency that the receiving agency lacks statutory authority to retain. U.S. Gov't Accountability Off., *GAO-06-382SP, Principles of Federal Appropriations Law* 6-167 (3d ed., Vol. II, Feb. 2006), https://tinyurl.com/ycxmkmsx (explaining that "any money an agency

32

receives for the government from a source outside of the agency must be deposited into the Treasury"); *id.* at 6-202 to -203 (explaining that the Economy Act, which authorizes inter- and intra-departmental transfers in exchange for goods or services, "is a statutory exception to the miscellaneous receipts statute").

* * *

By creating the Slush Fund without statutory authorization and empowering it to act in violation of multiple federal statutes, Defendants acted "not in accordance with law," and "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. §§ 705(2)(A), (C). Any one of these statutory violations provides an independently sufficient basis for the Court to "hold unlawful and set aside" the May 18 Order, *id.* § 706(2), and to enjoin its implementation under the Court's equitable authority.

### E. The May 18 Order is arbitrary and capricious (Count V).

Plaintiffs are likely to succeed on their claim that the May 18 Order is arbitrary and capricious. Compl. ¶¶ 184-94. This provision of the APA requires courts to set aside agency action that is "not reasonable" or "reasonably explained.'" *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)). "An agency violates this standard if it 'entirely fail[s] to consider an important aspect of the problem.'" *Carlson v. Postal Regul. Comm'n*, 938 F.3d 337, 344 (D.C. Cir. 2019) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). An agency also acts arbitrarily and capriciously if it fails to "provide a reasoned explanation" for its departure from longstanding agency policy, fails to "display awareness that" it is "changing position," or fails to "consider serious reliance interests." *FDA v. Wages & White Lion Invs.*, 604 U.S. 542, 568 (2025). Defendants' actions here check each box.

33

**1.**  As noted above, the May 18 Order does not explain why any settlement, never mind a $1.776 billion settlement, is warranted to stave off a meritless suit. *See supra* Argument § I.D. The Order fails to consider the lack of adversity in the suit that deprived the court of jurisdiction to issue any relief, nor why defenses it has raised in other challenges arising from the unauthorized release of tax returns were unavailable or unlikely to succeed in President Trump's case. Rather, it appears the May 18 Order was timed to deprive the court from considering these issues and reaching a result disfavored by the President and Defendants.

**2.**  Defendants also arbitrarily and capriciously disregarded potential violations of two constitutional provisions squarely implicated by the May 18 Order: the Domestic Emoluments Clause and Section Four of the Fourteenth Amendment. *See Meredith Corp. v. FCC*, 809 F.2d 863, 874 (D.C. Cir. 1987) (agency's "failure to [consider a constitutional claim]" was the "very paradigm of arbitrary and capricious administrative action" in light of officials' duty and oath to uphold the Constitution).

The Domestic Emoluments Clause provides for the President to receive "a Compensation" fixed by Congress during his term in office and forbids him from "receiv[ing] within that Period any other Emolument from the United States, or any of them." U.S. Const. art. II, § 1, cl. 7. This "sweeping and unqualified" provision, *Applicability of Emoluments Clause to Employment of Government Employees by Foreign Public Universities*, 18 Op. O.L.C. 13, 17 (1994), broadly prohibits the President from receiving any "profit, gain, or advantage" from the federal government. *See District of Columbia v. Trump,* 315 F. Supp. 3d 875, 904 (D. Md. 2018) ("[T]he term 'emolument' … extends to any profit, gain, or advantage, of more than de minimis value, received by him, directly or indirectly, from foreign, the federal, or domestic governments. … In the case of the Domestic Clause, receipt of any emolument is flatly prohibited."), *vacated as moot*,

34

141 S. Ct. 1262 (2021). "[E]xecutive branch precedent and practice" has been "overwhelmingly consistent" with this "expansive view of the meaning of the term 'emolument.'" *Id.* at 901, 902 (citing sources). The May 18 Order provides that the President "will not receive any monetary payment or damages of any kind" from the Fund, Ex. E, May 18 Agreement ¶ III.A—a likely acknowledgment of the constitutional infirmity of any such direct payments. But Defendants failed to consider that granting the President control over the $1.776 billion Fund and its unreviewable choice of beneficiaries, thus permitting the President to secretly convey benefits on his personal allies and supporters, *does* confer a "profit, gain, or advantage" on the President, even absent a direct money payment to him. *D.C.*, 315 F. Supp. at 904.

