**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **Citizens for Responsibility and Ethics in Washington** | |
| Plaintiff, | Case No. 1:26-cv-1789-RJL |
| v. | |
| **Department of Justice, et al.**, | |
| Defendants. | |

<u>**DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR A TEMPORARY
RESTRAINING ORDER, OR, IN THE ALTERNATIVE, A STAY UNDER 5 U.S.C. § 705
AND PRELIMINARY INJUNCTION**</u>

## TABLE OF CONTENTS

Introduction ..........................................................................................................................1

Background ...........................................................................................................................5

Procedural History ...............................................................................................................9

Legal Standard ...................................................................................................................10

Argument ...........................................................................................................................10

    I.        PLAINTIFF'S CLAIMS ARE NOT JUSTICIABLE ...................................................10

    A.  This Case Is Moot ........................................................................................................10

    B.  Plaintiff Lacks Standing ..............................................................................................11

    C.  Plaintiff's Claims Are Not Ripe For Adjudication .......................................................16

    II.       PLAINTIFF HAS NO LIKELIHOOD OF SUCCESS ON THE MERITS .................19

    A.  Plaintiff's Separation Of Powers Claim Fails .............................................................19

    B.  Plaintiff's APA Claims Fail .........................................................................................20

          i.       All APA claims fail because there has been no final agency action .........20
          ii.      Even if there had been final agency action, notice and comment would not have been required ...................................................................21
          iii.     The order does not exceed statutory authority .........................................21
          iv.     The order is not arbitrary and capricious ................................................22

    C.  Plaintiff's First Amendment Claim Fails .........................................................................23

    III.     PLAINTIFF CANNOT DEMONSTRATE IRREPARABLE HARM ........................24

    IV.    THE BALANCE OF EQUITIES AND PUBLIC INTEREST DO NOT SUPPORT ENJOINING OR STAYING A FUND THAT DOES NOT EXIST ..........24

Conclusion .........................................................................................................................25

i

**INTRODUCTION**

This dispute concerns an Anti-Weaponization Fund that had not been set up and is now not going forward. As a result, Plaintiff's claims are not justiciable. Federal courts may resolve "active political debate[s] . . . only if necessary to do so in the course of deciding an actual 'case' or 'controversy'" as those words are "used in the Constitution." *Hollingsworth v. Perry*, 570 U.S. 693, 697, 700 (2013). Article III of the Constitution is thus "an essential limit" on judicial power. *Id.* at 700. "It ensures that [courts] act as *judges*, and do not engage in policymaking properly left to elected representatives." *Id.* at 700. That remains true even when there is a high-profile "controversy" in the *non*-Article III sense. *Id.* After all, "[f]ederal courts are not roving commissions licensed to sally forth each day looking for wrongs to right." *Margolin v. Nat'l Ass'n of Immigr.n Judges*, 608 U.S. ---, 2026 WL 1463466 at *2 (2026) (internal quotation marks and citations omitted). Opining on abstract issues is all the more inappropriate when challengers have already received "the precise relief that [they] requested," rendering a case "moot." *New York State Rifle & Pistol Ass'n, Inc. v. City of New York*, 590 U.S. 336, 338–39 (2020). Those principles control here. The United States thus opposes Plaintiff's request for relief on justiciability and other grounds—not because the Fund will continue (it will not), but to protect the government's institutional interests in the proper application of Article III limitations on judicial review.

Plaintiff asks this Court to have the last word in a political debate. On May 18, 2026, the Department of Justice announced through a Settlement Agreement the establishment of "The Anti-Weaponization Fund," which would provide a systematic process to hear and redress certain claims alleging use of the levers of government power to target individuals, groups, and entities for improper and unlawful reasons. ECF No. 10-7. The Acting Attorney General issued a corresponding order the same day. ECF No. 10-8. The Settlement Agreement and order garnered

1

significant attention and provoked widespread debate about the weaponization of government, whether and how any claims process should function, and past settlements reached by other administrations. But when Plaintiff filed this case, no money had been transferred to the Fund. No mechanisms were in place for formally submitting, receiving, processing, granting, or denying claims. Indeed, none of the five contemplated "Members" who would establish and administer such procedures for the Fund had even been appointed. And after Plaintiff filed this case, the political process continued to play out. On June 2, 2026, the Acting Attorney General told Congress that although "the reasons for the Fund remain important," the Fund is "not going forward, period." House Appropriations Committee, Oversight Hearing – Department of Justice, at 40:30-42:50. [1]

Plaintiff nevertheless seeks, through "expeditious proceedings" an order to "[e]njoin the Fund from continuing to operate … [e]njoin Treasury from transferring funds" to the Fund, and "[e]njoin the Fund from disbursing any award payments." ECF No. 1 at 49. Plaintiff's motion for emergency relief claims that the Fund violates the separation of powers, the Administrative Procedure Act (APA), and the First Amendment. ECF No. 10-1 at 15-40. But the Court need not reach those claims, because this is not a case or controversy within the meaning of Article III. Plaintiff's claims are moot. In light of the Acting Attorney General's statements to Congress on June 2, 2026, the claims are "no longer embedded in any actual controversy about [Plaintiff's] particular legal rights." *Alvarez v. Smith*, 558 U.S. 87, 93 (2009).

Really, they never have been justiciable; Plaintiff has always lacked standing. From the start, Plaintiff could not show any "injury in fact that is concrete, particularized, and actual or

---

[1] *Available at* https://www.youtube.com/watch?v=rt_bIvnvq3o. Because the Acting Attorney General's statements were recorded, this Court can take judicial notice of them. *See* Fed. R. Evid. 201(b)(2) ("The court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.").

imminent," let alone an injury that "would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). Because courts are not "general complaint bureaus," a "federal taxpayer" does not have standing just because the taxpayer thinks that a "federal expenditure" is unlawful. *Hein v. Freedom From Religion Found., Inc.*, 551 U.S. 587, 593 (2007). And Plaintiff's purported "informational injuries," ECF No. 10-1 at 10, are illusory. Plaintiff has not been denied any information. The Fund was not set up. There are no Members and therefore no procedures in place. And if the Fund had ever been set up, the information Plaintiff seeks could have been subject to release under the Members' express "discretion" to make Fund matters "public in whole or in part." ECF No. 10-7 at 2. Indeed, the Settlement Agreement expressly incorporates any applicable federal law, including law governing the disclosure of information. *Id.* at 4–5 (Settlement Agreement does not impose requirements "inconsistent with federal statutes"). But this is all academic: Any information about the adjudication of claims, or monetary transfers or payments, does not (and now will not) exist.

