**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

CITIZENS FOR RESPONSIBILITY AND
ETHICS IN WASHINGTON,

      Plaintiff,

      v.

U.S. DEPARTMENT OF JUSTICE, *et al*.,

      Defendants.

Case No. 26-cv-1789-RJL

**REPLY IN SUPPORT OF
PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER, OR, IN THE
ALTERNATIVE, A STAY UNDER 5 U.S.C. § 705 AND PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................................................ii

INTRODUCTION ........................................................................................................... 1

SUPPLEMENTAL BACKGROUND ................................................................................ 3

I.      The May 29 Order in *Floyd v. DOJ*................................................................. 3

II.     The Acting Attorney General's June 2 congressional testimony......................... 3

III.    The President's June 3 statements about the Fund ............................................ 4

IV.     The parties' conferrals concerning this motion ................................................. 4

ARGUMENT .................................................................................................................. 5

I.      CREW's claims are justiciable. ........................................................................ 5

        A.    Defendants have not met their heavy burden to show this case is moot. .................... 5

        B.    CREW has standing.................................................................................. 9

        C.    CREW's claims are ripe. ........................................................................ 11

II.     CREW is likely to succeed on the merits........................................................ 12

        A.    Defendants' establishment of the Fund was final agency action. ............................. 13

        B.    Defendants' establishment of the Fund violated the separation of powers.............. 14

        C.    Defendants violated the APA's notice-and-comment requirements in establishing the Fund.............................................................................................. 16

        D.    Defendants' establishment of the Fund lacked statutory authorization. .................. 17

        E.    Defendants' establishment of the Fund affirmatively violated multiple statutes...... 19

        F.    Defendants' establishment of the Fund was arbitrary and capricious....................... 20

        G.    Defendants' establishment of the Fund violated CREW's First Amendment rights. 22

III.    CREW will be irreparably harmed absent preliminary relief. .......................... 22

IV.     The equitable factors weigh strongly in favor of preliminary relief. ................ 25

V.      The Court can convert CREW's motion to one for partial summary judgment under Rule 65(a)(2)................................................................................................. 25

CONCLUSION............................................................................................................ 25

**TABLE OF AUTHORITIES**

**Cases**

*Am. Hist. Ass'n v. Trump*,
2026 WL 1412395 (D.D.C. May 20, 2026)........................................................................19, 23

*Bank Markazi v. Peterson*,
578 U.S. 212 (2016)............................................................................................................12

*Bennett v. Spear*,
520 U.S. 154 (1997)......................................................................................................13, 14

*Campaign for Accountability v. DOJ*,
155 F.4th 724 (D.C. Cir. 2025)............................................................................................10

*Consumers' Rsch. v. Consumer Prod. Safety Comm'n*,
91 F.4th 342 (5th Cir. 2024) ...............................................................................................11

*Corner Post, Inc. v. Bd. of Govs. of Fed. Rsrv. Sys.*,
603 U.S. 799 (2024).............................................................................................................11

*CREW v. DOJ*,
846 F.3d 1235 (D.C. Cir. 2017)............................................................................................10

*Ctr. for Biological Diversity v. U.S. Int'l Dev. Fin. Corp.*,
77 F.4th 679 (D.C. Cir. 2023)...................................................................................9, 10, 11

*Curtis 1000, Inc. v. Suess*,
24 F.3d 941 (7th Cir. 1994) ................................................................................................25

*Dep't of Navy v. FLRA*,
665 F.3d 1339 (D.C. Cir. 2012) .....................................................................................14, 16

*FBI v. Fikre*,
601 U.S. 234 (2024)..............................................................................................................5

*FDA v. Wages & White Lion Invs.*,
604 U.S. 542 (2025).............................................................................................................21

*First Choice Women's Res. Ctrs., Inc. v. Davenport*,
146 S. Ct. 1114 (2026).........................................................................................................5

*Free Enter. Fund v. PCAOB*,
561 U.S. 477 (2010).............................................................................................................14

*Freytag v. C.I.R.*,
501 U.S. 868 (1991).............................................................................................................15

*Friends of Animals v. Jewell*,
824 F.3d 1033 (D.C. Cir. 2016)............................................................................................11

*Hearth, Patio & Barbecue Ass'n v. EPA*,
11 F.4th 791 (D.C. Cir. 2021)..............................................................................................11

*Hinge v. Lyons*,
2026 WL 787875 (D.D.C. Mar. 20, 2026).............................................................................8

*In re Admin. Subpoena 25 1431 032 to R.I. Hosp.*,
2026 WL 1392565 (D.R.I. May 14, 2026) ............................................................................2

*In re Al-Nashiri*,
47 F.4th 820 (D.C. Cir. 2022)........................................................................................11, 12

**Cases—continued**

*ITServe All., Inc. v. DHS*,
71 F.4th 1028 (D.C. Cir. 2023) .................................................................................17

*Keepseagle v. Perdue*,
856 F.3d 1039 (D.C. Cir. 2017) ...............................................................................16

*Keepseagle v. Vilsack*,
815 F.3d 28 (D.C. Cir. 2016) ..............................................................................15, 16

*Keepseagle v. Vilsack*,
No. 99-cv-03119 (D.D.C. Nov. 1, 2010) ..................................................................16

*L.A. Police Dep't v. United Reporting Publ'g Corp.*,
528 U.S. 32 (1999) ...................................................................................................22

*League of Women Voters of the U.S. v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) .....................................................................................23

*LULAC v. Exec. Off. of the President*,
780 F. Supp. 3d 135 (D.D.C. 2025) ..........................................................................20

*Marbury v. Madison*,
5 U.S. 137 (1803) .....................................................................................................12

*McBurney v. Young,*
569 U.S. 221 (2013) ..................................................................................................22

*Medellin v. Texas*,
552 U.S. 491 (2008) ..................................................................................................15

*Media Matters for Am. v. FTC*,
805 F. Supp. 3d 105 (D.D.C. 2025) ....................................................................12, 23

*Morris v. District of Columbia*,
38 F. Supp. 3d 57 (D.D.C. 2014) ..............................................................................25

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ...................................................................................................21

*N. Am. Butterfly Ass'n v. Wolf*,
977 F.3d 1244 (D.C. Cir. 2020) .................................................................................9

*N.Y. Stock Exch. LLC v. SEC*,
2 F.4th 989 (D.C. Cir. 2021) .....................................................................................17

*Nat'l Council of Nonprofits v. OMB*,
775 F. Supp. 3d 100 (D.D.C. 2025) ............................................................................8

*NJOY v. iMiracle*,
760 F. Supp. 3d 1070 (S.D. Cal. 2024) .....................................................................24

*Pub. Citizen, Inc. v. FERC*,
92 F.4th 1124 (D.C. Cir. 2024) ..................................................................................6

*Ramirez v. ICE*,
568 F. Supp. 3d 10 (D.D.C. 2021) .............................................................................24

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
592 U.S. 14 (2020) ...................................................................................................24

**Cases—continued**

*Row 1 Inc. v. Becerra,*
  92 F.4th 1138 (D.C. Cir. 2024) ................................................................6, 7

*Safari Club Int'l v. Zinke,*
  878 F.3d 316 (D.C. Cir. 2017) ...............................................................16, 17

*San Francisco v. Trump,*
  897 F.3d 1225 (9th Cir. 2018) ......................................................................19

*Sorrell v. IMS Health Inc.,*
  564 U.S. 552 (2011) .....................................................................................22

*Speech First, Inc. v. Fenves,*
  979 F.3d 319 (5th Cir. 2020) .........................................................................7

*Sugar Cane Growers Co-op. of Fla. v. Veneman,*
  289 F.3d 89 (D.C. Cir. 2002) ......................................................................17

