# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **Citizens for Responsibility and Ethics in Washington**<br><br>        Plaintiff,<br><br>v.<br><br>**Department of Justice, et al.**,<br><br>        Defendants. | Case No. 1:26-cv-1789-RJL |

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

## TABLE OF CONTENTS

Introduction ............................................................................................................. 1

Background ............................................................................................................. 5

Legal Standard ..................................................................................................... 11

Argument .............................................................................................................. 13

    I.      PLAINTIFF'S CLAIMS ARE NOT JUSTICIABLE ................................. 13

    A. Plaintiff's Claims Are Not Ripe For Adjudication ........................................... 13

    B. This Case Is Moot ............................................................................................. 16

    C. Plaintiff Lacks Standing ................................................................................... 18

    II.     PLAINTIFF FAILS TO PLEAD ANY COGNIZABLE CAUSE OF ACTION ................................................................................................... 24

    A. Plaintiff's APA Claims Must Fail Because There Has Been No Final Agency Action .................................................................................................. 25

        i.    Even if there had been final agency action, notice and comment would not have been required .............................................................. 27

        ii.   The order does not exceed statutory authority ..................................... 28

        iii.  The order is not arbitrary and capricious ............................................. 29

    B. Plaintiff's "Equitable Causes of Action" Also Fail .......................................... 29

    C. Plaintiff's *Ultra Vires* and Mandamus Claims Fail ........................................ 30

    D. Plaintiff's First Amendment Claim Fails .......................................................... 30

Conclusion ............................................................................................................ 31

## INTRODUCTION

Defendants respectfully move this Court to dismiss this case pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) because Plaintiff cannot establish subject-matter jurisdiction and, in any event, fails to state a claim upon which relief can be granted. This Court has already considered the jurisdictional issues—when Plaintiff moved for a Temporary Restraining Order or, in the alternative, a stay under 5 U.S.C. § 705 and a Preliminary Injunction, ECF No. 10—and correctly concluded that "there is no longer any effective relief" the Court could provide and, thus, "the case is moot or, in the alternative, not ripe" ECF No. 20 at 2.

While the facts and issues of this case are already known to this Court, they are restated here for completeness of the record. Federal courts may resolve "active political debate[s] . . . only if necessary to do so in the course of deciding an actual 'case' or 'controversy'" as those words are "used in the Constitution." *Hollingsworth v. Perry*, 570 U.S. 693, 697, 700 (2013). Article III of the Constitution is thus "an essential limit" on judicial power. *Id.* at 700. "It ensures that [courts] act as *judges*, and do not engage in policymaking properly left to elected representatives." *Id.* at 700. That remains true even when there is a high-profile "controversy" in the *non-*Article III sense. *Id.* After all, "[f]ederal courts are not roving commissions licensed to sally forth each day looking for wrongs to right." *Margolin v. Nat'l Ass'n of Immigr. Judges*, 146 S. Ct. 1285, 1288 (2026) (internal quotation marks and citations omitted). Opining on abstract issues is even more inappropriate where challengers have already received "the precise relief that [they] requested," rendering a case "moot." *N.Y. State Rifle & Pistol Ass'n, Inc. v. City of New York*, 590 U.S. 336, 338–39 (2020).

1

Those principles control here. Thus, the United States moves to dismiss this civil action on justiciability (and other) grounds—not because the Fund will continue (it will not)—but to protect the Executive's institutional interests in the proper application of Article III limitations on judicial review.

On May 18, 2026, the Department of Justice announced—through a Settlement Agreement—the establishment of "The Anti-Weaponization Fund," which would have provided a systematic process to hear and redress certain claims alleging use of the levers of government power to target individuals, groups, and entities for improper and unlawful reasons. ECF No. 1-1. The Acting Attorney General issued a corresponding order the same day. ECF No. 1-2. The Settlement Agreement and order garnered significant attention and provoked widespread debate about the weaponization of government, whether and how any claims process should function, and past settlements reached by other administrations. But when Plaintiff filed this case—and indeed to date—no money has been transferred to the Fund, let alone any potential claimant. No mechanisms were in place for formally submitting, receiving, processing, granting, or denying claims. Indeed, none of the five contemplated "Members" who would establish and administer such procedures for the Fund have even been appointed. And after Plaintiff filed this case, the political process continued to play out.

On June 2, 2026, the Acting Attorney General told Congress that although "the reasons for the Fund remain important," the Fund is "not going forward, period." House Appropriations Committee, Oversight Hearing – Department of Justice, at

2

40:30–42:50 ("House Oversight Hearing"). Based on those comments, along with the briefs and representations of counsel for the government, this Court denied the Temporary Restraining Order or, in the alternative, a stay under 5 U.S.C. § 705 and a Preliminary Injunction. *See* ECF No.s 10, 20, 21, Minute Entry of June 10, 2026.

Subsequent events underscore even further that the Fund will not move forward and reaffirm this Court's mootness analysis at the preliminary relief stage. On July 15, 2026, Acting Attorney General Blanche testified, under oath, at his Senate Confirmation hearing that the Fund "is a moot issue, meaning there is no weaponization fund. The weaponization fund is dead, it's not moving forward." Senate Judiciary Committee, Nomination Hearing of the Honorable Todd Blanche to be Attorney General of the United States ("Nomination Hearing"), at 1:26:42–:49. When pressed further, he emphasized, "The settlement Fund is just not moving forward. There's no modification. It never started. No money went from the Treasury to any other account. There's no commissioners. It's not moving forward." *Id.* at 1:27:12–:22. Later in the same hearing, he reiterated, "I'm under oath today, and I've said it's dead repeatedly." *Id.* at 2:30:44-:53.

In addition to Plaintiff's claims being not justiciable, Plaintiff lacks standing to bring the claims it asserts. Plaintiff cannot show any "injury in fact that is concrete, particularized, and actual or imminent," let alone an injury that "would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). Because courts are not "general complaint bureaus," a "federal taxpayer" does not

3

have standing just because the taxpayer thinks that a "federal expenditure" is unlawful. *Hein v. Freedom From Religion Found., Inc.*, 551 U.S. 587, 593 (2007).