Defendants also failed to consider that the Fund will likely make payments to insurrectionists in violation of Section Four of the Fourteenth Amendment. In the wake of the Civil War, Americans prohibited "the United States" from "assum[ing] or pay[ing] any debt or obligation incurred in aid of insurrection or rebellion against the United States," and "all such debts, obligations and claims shall be held illegal and void." *See* U.S. Const. amend. XIV, § 4. Among the Fund's expected beneficiaries here, however, are throngs of insurrectionists who have been convicted of brutally attacking police officers and storming the U.S. Capitol to halt the transfer of presidential power on January 6, 2021. *See* Liz Lander, *Ex-Proud Boys leader Enrique Tarrio tells PBS News he believes he's owed tens of millions from DOJ fund*, PBS News (May 22, 2026), https://tinyurl.com/y5m7dme3; Steven T. Dennis, *Jan. 6 Rioters Who Beat Police May Get Payouts, Blanche Says*, Bloomberg Law (May 19, 2026), https://tinyurl.com/2mcjz9xj; Gabe Kaminsky, *Trump's $1.7+ billion fund sparks rush to capitalize: "All J6ers will apply,"* CBS News (May 19, 2026), https://perma.cc/KR7C-25KX; Tom Dreisbach, *A Jan. 6 rioter pardoned by Trump was sentenced to life in prison for child sex abuse*, NPR (Mar. 5, 2026),

https://perma.cc/YLH5-CMDH (quoting official stating January 6 insurrectionist planned to use anticipated government payouts to buy silence of child sexual abuse victim); Susan Carpenter, *Trump Says Government is Talking About Compensation Fund for Jan. 6 Rioters*, Spectrum News NY1 (Mar. 26, 2025), https://tinyurl.com/ywc8m5b2; William Vaillancourt, *J6 Rioters Received Pardons—Now They Want Money*, Daily Beast (Sept. 1, 2025), https://tinyurl.com/mrne9amd.

"Courts have found or described the attack on the Capitol as an insurrection" within the meaning of the Fourteenth Amendment. DOJ, *Final Report on the Special Counsel's Investigations and Prosecutions*, Special Counsel Jack Smith, at 62 (Jan. 7, 2025), https://perma.cc/9WA9-DSUM (citing *Anderson v. Griswold*, 543 P.3d 283, 329 (Colo. 2023), *rev'd on other grounds sub nom. Trump v. Anderson*, 601 U.S. 100 (2024) (per curiam)); *see also New Mexico ex rel. White v. Griffin*, 2022 WL 4295619, at *17 (N.M. Dist. Ct. Sept. 6, 2022) ("The Court concludes that the January 6, 2021 attack on the United States Capitol and the surrounding planning, mobilization, and incitement constituted an 'insurrection' within the meaning of Section Three of the Fourteenth Amendment."), *cert. denied*. No. 23-279 (U.S. Mar. 18, 2024). Paying those who aided a constitutional "insurrection" for costs they incurred defending those charges or sustained because of their participation in the event runs afoul of the Fourteenth Amendment's ban on payments to insurrectionists. Yet Defendants failed entirely to consider this constitutional bar.

**3.** The May 18 Order's "$1.776" billion valuation is also facially arbitrary. It is not a good faith calculation of the United States's legal exposure, but rather an obvious reference to the year of America's founding. The Order fails to offer any reasoned justification for this clearly symbolic, farcical valuation. Despite claiming that the sum "is based on the projected valuation of future claimants' claims," Order ¶ IV.A, Defendants offer no support for that assertion. They made no

36

attempt to ascertain the total number of expected applicants, to analyze the strength of any of their asserted claims, to quantify their supposed damages, or to discern any purported ill-gotten gain. These failures are the height of unreasoned agency decisionmaking.