Plaintiff's ancillary standing theories fare no better. Plaintiff claims "First Amendment injuries." ECF No. 10-1 at 14. But Plaintiff's convoluted theory is just that a "process that deprives [Plaintiff] of facts" will have downstream effects on Plaintiff's "speech." *Id.* This is the same informational non-injury dressed up in constitutional garb, and it fails for the same reasons. So do Plaintiff's purported "procedural injuries," which are unexplained except by reference to the same "informational and constitutional" theories already discussed. *Id.*

Nor can Plaintiff demonstrate redressability. "Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement." *Steel Co. v. Citizens for a Better Env't.*, 523 U.S. 83, 107 (1998). But Plaintiff's requested relief—enjoining the Fund—could not redress, and is untethered from, the supposed

denial of information on which all of Plaintiff's claimed injuries rest. The appropriate remedy for a denial of information would be the disclosure of that information, not enjoining the Fund's (non-existent) "continued operations." ECF No. 10-1 at 15.

That leads to another "justiciability doctrine" that independently bars review— "ripeness." *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 807–08 (2003). Ripeness depends on "(1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Id.* at 808. A lawsuit is not "ripe for judicial review . . . until the scope of the controversy has been reduced to more manageable proportions, and its factual components fleshed out, by some concrete action" that applies to the challenger "in a fashion that harms or threatens to harm [them]." *Id.* Here, there has been (and will be) no concrete action. The dubious assumptions underlying all of Plaintiffs' theories about how the Fund might have operated confirm there is no basis for judicial intervention.

Because mootness, standing, and ripeness are all fatal to Plaintiff's motion, there is no need to reach the merits. But to be clear, Plaintiff does not come close to establishing a likelihood of success on the merits. Plaintiff's separation of powers claim ignores that past administrations have used similar claim adjudication mechanisms. Plaintiff's APA claims fail to allege any final agency action, among other defects. And Plaintiff's First Amendment claim fails because Plaintiff has not been restrained from engaging in any protected speech or activity.

Nor can Plaintiff satisfy the other factors for prospective equitable relief. Plaintiff is not suffering irreparable harm, or any harm. The balance of equities and public interest also cut against opining on the Fund after it has already been halted but before it ever took shape. Such matters are best "hashed out in the 'hurly-burly, the give-and-take of the political process between the legislative and the executive.'" *Trump v. Mazars USA, LLP*, 591 U.S. 848, 859 (2020) (quoting

4

Hearings on S. 2170 et al. before the Subcommittee on Intergovernmental Relations of the Senate Committee on Government Operations, 94th Cong., 1st Sess., 87 (1975) (A. Scalia, Assistant Attorney General, Office of Legal Counsel).  That is exactly what has happened.

The Court should deny Plaintiff's motion.

## BACKGROUND

In anticipation of the 2020 election, Charles Littlejohn obtained a job as an IRS contractor with the goal of leaking President Donald J. Trump's tax data.  Littlejohn leaked President Trump's tax returns (and the tax data of his sons Donald J. Trump, Jr. and Eric Trump, as well as the Trump Organization, LLC) to the New York Times in 2019, and the New York times published stories about the returns starting in September 2020.  Littlejohn separately stole tax data for thousands of wealthy individuals and shared that information with another media company.  Under 26 U.S.C. § 7213(a)(1), the unauthorized disclosure of tax return information is a felony.  Littlejohn was eventually caught, convicted, and sentenced to the maximum five years in prison.  *See* U.S. Department of Justice, *Former IRS Contractor Sentenced for Disclosing Tax Return Information to News Organizations* (Jan. 29, 2024). [2]

The federal tax code provides a right of action for taxpayers whose returns have been leaked to bring a civil action for damages against the United States.  26 U.S.C. § 7431(a)(1).  And under the federal Privacy Act, when an agency fails to "establish appropriate . . . safeguards to insure the security and confidentiality of records and to protect against any anticipated threats or hazards to their security or integrity which could result in substantial harm, embarrassment, inconvenience, or unfairness to any individual on whom information is maintained," an injured individual "may bring a civil action against the agency."  5 U.S.C. § 552a(e)(10), (g)(1).

---

[2]   *Available at* https://www.justice.gov/archives/opa/pr/former-irs-contractor-sentenced-disclosing-tax-return-information-news-organizations.

5

In 2022, another victim of Littlejohn's leak sued the United States in the Southern District of Florida and invoked these provisions. *See Griffin v. IRS*, 1:22-cv-24023 (S.D. Fla.). The United States unsuccessfully moved to dismiss the tax code claim on the ground that as a contractor, Littlejohn was not an employee of the United States. *See Griffin*, ECF No. 108 at 4–7. The court contemplated summary judgment proceedings, and potentially a trial, on that question. *See id.* at 10. And although the court held that the victim did not adequately allege damages under the Privacy Act, the court appeared to assume that the Privacy Act would otherwise apply. *See id.* at 9–10. Ultimately, the victim settled with the United States for a formal apology.[3]