*Texas v. United States,*
  523 U.S. 296 (1998) .....................................................................................11

*Texas v. United States,*
  798 F.3d 1108 (D.C. Cir. 2015) ...................................................................12

*Trinity Lutheran Church of Columbia, Inc. v. Comer,*
  582 U.S. 449 (2017) ...................................................................................2, 7

*True the Vote, Inc. v. IRS,*
  831 F.3d 551 (D.C. Cir. 2016) .......................................................................8

*Trump v. IRS,*
  No. 26-cv-20609, ECF 65 (S.D. Fla. May 29, 2026) .....................................2

*Trump v. IRS,*
  No. 26-cv-20609 (S.D. Fla.) ................................................................ *passim*

*Trump v. United States,*
  603 U.S. 593 (2024) (Thomas, J., concurring) ...........................................15

*United Reporting v. Cal. Highway Patrol,*
  No. 96-cv-0888-B (S.D. Cal. Aug. 14, 2001) ..............................................22

*United States v. Arthrex, Inc.,*
  594 U.S. 1 (2021) .........................................................................................15

*United States v. Donziger,*
  38 F.4th 290 (2d Cir. 2022) .........................................................................15

*Waterkeeper All. v. EPA,*
  853 F.3d 527 (D.C. Cir. 2017) ...............................................................10, 11

*West Virginia v. EPA,*
  597 U.S. 697 (2022) ...................................................................................6, 9

*Zukerman v. USPS,*
  961 F.3d 431 (D.C. Cir. 2020) .......................................................................5

**Statutes, Rules, and Regulations**

28 U.S.C. § 2414 ................................................................................................................17, 18

5 U.S.C.

    § 551(4) ............................................................................................................................17

    § 552(a) ............................................................................................................................19

    § 553 ................................................................................................................................16

    § 702 ................................................................................................................................11

    § 704 ................................................................................................................................11

31 U.S.C.

    § 1304 ..............................................................................................................................17

    § 1304(d) .....................................................................................................................19, 22

44 U.S.C.

    § 3101 ..............................................................................................................................19

    § 3102 ..............................................................................................................................19

D.D.C. Local Civ. R. 7(b) ......................................................................................................12

Fed. R. Civ. P. 65(a)(2) ..........................................................................................................25

**Other Authorities and Materials**

DOJ (@TheJusticeDept), X (June 1, 2026, 3:32 PM) .................................................................3

Exec. Order No. 14215, 90 Fed. Reg. 10447 (Feb. 24, 2025) ...............................................8, 24

House Appropriations Committee, *Oversight Hearing–Department of Justice*,
    (YouTube, June 2, 2026) ...................................................................................................3

Pod Force One with Miranda Devine and New York Post, *Donald Trump
    Unleashed: Bibi, "Are You Effing Crazy?!"* (YouTube June 3, 2026) ...................................4

Press Release, DOJ, *Attorney General Jeff Sessions Ends Third Party Settlement
    Practice* (June 7, 2017) ....................................................................................................15

**INTRODUCTION**

Defendants' opposition only confirms that the charter documents unlawfully creating the "Anti-Weaponization Fund" remain *in full force and effect*. No intervening events have changed that legal reality. By their plain terms, the May 18 "settlement" agreement in *Trump v. IRS*, No. 26-cv-20609 (S.D. Fla.), and the accompanying May 18 order of the Acting Attorney General comprise a single, integrated legal instrument. *See* Ex. E, May 18 Agreement ¶¶ IV.A, VII.[1] And that instrument "may be modified *only with the written agreement of the Parties*" in *Trump v. IRS*. *Id.* ¶ VIII (emphasis added). Defendants have provided no evidence that the parties in *Trump v. IRS* executed a written modification of the May 18 Agreement, and they have refused repeated requests to rescind the Fund's creation in writing. So long as the Fund's charter documents remain in effect, nothing stops Defendants from illegally siphoning, at any given moment, nearly $1.8 billion in taxpayer dollars from the Treasury's Judgment Fund to an unidentified "Designated Account" and rapidly disbursing those funds to whomever they want under a shroud of secrecy, in violation of the Constitution and multiple federal transparency and funding statutes.

Defendants wrongly claim that this case was rendered moot by the Acting Attorney General's vague statements to Congress on June 2 that Defendants are "not moving forward with the Fund." *See infra* Suppl. Background § II. Far from it. The Acting Attorney General's remarks had *no legal effect whatsoever* on the May 18 Agreement, which by its terms can be modified "only by written agreement of the Parties" in *Trump v. IRS*. Defendants also selectively omit damning portions of the Acting Attorney General's testimony confirming that the May 18 "settlement agreement" remains in effect and repeatedly refusing to issue a written rescission of the Fund's charter documents or otherwise "put[] anything in writing." *See id.* And the President—

---

[1] All exhibits cited in this brief are attached to the Sherman Declaration. *See* ECF 10-2.

who is both the Acting Attorney General's superior officer and the lead plaintiff in *Trump v. IRS*—explicitly *denied* he was abandoning the Fund the day after the Acting Attorney General's testimony and reaffirmed that he thinks potential Fund recipients "should be reimbursed for a crooked government." *See infra id.* § III. Because these public statements show the Administration has not in fact abandoned the Fund, and because "there is no clearly effective [legal] barrier that would prevent the [Defendants] from reinstating [the Fund] in the future," Defendants have fallen woefully short of their "'heavy burden' of making 'absolutely clear' that it could not revert to" proceeding with the Fund. *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 457 n.1 (2017) (citation omitted). As a result, this case continues to present a live, justiciable controversy, and Defendants' unlawful actions continue to create substantial risks of irreparable harm to CREW requiring this Court's intervention.

There is ample reason to be skeptical of Defendants' representations. Through their sham settlement of *Trump v. IRS* and unlawful creation of the Fund, Defendants conducted what may be the single most corrupt act of self-dealing by any administration in American history. The district court overseeing *Trump v. IRS* recently ordered the parties to brief "charges of collusion and whether the Parties are truly adverse," whether dismissal of the case "was premised on deception by the Parties," and whether "the case should be reopened because the Court was the 'victim of a fraud.'" Order, *Trump v. IRS*, No. 26-cv-20609, ECF 65 (S.D. Fla. May 29, 2026), https://perma.cc/8BTE-CWLJ. Now, Defendants seek to deprive *this Court* of jurisdiction to review an operative final agency action, based purely on non-binding statements that they are "not moving forward with the Fund." In these extraordinary circumstances, "[t]he presumption of regularity that has previously been extended to DOJ that it could be taken at its word—with little doubt about its intentions and stated purposes—no longer holds." *In re Admin. Subpoena 25 1431*

2

*032 to R.I. Hosp.*, 2026 WL 1392565, at \*10 (D.R.I. May 14, 2026) (quoting *United States v. Oregon*, 2026 WL 318402, at \*11 (D. Or. Feb. 5, 2026)) (cleaned up). This Court must intervene.

## SUPPLEMENTAL BACKGROUND

### I.      The May 29 Order in *Floyd v. DOJ*

The day after CREW filed its motion, *see* ECF 10, the U.S. District Court for the Eastern District of Virginia temporarily enjoined several defendants in this case "from taking any further action pursuant to the creation or operation of the Anti-Weaponization Fund." Order at 1, *Floyd v. DOJ*, No. 26-cv-1399, ECF 31 (E.D. Va. May 29, 2026) ("*Floyd* Order") (filed in this case at ECF 12-1). The court issued this temporary relief to allow time for "full briefing" and consideration of the plaintiffs' motion for preliminary relief, given the government's refusal to commit to not transferring money to the Fund or processing or paying claims until the plaintiffs' motion is resolved. *See id.* at 1 n.1. On June 1, DOJ posted on X that it "disagrees strongly" with the *Floyd* Order, but that it will "abide by the Court's ruling." DOJ (@TheJusticeDept), X (June 1, 2026, 3:32 PM), https://perma.cc/4DQA-XBSW. The *Floyd* Order will expire as soon as June 12, two days after the June 10 motion hearing in this case.