Plaintiff's purported informational injuries are illusory. ECF No. 1 at ¶ 119–22. Plaintiff has not been denied any information. The Fund was not set up. There are no Members and therefore no procedures in place. And if the Fund had ever been set up, the information Plaintiff seeks could have been released under the Members' express "discretion" to make Fund matters "public in whole or in part." ECF No. 1-1 at 2. Or it could have been obtained (had it been created) under the Freedom of Information Act (not Plaintiff's shoehorned pattern or practice claim it attempts to allege here, but a proper request following the exhaustion requirements and other procedures). Indeed, the Settlement Agreement expressly incorporates any applicable federal law, including law governing the disclosure of information. *Id.* at 4–5 (Settlement Agreement does not impose requirements "inconsistent with federal statutes"). But all of this is now academic; any information about the adjudication of claims, or monetary transfers or payments, does not (and now will not) exist.

Nor can Plaintiff demonstrate redressability. "Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement." *Steel Co. v. Citizens for a Better Env't.*, 523 U.S. 83, 107 (1998). But Plaintiff's requested relief—to enjoin the Fund—could not redress, and is untethered from, the supposed denial of information on which all of Plaintiff's claimed injuries rest. The appropriate remedy for a denial of information would be the disclosure of that information, not enjoining the Fund's (non-existent) operations.

That leads to another "justiciability doctrine" that independently bars review— "ripeness." *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 807–08 (2003). Ripeness depends on "(1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Id.* at 808. A lawsuit is not "ripe for judicial review . . . until the scope of the controversy has been reduced to more manageable proportions, and its factual components fleshed out, by some concrete action" that applies to the challenger "in a fashion that harms or threatens to harm [them]." *Id.* Here, there has been (and will be) no concrete action. The dubious assumptions underlying all of Plaintiff's theories about how the Fund might have operated confirm there is no basis for judicial intervention.

Because mootness, standing, and ripeness are all fatal to Plaintiff's complaint, there is no need to reach the merits of Plaintiff's claims. But to be clear, Plaintiff also fails to plead claims for which relief can be granted. Plaintiff's Administrative Procedure Act ("APA") claims fail to allege any "final agency action," among other defects. 5 U.S.C. § 704. Plaintiff's First Amendment claim fails because it has not been restrained from engaging in any protected speech or activity. And Plaintiff's attempt to assert Congress's interests as its own—by attempting to plead a separation of powers claim—sounds only in taxpayer standing, which is to say no standing at all. The Court should dismiss Plaintiff's case with prejudice.

## BACKGROUND

In anticipation of the 2020 election, Charles Littlejohn obtained a job as an IRS contractor with the goal of leaking President Donald J. Trump's tax data. Littlejohn leaked President Trump's tax returns (and the tax data of his sons Donald J. Trump,

Jr. and Eric Trump, as well as the Trump Organization, LLC) to the New York Times in 2019. The New York Times began to publish stories about the returns in September 2020. Separately, Littlejohn stole the tax data of thousands of wealthy individuals and shared that information with another media company.

Pursuant to 26 U.S.C. § 7213(a)(1), the unauthorized disclosure of tax return information is a felony. Littlejohn was eventually caught, convicted, and sentenced to the maximum five years in prison. *See* Judgment at 35, *United States v. Littlejohn*, 1:23-cr-343 (D.D.C.) (Jan. 31, 2024) (sentencing Defendant to "Sixty (60) Months" of incarceration), *aff'd* Case No. 24-3019, 2026 WL 2065951 (D.C. Cir., July 17, 2026); *see also* U.S. Department of Justice, *Former IRS Contractor Sentenced for Disclosing Tax Return Information to News Organizations* (Jan. 29, 2024) *available at* https://www.justice.gov/archives/opa/pr/former-irs-contractor-sentenced-disclosing-tax-return-information-news-organizations.

The federal tax code also provides a right of action for taxpayers whose returns have been leaked to bring a civil action for damages against the United States. 26 U.S.C. § 7431(a)(1). And under the federal Privacy Act, when an agency fails to "establish appropriate . . . safeguards to insure the security and confidentiality of records and to protect against any anticipated threats or hazards to their security or integrity which could result in substantial harm, embarrassment, inconvenience, or unfairness to any individual on whom information is maintained," an injured individual "may bring a civil action against the agency." 5 U.S.C. § 552a(e)(10), (g)(1).

6

In 2022, another victim of Littlejohn's leak sued the United States in the Southern District of Florida and invoked these provisions. *See Griffin v. IRS*, 1:22-cv-24023 (S.D. Fla.). The United States unsuccessfully moved to dismiss the tax code claim on the ground that Littlejohn was not technically an employee of the United States (despite his contractor label). *See Griffin*, ECF No. 108 at 4–7. The court contemplated summary judgment proceedings, and potentially a trial, on that question. *See id.* at 10. Although the court held that the victim did not adequately allege damages under the Privacy Act, the court appeared to assume that the Privacy Act would otherwise apply. *See id.* at 9–10. Ultimately, the victim settled with the United States for a formal apology.[1]

On January 29, 2026, President Trump, Donald J. Trump, Jr., Eric Trump, and the Trump Organization, LLC filed a complaint in the U.S. District Court for the Southern District of Florida. *See* Complaint at 1, *President Donald J. Trump, et al. v. Internal Revenue Serv.*, 1:26-cv-20609 (Jan. 29, 2026). They asserted claims under 26 U.S.C. § 6103, 26 U.S.C. § 7431, and 5 U.S.C. § 552a(e)(10). *See id.* In the Settlement Agreement counsel for plaintiffs indicated that they intended to amend their complaint to add a putative class claim. ECF No. 1-1 at 1. President Trump had also submitted Federal Tort Claims Act ("FTCA") administrative claims for relief alleging an unlawful raid on his Mar-a-Lago home in Palm Beach, Florida, as well as unlawful targeting in relation to the infamous Russia-collusion hoax. *See id.*

---

[1] *The IRS Apologizes to Ken Griffin*, WALL STREET JOURNAL (June 26, 2024), *available at* https://www.wsj.com/opinion/the-irs-apologizes-to-ken-griffin-citadel-taxdata-charles-littlejohn-propublica-d18b1917.