**4.** The May 18 Order failed to consider how the Fund would incentivize lawbreaking and harm to future victims by claimants who are compensated for their criminal acts. Paying individuals for attempting an insurrection is likely to incentivize similar behavior in the future. Individuals who believe that any attempts to hold them to account are "weaponization" and will be profitable will be emboldened to break other laws, like attacking police officers, Linnaea Honl-Stunkel, Sophia Barriga Hernandez & Alyssa Meiman, *At least 33 pardoned insurrectionists face other criminal charges-but many are now going free*, CREW (Dec. 18, 2025), https://tinyurl.com/y52ekaeb, attempting to murder elected officials, *id.*, and sexually abusing children and using the payout to buy their silence, Tom Dreisbach, *A Jan. 6 rioter pardoned by Trump was sentenced to life in prison for child sex abuse*, NPR (Mar. 5, 2026), https://perma.cc/YLH5-CMDH. Since these are not mere hypotheticals, but rather the actual response of individuals to pardons President Trump has already issued, Defendants' failure to consider these effects was unreasonable.

**5.** The May 18 Order further ignores and silently departs from existing rules and policies against confidential settlements, payments for hypothetical claims, and third-party settlements. *See supra* Argument § I(C) (citing 28 C.F.R. § 50.23 and two Attorney General memos). The Order does not address the Defendants' obligations under 31 U.S.C. § 1304(d) to make public certain details about the settlements or how its provision for "confidential" settlements comports with that duty. Order ¶¶ IV.C, IV.E. Contrary to 28 C.F.R. § 50.23, the Order does not consider the "the public's strong interest in knowing about the conduct of its Government and expenditure of its

resources" and does not require "documentation" of the "rare circumstances" in each settlement that justify departing from that interest. 28 C.F.R. 50.23(b). Nor does the Order address the existing Attorney General memorandum against settlements "to non-governmental, third-party organizations that were neither victims nor parties to the lawsuits" settled. Memorandum from the Attorney General, *Reinstating the Prohibition on Improper Third-Party Settlements* (Feb. 5, 2025), https://perma.cc/UQR3-QVBF. Contrary to that policy, the Order explicitly contemplates payments to individuals and organizations who were not "victims [of] or parties" to the settled matter. Ex. E, May 18 Agreement ¶ III.C (purpose of Fund is to "redress claims of others" who are not among plaintiffs), *id.* ¶ IV.A (Fund's corpus "is based on the projected valuation of future claimants' claims"). Contrary to 31 C.F.R. § 256.1(a), the Fund contemplates payment for those who merely claim victimization, even if there is no viable "actual or imminent litigation."

**6.** Nor does the Order consider any possible alternatives, such as evaluating potential claimants' claims when litigation is imminent and paying any warranted settlements through the Judgment Fund. The wisdom in the settlements aside, that was the path taken by the Defendants in paying over $1 million to President Trump's political allies who claimed they were the subject of weaponization. *See* Holmes Lybrand & Whitney Wild, *Trump Administration to Settle Ashli Babbitt Wrongful Death Suit for $5 Million, Source Says*, CNN (May 19, 2025), https://tinyurl.com/52cs5s26; Andrew Goudsward, *US DOJ Settles Lawsuit from Trump Ally Flynn for $1.25 Million, Source Says*, Reuters (Mar. 25, 2026), https://tinyurl.com/reresfyn. Indeed, several likely applicants to the Fund have lawsuits pending. *See, e.g.*, Complaint, *Sullivan v. United States*, 26-cv-00220 (M.D. Fla. Mar. 27, 2026), https://tinyurl.com/3u5tr5fc; Complaint, *Tarrio v. United States*, 25-cv-998 (M.D. Fla. June 6, 2025), https://tinyurl.com/37nru927. Defendants could settle those claims through the Judgment Fund, subject to public disclosure and

38

judicial approval of a class action settlement. The May 18 Order, however, never discusses this alternative path or explains why the Fund's ad hoc secretive process is preferential. Nor does the Order explain why only victims of supposed "Democrat" weaponization are eligible for payouts, and why an alternative settlement with all victims of improper targeting, including those targeted by President Trump, is not desirable. Ex. E, May 18 Agreement ¶ II.C.

F.      The May 18 Order violates CREW's First Amendment rights.

Defendants have previously settled claims with those whom the Administration considers to be victims of "lawfare" or "weaponization" through settlements and direct payments from the Judgment Fund. *See, e.g.*, Compl. ¶¶ 56, 58. Those payments are, however, subject to the Judgment Fund's transparency requirements. *See supra* Argument § I(A)(1). Such disclosures facilitate public speech, including CREW's speech, critical of the administration's actions. Sherman Decl. ¶¶ 23-24. By structuring the Fund to categorically evade statutory disclosure requirements and to instead make transparency entirely "discretion[ary]," Ex. E, May 18 Agreement ¶ IV.C, Defendants have sought to "reduce[] the quantity of expression," *Buckley v. Valeo*, 424 U.S. 1, 19 (1964), thereby suppressing First-Amendment-protected speech critical of the government's actions by CREW and others.