On January 29, 2026, President Trump, Donald J. Trump, Jr., Eric Trump, and The Trump Organization, LLC filed a complaint in the U.S. District Court for the Southern District of Florida. *See President Donald J. Trump, et al. v. IRS*, 1:26-cv-20609-KMW, ECF No. 1 (Jan. 29, 2026). They asserted claims under 26 U.S.C. § 6103, 26 U.S.C. § 7431, and 5 U.S.C. 552(a)(e)(10). *See id.* Their counsel indicated that they intended to amend their complaint to add a putative class claim. ECF No. 10-7 at 1. President Trump had also submitted Federal Tort Claims Act (FTCA) administrative claims for relief alleging an unlawful raid on his home, Mar-a-Lago, in Palm Beach, Florida, as well as unlawful targeting in relation to the infamous Russia-collusion hoax. *See id.*

Because President Trump is the Chief Executive, his lawsuits against the United States presented unique challenges. At the same time, Presidents do not forfeit their legal rights. Ultimately, the federal defendants agreed to resolve the litigation and pre-litigation FTCA administrative claims without the United States having to give the plaintiffs a "monetary payment or damages of any kind," as memorialized by a Settlement Agreement dated May 18, 2026. ECF

---

[3] WALL STREET JOURNAL, *The IRS Apologizes to Ken Griffin* (June 26, 2024), *available at* https://www.wsj.com/opinion/the-irs-apologizes-to-ken-griffin-citadel-taxdata-charles-littlejohn-propublica-d18b 1917.

No. 10-7 at 1. Instead, the plaintiffs would "receive a formal apology." *Id.* The plaintiffs waived all claims that could have been asserted in connection with the litigation and administrative claims process. *Id.* at 2. And the United States agreed to establish "a systematic process to hear and redress claims of others who, like Plaintiffs, state that they incurred harm from similar Lawfare and Weaponization" through "The Anti-Weaponization Fund." *Id.*

The Settlement Agreement states that the Attorney General, within 30 days of the settlement, would enter an order to "establish funding and any other relevant requirements, rules, conditions, terms, and waivers" and "issue an order appointing [five] Members, including the Chair." ECF No. 10-7 at 2. "One of the Members shall be chosen in consultation with congressional leadership," and all members would continue in their roles until the Fund concludes, "unless they resign or are removed by the President." *Id.* The Members comprising the Fund would "have the power to determine its own procedures for submitting, receiving, processing, and granting or denying claims." *Id.* And the "Fund may make those procedures public in whole or in part, in its discretion," while taking reasonable steps to protect private personal and financial information submitted to [the Fund] under th[e] Settlement Agreement." *Id.* at 2, 4.

The Settlement Agreement further states that the "Fund shall have the power to issue formal apologies, issue monetary relief owed to claimants as a result of their legal rights, grant claims in whole or in part, deny claims in whole or in part, defer review of claims, and receive and request evidence or other support for claims, including requesting information from, or consulting with, federal agencies." ECF No. 10-7 at 2–3. And "[o]n a quarterly basis, or otherwise as directed by the Attorney General, The Anti-Weaponization Fund shall provide to the Attorney General a confidential written report that includes the name and address of each claimant who has received any relief and if so, the nature of such relief." *Id.* at 3. The Fund would "cease processing claims

no later than December 1, 2028," and the Fund would "transfer [any remaining] balance . . . to the Department of Commerce, Interior, or another appropriate federal government account as designated by the President." *Id.* (citing 43 U.S.C. §§ 1473, 1737(c); 15 U.S.C. § 1522).

The Settlement Agreement states that "To be eligible for relief, a claimant must assert at least one legal claim stating that the claimant was a victim of Lawfare and/or Weaponization." ECF No. 10-7 at 3.    In evaluating claims, the Fund would "consider the totality of the circumstances," including

> a. The strength of the claim and supporting evidence.
> b. The claimant's actions.
> c. The claimant's actual damages . . . .
> d. Reasonable attorneys' fees paid by the claimant as a result of the Lawfare and Weaponization.
> e. Any time the claimant spent in prison . . . or custody as a result of the Lawfare and Weaponization.
> f. Whether and to what extent the claimant has already obtained any form of relief . . . from any source.
> g. Other factors The Anti-Weaponization Fund deems just and appropriate.

*Id.* at 3–4.

The Settlement Agreement clarifies that it does not "impose on Defendants . . . any duty, obligation, or requirement, the performance of which would be inconsistent with federal statutes." ECF No. 10-7 at 4–5.

On May 18, 2026, the Attorney General issued an order pursuant to the Settlement Agreement. *See* ECF No. 10-8.  The order stated that the United States would "provide the U.S. Department of the Treasury with all necessary forms and documentation to direct a payment of $1,766,000,000 to an account for the sole use by the Anti-Weaponization Fund" "[w]ithin 60 days."

*Id.* at 1.  The order also noted that previous cases have been settled on similar terms.  *See id.* at 1–2 (citing, e.g., *Keepseagle v. Vilsack*, 102 F. Supp. 3d 306, 309 (D.D.C. 2015)). [4]

## PROCEDURAL HISTORY

On May 22, 2026, Plaintiff—Citizens for Responsibility and Ethics in Washington, a political nonprofit—filed this lawsuit.  ECF No. 1.

Although counsel for the United States informed counsel for Plaintiff that no money had been transferred to the Fund, Plaintiff has moved for a temporary restraining order or preliminary injunction and for a stay under 5 U.S.C. § 705.  ECF No. 10.  Plaintiff seeks an order requiring Defendants to "halt, suspend, and cease all operations" of the Fund, cease "taking any action to transfer funds" to the Fund, and "preserve all records related to the Fund."  ECF No. 10-12 at 1-2.

After Plaintiff filed its motion, Political debate surrounding the Fund—and similar past settlements, *see* n.4, *supra*—continued.  On June 2, 2026, the Acting Attorney General testified at a congressional hearing:

> A: ". . . We're not moving forward with the Fund . . . We are not moving forward with the Fund, period. . . . The reasons for the Fund remain as important as they were before, but we are not moving forward with the Fund."
>
> Q: "Not moving forward ever?"
>
> A: "Correct."