### II.      The Acting Attorney General's June 2 congressional testimony

On June 2, the Acting Attorney General testified at a congressional oversight hearing. When asked what DOJ's "plans were for the Fund after June 12," the Acting Attorney General replied, "we're not moving forward with the Fund," while stressing that the "reasons for the Fund" are "something that President Trump talked about for a long time, which is the fact that there were a lot of people in this country who had their government weaponized against them," and those reasons "remain important as they were before." House Appropriations Committee, *Oversight Hearing – DOJ*, at 40:30-41:00 (YouTube, June 2, 2026), https://tinyurl.com/ym67xahs. However, when asked whether DOJ will "now sign and release documents reversing the DOJ's position on

the Fund," the Acting Attorney General refused, stating "I'm not sure what that means to sign documents reversing. There's nothing to reverse." *Id.* at 41:38. Later, he was again asked whether he would "disavow" and "rescind . . . in writing" the May 18 Settlement Agreement in *Trump v. IRS* ("May 18 Agreement") and incorporated Attorney General Order ("May 18 AG Order") creating the Fund and providing its funding. *Id.* at 51:01-51:18. He again refused to do so, clarified that the "only document" DOJ is "not moving forward on" is the May 18 AG Order, and confirmed "there is still a settlement agreement" that remains in effect. *Id.* at 51:18-51:43. In a third exchange, the Acting Attorney General again was asked if he would "issue a new memo in writing rescinding that May 18th memo," to which he responded, "I'm not committing to putting anything in writing," and "I'm not committing to doing anything in writing." *Id.* at 1:42:35-1:43:09.

## III.     The President's June 3 statements about the Fund

In a June 3 interview, the President was asked, "The anti-weaponization fund, have you dropped that?" The President responded: "No. A court ruled against it. But just so you understand, these are people that have been decimated. . . . I'm very proud to have given them pardons. And I think they should be reimbursed for a crooked government." Pod Force One with Miranda Devine and New York Post, *Donald Trump Unleashed*, at 40:33-41:06 (YouTube June 3, 2026), https://tinyurl.com/ec3yavy8.

## IV.     The parties' conferrals concerning this motion

Counsel have continued to confer to try and resolve this matter without the Court's intervention. On a June 3 call, counsel for Defendants asserted that the Acting Attorney General's June 2 testimony mooted CREW's claims. Counsel for CREW disagreed, noting the Acting Attorney General's repeated refusals to rescind the Fund's charter documents in writing, his confirmation that the May 18 Agreement (which created the Fund and unlawfully structured it to evade transparency statutes, *see* Mem. 7, ECF 10-1) remains in effect, and the President's denial

4

on June 3 that he had "dropped" the Fund. Counsel for CREW asked that Defendants rescind the Fund's charter documents in writing and provide assurances that the Fund will cease all operations, consistent with the relief requested in CREW's Complaint and motion. *See, e.g.*, Compl. Prayer for Relief ¶ (7), ECF 1; Proposed Order at 1-2, ECF 10-12. Defendants responded that they could not unilaterally rescind the May 18 Agreement under the agreement's terms. *See* Ex. E, May 18 Agreement ¶ VIII. Although Defendants indicated they would otherwise consider CREW's proposal, they proceeded to file their opposition on June 5 without responding to the proposal, without agreeing to rescind in writing the May 18 Agreement and AG Order, and without providing any of CREW's requested assurances of legal compliance. *See* Mem. 8.

## ARGUMENT

### I.      CREW's claims are justiciable.

#### A.  Defendants have not met their heavy burden to show this case is moot.

Intervening events have done nothing to moot CREW's claims—if anything, they have confirmed the need for judicial intervention. "A lawsuit becomes moot . . . only when it is *impossible* for a court to grant '*any effectual relief whatever*' to the prevailing party.'" *Zukerman v. USPS*, 961 F.3d 431, 442 (D.C. Cir. 2020). Defendants, as the parties "urging mootness, bear[] the 'heavy burden' of establishing that the case is moot." *Id.* at 441.

The Supreme Court's "precedents hold" that "a defendant's voluntary cessation of a challenged practice will moot a case only if the defendant can show that the practice cannot reasonably be expected to recur," and "no reasonable expectation remains that [the defendant] will return to [its] old ways." *FBI v. Fikre*, 601 U.S. 234, 241 (2024) (cleaned up). This is a "formidable burden," and it "holds for governmental defendants no less than for private ones." *Id.*; *accord First Choice Women's Res. Ctrs., Inc. v. Davenport,* 146 S. Ct. 1114, 1130 (2026). "'[V]oluntary cessation does not moot a case' unless it is '*absolutely clear* that the allegedly wrongful behavior

5

could not reasonably be expected to recur.'" *West Virginia v. EPA*, 597 U.S. 697, 720 (2022) (emphasis added). This "demanding voluntary-cessation standard" applies with special force when "the facts . . . suggest" an "arguable manipulation of [the court's] jurisdiction." *Pub. Citizen, Inc. v. FERC*, 92 F.4th 1124, 1128 (D.C. Cir. 2024). Where, as here, an agency claims it has rescinded a challenged policy or order, the "rescission" must "completely and irrevocably eradicate[] the effects" of the challenged actions. *Row 1 Inc. v. Becerra*, 92 F.4th 1138, 1144 (D.C. Cir. 2024) (agency's written "rescission" of policy letters mooted claims seeking their vacatur).

Defendants fall spectacularly short of this "heavy burden." Their mootness argument consists of two anemic paragraphs that hinge on the Acting Attorney General's June 2 statements. *See* Opp. 10-11, ECF 15. But those non-binding remarks were nothing but an ineffectual attempt to evade judicial review of Defendants' illegal creation of the Fund. By no means did those words constitute a legally valid rescission of the Fund's charter documents.

By their plain terms, the May 18 Agreement and AG Order creating the Fund comprise one integrated legal instrument. *See* Ex. E, May 18 Agreement ¶ IV.A ("An accompanying order of the Attorney General, issued within 30 days of the Effective Date, shall establish funding and any other relevant requirements, rules, conditions, terms, and waivers, *which shall be treated as incorporated herein*."); *id.* ¶ VII ("This Settlement Agreement, *including the accompanying orders by the Attorney General*, constitutes *the entire agreement of the Parties*.") (emphases added). Once the AG Order was issued, its terms became part and parcel of the May 18 Agreement, and the integrated agreement could "be modified *only* with the written agreement of the Parties" in *Trump v. IRS*. Ex. E, May 18 Agreement ¶ VIII (emphasis added).