Because President Trump is the Chief Executive, his lawsuits against the United States presented unique challenges. At the same time, Presidents do not forfeit their personal legal rights merely because they are President. Ultimately, the federal defendants agreed to resolve the litigation and pre-litigation FTCA administrative claims without the United States having to give the plaintiffs "monetary payment or damages of any kind," as memorialized by a Settlement Agreement dated May 18, 2026. ECF No. 1-1 at 1. Instead, the plaintiffs would "receive a formal apology." *Id.* The plaintiffs waived all claims that could have been asserted in connection with the litigation and administrative claims process. *Id.* at 2. And the United States agreed to establish "a systematic process to hear and redress claims of others who state that they incurred harm from similar Lawfare and Weaponization" through "The Anti-Weaponization Fund." *Id.*

The Settlement Agreement states that the Attorney General, within 30 days of the settlement, would enter an order to "establish funding and any other relevant requirements, rules, conditions, terms, and waivers" and "issue an order appointing [five] Members, including the Chair." *Id.* at 2. "One of the Members shall be chosen in consultation with congressional leadership," and all members would continue in their roles until the Fund concludes, "unless they resign or are removed by the President." *Id.* The Members comprising the Fund would "have the power to determine its own procedures for submitting, receiving, processing, and granting or denying claims." *Id.* And the "Fund may make those procedures public in whole or in part, in its discretion," while "taking reasonable steps to protect private personal and

8

financial information submitted to [the Fund] under th[e] Settlement Agreement." *Id.* at 2, 4.

The Settlement Agreement further states that the "Fund shall have the power to issue formal apologies, issue monetary relief owed to claimants as a result of their legal rights, grant claims in whole or in part, deny claims in whole or in part, defer review of claims, and receive and request evidence or other support for claims, including requesting information from, or consulting with, federal agencies." *Id.* at 2–3. And "[o]n a quarterly basis, or otherwise as directed by the Attorney General, The Anti-Weaponization Fund shall provide to the Attorney General a confidential written report that includes the name and address of each claimant who has received any relief and if so, the nature of such relief." *Id.* at 3. The Fund would "cease processing claims no later than December 1, 2028," and the Fund would "transfer [any remaining] balance . . . to the Department of Commerce, Interior, or another appropriate federal government account as designated by the President." *Id.* (citing 43 U.S.C. §§ 1473, 1737(c); 15 U.S.C. § 1522).

The Settlement Agreement states that "[t]o be eligible for relief, a claimant must assert at least one legal claim stating that the claimant was a victim of Lawfare and/or Weaponization." ECF No. 1-1 at 3. In evaluating claims, the Fund would "consider the totality of the circumstances," including:

> a. The strength of the claim and supporting evidence.
> b. The claimant's actions.
> c. The claimant's actual damages . . . .
> d. Reasonable attorneys' fees paid by the claimant as a result of the Lawfare and Weaponization.

> e. Any time the claimant spent in prison . . . or custody as a result of the Lawfare and Weaponization.
> f. Whether and to what extent the claimant has already obtained any form of relief . . . from any source.
> g. Other factors The Anti-Weaponization Fund deems just and appropriate.

*Id.* at 3–4. The Settlement Agreement clarifies that it does not "impose on Defendants . . . any duty, obligation, or requirement, the performance of which would be inconsistent with federal statutes." *Id.* at 4–5.

On May 18, 2026, the Attorney General issued an order pursuant to the Settlement Agreement. *See* ECF No. 1-2. The order stated that the United States would "provide the U.S. Department of the Treasury with all necessary forms and documentation to direct a payment of $ 1,776,000,000 to an account for the sole use by the Anti-Weaponization Fund" "[w]ithin 60 days." *Id.* at 1. The order also noted that previous cases have been settled on similar terms. *See id.* at 1–2 (citing, e.g., *Keepseagle v. Vilsack*, 102 F. Supp. 3d 306, 309 (D.D.C. 2015)).[2]

---

[2] The *Keepseagle* settlement "created a Compensation Fund . . . of $680,000,000" that would be paid through a "Non-Judicial Claims Process." 102 F. Supp. 3d at 309. Unlike the Anti-Weaponization Fund, which would revert any balance to the federal government, the *Keepseagle* settlement provided for "leftover" money to be distributed to persons and entities that the plaintiffs' class counsel designated as having benefited Native American farmers and ranchers. *See id.* Such persons and entities included "non-profit organizations." *Id.* (alteration omitted). When the non-judicial claims process concluded, "approximately $380,000,000 remained leftover," leading to further settlement modifications and litigation about what persons and entities would receive the remaining funds. *Id.* at 310. The Obama administration also administratively created a voluntary claims process for Hispanic and women farmers, without requiring the filing of a prior lawsuit, by making over $1.3 billion available from the Judgment Fund (plus up to $160 million in debt relief). Department of Justice, *Department of Justice and USDA Announce Process to Resolve Discrimination Claims of Hispanic and Women Farmers* (Feb. 25, 2011), *available at* https://www.justice.gov/archives/opa/pr/department-justice-and-usda-announce-process-resolve-discrimination-claims-hispanic-and-women; *see also Garcia v. Vilsack*, No. 00-2445 (D.D.C.); *Love v. Vilsack*, No. 00-02502 (D.D.C.).

Following this announcement, however, the political process continued to unfold. In the ensuing weeks, the Department, through its official pages, in its court filings, in its representations to courts, and through the testimony of the Acting Attorney General before a Committee of the House of Representatives stated that "we are not moving forward with the Fund, period." House Oversight Hearing, at 40:30–42:50. Thereafter, the Acting Attorney General testified, under oath, to the Senate Judiciary Committee, in his confirmation hearing to be Attorney General of the United States of America that "there is no weaponization fund. The weaponization fund is dead, it's not moving forward" and "I am under oath today and I've said it's dead repeatedly." Nomination Hearing at 1:26:42–:49, 2:30:44–47.