By depriving CREW of "facts" upon which its speech is based—including facts that must be disclosed by "legal mandate"—Defendants have acted with a "purpose to suppress speech" that "render [their actions] unconstitutional." *Sorrell*, 564 U.S. at 566, 567-68; *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013) (government "may not deny a benefit to a person on a basis that infringes his constitutionally protected … freedom of speech even if he has no entitlement to that benefit"); *Rosenberger v. Rector & Visitors of the Univ. of Va.,* 515 U.S. 819, 828-30 (1995) (government acts intended to disadvantage a particular viewpoint are "presumed to be unconstitutional," and government may not suppress speech that is a result of the

government's "own creation"); *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985) ("the government violates the First Amendment when it denies access to a speaker" to a benefit, even if gratuitously given, "solely to suppress the point of view he espouses"). Settlements with individuals that are unlikely to generate criticism can and likely will be paid out of the Judgment Fund, subject to disclosure. But settlements likely to generate "disfavored speech," *Sorrell*, 564 U.S. at 564, like those involving ideological allies of the President who were purportedly victims of a "sustained use of the levers of government power by Democrat [sic] elected officials … to target individuals, groups, and entities for improper or unlawful political, personal, and/or ideological reasons," Ex. E, May 18 Agreement ¶ II.C, will be channeled to the $1.776 billion slush Fund to be settled quickly and quietly—outside of public view. The May 18 Order thus "imposes burdens that are based on the content of speech and that are aimed at a particular viewpoint," *Sorrell*, 564 U.S. at 565: that of CREW and others critical of this administration's corrupt practices.

## II.    CREW will suffer irreparable injury absent preliminary relief.

"As a preliminary injunction requires only a likelihood of irreparable injury, Damocles's sword does not have to actually fall on [CREW] . . . before the court will issue an injunction." *League of Women Voters of the United States v. Newby*, 838 F.3d 1, 8-9 (D.C. Cir. 2016) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). Here, CREW will suffer multiple forms of irreparable injury absent preliminary relief blocking the unlawful May 18 Order and immediately halting the Fund's operations.

### A.  Irreparable loss of federal records.

The May 18 Order created the Fund and directed the United States to complete the documentation to effectuate the transfer of $1.776 billion by *no later* than July 17, though it could happen *sooner* than that and Defendants' counsel have refused to share a more definitive timeline.

40

Ex. F, May 18 AG Order ¶ C. Yet, as explained above, Defendants erroneously claim the Fund is not subject to the robust records creation and preservation requirements of the FRA. *See supra* Argument § I(D)(2). As a result, it is a virtual certainty that federal records generated by the Fund—including records CREW has already requested through FOIA, intends to request in the future, and plans to utilize in fulfilling its mission-critical functions, *see supra* Argument § I(A)—will be irretrievably lost or destroyed absent preliminary relief.

Courts routinely find that "the threat" of such a loss of government records is a "text book example of irreparable harm," including to CREW specifically. *CREW v. Cheney*, 577 F. Supp. 2d 328, 339 (D.D.C. 2008) (issuing preliminary injunction because if "Defendants' interpretation is not correct as a matter of law, there is no question that documents that may be entitled to [Presidential Records Act ("PRA")] protection will not receive the statute's protections," and "[t]hose unprotected documents could be transferred to other entities, destroyed, or not preserved, and if any of these events occur, the damage is inherently irreparable; once documentary material is gone, it cannot be retrieved."); *see e.g.*, *AHA*, 2026 WL 1412395, at *25-26 (same, reasoning that "[u]npreserved or improperly destroyed documents are 'lost forever to history,' and therefore injury from failure to preserve presidential records or the unlawful destruction of those records would be irreparable"); *Am. First Legal Found. v. Becerra*, 2024 WL 3741402, at *14 (D.D.C. Aug. 9, 2024) (same, reasoning that "the loss or destruction of federal records is a significant harm to both Plaintiff and the public, and . . . it is a harm that cannot be cured once the records are lost or destroyed" because "records that have been destroyed or deleted are almost certain to have been 'lost forever to history'" (quoting *Armstrong v. Bush*, 924 F.2d 282, 288 (D.C. Cir. 1991)); *Armstrong v. Bush*, 807 F. Supp. 816, 820-823 (D.D.C. 1992) (issuing temporary restraining order in case alleging violations of FOIA, FRA, and the PRA to prevent the "immediate and irreparable