---

[4] The *Keepseagle* settlement "created a Compensation Fund . . . of $680,000,000" that would be paid through a "Non-Judicial Claims Process."  102 F. Supp. 3d at 309.  Unlike the Anti-Weaponization Fund, which would revert any balance to the federal government, the *Keepseagle* settlement provided for "leftover" money to be distributed to persons and entities that the plaintiffs' class counsel designated as having benefited Native American farmers and ranchers.  *See id.*  Such persons and entities included "non-profit organizations."  *Id.* (alteration omitted).  When the non-judicial claims process concluded, "approximately $380,000,000 remained leftover," leading to further settlement modifications and litigation about what persons and entities would receive the remaining funds.  *Id.* at 310.  The Obama administration also administratively created a voluntary claims process for Hispanic and women farmers, without requiring the filing of a prior lawsuit, by making over $1.3 billion available from the Judgment Fund (plus up to $160 million in debt relief).  Department of Justice, *Department of Justice and USDA Announce Process to Resolve Discrimination Claims of Hispanic and Women Farmers* (Feb. 25, 2011), *available at* https://www.justice.gov/archives/opa/pr/department-justice-and-usda-announce-process-resolve-discrimination-claims-hispanic-and-women; *see also Garcia v. Vilsack*, No. 00-2445 (D.D.C.); *Love v. Vilsack*, No. 00-02502 (D.D.C.).

Q: "Oh, there's no more Fund then."

A: "Well, to the extent there was a Fund.  Remember, the Fund wasn't set up yet.  There were no commissioners named, there were no claims made yet, so yes we are not moving forward with the Fund."

\*\*\*

Q: . . . Is there any way that you could put this in writing . . . ?

A: I'm telling you it's not . . . Notwithstanding what we do in those litigations and protecting our rights and making sure those rights are protected, we're not moving forward with the Fund.

House Appropriations Committee, Oversight Hearing – Department of Justice, at 40:30-42:50.

## LEGAL STANDARD

"To obtain a TRO, the plaintiff must show '(1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the TRO were not granted, (3) that the TRO would not substantially injure other interested parties, and (4) that the public interest would be furthered by the TRO.'" *Nat'l Tr. for Hist. Pres. in United States v. Nat'l Park Serv.*, 813 F. Supp. 3d 42, 43–44 (D.D.C. 2025) (Leon, J.).  When the government is a party, the balance of equities and public interest "merge."  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  And "[t]he factors governing issuance of a preliminary injunction also govern issuance of a § 705 stay."  *Casa de Maryland, Inc. v. Wolf*, 486 F. Supp. 3d 928, 950 (D. Md. 2020) (quoting *District of Columbia v. Dep't of Agric.*, 444 F. Supp. 3d 1, 16 (D.D.C. 2020)).

## ARGUMENT

### I.    PLAINTIFF'S CLAIMS ARE NOT JUSTICIABLE

#### A. This Case Is Moot

Under Article III, federal courts can exercise jurisdiction over only "Cases" and "Controversies."  U.S. Const. Art. III, § 2, cl. 1.  "The case or controversy requirement limits the

10

role of the Federal Judiciary in our system of separated powers." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 378 (2024).

This case is moot, and thus does not present a "Case" or "Controversy," because "the issues presented are no longer live [and] the parties lack a legally cognizable interest in the outcome." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (internal quotation marks omitted). The Acting Attorney General's statements to Congress make it "absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Id.* (quotation omitted). And that is true "[n]o matter how vehemently the parties continue to dispute the lawfulness of the conduct that precipitated the lawsuit." *Id.* Because "the court is not empowered to decide moot questions," *People of State of Cal. V. San Pablo & T.R. Co.*, 149 U.S. 308, 314 (1893), this case should be dismissed in its entirety.

## B. Plaintiff Lacks Standing

In truth, this case has *never* presented an Article III Case or Controversy. Federal courts do not "operate as an open forum for citizens 'to press general complaints about the way in which government goes about its business.'" *All. for Hippocratic Med.,* 602 U.S. at 379 (quoting *Allen v. Wright*, 468 U.S. 737, 760 (1984)). For the same reason, "taxpayer standing" does not exist just because a plaintiff "challenges [a] Government expenditure." *Hein*, 551 U.S. at 593. "The requirement that the plaintiff possess a personal stake helps ensure that courts decide litigants' legal rights in specific cases, as Article III requires, and that courts do not opine on legal issues in response to citizens who might 'roam the country in search of government wrongdoing.'" *All. for Hippocratic Med.*, 602 U.S. at 379 (quoting *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 487 (1982)). Standing doctrine also "tends to assure that the legal questions presented to the court will be resolved, not in the rarified

11

atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action." *Valley Forge*, 454 U.S. at 472. "[T]he standing requirement means that the federal courts may never need to decide some contested legal questions: 'Our system of government leaves many crucial decisions to the political processes,' where democratic debate can occur and a wide variety of interests and views can be weighed." *All. For Hippocratic Med.*, 602 U.S. at 380 (quoting *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 227 (1974)).

"[T]o establish standing, a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion*, 594 U.S. at 423. "And standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." *Id.* at 431.

The first requirement, "injury in fact," requires an injury that is "real and not abstract," and "particularized" to "the plaintiff in a personal and individual way" (rather than a "generalized grievance"). *All. for Hippocratic Med.*, 602 U.S. at 381 (internal quotation marks omitted). To count as a concrete harm, an alleged injury must have a "close relationship" to a harm "traditionally recognized as providing a basis for a lawsuit in American courts." *TransUnion*, 594 U.S. at 424 (internal quotation marks omitted). "The most obvious are traditional tangible harms, such as physical harms and monetary harms." *Id.* at 425. Certain "intangible harms can also be concrete" if they have a sufficient historical pedigree "as providing a basis for lawsuits in American courts." *Id.* "And when a plaintiff seeks prospective relief such as an injunction, the plaintiff must establish a sufficient likelihood of future injury." *All. for Hippocratic Med.*, 602 U.S. at 381.