Yet the undisputed facts show that Defendants did *not* modify the May 18 Agreement by "written agreement of the Parties" in *Trump v. IRS*. Instead, the Acting Attorney General vaguely

6

told Congress that the Fund is "not moving forward." At the same time, he expressly refused multiple requests to rescind the Fund's charter documents "in writing," and confirmed that the May 18 Agreement creating the Fund remains in effect. *See supra* Suppl. Background § II. Under the May 18 Agreement's express terms, the Acting Attorney General's words had no legal effect whatsoever. And they certainly came nowhere close to "completely and irrevocably eradicat[ing] the effects" of the Fund's creation. *Row 1*, 92 F.4th at 1144. To the contrary, the May 18 Agreement and the incorporated terms of the AG Order *are fully operative*, and will remain so unless modified by "written agreement of the Parties" in *Trump v. IRS*, or vacated by this Court. As a result, there remains a live case or controversy. *See, e.g.*, *Trinity Lutheran Church*, 582 U.S. at 457 n.1 (Governor's press release announcing cessation of challenged policy did "not moot this case" where there was "no clearly effective barrier that would prevent the Department from reinstating its policy in the future") (cleaned up); *Speech First, Inc. v. Fenves*, 979 F.3d 319, 328 (5th Cir. 2020) (challenge to policy was not mooted by revised policy due to "continuing existence of the unaltered definition of 'harassment'" from original policy).[2]

Moreover, the President's June 3 statements create a substantial risk that, notwithstanding the Acting Attorney General's vague remarks to Congress the day prior, the Administration has not abandoned the Fund. When asked in a June 3 interview if he "dropped" the Fund, the President replied, "No. A court ruled against it," and stressed that January 6 participants and other convicted felons that he pardoned *en masse* "should be reimbursed for a crooked government." *Supra* Suppl. Background § III. The President's words carry great weight here given his dual-capacity as both

---

[2] The May 18 Agreement also provides that the "Attorney General may . . . change the formal name of The Anti-Weaponization Fund by order." Ex. E, May 18 Agreement ¶ IV.A. So the Acting Attorney General could unilaterally change the name of the Fund and continue its operations, notwithstanding his June 2 statements that Defendants are not moving forward with "the Fund."

Chief Executive who wields "supervision and control of the entire executive branch," Exec. Order No. 14215, § 1, 90 Fed. Reg. 10447 (Feb. 24, 2025), and as a plaintiff in *Trump v. IRS* whose consent is required to modify the May 18 Agreement, *see* Ex. E, May 18 Agreement ¶ VIII.

Even if the Court were to disregard the May 18 Agreement's plain terms, the Acting Attorney General *at most* purported to verbally rescind the May 18 AG Order alone and left the May 18 Agreement intact. *See supra* Suppl. Background § II. Yet it was the May 18 Agreement that "create[d] 'the Anti-Weaponization Fund,'" Ex. E, May 18 Agreement ¶ III.C; Ex. F, AG Order ¶ A, and that unlawfully structured the Fund to evade transparency and accountability statutes in ways that violate CREW's informational rights, Ex. E, May 18 Agreement ¶¶ IV.C, E (emphasis added); *see* Mem. 10-15, 40-44; *infra* § I.B. The continued existence of this injury-causing agreement is sufficient reason to reject Defendants' mootness claim. And even if Defendants' actions could be viewed as *partial* cessation (which they were not), that would not suffice. *See True the Vote, Inc. v. IRS*, 831 F.3d 551, 561 (D.C. Cir. 2016) ("[Defendants'] heavy burden requires that they establish cessation, not near cessation.").

Notably, courts routinely find a live controversy even where agencies—unlike Defendants here—*have* formally rescinded challenged policies in writing. *See Nat'l Council of Nonprofits v. OMB*, 775 F. Supp. 3d 100, 117 (D.D.C. 2025) (challenge to funding freeze policy was not moot, even after agency formally rescinded challenged memorandum, where "White House Press Secretary appeared to completely contradict the act of rescission by expressly stating that it was 'NOT a rescission of the federal funding freeze'" and thus "the memorandum's retraction was an empty gesture"); *Hinge v. Lyons*, 2026 WL 787875, at *4 (D.D.C. Mar. 20, 2026) (case not moot where ICE declaration did not provide "sufficient assurance" that agency would not "re-engage in the challenged action" because "[r]ather than 'requiring' or 'mandating' a change," the

8

"declaration states only that ICE currently has 'no plans' to" take the challenged action (citing similar cases)). Here, Defendants have not even *nominally* rescinded the Fund's charter documents in writing and have rejected repeated requests to do so. Because Defendants have fallen far short of their "heavy burden" to show it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur," *West Virginia*, 597 U.S. at 720, this case is not moot.

### B. CREW has standing.

Across five pages of briefing on standing, Defendants include just a few paragraphs addressing CREW's actual standing theories, and, even then, fail to address a single case cited by CREW. *Compare* Mem. 9-15 *with* Opp. 11-16. The few arguments they make are meritless.

Start with informational injury. Defendants agree (as they must) that deprivation of statutorily required information can constitute an injury in fact. *Compare* Mem. 10 *with* Opp. 14. Recycling their mootness argument, however, they claim no such informational injury will ever occur because, after the Acting Attorney General's June 2 remarks, "there is no Fund." Opp. 14. But Defendants' "standing argument is misplaced because," unlike mootness, the "standing inquiry focuses on whether the plaintiff has demonstrated an injury *at the outset of the litigation*, so *post-filing developments* . . . do not undercut standing." *N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1258 (D.C. Cir. 2020) (cleaned up) (emphasis added). CREW filed this suit on May 22, *see* ECF 1, well before the Acting Attorney General's June 2 statements to Congress. Any "post-filing developments" are irrelevant to CREW's standing.

Defendants continue to disregard hornbook standing law in disputing *the merits* of CREW's claims that the May 18 Agreement unlawfully structured the Fund to evade federal transparency statutes. Opp. 14-15. These arguments are improper because, "[f]or purposes of standing," the Court must "assume the merits in favor of the plaintiff." *Ctr. for Biological Diversity v. U.S. Int'l Dev. Fin. Corp.*, 77 F.4th 679, 685 (D.C. Cir. 2023) ("*CBD*"). And Defendants'

9

"standing" arguments fail in any event because the Fund's charter documents *facially conflict* with federal transparency statutes. *See* Mem. 10-12; 26-29; *infra* § II.E.

Defendants also suggest that a plaintiff does not have informational standing to challenge agency action that will unlawfully limit statutory disclosure requirements unless and until the information actually "exist[s]" and the plaintiff is "denied that information." Opp. 14-15. Wrong again. As previously explained, *see* Mem. 10, binding precedent holds that a plaintiff "need not receive a specific denial" of information from an agency "to sustain an informational injury"; rather "a plaintiff suffers an informational injury when an agency . . . *adopts a rule that places a legally unsupported limit on its statutory reporting requirements*." *CBD*, 77 F.4th at 686 (citing *Waterkeeper All. v. EPA*, 853 F.3d 527, 533 (D.C. Cir. 2017)) (emphasis added); *see also CREW v. DOJ*, 846 F.3d 1235, 1242 (D.C. Cir. 2017) (plaintiff may challenge a "policy or practice [that] will impair [its] lawful access to information in the future") (cleaned up). Thus, in *Waterkeeper*, the plaintiffs had informational standing to seek vacatur of a final agency rule that "had the automatic effect of cutting back on [statutory] reporting and disclosure requirements" and thus "deprive[d] [the plaintiff] of information, the public disclosure of which would otherwise be required by [statute]." 853 F.3d at 534. So too here.[3]

Defendants wrongly dispute redressability on the ground that CREW's informational standing can enable it to obtain only informational relief. Opp. 15-16. The D.C. Circuit has

---

[3] Defendants are wrong that CREW lacks informational standing because it "'ha[s] identified no downstream consequences' from failing to receive the required information." Opp. 15 n.6 (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021)). The D.C. Circuit has rejected that informational standing requires a separate showing of "downstream consequences." *Campaign for Accountability v. DOJ*, 155 F.4th 724, 734-35 (D.C. Cir. 2025). Even if it were required, CREW has amply made that showing by providing a declaration that explains how the deprivation of statutorily mandated information about the Fund will "directly impair CREW's core government oversight functions," and identifies specific "tracking projects" that would utilize the information if it were made available to CREW. *See* Mem. 12-13 (citing Sherman Decl. ¶¶ 3-4, 13-24, 20-23).