In addition to the developments through the political process, the judicial process also brought new developments. Relying on the Acting Attorney General's testimony to the House Committee and the representations of counsel in its papers and in open court, this Court denied Plaintiff's motions for preliminary relief. *See* Minute Entry dated June 10, 2026; ECF No.s 20, 21. Across the river, another court gave less credence to the same representations and entered a preliminary injunction on June 12, enjoining any further action relating to the Fund. ECF No. 18; *see Floyd v. U.S. Dep't of Justice*, 1:26-cv-1933 (E.D. Va. June 12, 2026) (ECF No. 85 Order Granting Motion for Preliminary Injunction).

## LEGAL STANDARD

Defendants move to dismiss this action under both Rule 12(b)(1) and 12(b)(6). "Rule 12(b)(1) permits a party to challenge the Court's jurisdiction, whereas Rule

11

12(b)(6) permits a party to challenge the sufficiency of the Complaint." *Bailey v. Bureau of Prisons*, 133 F. Supp. 3d 50, 53 (D.D.C. 2015) (Leon, J.). "When a defendant files a motion to dismiss a complaint for lack of subject matter jurisdiction, the plaintiff bears the burden of establishing jurisdiction by a preponderance of the evidence." *Id.* at 54 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)). "In considering a motion to dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1), the Court is not confined to the letter of the complaint and may 'consider such materials outside the pleadings as it deems appropriate to resolve the question [of] whether it has jurisdiction to hear the case.'" *Id.* (quoting *Scolaro v. District of Columbia Bd. of Elections & Ethics*, 104 F. Supp. 2d 18, 22 (D.D.C.2000)). This is tied to the Court's "independent obligation to ensure [a] case falls within the bounds of Article III of the Constitution." ECF No. 20 at 5 (citing *TikTok Inc. v. Garland*, 122 F.4th 930, 947 (D.C. Cir. 2024)).

On a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Bailey*, 133 F. Supp. 3d at 54 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "Although the plaintiff must be given every favorable inference that may be drawn from the factual allegations, the Court need not accept as true 'a legal conclusion couched as a factual allegation,' or inferences that are entirely unsupported by the facts pled in the complaint." *Id.* at 53–54 (quoting *Trudeau v. Fed. Trade Comm'n,* 456 F.3d 178, 193 (D.C.Cir.2006)). And while "the plausibility standard is not akin to a probability requirement … the facts alleged in the complaint 'must be enough to raise a right to

relief above the speculative level." *Id.* at 54 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007)) (internal quotations omitted). "Thus, to suffice, a complaint must offer in support of its allegations more than mere 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action.'" *Id.*; *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

**ARGUMENT**

### I.    PLAINTIFF'S CLAIMS ARE NOT JUSTICIABLE

Under Article III, federal courts can exercise jurisdiction over only "Cases" and "Controversies." U.S. Const. Art. III, § 2, cl. 1. "The case or controversy requirement limits the role of the Federal Judiciary in our system of separated powers." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 378 (2024). This Court has already considered the merits of the case's justiciability and correctly concluded that it lacks jurisdiction to hear this challenge to the Anti-Weaponization Fund "because the case is moot or, in the alternative, not ripe." ECF No. 20 at 2.

### A. Plaintiff's Claims Are Not Ripe For Adjudication.

One part of the "justiciability doctrine"—which independently resolves this matter—is "ripeness." *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 807–08 (2003). The ripeness doctrine is not a mere speed bump; it is a doctrine "drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." *Id.* at 808 (quoting *Reno v. Cath. Social Servs., Inc.*, 509 U.S. 43, 57, n.18 (1993)). For a controversy to be ripe, its "factual components" should be "fleshed out, by some concrete action" that applies to the challenger "in a fashion that harms or threatens to harm them." *Id.*

13

The Supreme Court has specifically stated that ripeness is lacking when a claim or injury depends on "contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998). "Dismissal for lack of ripeness is appropriate where '(n)othing in the record shows that appellants have suffered any injury thus far, and the law's future effect remains wholly speculative.'" *Metzenbaum v. FERC*, 675 F.2d 1282, 1290 (D.C. Cir. 1982) (quoting *Socialist Labor Party v. Gilligan*, 406 U.S. 583, 589 (1972)). Or, as the Fourth Circuit has put it: "Where an injury is contingent upon a decision to be made by a third party that has not yet acted, it is not ripe as the subject of decision in a federal court." *Doe v. Virginia Dep't. of State Police*, 713 F.3d 745, 758 (4th Cir. 2013).

The test for ripeness, requires courts to assess "(1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Nat'l Park*, 538 U.S. at 808; ECF No. 20. at 12 (quoting *Cobell v. Jewell*, 802 F.3d 12, 21 (D.C. Cir. 2015)). Plaintiff has the "burden of proving ripeness, and its allegations are not entitled to presumptive truthfulness." *Beach TV Props., Inc. v. Solomon*, 254 F. Supp. 3d 118, 131 (D.D.C. 2017) (citing *Renne v. Geary*, 501 U.S. 312, 316 (1991)).

When evaluating whether a case is fit for judicial decision, courts consider "whether the issue is purely legal, whether consideration of the issue would benefit from a more concrete setting, and whether the agency's decision is sufficiently final." *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 440 F.3d 459, 463–64 (D.C.

14

Cir. 2006). As discussed, *infra*, there is no final agency action or decision. But there are also not any concrete facts that allow the Court to rule on a purely legal dispute.

There has been (and will be) no concrete action. No Members were appointed. No claims procedures were established. No claims were formally submitted, received, adjudicated, granted, or denied. No claimant received money, let alone engaged in any of the (highly attenuated) conduct that Plaintiff alleges it is concerned about. And the Acting Attorney General's statements to Congress only underscore that all of these events could not occur as Plaintiff anticipates—in fact, they will not "occur at all." *Texas*, 523 U.S. at 300.