41

harm" of records being erased); *CREW v. Off. of Admin.*, 565 F. Supp. 2d 23, 29 (D.D.C. 2008) (granting stay pending appeal because "CREW convincingly argues [] it will suffer irreparable harm if the records . . . are not preserved"). CREW's requested relief blocking the Fund from operating—and, in turn, halting any action that would trigger duties under the FRA—would prevent this irreparable harm to CREW during the pendency of this litigation.

### B. Irreparable loss of notice-and-comment opportunities.

Deprivation of the right to participate in notice and comment *prior to* a regulation or policy's adoption can constitute irreparable harm. *See, e.g.*, *N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 18 (D.D.C. 2009) (finding irreparable harm where "damage done by" agency's violation of notice-and-comment requirements "cannot be fully cured by later remedial action" because agency would be "far less likely to be receptive to comments" once the program structured by the rule "has begun operation," and plaintiff would "never have an equivalent opportunity to influence the Rule's contents"); *Association of Cmty. Cancer Ctrs. v. Azar,* 509 F. Supp. 3d 482, 501 (D. Md. 2020) (same). "Section 553 is designed to ensure that affected parties have an opportunity to participate in and influence agency decision making at an early stage, when the agency is more likely to give real consideration to alternative ideas." *New Jersey v. EPA*, 626 F.2d 1038, 1049 (D.C. Cir. 1980) (cleaned up). And the APA requires that agencies "consider[]" comments, not just receive them. 5 U.S.C. § 553(c). "[P]ermitting the submission of views after the effective date of a regulation is no substitute for the right of interested persons to make their views known to the agency in time to influence the rule making process in a meaningful way." *Am. Fed. of Gov't Emps. v. Block,* 655 F.2d 1153, 1158 (D.C. Cir. 1981). Here, CREW has a right to have its comments on the May 18 Order considered *before* its concrete interests are irreparably harmed by Defendants' impending transfer of nearly $1.8 billion to the Fund.

42

### C.      Irreparable constitutional harms.

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016) (quoting *Elrod*, 427 U.S. at 347). By channeling unpopular settlements through their shadowy Fund, Defendants preclude CREW and others from engaging in timely criticism. Even if those settlements are later made public, "[t]he timeliness of political speech is particularly important." *Elrod*, 427 U.S. at 374 n.29; *see also Payne Enterps. v. United States*, 837 F.2d 486, 494 (D.C. Cir. 1988) ("[S]tale information is of little value"). CREW will have irretrievably lost its ability to analyze and criticize those actions in the days and weeks that elapse: criticism that could dissuade the administration from engaging in any settlements that could occur in the interlude or persuade Congress to prevent the administration from doing so. Once payments from the slush fund are made, any criticism, or any judicial order enabling that criticism, is likely to be "too little, too late." *Nat'l Trust for Historic Pres.*, 2026 WL 877779, at *15 n.19; *see also CREW v. OMB*, 791 F. Supp. 3d at 57 (finding that CREW was irreparably harmed by deprivation of timely access to information about matters of "ongoing, imminent concern[]" concerning federal spending); *CREW v. DOJ*, 2026 WL 472589, at *12 (D.D.C. Feb. 19, 2026) (same, concerning elections); *Neguse v. ICE*, 813 F. Supp. 3d 45, 98 (D.D.C. 2025) (members of Congress irreparably harmed by denial of access to information that was "'time-sensitive and highly probative' to the Members' ongoing duties").

Similarly, Defendants' "violation of [the] constitutional separation of powers" causes "immediate or ongoing harm stemming from [their] alleged constitutional defects." *John Doe Co. v. CFPB*, 849 F.3d 1129 (D.C. Cir. 2017); *see also Bond*, 564 U.S. at 223. Defendants' usurpation of Congress's decision to subject settlement authority to public disclosure by routing controversial

43

settlements through the Fund for secretive resolution will imminently deprive CREW of time-sensitive information to which it is statutorily entitled.