To establish causation, a plaintiff must show that his alleged "injury likely was caused or likely will be caused by the defendant's conduct." *Id.* at 382. When a plaintiff does not challenge government action "that require[s] or forbid[s] some action by the plaintiff," causation "is ordinarily substantially more difficult to establish." *Id.* (internal quotation marks omitted). That is partly because "plaintiffs attempting to show causation generally cannot 'rely on speculation about the unfettered choices made by independent actors not before the courts.'" *Id.* at 383 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 415 n.5 (2013)). "The causation requirement precludes speculative links" where "downstream injury to plaintiffs" is not "sufficiently predictable," as well as "attenuated links . . . where the government action is so far removed from its distant (even if predictable) ripple effects." *Id.*

To establish redressability, a plaintiff must show "a likelihood that the requested relief will redress the alleged injury." *Steel Co.*, 523 U.S. at 103. Such relief must benefit the plaintiff "as opposed to the citizenry at large" or the "undifferentiated public interest." *Id.* at 106, 107. "[A]lthough a suitor may derive great comfort and joy" from a favorable judgment because they would believe "the United States Treasury is not cheated, that a wrongdoer gets his just deserts, or that the Nation's laws are faithfully enforced, that psychic satisfaction is not an acceptable Article III remedy because it does not redress a cognizable Article III injury." *Id.* at 107.

As those principles make clear, Plaintiff flunks the standing inquiry at every step. For the same reasons this case is moot, Plaintiff cannot "establish a sufficient likelihood of future injury" to seek injunctive relief. *All. for Hippocratic Med.*, 602 U.S. at 381. And as an ideological objector to a proposed program that could have resulted in government expenditures, Plaintiff has always been no different from the many litigants who have unsuccessfully sought to invoke taxpayer

13

standing; Plaintiff has no individualized interests distinct from "the interests of the public at large."

*Hein*, 551 U.S. at 600; *see also* ECF No. 10-1 (invoking "taxpayer" rhetoric fifteen times).

Plaintiff nevertheless argues that it is suffering "informational injuries" because the Fund "evade[s] disclosure and records preservation obligations" under federal law.  ECF No. 10-1 at 10. To be sure, "[a] plaintiff claiming informational standing suffers a concrete injury if he is denied information that a 'statute entitled him to receive.'" *Am. First Legal Foundation v. Greer*, 153 F.4th 1311, 1315 (D.C. Cir. 2025) (quoting *Am. Soc'y for Prevention of Cruelty to Animals v. Feld Ent., Inc.*, 659 F.3d 13, 23 (D.C. Cir. 2011)).  But that is clearly not the case here.  As an initial matter, the information that Plaintiff wants—about Fund "payment[s]" and "procedures," ECF No. 10-1 at 26, 29; *see also* ECF No. 10-1 at 12–13 ("disclosure of award decisions, claimant and counsel identities, award amounts, and descriptions of the basis of claims"), indisputably does not (and now will not) exist.  There are no payments or claims or procedures, because there is no Fund. That should be the end of this case.

Regardless, any assumption that the Fund would have operated in conflict with federal disclosure laws rests on sheer speculation.   Indeed, the Settlement Agreement expressly contemplates the application of "federal statutes."  ECF 10-7 at 5.  The fact that the Settlement Agreement elsewhere gives the hypothetical Members "discretion" to make any or all "procedures public" must be read against that backdrop recognition of federal statutory requirements.  ECF No. 10-7 at 2.[5]  If anything, the potential for the Members to have provided transparency above and beyond such requirements reinforces the speculative layers of Plaintiff's standing theory.  *If* the

---

[5] Plaintiff also appears to assume, incorrectly and without explanation, that the Fund would have needed to promulgate its own FOIA regulations.  *See* ECF No. 10-1 at 29.  Plaintiff is familiar with the Department of Justice's FOIA regulations.  *See* 28 C.F.R. Part 16.  After all, Plaintiff submitted a FOIA request relating to the Fund the same day it filed this lawsuit.  See ECF No. 10-10.  And on May 28, 2026, the Department's Office of Information Policy granted Plaintiff's request for expedited processing.  *See* Ex. A.  Because Plaintiff has not suffered any informational injury under FOIA, any theory of harm sounding in FOIA cannot give rise to standing for this lawsuit.

14

Fund had ever been set up, *if* the information that Plaintiff seeks ever existed, and *if* Plaintiff were ever denied that information, then Plaintiff might have had standing.  In this dispute rather than that hypothetical, Plaintiff's claimed injury is "too indeterminable, remote, uncertain, and indirect to furnish a basis for an appeal to the preventive powers of the Court."  *Hein*, 551 U.S. at 600. [6]

Plaintiff's other claimed injuries do not move the needle.  Plaintiff seeks to transform its faulty information theory into an equally faulty First Amendment theory.  *See* ECF No. 10-1 at 14.  Specifically, Plaintiff claims it is suffering a "loss of First Amendment freedoms" because the information Plaintiff seeks would eventually "generate speech critical of the government by [Plaintiff]."  *Id.*  This downstream-speech theory fails for the reasons already discussed—and because a denial of government information is not a First Amendment injury regardless.  *See McBurney v. Young*, 569 U.S. 221, 232 (2013) ("The Constitution itself is not a Freedom of Information Act" (internal quotation marks and alteration omitted)).  Plaintiff also claims to be suffering "procedural injuries."  ECF No. 10-1 at 14.  But those injuries rely entirely on the same baseless "informational and constitutional injuries."  *Id.* [7]  So Plaintiff has no cognizable injury in connection with any of its claims.

Even if Plaintiff had articulated an injury, Plaintiff would run into a fatal redressability problem.  Plaintiff must have standing not only as to each claim, but also as to each "form of

---

[6] Plaintiff's theory fails for another reason. An "asserted informational injury that causes no adverse effects cannot satisfy Article III." *TransUnion*, 594 U.S. at 442. But Plaintiff "ha[s] identified no downstream consequences' from failing to receive the required information." *Id.* (internal quotation marks omitted). Plaintiff cannot explain how it would "use and disseminat[e]" information, ECF No. 10-1 at 13, now that it is clear the information Plaintiff discusses in its motion does not exist.