repeatedly held that a plaintiff can seek vacatur of agency action under the APA based solely on informational injuries. *See, e.g.*, *Waterkeeper*, 853 F.3d at 530 (granting vacatur of final rule based on informational injuries); *CBD*, 77 F.4th at 686 (plaintiff's informational standing allowed it to seek vacatur of rule); *Friends of Animals v. Jewell*, 824 F.3d 1033, 1040 (D.C. Cir. 2016) (plaintiff's informational standing allowed it to pursue separation of powers claim and APA vacatur of rule); *see also Consumers' Rsch. v. Consumer Prod. Safety Comm'n*, 91 F.4th 342, 350 (5th Cir. 2024) (same). This conclusion follows from the APA's plain text, which authorizes any person "adversely affected or aggrieved" by a "final agency action" to obtain judicial review, 5 U.S.C. §§ 702, 704, and mandates that the court "shall" "hold unlawful and set aside" illegal "agency action." *Id.* § 706(2); *see also Corner Post, Inc. v. Bd. of Govs. of Fed. Rsrv. Sys.*, 603 U.S. 799, 828, 838 (2024) (Kavanaugh, J., concurring) (the APA "depart[ed]" from "baseline" principles of "equitable relief" by allowing parties to "obtain relief" they "would not be able to obtain … through any remedy other than vacatur").

### C. CREW's claims are ripe.

Defendants' ripeness argument merely repackages their other meritless justiciability objections. *See* Opp. 16-18. The ripeness inquiry requires evaluation of "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Texas v. United States*, 523 U.S. 296, 300-301 (1998) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967)). In this Circuit, "[i]t is well established that 'a purely legal claim in the context of a facial challenge . . . is presumptively reviewable.'" *Hearth, Patio & Barbecue Ass'n v. EPA*, 11 F.4th 791, 804 (D.C. Cir. 2021). "A case is ripe when it presents a concrete legal dispute [and] no further factual development is essential to clarify the issues" and "the issue 'has crystallized sufficiently for purposes of judicial review." *In re Al-Nashiri*, 47 F.4th 820, 826 (D.C. Cir. 2022).

This is precisely such a case. The crux of CREW's claims is that the Fund's charter

documents are *facially inconsistent* with the Constitution and multiple federal statutes. *See* Mem. 15-40. The parties' briefing has confirmed that this is a "concrete legal dispute" and "no further factual development" is needed to facilitate judicial review. *See In re Al-Nashiri*, 47 F.4th at 826. As the case law discussed above holds, a plaintiff can challenge final agency action that will unlawfully limit its access to statutorily required information in the future. *See supra* Argument § I.B. This precedent forecloses Defendants' (citationless) arguments that CREW's suit is not ripe until the Fund is fully operational, establishes procedures and adjudicates claims, and CREW requests and is denied information. *See* Opp. 17. The Complaint here does not concern any individual claim for payment or any specific request for information; it challenges *the creation* of the Fund under its charter documents. That action is already completed, and its validity is a purely legal issue. And CREW will suffer great hardship if review is delayed. *See infra* § III.

The government also urges the Court to decline consideration of these purely legal issues to leave opportunity for their "political resolution." Opp. 18. But it is the "province and duty" of the federal judiciary "'to say what the law is' in particular cases and controversies," not to defer legal decisions to the other branches of government. *Bank Markazi v. Peterson*, 578 U.S. 212, 225 (2016) (quoting *Marbury v. Madison,* 5 U.S. 137, 177 (1803)).

**II.     CREW is likely to succeed on the merits.**

It is no wonder Defendants tried desperately to moot this case: their feeble merits arguments only confirm that their creation of the Fund was flagrantly lawless and indefensible. Indeed, Defendants' arguments largely recycle their justiciability objections and do not respond to the substance of CREW's claims and supporting authority. The Court should deem all unaddressed arguments conceded. *See Texas v. United States*, 798 F.3d 1108, 1110 (D.C. Cir. 2015); D.D.C. Local Civ. R. 7(b); *see also Media Matters for Am. v. FTC*, 805 F. Supp. 3d 105, 138 (D.D.C. 2025) (noting the "concession rule applies with particular force" in the preliminary relief context,

12

where "a plaintiff need only demonstrate a likelihood of success on the merits instead of 'an absolute certainty of success." (cleaned up)). For the few merits arguments Defendants do address, they fall far short of refuting CREW's entitlement to relief.

### A. Defendants' establishment of the Fund was final agency action.

Defendants wrongly claim that the formal establishment of a new Executive Branch entity empowered with final authority to adjudicate claims of third parties, dole out billions of dollars in taxpayer funds, and issue formal apologies on behalf of the United States is "[n]ot even close" to a final agency action reviewable under the APA. Opp. 20. This argument is not serious. Defendants' establishment of the Fund is plainly final agency action.

Agency action is final if it (1) "mark[s] the consummation of the agency's decisionmaking process" and is not "of a merely tentative or interlocutory nature," and (2) is "one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (cleaned up). Both conditions are easily met here. First, by their terms, the May 18 Agreement and incorporated AG Order plainly "mark the consummation of the agency's decisionmaking process" regarding creation of the Fund. The Fund is not "tentative or interlocutory" in nature; through its charter documents, Defendants formally created the Fund and established the parameters of its operations and funding. *See, e.g.*, Ex. E, May 18 Agreement ¶ III.C ("[T]he Attorney General of the United States agrees to create 'The Anti-Weaponization Fund,' subject to the terms and limitations described herein"); Ex. F, May 18 AG Order ¶ A (stating that "[t]he Settlement Agreement . . . *has created* the Anti-Weaponization Fund" and that this order "establish[es] funding and . . . other relevant requirements for the fund") (emphasis added). Indeed, Defendants concede as much. *See* Opp. 1 (on May 18, DOJ "announced through a Settlement Agreement *the establishment of* 'The Anti-Weaponization Fund'") (emphasis added).

Second, Defendants' creation of the Fund was action "by which rights or obligations have

been determined, or from which legal consequences will flow." *Bennett*, 520 U.S. at 178.  As DOJ succinctly explained in its "Overview" of the Fund, the May 18 Agreement and Order identify the class of persons who may submit claims to the Fund, determine the Fund's operational structure, identify the funding source for capitalization of the Fund, impose oversight mechanisms, and provide a termination date for the Fund's operations. *See* Ex. G, *Overview of the Department of Justice's Anti-Weaponization Fund*, ECF 10-9. And the Fund's charter documents determine a host of other rights, obligations, and legally consequential activities, empowering the Fund to determine its own claim procedures and providing the Fund unfettered discretion on whether to make them public; empowering the Fund to issue formal apologies on behalf of United States, to adjudicate claims, and to award taxpayer money to claimants; eliminating any legal right to an appeal or judicial review of award determinations; excusing the United States from legal liability relating to the safeguarding of money used to capitalize the fund; terminating the Fund's operations by a particular date; and deciding how any remaining capital will be handled. *See* Mem. 7; Exs. E & F. Thus, Defendants' establishment of the Fund was final agency action.

**B.  Defendants' establishment of the Fund violated the separation of powers.**

"Congress has plenary control over the salary, duties, and even existence of executive offices," *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 500 (2010), and the "exclusive power over the federal purse," *Dep't of Navy v. FLRA*, 665 F.3d 1339, 1346 (D.C. Cir. 2012) (Kavanaugh, J.). Yet Defendants have unilaterally created, without statutory authorization, a powerful new agency, with new officers removable by the President alone, and funded it with $1.776 billion in taxpayer funds. *See* Mem. 15-20. Defendants offer no justification for their "immediate and dire threat to our constitutional order and the authority of Congress." Br. of *Amici Curiae* U.S. Senators Cory Booker and Bill Cassidy, *Floyd v. DOJ*, No. 26-cv-01399 (E.D. Va. June 3, 2026), https://perma.cc/LB83-KX9V (arguing that the Fund violates the separation of powers).