Thus, Plaintiff's dubious assumptions about how the Fund might have operated, who it might have compensated, and the injuries that may have caused Plaintiff (underlying the entire compliant) are precisely the type of speculative harms the Supreme Court routinely finds unripe. And for good reason. As a constitutional doctrine, ripeness is "designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'" *Nat'l Park*, 538 U.S. at 807–08 (quoting *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 148–49 (1967)). "Just as the constitutional standing requirement for Article III jurisdiction bars disputes not involving injury-in-fact, the ripeness requirement excludes cases not involving present injury. As the Supreme Court stated in *Whitmore v. Arkansas*, '[a]llegations of possible future injury do not

satisfy the requirements of Art. III.'" *Wyoming Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 48 (D.C. Cir. 1999) (internal citation omitted).

There is also no hardship to Plaintiff from this Court withholding consideration of its claims. The bare existence of the Settlement Agreement and corresponding order has no "direct effect on the day-to-day" operations of Plaintiff. *Texas*, 523 U.S. at 301. And Plaintiffs cannot rely on "abstraction[s]" in the absence of some "primary conduct [that] is affected." *Id.* at 302. The "hardship . . . of biding [their] time" is thus "insubstantial." *Id.* By contrast, requiring the parties to litigate in the abstract, without a concrete set of facts against which to analyze Plaintiff's claims, would cause the parties significant hardship. It would also cause this Court hardship. "Unnecessary decisions dissipate judicial energies better conserved for litigants who have a real need for official assistance." Wright & Miller, Fed. Practice and Procedure § 3532.1 (3d ed. April 2026 update). The Court was correct when it said, "postponing review imposes no cognizable hardship on CREW." ECF No. 20 at 14. The events that have transpired since the Court published its opinion on preliminary relief have only reiterated that there will be no hardship to Plaintiff by postponing review, because the complained-of action is no longer occurring.

Ultimately, it is Plaintiff's burden to establish justiciability, and it cannot do that here.

### B.  This Case Is Moot.

This is a rare case that is simultaneously premature *and* already moot. This Court's mootness analysis in *CREW* is correct and should be similarly applied here.

This case does not present a "Case" or "Controversy," because "the issues presented are no longer live [and] the parties lack a legally cognizable interest in the outcome." *Already, LLC v. Nike Inc.*, 568 U.S. 85, 91 (2013) (internal quotation marks omitted). And while it is true that "the initial burden of proving mootness lies with the party claiming it," *Planned Parenthood of Wis., Inc. v. Azar*, 942 F.3d. 512, 516 (D.C. Cir. 2019), the Acting Attorney General's testimony to Congress makes it "absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Already*, 568 U.S. at 91 (quotation omitted). And that is true "[n]o matter how vehemently the parties continue to dispute the lawfulness of the conduct that precipitated the lawsuit." *Id.* Because "the court is not empowered to decide moot questions," *People of State of Cal. v. San Pablo & T.R. Co.*, 149 U.S. 308, 314 (1893), this case should be dismissed in its entirety.

This Court has previously—and correctly—applied the presumption of regularity to the Acting Attorney General's public statements and representations of Counsel. ECF No. 20 at 1. Since that time the Acting Attorney General has further reiterated his comments, under oath, at his Senate Hearing to become the Attorney General. There he said the Fund "is a moot issue, meaning there is no weaponization fund. The weaponization fund is dead, it's not moving forward … The settlement Fund is just not moving forward. There's no modification. It never started. No money went from the Treasury to any other account. There's no commissioners. It's not moving forward. Nomination Hearing at 1:26:42–1:27:22. Based on these statements, the challenged conduct can "not reasonably be expected to recur." *Friends of the*

17

*Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000). Accordingly, this case is moot and should be dismissed.

### C. Plaintiff Lacks Standing.

Finally, under a traditional standing analysis, this case fails to present an Article III Case or Controversy. Federal courts do not "operate as an open forum for citizens 'to press general complaints about the way in which government goes about its business.'" *All. for Hippocratic Med.,* 602 U.S. at 379 (quoting *Allen v. Wright*, 468 U.S. 737, 760 (1984)). For the same reason, "taxpayer standing" does not exist just because a plaintiff "challenges [a] Government expenditure." *Hein,* 551 U.S. at 593. "The requirement that the plaintiff possess a personal stake helps ensure that courts decide litigants' legal rights in specific cases, as Article III requires, and that courts do not opine on legal issues in response to citizens who might 'roam the country in search of government wrongdoing.'" *All. for Hippocratic Med.*, 602 U.S. at 379 (quoting *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 487 (1982)). Standing doctrine also "tends to assure that the legal questions presented to the court will be resolved, not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action." *Valley Forge*, 454 U.S. at 472. "[T]he standing requirement means that the federal courts may never need to decide some contested legal questions: 'Our system of government leaves many crucial decisions to the political processes,' where democratic debate can occur and a wide variety of interests and views can be weighed." *All. For Hippocratic Med.*, 602

18

U.S. at 380 (quoting *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 227 (1974)).

"[T]o establish standing, a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion*, 594 U.S. at 423. "And standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." *Id.* at 431.

The first requirement, "injury in fact," requires an injury that is "real and not abstract," and "particularized" to "the plaintiff in a personal and individual way" (rather than a "generalized grievance"). *All. for Hippocratic Med.*, 602 U.S. at 381 (internal quotation marks omitted). For a concrete harm to exist, an alleged injury must have a "close relationship" to a harm "traditionally recognized as providing a basis for a lawsuit in American courts." *TransUnion*, 594 U.S. at 424 (internal quotation marks omitted). "The most obvious are traditional tangible harms, such as physical harms and monetary harms." *Id.* at 425. Intangible harms are concrete only if they have a sufficient historical pedigree "as providing a basis for lawsuits in American courts." *Id.*

To establish causation, a plaintiff must show that his alleged "injury likely was caused or likely will be caused by the defendant's conduct." *All. for Hippocratic Med.*, 602 U.S. at 382. When a plaintiff does not challenge government action "that require[s] or forbid[s] some action by the plaintiff," causation "is ordinarily

19

substantially more difficult to establish." *Id.* (internal quotation marks omitted). That is partly because "plaintiffs attempting to show causation generally cannot 'rely on speculation about the unfettered choices made by independent actors not before the courts.'" *Id.* at 383 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 415 n.5 (2013)). "The causation requirement precludes speculative links" where "downstream injury to plaintiffs" is not "sufficiently predictable," as well as "attenuated links . . . where the government action is so far removed from its distant (even if predictable) ripple effects." *Id.*

To establish redressability, a plaintiff must show "a likelihood that the requested relief will redress the alleged injury." *Steel Co.*, 523 U.S. at 103. Such relief must benefit the plaintiff "as opposed to the citizenry at large" or the "undifferentiated public interest." *Id.* at 106, 107. "[A]lthough a suitor may derive great comfort and joy" from a favorable judgment because they would believe "the United States Treasury is not cheated, that a wrongdoer gets his just deserts, or that the Nation's laws are faithfully enforced, that psychic satisfaction is not an acceptable Article III remedy because it does not redress a cognizable Article III injury." *Id.* at 107.