**III.     The balance of equities and public interest strongly favor preliminary relief.**

The final two factors for preliminary relief—which "merge when the Government is the opposing party," *Nken v. Holder*, 556 U.S. 418, 435 (2009)—weigh heavily in CREW's favor. CREW's strong likelihood of success on the merits itself establishes that the equities and public interest favor preliminary relief because "there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations," and "generally no public interest in the perpetuation of unlawful agency action." *Newby*, 838 F.3d at 12 (cleaned up). "Further, this case involves the Government's violation of []appropriations statute[s] passed by Congress and signed by the President," and "[t]he public has an interest in ensuring that 'statutes enacted by their representatives are not imperiled by executive fiat." *Neguse*, 813 F. Supp. 3d at 98. "Congress is the collective voice of the American people in our system of government, and the Constitution itself vests authority" to create and fund agencies in Congress, not the Executive. *See Nat'l Trust for Historic Pres.*, 2026 WL 877779, at *16. And "there is always a strong public interest in the exercise of free speech rights otherwise abridged by an unconstitutional regulation." *Pursuing Am.'s Greatness*, 831 F.3d at 511.

The other side of the scale, by contrast, is empty. Defendants' only purported harm is having to follow the longstanding, transparent Judgment Fund process for compromise settlements against the United States—rather than its secretive new slush fund process for claims the administration subjectively deems "lawfare" and "weaponization"—"while judicial review of its new [action] runs its course." *District of Columbia v. USDA,* 444 F. Supp. 3d 1, 45 (D.D.C. 2020). "That hardship pales in comparison to the injuries asserted by" CREW. *Id.* Pausing the May 13 Order until the Court can determine its lawfulness merely "preserve[s] the relative positions of the

44

parties" as they existed prior to May 18, 2026. *Robertson v. Cartinhour,* 429 F. App'x 1, 3 (D.C. Cir. 2011). That will cause Defendants no harm.

**IV.    The Court should issue an immediate TRO and subsequently, or in the alternative, stay and preliminarily enjoin Defendants' May 18 Order.**

Given the opacity of Defendants' unlawful actions, the threatened irreparable loss of federal records, and the imminent transfer of $1.776 billion in taxpayer money from the Judgment Fund to an unidentified "Designated Account" before any opportunity for notice and comment, CREW requests that this Court enter a TRO immediately restraining Defendants from effectuating the May 18 Order. In the alternative, or subsequent to an immediate TRO, a stay of Defendants' May 18 Order is the appropriate preliminary relief to preserve the status quo ante while this case proceeds. *See* 5 U.S.C. § 705. In cases such as this one where vacatur of the agency action would be the "normal remedy under APA section 706," a stay of the unlawful agency action under § 706 is the proper form of interim relief. *See Coal. for Humane Immigrant Rts. v. Noem*, 805 F. Supp. 3d 48, 103 (D.D.C. 2025) (holding that § 705 authorizes courts to "preliminarily 'set aside' a new agency [action]'" (quoting *Trump v. CASA, Inc.*, 606 U.S. 831, 869 (2025) (Kavanaugh, J., concurring)); *Make the Rd. N.Y. v. Noem,* 2025 WL 3563313, at *16 (D.C. Cir. Nov. 22, 2025) ("[A] stay under Section 705 functions as a 'temporary form of vacatur.'"). The Court may also supplement § 705 relief with preliminary injunctive relief, to the extent it deems temporary vacatur alone insufficient. *See supra* n.12 (citing cases).

## CONCLUSION

The Court should grant CREW's motion for a temporary restraining order or, in the alternative, a § 705 stay and preliminary injunction.

Dated: May 28, 2026

Respectfully Submitted,

*/s/ Nikhel S. Sus*
Kayvan Farchadi (D.C. Bar No. 1672753)
Nikhel S. Sus (D.C. Bar No. 1017937)
Stuart C. McPhail (D.C. Bar No. 1032529)
Stephen J. Buckingham (D.C. Bar No. 1562756)*
CITIZENS FOR RESPONSIBILITY AND
ETHICS IN WASHINGTON
P.O. Box 14596
Washington, DC 20044
(202) 408-5565
kfarchadi@citizensforethics.org
nsus@citizensforethics.org
smcphail@citizensforethics.org
sbuckingham@citizensforethics.org

* Admitted *pro hac vice*

46