[7] Additionally, "the 'deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient' to confer Article III standing." *Greer* 153 F.4th at 1314 (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009)). A procedural right must be "afforded to [the plaintiff] by statute and designed to protect their threatened concrete interest." *Id.* (quoting *Ct.r for Law & Educ. V. Dep't of Educ.*, 396 F.3d 1152, 1157 (D.C. Cir. 2005). The APA's notice-and-comment requirements, which do not apply here anyway, obviously were not designed to facilitate Plaintiff's interest in, *e.g.*, "operating . . . tracking projects." ECF No. 10-1 at 13.

relief." *TransUnion*, 594 U.S. at 431.  Plaintiff asks this Court to shut down all Fund operations, halt any financial transfers, and require Defendants to preserve records (and, in a footnote in its brief, Plaintiff now includes a drive-by request for vacatur).  ECF No. 10-12; ECF No. 10-1 at 20 n.12.  But all of Plaintiff's claimed injuries boil down to a purported lack of information.  Any denial of information would not support, and has nothing to do with, halting non-existent Fund operations and transactions.  The only remedy that even relates to redressing the sort of informational injury Plaintiff claims is Plaintiff's request for records preservation.[8]  But according to Plaintiff, such records would relate to "the organization, functions, policies, decisions, procedures, and essential transactions of the [Fund]."  ECF No. 10-1 at 28.  There are, and will not be, any such records.

With no real injury for this Court to redress, there is little doubt what Plaintiff is actually seeking:  the "psychic satisfaction" of a "favorable judgment."  *Steel Co.*, 523 U.S. at 107.  But federal courts do not "exercise general legal oversight of the . . . Executive Branch[.]"  *TransUnion*, 594 U.S. at 423–24.

### C.  Plaintiff's Claims Are Not Ripe For Adjudication

This is a rare case that is simultaneously moot *and* premature.  One of the reasons Plaintiff is forced to speculate so much about how the Fund would operate—and one of the reasons why there has never been Fund information for Plaintiff to seek—is because so little has happened.  As a result, ripeness doctrine bars Plaintiff's claims as well.

Ripeness doctrine "rest[s] both on Article III concepts and on discretionary reasons of policy."  Wright & Miller, Fed. Practice and Procedure § 3532 (3d ed. April 2026 update).  It requires analyzing "(1) the fitness of the issues for judicial decision and (2) the hardship to the

---

[8] Plaintiff also ignores that the Settlement Agreement's express severability clause would apply to any unlawful prohibition on disclosure.  *See* ECF No. 10-7 at 5

parties of withholding court consideration." *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. at 808. For a controversy to be ripe, its "factual components" should be "fleshed out, by some concrete action" that applies to the challenger "in a fashion that harms or threatens to harm them." *Id.* Ripeness is thus lacking when a claim or injury depends on "contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998). Plaintiff has the "burden of proving ripeness, and its allegations are not entitled to presumptive truthfulness." *Beach TV Props., Inc. v. Solomon*, 254 F. Supp. 3d 118, 131 (D.D.C. 2017).

Plaintiffs cannot carry that burden here. They have not been denied any of the information that they seek about the Fund. Indeed, no Fund Members were appointed. No claims procedures were established. No claims were formally submitted, received, adjudicated, granted, or denied. And no claimant received money. Even if any of those things had happened, Plaintiff would have needed to have requested and been denied information for the Court to have an adequate factual basis to evaluate Plaintiff's claims. Plaintiff's underlying assumption that the government would simply disregard records preservation laws (or somehow take the position that federal laws do not apply) warrants no weight in these circumstances. And the Acting Attorney General's statements to Congress about the Fund not going forward underscore that any request for information could have been handled differently than Plaintiff expected. Now, any potential informational disputes will not "occur at all." *Texas*, 523 U.S. at 300. The United States is not aware of any federal court ever adjudicating a claim in similar circumstances. To the contrary, courts routinely decline to adjudicate claims based on speculative fears. *Texas*, 523 U.S. at 301 (challenge that relied on contingent and uncertain action by State authorities under state law "involve[d] too remote and abstract an inquiry for the proper exercise of the judicial function").

17

There is also no hardship to Plaintiff from this Court withholding consideration of its claims. The bare existence of the Settlement Agreement and corresponding order has no "direct effect on the day-to-day" operations of Plaintiff. *Texas*, 523 U.S. at 301. And Plaintiff cannot rely on "abstraction[s]" in the absence of some "primary conduct [that] is affected." *Id.* at 302. The "hardship . . . of biding [their] time" is thus "insubstantial." *Id.* By contrast, requiring the parties to litigate in the abstract, without a concrete set of facts against which to analyze Plaintiff's claims, would cause the parties significant hardship.

It would also cause this Court hardship. "Unnecessary decisions dissipate judicial energies better conserved for litigants who have a real need for official assistance." Wright & Miller, *supra*, § 3532.1. "Prudentially, the ripeness doctrine exists to prevent the courts from wasting [their] resources by prematurely entangling [them]selves in abstract disagreements, and, where, as here, other branches of government are involved, to protect the other branches from judicial interference until their decisions are formalized and their 'effects felt in a concrete way by the challenging parties.'" *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1431 (D.C. Cir. 1996) (quoting *Abbot Lab'ys v. Gardner*, 387 U.S. 136, 148–49 (1967)).