14

Defendants admit that the Fund is akin to an "Executive Branch agenc[y]." Opp. 22. Yet they identify no organic statute for the Fund, because none exists. They misconstrue case law to support their claim that the "temporary, episodic" nature of the Fund Members' appointment makes them mere employees, not officers. *Id.* at 19 (quoting *Freytag v. C.I.R.*, 501 U.S. 868, 881 (1991)). But the critical point in *Freytag* was that the "special trial judges perform[ed] more than ministerial tasks," 501 U.S. at 881, which is undoubtedly true of the Fund's members, *see United States v. Arthrex, Inc.*, 594 U.S. 1, 14 (2021) (those with "the power to render a final decision on behalf of the United States without any . . . review by their nominal superior or any other principal officer" are principal officers); *United States v. Donziger*, 38 F.4th 290, 296 (2d Cir. 2022) ("[A] temporary position can be an office" (citing *Morrison v. Olson*, 487 U.S. 654, 664 (1988)). And regardless of whether anyone was improperly appointed, *cf.* Opp. 19, the positions themselves must first be "established by law" "*before*" they can be appointed. *Trump v. United States*, 603 U.S. 593, 644-45 (2024) (Thomas, J., concurring) (emphasis added); *see* Mem. 16, 18. Defendants do not even attempt, moreover, to address their wrongful diversion of congressionally appropriated funds—either in misdirecting Judgment Fund assets to this new agency, or in giving the President discretion to redirect residual funds as he wishes without congressional authorization.

Rather, Defendants point to a single "example" they claim absolves them of any constitutional constraints: the settlement in *Keepseagle v. Vilsack*, 815 F.3d 28 (D.C. Cir. 2016). *See* Opp. 19. But "[p]ast [executive] practice does not, by itself, create power," and certainly a single prior settlement comes nowhere close to a "'longstanding practice' of congressional acquiescence.'" *Medellin v. Texas*, 552 U.S. 491, 532 (2008).[4] In any event, the *Keepseagle*

_____

[4] Nor does the *Keepseagle* settlement constitute an uncontested precedent. It was criticized as potentially unconstitutional, leading DOJ to ban similar settlements. *See* Press Release, DOJ, *Attorney General Jeff Sessions Ends Third Party Settlement Practice* (June 7, 2017),

15

settlement is hardly precedent for Defendants' actions. The *Keepseagle* settlement fund was a private entity, staffed by private adjudicators hired and overseen by plaintiffs' class counsel, funded by a Judgment Fund payment to a known set of plaintiffs to settle a known legal claim, distributing plaintiffs' assets among themselves and their chosen charities. *See generally* Settlement Agreement, *Keepseagle v. Vilsack*, No. 99-cv-03119-EGS (D.D.C. Nov. 1, 2010), https://perma.cc/H5J6-CMC4. The *Keepseagle* settlement did not create anything like the Fund— a powerful new Executive Branch entity with unreviewable final authority. *See* Mem. 7. If Defendants' actions stand, then future Presidents will have free rein to unilaterally create, staff, empower, and fund new federal agencies "at [their] pleasure." *Dep't of Navy*, 665 F.3d at 1347.

### C. Defendants violated the APA's notice-and-comment requirements in establishing the Fund.

Defendants' one paragraph on CREW's notice-and-comment claim cites no authority, fails to address CREW's arguments, and has no coherent legal reasoning. *Compare* Mem. 20-22 *with* Opp. 21. Defendants' argument appears to be that the Fund's creation could not be a legislative rule because it "did not create any generally applicable policy" and instead "contemplated a single fund." *Id.* But agencies "may not escape the requirements of § 553 by labeling [a] rule" as something else; rather, when the "agency action satisfies the APA's definition of a rule and eludes exemptions to § 553, it is procedurally defective unless promulgated with the procedures required by law." *Safari Club Int'l v. Zinke*, 878 F.3d 316, 332 (D.C. Cir. 2017) (citation omitted).

Here, Defendants' establishment of the Fund easily fits the APA's "very broad[]" definition of "rule," which is "'the whole or a part of an agency statement of general or particular applicability

---

https://bit.ly/4dv4qeg. And the settlement's constitutionally was never resolved by a court. *See Keepseagle v. Perdue*, 856 F.3d 1039, 1052-56 (D.C. Cir. 2017) (declining to address separation of powers challenge because of waiver); *id.* at 1058-79 (Brown, J., dissenting) (arguing settlement and *cy pres* generally violated the Constitution).

and future effect designed to implement, interpret, or prescribe law or policy.'" *Id.* (quoting 5 U.S.C. § 551(4)). The Fund's charter documents fit this description to a tee. *See ITServe All., Inc. v. DHS*, 71 F.4th 1028, 1035 (D.C. Cir. 2023). The Fund's terms entitle a vaguely defined class of future claimants—none of them parties to *Trump v. IRS*—to apply for compensation in the future, subject to the substantive standards and processes set out in the May 18 Agreement. Ex. E, May 18 Agreement ¶ V. And because the APA defines "rule" to reach even statements of "particular applicability," Defendants' argument that they created only "a single fund" is no answer. 5 U.S.C. § 551(4). Defendants' establishment of the Fund easily qualifies as a legislative rule for which notice and comment was required. *See, e.g.*, *Sugar Cane Growers Co-op. of Fla. v. Veneman*, 289 F.3d 89, 96 (D.C. Cir. 2002) (package of agency "announcements" for payment-in-kind program for sugar beet farmers was a legislative rule where it "set forth the bid submission procedures which all applicants must follow, the payment limitations of the program, and the sanctions that will be imposed on participants if they plant more in future years than in 2001"). "It is simply absurd to call" the Fund's establishment "anything but a rule." *Id.*[5]

## D. Defendants' establishment of the Fund lacked statutory authorization.

Defendants fail to address the bulk of CREW's arguments regarding why the Judgment Fund statutes (28 U.S.C. § 2414 and 31 U.S.C. § 1304) did not authorize creation of the Fund. *Compare* Mem. 23-26 *with* Opp. 21-22. Most notably, Defendants have no response to CREW's arguments that the May 18 Agreement did not, by its terms, operate as a settlement of the claims

---

[5] Accepting CREW's claim will not open the floodgates to notice-and-comment challenges to *genuine* settlement agreements, *contra* Opp. 21, because the May 18 Agreement is a "settlement" in name only. Together with the incorporated AG Order, it is more accurately described as an agency directive to (illegally) create and fund a new agency. *See N.Y. Stock Exch. LLC v. SEC,* 2 F.4th 989, 994 (D.C. Cir. 2021) ("[A]n agency label does not determine the substantive legal standard under which we evaluate agency action").

in *Trump v. IRS*, and that the Judgment Fund statutes plainly do not authorize Defendants to execute a "compromise settlement" of a pending case that operates as a settlement of wholly unrelated future claims by unidentified future claimants, or to pay for the day-to-day operational expenses of a new federal agency. *See* Mem. 23-24. That alone provides sufficient grounds to find that the Fund lacks statutory authorization.

Defendants wrongly claim that the merits of *Trump v. IRS* are "irrelevant" to whether the Judgment Fund statutes authorized the May 18 Agreement, Opp. 21, contrary to a longstanding opinion of DOJ's Office of Legal Counsel that settlements may be paid out of the Judgment Fund only if the "underlying 'cause[]' of a settlement could have led to a money judgment, had no settlement been reached." Mem. 23 (quoting *Availability of Judgment Fund in Cases Not Involving a Money Judgment Claim*, 13 Op. OLC 98, 103 (1989)). Defendants also halfheartedly argue there was Article III adversity in *Trump v. IRS* due to the "several co-plaintiffs"—*i.e.*, the President's sons and his business. Opp. 21. But given their obvious alignment with the President, the presence of these co-plaintiffs did not introduce meaningful adversity into a case the President openly admitted was collusive and controlled by him on "both sides." Mem. 25.