As those principles make clear, Plaintiff flunks the standing inquiry at every step. For the same reasons this case is moot, Plaintiff cannot establish injury in fact, causation, or redressability. And as an ideological objector to a proposed program that could have resulted in government expenditures, Plaintiff is no different from the many litigants who have unsuccessfully sought to invoke taxpayer standing. Plaintiff

20

has no individualized interests distinct from "the interests of the public at large." *Hein*, 551 U.S. at 600; *see* ECF No. 1 at ¶ 132–33 (invoking expenditure language in Count I of Plaintiff's Complaint); *see also* ECF No. 10-1 (invoking "taxpayer" rhetoric fifteen times).

Plaintiff also argues that it is suffering "informational injuries" because the Fund "evade[s] disclosure and records preservation obligations" under federal law. *See e.g.*, ECF No. 1 at ¶¶ 201–213 (Counts VII and VIII). "A plaintiff claiming informational standing suffers a concrete injury if he is denied information that a 'statute entitled him to receive.'" *Am. First Legal Found. v. Greer*, 153 F.4th 1311, 1315 (D.C. Cir. 2025) (quoting *Am. Soc'y for Prevention of Cruelty to Animals v. Feld Ent., Inc.*, 659 F.3d 13, 23 (D.C. Cir. 2011)). But that is clearly not the case here. As an initial matter, the information that Plaintiff apparently wants—about Fund payments, procedures, policies, and award recipients—does not, and will never, exist. There are no payments or claims or procedures, because there is no Fund. But more fundamentally, there is no statute that entitles Plaintiff to receive information they allege they are being deprived of. At best, they point to general disclosure statutes, which are insufficient to create the specified harm needed to bring a private cause of action where one is lacking in the statute itself. That should be the end of this case.

Regardless, any assumption that the Fund would have operated in conflict with federal disclosure laws rests on sheer speculation. Indeed, the Settlement Agreement expressly contemplates the application of "federal statutes." ECF 1-1 at 5. Such an assumption—that the government's default position will be noncompliance

21

with the law—is also inconsistent with the presumption of regularity. *See Jud. Watch, Inc. v. Dep't of Justice*, 319 F. Supp. 3d 431, 438–39 (D.D.C. 2018) (Friedrich, J.) (holding "[a]bsent evidence to the contrary, a government employee is presumed to have properly discharged the duty" to comply with federal records management laws (citing *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 174 (2004))). The fact that the Settlement Agreement elsewhere gives the hypothetical Members "discretion" to make any or all "procedures public" must be read against that backdrop recognition of federal statutory requirements. ECF No. 1-1 at 2. If anything, the potential for the Members to have provided transparency above and beyond such requirements reinforces the speculative layers of Plaintiff's standing theory. *If* the Fund had ever been set up, *if* the information that Plaintiff seeks ever existed, and *if* Plaintiff were ever denied that information, then Plaintiff might have had standing (to bring a FOIA claim at best). In this dispute all these "what-ifs" and hypotheticals prove Plaintiff's claimed injury is "too indeterminable, remote, uncertain, and indirect to furnish a basis for an appeal to the preventive powers of the Court." *Hein*, 551 U.S. at 600.

As to the FOIA pattern or practice claim, as a frequent FOIA requestor, Plaintiff surely knows that its argument that the Fund must promulgate its own FOIA regulations is baseless. ECF No. 1 at ¶¶ 201–05. Plaintiff is familiar with the Department's FOIA regulations and that the same regulations are administered by several Department components who are each responsible for responding to the requests submitted to their component. *See* 28 C.F.R. Part 16; *see also* "Find a FOIA

22

Contact at DOJ" – Office of Information Policy, U.S. Dep't of Justice, *available at* https://www.justice.gov/oip/find-foia-contact-doj/list.

Plaintiff's other claimed injuries do not move the needle. Plaintiff seeks to transform its faulty information theory into an equally faulty First Amendment theory. *See* ECF No. 1 ¶ 123. Plaintiff claims it is suffering a loss of First Amendment rights because the information Plaintiff seeks would eventually "generate speech critical of the government by [Plaintiff]." *Id.* at ¶¶ 127, 182. This downstream-speech theory fails for the reasons already discussed—and because a denial of government information is not a First Amendment injury regardless. *See McBurney v. Young*, 569 U.S. 221, 232 (2013) ("The Constitution itself is not a Freedom of Information Act" (internal quotation marks and alteration omitted)).

Even if Plaintiff had articulated an injury, it would run into a fatal redressability problem. Plaintiff must have standing not only as to each claim, but also as to each "form of relief." *TransUnion*, 594 U.S. at 431. Plaintiff asks this Court to shut down all (already-abandoned) Fund operations, halt any financial transfers, and require Defendants to preserve records. ECF No. 1 at 49 (Prayer for Relief). But all of Plaintiff's claimed injuries boil down to a purported lack of information. Any denial of information would not support, and has nothing to do with, halting non-existent Fund operations and transactions. The only remedy that even relates to redressing the sort of informational injury Plaintiff claims is Plaintiff's request for records preservation.[3] But according to Plaintiff, such records would relate to "the

---

[3] Plaintiff also ignores that the Settlement Agreement's express severability clause would apply to any unlawful prohibition on disclosure. *See* ECF No. 10-7 at 5

23

organization, functions, policies, decisions, procedures, and essential transactions of the [Fund]." ECF No. 1 at ¶ 160. There are, and will not be, any such records.