The Court should thus let the political resolution regarding the Fund stand on its own. "[T]he values of avoiding unnecessary constitutional determinations and establishing proper relationships between the judiciary and other branches of the federal government lie at the core of ripeness policies." Wright & Miller, *supra*, § 3532.1. And, as the Acting Attorney General's recent statements illustrate, "refusal to decide may itself be a healthy spur to inventive private or public planning that alters the course of possible conduct so as to achieve the desired ends in less troubling or more desirable fashion." *Id.*

18

## II.   PLAINTIFF HAS NO LIKELIHOOD OF SUCCESS ON THE MERITS

Given all those justiciability issues, there is no need to reach the merits.  That said, Plaintiff's claims are not likely to succeed.

### A.  Plaintiff's Separation Of Powers Claim Fails

Plaintiff's separation-of-powers arguments are meritless.

*First*, Plaintiff argues that the Fund impermissibly creates an Executive Branch "agency." ECF No. 10-1 at 16.  But (i) this purported agency has no people, processes, or funding; and (ii) the Department of Justice has previously provided for claims administration processes using third-party adjudicators.  *See, eg.*, *Keepseagle v. Vilsack*, 815 F.3d 28, 30 (D.C. Cir. 2016).  No one suggested the *Keepseagle* adjudicators comprised an "agency."  So it would be especially odd to treat the similar and hypothetical Fund as one.  Congress may have the "power of the purse" as a general matter.  ECF No. 10-1 at 16.  But *Keepseagle* and other similar settlements suggest no violation.

*Second*, Plaintiff appears to raise an argument under the Appointments Clause.  *See* ECF No. 10-1 at 17-18.  But Plaintiff does not try to explain how it could have standing to challenge appointments of Fund Members who have not been and will not be appointed.  Regardless, the Members are not "officers," because they exercise limited, temporary authority to administer a Settlement Agreement.  *See Freytag v. C.I.R.*, 501 U.S. 868, 881 (1991) (distinguishing adjudicators who work "on a temporary, episodic basis, whose positions are not established by law, and whose duties and functions are not delineated in a statute").  Notably, Plaintiff's contrary argument would imply that the *Keepseagle* adjudicators were improperly appointed.  *See* n.4, *supra*.  Thus, even if the Fund differs in certain respects from that third-party claims commission, which lacked meaningful oversight, Plaintiff is wrong to suggest a "lack of historical precedent." ECF No. 10-1 at 19.

19

### B. Plaintiff's APA Claims Fail

Plaintiff spends most of its motion raising a kitchen sink of APA claims. But those claims fail at the threshold, because there is nothing like final agency action here. And in treating the Settlement agreement and accompanying order like federal regulations, Plaintiff badly misapplies inapt APA principles.

#### i. *All APA claims fail because there has been no final agency action.*

The APA contemplates judicial review of "final agency action." 5 U.S.C. § 704. "[T]wo conditions generally must be satisfied for agency action to be 'final' under the APA." *U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 578 U.S. 590, 597 (2016). "First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)). Agency action is nonfinal, and thus not subject to judicial review under the APA, when it "does not itself adversely affect [the] complainant but only affects his rights adversely on the contingency of future administrative action." *DRG Funding Corp v. Secretary of Housing and Urban Development*, 76 F.3d 1212, 1214 (D.C. Cir. 1996) (quoting *Rochester Tel. Corp. v. United States*, 307 U.S. 125, 130 (1939)).

Here, there is no final agency action. Not even close. The Settlement Agreement and accompanying order do not award relief on any claims or even establish formal processes for the Fund to do so—that would have been up to the Members, who were not even appointed. No rights or obligations were determined, and no legal consequences flowed—let alone rights, obligations, or consequences that directly impact Plaintiff. Plaintiff's argument that the Attorney General's May 18 order "is a legislative rule," ECF No. 10-1 at 20, simply ignores these threshold

requirements for final agency action—which are fatal to all of Plaintiff's APA arguments, *see* ECF No. 10-1 at 20-39.

ii.    *Even if there had been final agency action, notice and comment would not have been required.*

Plaintiff suggests that the order accompanying the Settlement Agreement was subject to notice-and-comment requirements as a "legislative rule." ECF No. 10-1 at 20. Putting aside the fact that this theory has no connection to Plaintiff's claimed informational injury, Plaintiff's characterization of the order as a "seismic shift" in "law or policy" (while continuing to rely on made-up "secrecy provisions" that are not in the order), *id.* at 20-21, ignores that the order contemplated a single fund, did not create any generally applicable policy, and cited similar historical examples. Approving Plaintiff's theory would also have problematic and unpredictable consequences. Entertaining notice-and-comment challenges to settlement agreements would drain significant administrative, court, and party resources.

iii.    *The order does not exceed statutory authority.*

Plaintiff rehashes its argument that the order exceeds statutory authority and violates transparency and funding statutes. *See* ECF No. 10-1 at 22-33. Those arguments fail for the reasons already discussed. But a few points warrant emphasis.

First, Plaintiff's opinions about whether the *Trump v. IRS* lawsuit was "meritless," ECF No. 10-1 at 24, are irrelevant. Given the justiciability problems in this case, it is hard to take Plaintiff's simplistic discussion of "Article III" (which, among other problems, ignores the fact that there were several co-plaintiffs in *Trump v. IRS*) seriously. *Id.* And Plaintiff's suggestion that the United States must treat every case identically, *see* ECF No. 10-1 at 25-26, is plainly incorrect.

21

Second, the Settlement Agreement requires claimants to "assert at least one legal claim," and "[t]he strength of the claim" would have been relevant to the Fund's assessment. ECF No. 10-7 at 3. Plaintiff appears to miss that basic point entirely.

Third, Plaintiff's arguments about transparency only reinforce the many reasons why this case is not justiciable. ECF No. 10-1 at 26-29. Plaintiff's lengthy discussion of purported requirements after a payment is made just highlights the fact that no payment has been or will be made. The same goes for Plaintiff's arguments about sovereign immunity. *See* ECF No. 10-1 at 31; *see Millbrook v. United States*, 569 U.S. 50, 52 (2013) (Federal Tort Claims Act waives sovereign immunity for certain claims).