While the government need not "treat every case identically," Opp. 21, compromise settlements from the Judgment Fund must be "settled and paid in a manner similar to judgments in like causes," 28 U.S.C. § 2414. And Defendants do not dispute or explain why they failed to defend the public fisc in *Trump v. IRS* in a "manner similar" to how they have defended (and currently are defending) related cases where the President is not a plaintiff. *See* Mem. 25-26.

It is beside the point that claimants to the Fund would be required to "assert at least one legal claim," Opp. 22, as these "claims" would be submitted entirely outside of the Judgment Fund process and paid out through a non-statutory, shadow judgment fund.

18

### E.  Defendants' establishment of the Fund affirmatively violated multiple statutes.

Defendants do not respond to CREW's arguments that the establishment of the Fund was contrary to 31 U.S.C. § 1304(d)'s mandatory disclosure requirements for the Judgment Fund and a slew of funding statutes. *Compare* Mem. 26-33 *with* Opp. 21-22. Each violation is independently sufficient to set aside the agency action. The few points Defendants press fail.

Because the anti-transparency provisions in the Fund's charter documents are contrary to law on their face, Defendants are wrong that CREW's claims depend on "speculation." Opp. 14. Specifically, the May 18 Agreement:

- requires the Fund to provide the Attorney General alone, each quarter, a non-public "confidential written report," Ex. E, May 18 Agreement ¶ IV.E, in violation of § 1304(d)'s requirements that Treasury rapidly post granular payment information publicly within 30 days of any compromise-settlement payment from the Judgment Fund;

- gives the Fund "discretion" to disclose its procedures and actions, *id.* ¶ IV.C, in violation of FOIA's non-discretionary and proactive public disclosure requirements, *see, e.g.*, 5 U.S.C. § 552(a); and

- is entirely silent on the Fund's records preservation obligations under the FRA, *see* 44 U.S.C. §§ 3101, 3102, with counsel for Defendants refusing to confirm whether the government is treating the Fund as covered by the FRA and FOIA.

Nor do the merits depend on the Fund withholding a particular record; a policy that permits discretionary performance of mandatory statutory duties, or that otherwise provides deficient guidance on those duties, is contrary to law. *See, e.g.*, *Am. Hist. Ass'n v. Trump*, 2026 WL 1412395, at *7 (D.D.C. May 20, 2026).

Defendants' argument that the Agreement "contemplates the application of federal statutes" and that the discretion must be "read against that backdrop" fails as a matter of law. Opp. 14. A saving clause "does not and cannot override [the operative provision's] meaning," otherwise judicial review would become "a meaningless exercise." *San Francisco v. Trump*, 897 F.3d 1225, 1240 (9th Cir. 2018). Where an instrument "unambiguously command[s] . . . action that a saving[]

19

clause purports to negate," the court reads the operative provision to mean what it says, and "the saving clause does not preclude review." *LULAC v. Exec. Off. of the President*, 780 F. Supp. 3d 135 (D.D.C. 2025). The May 18 Agreement and Order unambiguously command the $1.8 billion draw and vest the Fund's Members with complete discretion over disclosure. Mem. 7. It does not matter that Members have the "potential" to disclose "above and beyond" what the law requires, Opp. 14; the statutes make disclosure and preservation mandatory, but the Fund's charter makes them discretionary. That is contrary to law.[6]

Defendants also include a drive-by reference to the Federal Tort Claims Act's ("FTCA's") waiver of sovereign immunity. *See* Opp. 22. But the FTCA's administrative process was not used here and so its waiver of immunity is inapplicable. Indeed, it is undisputed that the Fund would *circumvent* the FTCA process by allowing upwards of $1.776 billion in tort claims against the United States under a non-FTCA process, with no statutory waiver of immunity. *See* Mem. 31-32.

### F. Defendants' establishment of the Fund was arbitrary and capricious.

Defendants' opposition confirms their decision to establish the Fund was neither reasonable nor reasonably explained. They point to no contemporaneous agency explanation addressing the issues CREW identified, *see* Mem. 33-39, which by itself renders the decision arbitrary and capricious. Defendants never explain how they arrived at the clearly farcical valuation of $1.776 billion for the Fund. *Compare* Mem. 36-37 *with* Opp. 36. They claim the application of the Fourteenth Amendment's bar on payments in aid of insurrection is "speculative,

---

[6] Defendants suggest the Fund need not issue its own FOIA regulations because it is subject to *DOJ's* regulations. *See* Opp. 14 n.5. The unstated premise, it seems, is that the Fund is a DOJ component rather than a freestanding Executive Branch entity. But the Fund's Members are removable only by the President, and the Attorney General lacks power to review their decisions, so it is not clear how the Fund could be a DOJ component. As a distinct FOIA-covered "agency," the Fund would need to issue its own FOIA regulations. And even if the Fund were subject to DOJ's FOIA regulations, the May 18 Agreement conflicts with those regulations for the same reason it conflicts with the FOIA statute.

paranoid, and hyperbolic," and payments in contravention of it "do not warrant a detailed response," *id.* 23, despite numerous public statements reflecting that the purpose of the Fund is to reward those who engaged in the January 6 insurrection, *see* Mem. 4, 35-36. Nor is it "paranoid" or "hyperbolic" to note that paying individuals who committed crimes to which they pled guilty or of which they were found guilty beyond a reasonable doubt would likely incentivize more criminal activity—an inference borne out by the high rates of recidivism among those pardoned for supposed weaponization by the President. *See* Mem. 37. Those are "important aspects of the problem," *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), that at least "warrant a detailed response," *cf.* Opp. 23.

Defendants say more about the settlement of *Trump v. IRS*, *see* Opp. 6, but never grapple with the lack of Article III adversity, or the untimeliness of President Trump's claims. Their lackluster attempt to address the Domestic Emoluments Clause merely underscores the Fund's illegal structure. *See* Opp. 22 (admitting Fund is not a private entity of settling plaintiffs, but a new government agency). Defendants similarly fail to even "display awareness" of their changes in policy against confidential payments for hypothetical third-party claims. *FDA v. Wages & White Lion Invs.*, 604 U.S. 542, 568 (2025); *see* Mem. 37 (citing policies and memos).

Rather than addressing these important factors, Defendants attack a strawman: an argument that "every settlement must explain all of the underlying reasoning and expressly address the infinite number of 'possible alternatives.'" Opp. 23. But not every settlement—indeed no other settlement known to counsel—created a new $1.8 billion federal agency with new officers and taxpayer funds to make confidential and potentially unconstitutional payments to unknown third parties for hypothetical legal claims. *See supra* Argument § II.B.

### G. Defendants' establishment of the Fund violated CREW's First Amendment rights.

In establishing the Fund, Defendants channeled settlements likely to generate criticism into a secretive process "designed" to "impose[] burdens that are based on the content of speech and that are aimed at a particular viewpoint." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 565 (2011). Defendants do not contest this, relying on only counsel's assertion that "there is no arguable purpose to suppress speech," Opp. 23, and a flawed understanding of CREW's claim and case law.