With no real injury for this Court to redress, there is little doubt what Plaintiff is actually seeking: the "psychic satisfaction" of a "favorable judgment." *Steel Co.*, 523 U.S. at 107. But federal courts do not "exercise general legal oversight of the . . . Executive Branch[.]" *TransUnion*, 594 U.S. at 423–24.

## II.    PLAINTIFF FAILS TO PLEAD ANY COGNIZABLE CAUSE OF ACTION

Given all the justiciability issues, the Court has ample ground on which to dismiss the complaint on the basis of Rule 12(b)(1) alone and it need not reach the substance of the pleadings. That said, Plaintiff also fails to allege facts that state a cognizable claim for which relief can be granted under the standard of Rule 12(b)(6). A key factor here is that the Court must take the well-pled facts as true, but the Court need not accept speculation or "accept as true legal conclusion couched as factual allegation." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). And all Plaintiff offers are hypotheticals that boil down to "*If* the Fund went forward, it *could* provide money to certain claimants, that *might* then cause some injury." ECF No. 1 at ¶¶ 106, 109–10, 113–15, 119–22. These are not facts. They are not even factual allegations. These recitations are pure, unadulterated speculation about how future events would occur or unfold. It is the opposite of the standard requiring plaintiffs to "plead[ ] factual content that allows the court" to assess the claims asserted. *Iqbal*, 556 U.S. at 678. Here, the Complaint does not contain any "well pleaded, nonconclusory factual

24

allegation[s]," *id.* at 680, that go beyond the "unadorned, the-defendant-unlawfully-harmed-me accusation" and should be dismissed, *id.* at 678.

## A. Plaintiff's APA Claims Must Fail Because There Has Been No Final Agency Action.

The Administrative Procedure Act contemplates judicial review of "final agency action." 5 U.S.C. § 704. "[T]wo conditions generally must be satisfied for agency action to be 'final' under the APA." *U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 578 U.S. 590, 597 (2016). "First, the action must mark the *consummation* of the agency's decision-making process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)) (emphasis added). Agency action is nonfinal, and thus not subject to judicial review under the APA, when it "does not itself adversely affect [the] complainant but only affects his rights adversely on the contingency of future administrative action." *DRG Funding Corp v. Secretary of Housing and Urban Development*, 76 F.3d 1212, 1214 (D.C. Cir. 1996) (quoting *Rochester Tel. Corp. v. United States*, 307 U.S. 125, 130 (1939)).

Here, there is no final agency action. Not even close. The Settlement Agreement and accompanying order do not award relief on any claims or even establish formal processes for the Fund to do so—that would have been up to the Members, who were not even appointed. No rights or obligations were determined, and no legal consequences flowed—let alone rights, obligations, or consequences that directly impact Plaintiff.

25

Plaintiff attempts to shoehorn a legal conclusion into a factual pleading by asserting that the Fund constitutes a "final agency action" subject to judicial review under 5 U.S.C. §§ 704, 706. ECF No. 1 at ¶ 145–46. But it is not true. The creation of the Fund, without further action is a legal nullity. At best, the Settlement Agreement is the *conception* of—not "consummation of"—an agency process. *Hawkes Co.*, 578 U.S. at 597. And even if money was now in the Fund—which it is not—there would still be only tentative, interlocutory action that does not impact Plaintiff. Thus, until a final agency action were to occur that awarded funding to a claimant and then a disclosure were not made, the Plaintiff will have suffered no harm. But all of this is academic because Members of the Fund were never appointed, the Fund never adopted any process or standards for evaluating or compensating claims, never received any money, and never disbursed any money. For the same reasons the case is moot and not ripe, there is no reviewable "final agency action" giving rise to the Court's jurisdiction under 5 U.S.C. § 704.

The best comparator here is APA review in agency grant-making decisions. In that context, courts have consistently held that an agency does not take final action in the grant context until it completes review of an application and decides whether to award or disburse funds. *See Karst Env't Educ. & Prot., Inc. v. EPA*, 403 F. Supp. 2d 74, 81 (D.D.C. 2005), *aff'd* 475 F.3d 1291, 1295 (D.C. Cir. 2007) (finding that the "district court's decision is unassailable"); *see also Friends of the Everglades, Inc. v. Sec'y of U.S. Dep't of Homeland Sec.*, 174 F.4th 822, 831 (11th Cir. 2026) ("The *agency* has taken no action to fund the project. Even congressional appropriation of funds for

26

a project will not allow challengers to an agency's use of those funds to obtain relief 'until the [agency] has reviewed a grant application and decided to disburse the funds.'" (quoting *Rattlesnake Coal. v. EPA*, 509 F.3d 1095, 1103 (9th Cir. 2007)); *Cnty. of Westchester v. U.S. Dep't of Hous. & Urb. Dev.*, 802 F.3d 413, 430–32 (2d Cir. 2015) (considering HUD's rejection of county's proposals and decision to withhold allocated funds was final because it made a definitive funding determination); *City of Philadelphia v. Sec'y U.S. Dep't of Interior*, No. 26-1348, 2026 WL 1755493 (3d Cir. June 18, 2026) (NPS exhibit-removal decisions not final agency action because they did not alter obligations).

Indeed, the scope of APA review for spending decisions is so narrow that agency decisions to *terminate* funding are not even subject to APA review, but are instead governed by the Tucker Act and routed to the court of Federal Claims. *Vera Institute of Justice v. U.S. Dep't of Justice*, 805 F. Supp. 3d 12, 26 (D.D.C. 2025) (Mehta, J.).

> i.    *Even if there had been final agency action, notice and comment would not have been required.*

Plaintiff suggests that the order accompanying the Settlement Agreement was subject to notice-and-comment requirements as a "legislative rule." ECF No. 1 at ¶¶ 9, 11, 90, 148–49. Putting aside the fact that this theory has no connection to Plaintiff's claimed informational injury, the claim appears to rely on what the Complaint alleges is actually Congress's injury. See ECF No. 1 at ¶ 142 (alleging "Defendants have unilaterally shifted the powers of *Congress*…") (emphasis added). This argument ignores that the order contemplated a single fund, did not create any

27

generally applicable policy, and cited similar historical examples. Approving Plaintiff's theory would also have problematic and unpredictable consequences. Entertaining notice-and-comment challenges to settlement agreements would drain significant administrative, court, and party resources.