### iv.    The order is not arbitrary and capricious.

Plaintiff appears to assume that ordinary arbitrary-and-capricious review applies to a settlement agreement contemplating the establishment of a claims process to be implemented by hypothetical Members. ECF No. 10-1 at 34. Even if that were the case, Plaintiff ignores the actual explanation in the settlement agreement. It was intended to address "conduct . . . representative of the sustained use of the levers of government power . . . in order to target individuals, groups, and entities for improper and unlawful political, personal, and/or ideological reasons." ECF No. 10-7 at 1. Plaintiff does not meaningfully challenge that rationale. *See* ECF No. 10-1 at 34.

Instead, Plaintiff shoehorns two "potential" constitutional theories into its arbitrary and capricious claim. ECF No. 10-1 at 34. Plaintiff invokes the Domestic Emoluments Clause, even though the President cannot submit a claim or receive any "economic benefit" under the Settlement Agreement. *See* ECF No. 10-7 at 2. Plaintiff's argument—that indirect "control" of the Fund, based on ability to remove Fund Members, constitutes an emolument, ECF No. 10-1 at 35—proves too much. Under Article II, the President has similar control over all Executive Branch agencies. Plaintiff's additional characterizations of the Fund as violating the Fourteenth Amendment's

22

prohibition on paying debts or obligations "incurred in aid of insurrection or rebellion against the United States," *id.* (citing U.S. Const. amend. XIV § 4), and as "incentiviz[ing] lawbreaking," *id.* at 37, are so moot, premature, speculative, paranoid, and hyperbolic that they do not warrant a detailed response. Plaintiff ignores that the Settlement Agreement states that claimants must assert "at least one legal claim" and contemplates "monetary relief" only where the Fund determines that such relief is "owed to claimants as a result of their legal rights." ECF No. 10-7 at 2, 3.

Finally, Plaintiff's argument that the Fund's $1.776 billion ceiling is "arbitrary," ECF No. 10-1 at 36, ignores that any leftover money would revert to the federal government. In Plaintiff's view, every settlement must explain all of the underlying reasoning and expressly address the infinite number of "possible alternatives." *Id.* at 38. That cannot be right. Regardless, even Plaintiff appears to recognize that its arbitrary-and-capricious theories are "hypothetical." *Id.* at 37.

## C. Plaintiff's First Amendment Claim Fails

Plaintiff's First Amendment argument, spanning less than 1.5 pages, is equally without merit. *See* ECF No. 10-1 at 39-40. As noted above, there is generally no constitutional right to government information. *See McBurney*, 569 U.S. at 232. Plaintiff's contrary argument misleadingly pieces together language from *Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011). The Supreme Court did not hold that a plaintiff suffers a First Amendment injury when the government withholds information subject to disclosure law. *See* ECF No. 10-1 at 39. To the contrary, *Sorrell* distinguished between "a governmental denial of access to information in its possession" and the "government . . . prohibiting a speaker from conveying information that the speaker already possesses." *Id.* at 568 (internal quotation marks omitted). Here, there is no arguable "purpose to suppress speech." *Contra* ECF No. 10-1 at 39.

23

Even accepting Plaintiff's incorrect legal framework, Plaintiff would not have a colorable First Amendment Claim.  For the reasons discussed above, Plaintiff's speculative premise that it would have been denied information is unfounded.

### III.   PLAINTIFF CANNOT DEMONSTRATE IRREPARABLE HARM

Plaintiff's irreparable harm arguments essentially duplicate Plaintiff's standing arguments. *See* ECF No. 10-1 at 40-44.  Plaintiff cannot show irreparable harm for all the same reasons Plaintiff's claims are moot, they lack standing, and their claims are not ripe.  There are no covered records to which Plaintiff could irreparably lose access.  There is no agency action for Plaintiff to have notice of, or comment on.  And Plaintiff's speech has not been impacted at all.  If the Court denies Plaintiff's motion for emergency prospective relief, it will not cause Plaintiff any cognizable injury, let alone an irreparable one.

### IV.   THE BALANCE OF EQUITIES AND PUBLIC INTEREST DO NOT SUPPORT ENJOINING OR STAYING A FUND THAT DOES NOT EXIST

The equities and the public interest do not favor this Court interjecting itself in a political process to shut down a Fund that never got off the ground and is not going forward.  As noted above, the Fund has been the subject of vigorous public debate.  That process may seem messy. But the push-and-pull of such debate is a feature of our constitutional republic.  Indeed, one of the main points of Article III is that "the federal courts decide some contested legal questions later rather than sooner, thereby allowing issues to percolate and potentially be resolved by the political branches."  *All. For Hippocratic Med.*, 602 U.S. at 380.  By nevertheless accepting Plaintiffs' baseless standing theories and meritless claims, the Court would effectively unwind a preferable political resolution.  All in service of Plaintiffs who are classic ideological objectors rather than genuinely injured parties.  That would undermine, rather than promote, the "constitutional separation of powers" that Plaintiff claims to be defending.  ECF No. 10- 1 at 43.

24

## CONCLUSION

The Court should deny Plaintiffs' motion for a temporary restraining order or a preliminary injunction and a § 705 stay.[9]


Date: June 5, 2026

STANLEY E. WOODWARD, JR.
*Associate Attorney General*


/s/ ANDREW J. BLOCK
Andrew J. Block
*Senior Counsel to the Associate Attorney General*
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530

*Counsel for Defendants*

---

[9] If the Court is inclined to grant the Plaintiffs' motion for a preliminary injunction—which it should not for all the reasons stated in this brief—the Defendants request that the Court requires the Plaintiffs to post a bond, pursuant to Fed. R. Civ. P. 65(c), in the amount of the damages the Plaintiffs allege to have suffered or, in the alternative, the cost to the United States to litigate this unripe case.

**Certificate of Service**

I hereby certify that on June 5, 2026, I filed the foregoing document with the Clerk of Court using the Court's CM/ECF system, thereby serving all counsel who have appeared in this case.

/s/ *Andrew J. Block*
Andrew Block