CREW is not asserting a free-floating "constitutional right to government information." *Contra* Opp. 23 (citing *McBurney v. Young*, 569 U.S. 221, 232 (2013)). Congress provided that right in the Judgment Fund statue. *See* 31 U.S.C. § 1304(d). "[O]nce" Congress "decides to make [disclosures] available to the public, there are no doubt limits to its freedom to decide how that benefit will be distributed." *Sorrell*, 564 U.S. at 569 (quoting *L.A. Police Dep't v. United Reporting Publ'g Corp.*, 528 U.S. 32, 43 (1999) (Ginsburg, J., concurring)). Among those limits are any "restrictions on the disclosure of government-held information" that "burden the expression of potential recipients" to suppress "disfavored speech by disfavored speakers." *Id.* at 569 (citing *United Reporting*, 564 U.S. at 42 (Scalia, J., concurring); *id.* at 574; *contra* Opp. 23 (wrongly claiming *Sorrell* is limited to restraints on "information that [a] speaker already possesses). Indeed, in *United Reporting*, the Court remanded the case to permit the plaintiffs to present an as-applied First Amendment challenge to just such a restraint, *United Reporting*, 528 U.S. at 41, which the plaintiffs subsequently did successfully, *see* Consent Judgment, *United Reporting v. Cal. Highway Patrol*, 96-cv-0888-B (S.D. Cal. Aug. 14, 2001) (adjudging restraints on government disclosure violated the plaintiffs' First Amendment rights).

## III.    CREW will be irreparably harmed absent preliminary relief.

Defendants muster just one short paragraph on irreparable harm that recycles their

justiciability and merits arguments. *See* Opp. 24. Defendants do not respond to the case law cited by CREW holding that the threatened loss of federal records, the loss of prompt access to time-sensitive information of urgent public importance, the loss of notice-and-comment opportunities *before* an agency implements a new policy, and the deprivation of constitutional rights all constitute irreparable harm as a matter of law. *See* Mem. 40-44 (citing cases). These arguments should be deemed conceded. *See Media Matters*, 805 F. Supp. 3d at 138.

Although Defendants claim the Fund is not operating, Opp. 24, "Damocles's sword does not have to actually fall on [CREW] . . . before the court will issue an injunction." *League of Women Voters of the U.S. v. Newby,* 838 F.3d 1, 8-9 (D.C. Cir. 2016); *see Am. Hist. Ass'n*, 2026 WL 1412395, at *25 (finding irreparable harm to CREW based on "substantial risk that defendants" would "fail[]" in the future "to adequately preserve records as required by" statute). Because the Fund's charter documents and injury-causing terms remain in full force and effect notwithstanding the Acting Attorney General's non-binding remarks, *see supra* Argument § I.A, the substantial threat of irreparable harm to CREW persists.

Indeed, absent preliminary relief, the plain terms of the Fund's charter documents allow Defendants to siphon nearly $1.8 billion from the Judgment Fund and start paying out those taxpayer funds with remarkable speed. *See* Ex. E, May 18 Agreement ¶ IV.B (appointment of Fund Members by June 17, 2026); Ex. F, AG Order ¶ C (effectuation of transfer of $1.776 billion from the Judgment Fund by July 17). Those actions could happen at any moment with no advance notice to the public—much like the *Trump v. IRS* settlement. *See* Mem. 4-6. Heightening the need for immediate relief are Defendants' repeated refusals to memorialize any rescission of the Fund in writing, and the President's express denial that he has "dropped" the Fund.

Once the temporary injunction in *Floyd* expires (which will happen as soon as June 12),

*see* Suppl. Background § I, the Fund will be free to begin rapidly disbursing taxpayer funds as outlined in its fully operative charter documents without creating and preserving federal records as required by the FRA, without first conducting notice-and-comment rulemaking under the APA, and without complying with the Judgment Fund statute's and FOIA's mandatory and continuous public disclosure requirements. *See* Mem. 40-44 (outlining irreparable injuries). In those events, there will be no time for CREW to obtain judicial relief before incurring injuries that cannot be remedied after the fact. Nor have Defendants agreed to take basic steps to mitigate these threatened injuries. Instead, they have refused CREW's requests for assurances that the Fund will create, preserve, and disclose federal records as required by law.[7]

Thus, Defendants' lackluster efforts to moot this controversy do nothing to defeat CREW's showing of irreparable harm. *See Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 20 (2020) (per curiam) (Governor's remedial measures did not moot irreparable harm where plaintiffs "remain[ed] under a constant threat" of being subject to executive order's restrictions "without prior notice" and that harm would likely be incurred "before judicial relief can be obtained"); *Ramirez v. ICE*, 568 F. Supp. 3d 10, 33 (D.D.C. 2021) (voluntary cessation did not moot irreparable harm where ICE had not "implement[ed] any new training" to address challenged conduct and its "past behavior" made the court "wary of simply assuming that the problem has been addressed in full"); *NJOY v. iMiracle*, 760 F. Supp. 3d 1070, 1082 (S.D. Cal. 2024) (defendants' voluntary cessation did not defeat irreparable harm).

---

[7] Defendants fault CREW for "assum[ing]" that "the government would have simply disregarded records preservation laws" or "somehow take the position that federal laws do not apply." Opp. 17. But that was no assumption: CREW reasonably drew that conclusion from the May 18 Agreement's plain terms and its facial conflict with federal transparency statutes. *See* Mem. 26-29. Moreover, during the conferral process, CREW specifically asked Defendants' counsel to confirm whether they are treating the Fund as an "agency" covered by FOIA and the FRA, and Defendants refused (and still refuse) to provide any response.

**IV.    The equitable factors weigh strongly in favor of preliminary relief.**

Against CREW's strong showing of likelihood of success on the merits and irreparable harm, Defendants have articulated no harm—none—if the Court issues preliminary relief. They merely urge the Court not to get involved in a "messy" "political process." Opp. 24. But as explained above, this case is precisely the type of concrete, justiciable controversy that federal courts have a duty to adjudicate. The equities weigh overwhelmingly in favor of preliminary relief.

**V.    The Court can convert CREW's motion to one for partial summary judgment under Rule 65(a)(2).**

Under Federal Rule of Civil Procedure 65(a)(2), "[b]efore or after beginning the hearing on a motion for a preliminary injunction, the court may advance the trial on the merits and consolidate it with the hearing." Under this rule, "when the eventual outcome on the merits is plain at the preliminary injunction stage, the judge should, after due notice to the parties, merge the stages and enter a final judgment." *Curtis 1000, Inc. v. Suess*, 24 F.3d 941, 945 (7th Cir. 1994); *see also Morris v. District of Columbia,* 38 F. Supp. 3d 57, 62 & n.1 (D.D.C. 2014) (treating "motion for a preliminary injunction as one for summary judgment" following motion hearing). Here, the parties' briefing has confirmed that Counts I, II, III, IV, and VI of the Complaint hinge on undisputed facts (*i.e.*, the terms of the Fund's charter documents and federal officials' public statements) and do not require the production of an administrative record. And a favorable judgment on any one of these claims would grant CREW complete relief. Thus, if the Court sees fit and after giving notice under Rule 65(a)(2), it should treat CREW's motion as one for summary judgment as to Counts I, II, III, IV, and VI.

## CONCLUSION

The Court should grant CREW's motion for a temporary restraining order or, in the alternative, a § 705 stay and preliminary injunction.

Dated: June 9, 2026

Respectfully Submitted,

*/s/ Nikhel S. Sus*
Nikhel S. Sus (D.C. Bar No. 1017937)
Kayvan Farchadi (D.C. Bar No. 1672753)
Stuart C. McPhail (D.C. Bar No. 1032529)
Stephen J. Buckingham (D.C. Bar No. 1562756)*
CITIZENS FOR RESPONSIBILITY AND
ETHICS IN WASHINGTON
P.O. Box 14596
Washington, DC 20044
(202) 408-5565
nsus@citizensforethics.org
kfarchadi@citizensforethics.org
smcphail@citizensforethics.org
sbuckingham@citizensforethics.org

* Admitted *pro hac vice*

26