          *ii.*    *The order does not exceed statutory authority.*

Plaintiff argues the order exceeds statutory authority and violates transparency and funding statutes. *See* ECF No. 1 at 4, 7, 16, 23, 119–20, 142, 154. These arguments fail for the reasons already discussed. But a few points warrant emphasis.

First, Plaintiff's opinions about whether the *Trump v. IRS* lawsuit was "meritless," ECF No. 1 at 16, ¶¶ 156, 188, are irrelevant. Given the justiciability problems in this case, it is hard to take Plaintiff's simplistic discussion of "Article III" (which, among other problems, ignores the fact that there were several co-plaintiffs in *Trump v. IRS*) seriously. *Id.* at ¶ 187.

Second, the Settlement Agreement requires claimants to "assert at least one legal claim," and "[t]he strength of the claim" would have been relevant to the Fund's assessment. ECF No. 1-1 at 3. Plaintiff appears to miss that basic point entirely.

Third, Plaintiff ignores the clear precedent and the Department of Justice's prior employment of a claims administration processes (via using third-party adjudicators) to administer settlement funds. *See* ECF No. 1-2 at 1–2 (citing, e.g., *Keepseagle v. Vilsack*, 102 F. Supp. 3d 306, 309 (D.D.C. 2015)). This precedent is cited in the Plaintiff's own exhibits to the complaint.

28

Finally, Plaintiff spills a great deal of ink alleging what violations of law it fears will occur in the future. ECF No. 1 at ¶¶ 119–127. Such fears only reinforce that no funds have transferred and no payments have been (or will be) made, thus underscoring why Plaintiff lacks standing and why this case is not ripe for review.

### iii.    The order is not arbitrary and capricious.

Plaintiff appears to assume that ordinary arbitrary-and-capricious review applies to a settlement agreement contemplating the establishment of a claims process to be implemented by hypothetical Members. ECF No. 1 at ¶ 185. Even if that were the case, Plaintiff ignores the actual explanation in the settlement agreement. It was intended to address "conduct . . . representative of the sustained use of the levers of government power . . . in order to target individuals, groups, and entities for improper and unlawful political, personal, and/or ideological reasons." ECF No. 1-1 at 1. Plaintiff does not meaningfully challenge that rationale or allege facts to support why it is arbitrary.

### B. Plaintiff's "Equitable Causes of Action" Also Fail

As an initial matter, it is unclear what "equitable causes of action" Plaintiff brings, the legal basis for bringing those claims, and the facts upon which such claims are premised. Plaintiff's theory appears to be that they have standing to bring a self-executing cause of action to enforce separation of powers claim.

But working off the conclusory assertions that are contained in the Complaint, Plaintiff appears to argue that the Fund impermissibly creates an Executive Branch "agency." ECF No. 1 at ¶ 104. But (i) this purported agency has no people, processes,

29

or funding; and (ii) the Department of Justice has previously provided for claims administration processes using third-party adjudicators. *See, eg.*, *Keepseagle v. Vilsack*, 815 F.3d 28, 30 (D.C. Cir. 2016). No one suggested the *Keepseagle* adjudicators comprised an "agency." So it would be especially odd to treat the similar and hypothetical Fund as one. Congress may have the "power of the purse" as a general matter, but *Keepseagle* and other similar settlements suggest no violation of the appropriations clause, as Plaintiff seems to insinuate in Count I. ECF No. 1 at ¶¶130–34.

### C. Plaintiff's *Ultra Vires* and Mandamus Claims Fail

Plaintiff also includes, barely, an *ultra vires* claim. ECF No. 1 at ¶¶ 196–99. But this claim is so bare-bones that it is difficult to understand what, precisely, the theory of that claim is. Because Plaintiff has failed to allege facts giving rise to such a claim, it should be dismissed. Defendants also reserve the right to raise any and all arguments responsive to Plaintiff's *ultra vires* claim in their reply brief given the lack of substance in the Complaint.

As to the Mandamus count, ECF No. 1 at ¶ 207, for the same reasons that this case is moot and unripe, any such relief would amount to an advisory opinion.

### D. Plaintiff's First Amendment Claim Fails.

Plaintiff appears to make First Amendment claims as well, though fails to allege it as an independent count and instead wraps it into an APA count. ECF No. 1 at ¶¶ 12, 127, 178. As noted above, there is generally no constitutional right to government information. *See McBurney*, 569 U.S. at 232. Plaintiff's argument

misleadingly pieces together language from *Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011). See ECF No. 1 at ¶ 182. The Supreme Court did not hold that a plaintiff suffers a First Amendment injury when the government withholds information subject to disclosure law. To the contrary, *Sorrell* distinguished between "a governmental denial of access to information in its possession" and the "government . . . prohibiting a speaker from conveying information that the speaker already possesses." *Sorrell*, 564 U.S. at 568 (internal quotation marks omitted). Here, there is no arguable purpose to "suppress speech." ECF No. 1 at ¶¶ 8, 181.

Even accepting Plaintiff's incorrect legal framework, Plaintiff would not have a colorable First Amendment Claim. For the reasons discussed above, Plaintiff's speculative premise that it would have been denied information is unfounded.

**CONCLUSION**

For the foregoing reasons, and the reasons articulated in the Court's Memorandum Opinion denying the Plaintiff's motion for a Preliminary Injunction, ECF No. 20, the Court should dismiss the Complaint with prejudice.

Date: July 31, 2026

STANLEY E. WOODWARD, JR.
*Associate Attorney General*


   */s/ Andrew J. Block*
Andrew J. Block
*Senior Counsel to the Associate Attorney General*
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530

*Counsel for Defendants*

31

## Certificate of Service

I hereby certify that on July 31, 2026, I filed the foregoing document with the Clerk of Court using the Court's CM/ECF system, thereby serving all counsel who have appeared in this case.

/s/ *Andrew J. Block*
Andrew Block