**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON,

Plaintiff,

v.

U.S. DEPARTMENT OF JUSTICE, *et al*.,

Defendants.

Case No. 26-cv-1789-RJL

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ..... iii

INTRODUCTION ..... 1

BACKGROUND ..... 3

STANDARD OF REVIEW ..... 7

ARGUMENT ..... 8

I. The Government Fails to Meet Its Heavy Burden of Demonstrating Mootness ..... 8

A. Defendants Fail to Eliminate Any Reasonable Expectation that the Alleged Violation will Recur ..... 9

B. The Presumption of Regularity Does Not Attach Here ..... 12

C. Defendants Have Not Irrevocably Eradicated the Effects of the Fund; Fund Records Exist, and a Court Order is Required to Ensure their Preservation ..... 14

D. Defendants' Actions Have Been Designed to Manipulate the Jurisdiction of the Courts ..... 17

II. This Matter is Ripe for Judicial Review ..... 18

A. The Issues Are Fit for Judicial Decision ..... 18

B. The Hardship Inquiry Counsels in Favor of Prompt Review ..... 20

III. CREW Has Standing to Assert Its Claims ..... 21

A. CREW Has Alleged Informational Injury ..... 22

B. CREW Has Alleged First Amendment Injury ..... 24

C. CREW Has Alleged Procedural Injury ..... 24

D. The Fund's Establishment Caused CREW's Injuries and the Court Is Capable of Redressing those Injuries ..... 25

IV. CREW Has Sufficiently Alleged Claims Upon Which Relief Can be Granted ..... 26

A. CREW Has Alleged an Equitable Constitutional Claim ..... 26

B. CREW Sufficiently Alleges that Establishment of the Fund Violated the APA ..... 28

1. Establishment of the Fund Constitutes Final Agency Action ..... 28

2. Defendants Created the Fund Without Following the Required Notice-and-Comment Process ..... 31

3. Establishment of the Fund is Contrary to Federal Law ..... 32

4. The Structure of the Fund Inhibits CREW's First Amendment Rights ..... 37

5. Establishment of the Fund was Arbitrary and Capricious ..... 39

C. Establishment of the Fund Constitutes *Ultra Vires* Action ..... 40

D. CREW Alleges a Policy or Practice Claim under FOIA ..... 41

E. Absent Other Relief, CREW Is Entitled to a Writ of Mandamus ............................ 42
CONCLUSION ............................................................................................................ 42

## TABLE OF AUTHORITIES*

**Cases**

*Abbott Labs. v. Gardner*,
387 U.S. 136 (1967) .......... 18

*In re Aiken Cnty.*,
725 F.3d 255 (D.C. Cir. 2013) .......... 42

*In re Al-Nashiri*,
47 F.4th 820 (D.C. Cir. 2022) .......... 18

*Am. Hist. Ass'n v. Trump*,
2026 WL 1412395 (D.D.C. May 20, 2026) .......... 23, 24

*Am. Nat'l Ins. Co. v. F.D.I.C.*,
642 F.3d 1137 (D.C. Cir. 2011) .......... 8

*Arpaio v. Obama*,
797 F.3d 11 (D.C. Cir. 2015) .......... 8

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......... 8

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .......... 8

*Bellion Spirits, LLC v. United States*,
7 F.4th 1201 (D.C. Cir. 2021) .......... 20

*Bennett v. Spear*,
520 U.S. 154 (1997) .......... 29

*Block v. Meese*,
793 F.2d 1303 (D.C. Cir. 1986) .......... 25

*Boardman v. Inslee*,
978 F.3d 1092 (9th Cir. 2020) .......... 39

*Bowsher v. Synar*,
478 U.S. 714 (1986) .......... 21

*Carlson v. Postal Regul. Comm'n*,
938 F.3d 337 (D.C. Cir. 2019) .......... 39

*Cement Kiln Recycling Coal. v. EPA*,
493 F.3d 207 (D.C. Cir. 2007) .......... 18

*City of Billings v. TSA*,
153 F.4th 46 (D.C. Cir. 2025) .......... 31

*Consumers' Rsch. v. Consumer Prod. Safety Comm'n*,
91 F.4th 342 (5th Cir. 2024) .......... 24

---

* Authorities marked with an asterisk are those on which counsel chiefly relies.

**Cases—continued**

*Cotton v. Heyman*,
63 F.3d 1115 (D.C. Cir. 1995) ....................34

*CREW v. Cheney*,
593 F. Supp. 2d 194 (D.D.C. 2009) ....................23

**CREW v. DOJ*,
846 F.3d 1235 (D.C. Cir. 2017) ....................22, 41, 42

*CREW v. EOP*,
587 F. Supp. 2d 48 (D.D.C. 2008) ....................23

*CREW v. Off. of Admin.*,
566 F.3d 219 (D.C. Cir. 2009) ....................34

*CREW v. OMB*,
791 F. Supp. 3d at 47-48 ....................24

*CREW v. U.S. DOGE Serv.*,
769 F. Supp. 3d 8 (D.D.C. 2025) ....................34

*CREW v. Wheeler*,
352 F. Supp. 3d 1 (D.D.C. 2019) ....................9

*Ctr. for Biological Diversity v. U.S. Int'l Dev. Fin. Corp.*,
77 F.4th 679 (D.C. Cir. 2023) ....................22, 23

*Dep't of Com. v. New York*,
588 U.S. 752 (2019) ....................22

*Dep't of Def. v. FLRA*,
510 U.S. 487 (1994) ....................23

*Echevarria-N. v. Shinseki*,
437 F. App'x 941 (Fed. Cir. 2011) ....................13

*Elrod v. Burns*,
427 U.S. 347 (1976) ....................24

*FBI v. Fikre*,
601 U.S. 234 (2024) ....................9

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) ....................25

*FEC v. Akins*,
524 U.S. 11 (1998) ....................22

*FEC v. Cruz*,
596 U.S. 289 (2022) ....................33

*Fed. Educ. Ass'n v. Trump*,
795 F. Supp. 3d 74 (D.D.C. 2025) ....................13

**Cases—continued**

*Fed. Express Corp. v. Dep't of Com.*,
39 F.4th 756 (D.C. Cir. 2022) .......... 40, 41

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
561 U.S. 477 (2010) .......... 26, 27

*Freedom Republicans, Inc. v. FEC*,
13 F.3d 412 (D.C. Cir. 1994) .......... 25

*Friends of Animals v. Jewell*,
824 F.3d 1033 (D.C. Cir. 2016) .......... 24

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
528 U.S. 167 (2000) .......... 9

*Fusaro v. Cogan*,
930 F.3d 241 (4th Cir. 2019) .......... 39

*Harris v. D.C. Water & Sewer Auth.*,
791 F.3d 65 (D.C. Cir. 2015) .......... 8, 15

*Hearth, Patio & Barbecue Ass'n v. EPA*,
11 F.4th 791 (D.C. Cir. 2021) .......... 18, 21

*Illinois v. FEMA*,
801 F. Supp. 3d 75 (D.R.I. 2025) .......... 30

*Jafarzadeh v. Nielsen*,
321 F. Supp. 3d 19 (D.D.C. 2018) .......... 29

*Karst Env't Educ. & Prot., Inc. v. EPA*,
403 F. Supp. 2d 74 (D.D.C. 2005) .......... 30

*Knox v. Serv. Emps. Int'l Union, Loc. 1000*,
567 U.S. 298 (2012) .......... 12

*Lanphere & Urbaniak v. Colo.*,
21 F.3d 1508 (10th Cir. 1994) .......... 39

*League of United Latin Am. Citizens v. EOP*,
780 F. Supp. 3d 135 (D.D.C. 2025) .......... 17

*Learning Res., Inc. v. Trump*,
146 S. Ct. 628 (2026) (plurality opinion) .......... 27

*Los Angeles Police Dep't v. United Reporting Pub. Corp.*,
628 U.S. 32 (1999) (Scalia, J., concurring) .......... 38, 39

*McBurney v. Young*,
569 U.S. 221 (2013) .......... 37

*Medellin v. Texas*,
552 U.S. 491 (2008) .......... 28

**Cases—continued**

**Mendoza v. Perez*,
754 F.3d 1002 (D.C. Cir. 2014) ....................25, 26, 31

*N. Am. Butterfly Ass'n v. Wolf*,
977 F.3d 1244 (D.C. Cir. 2020) ....................8

*N.Y. Stock Exch. LLC v. SEC*,
2 F.4th 989 (D.C. Cir. 2021) ....................32

*NARA v. Favish*,
541 U.S. 157 (2004) ....................23

*Newport Aeronautical Sales v. Air Force*,
684 F.3d 160 (D.C. Cir. 2012) ....................41

*Ohio v. EPA*,
603 U.S. 279 (2024) ....................39

*OPM v. Richmond*,
496 U.S. 414 (1990) ....................27

*Owlfeather-Gorbey v. Avery*,
119 F.4th 78 (D.C. Cir. 2024) ....................13

*Payne Enters., Inc. v. United States*,
837 F.2d 486 (D.C. Cir. 1988) ....................20

*Perez v. Goldin*,
360 F. Supp. 2d 12 (D.D.C. 2003) (Leon, J.) ....................2, 11

*Pub. Citizen, Inc. v. FERC*,
92 F.4th 1124 (D.C. Cir. 2024) ....................9

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
566 U.S. 639 (2012) ....................16

*Rio Grande Pipeline Co. v. FERC*,
178 F.3d 533 (D.C. Cir. 1999) ....................18

*Seila L. LLC v. CFPB*,
591 U.S. 197 (2020) ....................21

*Shomberg v. United States*,
348 U.S. 540 (1955) ....................17

**Sorrell v. IMS Health Inc.*,
564 U.S. 552 (2011) ....................24, 38, 39

*Soundboard Ass'n v. FTC*,
888 F.3d 1261 (D.C. Cir. 2018) ....................29

*South Dakota v. Dole*,
483 U.S. 203 (1987) ....................30

**Cases—continued**

*Texas v. United States*,
523 U.S. 296 (1998)....................18

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021)....................21

**Trump v. IRS*,
No. 26-cv-20609, 2026 WL 2015525 (S.D. Fla. July 13, 2026) .................... *passim*

*Trump v. Slaughter*,
146 S. Ct. 2283 (2026)....................28

*Trump v. United States*,
603 U.S. 593 (2024) (Thomas, J., concurring) ....................27

*U.S. Dep't of Navy v. FLRA*,
665 F.3d 1339 (D.C. Cir. 2012) (Kavanaugh, J.)....................27

*United Reporting v. Cal. Highway Patrol*,
96-cv-0888-B (S.D. Cal. Aug. 14, 2001)....................39

*United States v. W. T. Grant Co.*,
345 U.S. 629 (1953)....................9

*Vill. of Kaktovik v. Watt*,
689 F.2d 222 (D.C. Cir. 1982) ....................11

*Waterkeeper All. v. EPA*,
853 F.3d 527 (D.C. Cir. 2017) ....................22

*West Virginia v. EPA*,
597 U.S. 697 (2022)....................9

*World Wide Mins., Ltd. v. Republic of Kaz.*,
296 F.3d 1154 (D.C. Cir. 2002) ....................41

*Zillow, Inc. v. Miller*,
126 F.4th 445 (6th Cir. 2025) ....................39

**Constitutional Provisions**

U.S. Const. amend. XIV, § 4 ....................40

U.S. Const., art. I, § 8, cl. 1....................26

U.S. Const., art. I, § 9, cl. 7....................26

U.S. Const. art. II, § 1, cl. 7 ....................40

**Statutes, Rules & Regulations**

*5 U.S.C.
§ 552(a)(1) ....................35
§ 552(a)(1)(A) ....................23
§ 552(a)(2) ....................35
§ 552(a)(3)(A) ....................35
§ 552(a)(4)(i) ....................35
§ 552(f)(1) ....................34
§ 706(2)(A) ....................33
§ 706(2)(C) ....................33

28 U.S.C.
§ 509 ....................16
§ 2414 ....................33

31 U.S.C.
§ 1301(a) ....................35, 36
§ 1304 ....................33
§ 1304(a)(3)(A) ....................33
§ 1304(g) ....................34
§ 1341 ....................35, 37
§ 1342 ....................35, 37
§ 1532 ....................35, 36
§ 3302(b) ....................36

*44 U.S.C.
§ 2901(14) ....................34
§ 3101 ....................35
§ 3102 ....................35
§ 3103 ....................35
§ 3104 ....................35
§ 3105 ....................35
§ 3106 ....................35
§ 3107 ....................35

28 C.F.R.
§ 50.23(a) ....................32
§ 50.23(b) ....................32

31 C.F.R. § 256.1(a) ....................33

36 C.F.R. Pt. 1220 ....................35

**Other Authorities**

Ellie Quinlan Houghtaling, *The Worst People You Know Are Applying to Trump's Slush Fund*, The New Republic (May 21, 2026) ....................15

House Appropriations Committee, *Oversight Hearing - DOJ* (YouTube, June 2, 2026) ....................1, 6

**Other Authorities—continued**

Jeremy Roebuck, *Blanche formally rescinds plan for 'weaponization' fund, in deal to advance AG nomination,* Wash. Post (Aug. 3, 2026) ....12

Mem. from the Attorney General, Reinstating the Prohibition on Improper Third-Party Settlements (Feb. 5, 2025) ....32

Molly Beck & Clara Strecker, *Ex-Trump attorney Troupis seeks $3.2M from new 'weaponization' fund*, Milwaukee Journal Sentinel (May 26, 2026) ....15

Order Rescinding Attorney General's May 18, 2026 Order, Office of the Attorney General (Aug. 2, 2026) ....1, 7, 10

Pod Force One with Miranda Devine and New York Post, *Donald Trump Unleashed* (YouTube June 3, 2026) ....12

President Donald J. Trump (@realDonaldTrump), Truth Social (Jul. 31, 2026, 7:03am ET) ....12

Press Release, *Justice Department Announces Anti-Weaponization Fund*, U.S. Department of Justice (May 18, 2026) ....1, 19

Siladitya Ray, *Ex-Trump Official Seeks $2.7 Million Payout From President's $1.8 Billion 'Anti-Weaponization' Fund*, Forbes (May 20, 2026) ....15

U.S. Gov't Accountability Off., *GAO-06-382SP, Principles of Federal Appropriations Law* 6-166 (3d ed., Vol. II, Feb. 2006) ....36

White House, Nomination Sent to the Senate (June 8, 2026) ....7

## INTRODUCTION

On May 18, 2026, "the Attorney General established 'The Anti-Weaponization Fund.'" Press Release, *Justice Department Announces Anti-Weaponization Fund*, U.S. Department of Justice ("DOJ") (May 18, 2026), https://perma.cc/V9TK-TPKW. The Fund is historically unprecedented, and it represents one of the most brazen acts of corrupt government self-dealing in American history. Defendants created the Fund under the guise of a settlement agreement in a lawsuit—*Trump v. IRS*—that the sitting President brought against federal agencies that he controls. Compl. ¶¶ 68-99 (ECF 1). They launched the Fund as a freestanding federal entity not answerable to the Attorney General or any other cabinet official. *Id.* They created five new Executive Branch offices and made the office holders removable only by the President. *Id.* They authorized the use of nearly $2 billion in separately appropriated taxpayer money for the Fund's capitalization and operations and endowed the Fund with unreviewable powers to dole out that money to persons claiming to be a victim of "lawfare" or "weaponization" by "Democrat elected officials." *Id.* And they bestowed on the President the power to determine how residual federal money would be handled once the Fund ceased operations. *Id.* They took all these actions without any statutory authorization and in violation of fundamental Constitutional principles, including that only Congress can create federal agencies and provide for their funding.

Plaintiff Citizens for Responsibility and Ethics in Washington ("CREW") swiftly filed this suit challenging the Fund's legality. But in an effort to avoid adjudication of the legality of the Fund and to dampen political criticism of it, the Acting Attorney General testified on June 2d that the Fund would not move forward, *see* House Appropriations Committee, *Oversight Hearing – DOJ*, at 40:30-41:00 (YouTube, June 2, 2026), https://tinyurl.com/ym67xahs, and he subsequently issued a unilateral rescission of an order relating to the Fund that had been incorporated into the *Trump v. IRS* Settlement Agreement. *See* Order Rescinding Attorney General's May 18, 2026

Order, Office of the Attorney General (Aug. 2, 2026), https://tinyurl.com/4zmjcr25 ("Order of August 2, 2026"). Defendants now argue that voluntary cessation of the Fund's operations moots this case or renders the matter unripe, keeping the Fund's legality shielded from judicial scrutiny. *See* Mem. in Supp. of Mot. to Dismiss at 13-17 (ECF 22-1) ("Defs.' Mem.").

Defendants fail to meet the heavy burden required to satisfy the doctrines of mootness and ripeness. To begin with, it is hornbook law that one party to a lawsuit may not unilaterally rescind or alter a settlement agreement; thus, DOJ's unilateral alteration of the terms of the *Trump v. IRS* Settlement Agreement has no legal effect. *See Perez v. Goldin*, 360 F. Supp. 2d 12, 15 (D.D.C. 2003) (Leon, J.). Moreover, this matter is not moot because the Fund is capable of resuming operations, and defendants have not eradicated the effects of the Fund's establishment. The legality of the Fund's creation is also ripe for review. Whether defendants violated the Constitution and federal law in creating the Fund is a purely legal issue, and while postponing review poses no hardship to defendants, it would impose a hardship on CREW, including with respect to the treatment of Fund records that came into existence following the Fund's creation.

Defendants' remaining arguments are perfunctory and fall woefully short of justifying dismissal. As a government watchdog whose mission-critical functions entail monitoring Executive Branch spending and accessing federal records on topics relevant to the Fund's operations, CREW has standing to challenge the Fund's unlawfully opaque and unconstitutional structure. And CREW asserts multiple, well-supported claims that the Fund's establishment violates the Constitution, the Administrative Procedure Act ("APA"), and a host of other federal laws. Defendants' contention that these asserted claims are too "unclear" to survive a motion to dismiss is meritless. Thus, the Court should reject defendants' Motion and consider the legality of

defendants' actions, which one federal court has described as having "no viable basis in law or fact." *Trump v. IRS*, No. 26-cv-20609, 2026 WL 2015525, at *17 (S.D. Fla. July 13, 2026).

**BACKGROUND**

For years, President Trump has fixated on promoting a narrative that Democratic officials engaged in "lawfare" or "weaponization" to target him and his supporters. *See* Compl. ¶ 40. This narrative arises in large part from DOJ's appointment in 2022 of a Special Counsel to oversee investigations into the January 6 attack on the U.S. Capitol and the mishandling of classified documents transported to Trump's Mar-a-Lago Club in Florida. *Id.* ¶ 36. The Special Counsel's investigations led two grand juries to charge Trump with 44 criminal counts, including conspiracy to defraud the United States, obstructing an official proceeding, conspiracy against rights, willful retention of national security material, and obstruction of justice. *Id.* ¶ 37.

President Trump has repeatedly characterized these legitimate federal law enforcement activities as unlawful "weaponization" and "lawfare," and he has pledged to seek restitution for the more than 1,500 defendants who were charged in connection with the January 6 attack, most of whom opted to plead guilty. *Id.* ¶¶ 40-41. Despite their admissions of guilt and criminal convictions, Trump has claimed that "most of the people" involved in the January 6 attacks "were absolutely innocent," *Id.* ¶ 31, that they were "patriots," and that the legal jeopardy they faced was akin to Trump's own treatment as a "public enemy of a rogue regime." *Id.* ¶ 46.

Immediately upon taking office for his second term on January 20, 2025, President Trump granted clemency to more than 1,500 people who had been convicted of or charged with crimes related to the January 6 attacks, including brutal crimes of violence against police officers. *Id.* ¶ 47. In March 2025, President Trump publicly confirmed his administration was discussing creating a compensation fund for pardoned January 6 participants, stating: "A lot of people that are in

government now talk about [a January 6 compensation fund] because a lot of the people in government really like that group of people." *Id.* ¶ 49.

On January 29, 2026, President Trump, two of his sons, and the Trump Organization, filed a federal lawsuit against the Internal Revenue Service ("IRS") and the Treasury, seeking at least $10 billion in damages arising from the 2019 unauthorized disclosure of Trump's tax returns by a former government contractor named Charles Littlejohn. *Id.* ¶¶ 60-67. Due to the highly unusual posture of the suit—brought by a sitting President against Executive Branch agencies under his control—the Court *sua sponte* ordered briefing on whether the matter presented a "Case" or "Controversy" under Article III of the Constitution. *Id.* To help resolve that question, the Court appointed amici to submit arguments on the justiciability of the suit, and it scheduled a May 27 hearing to address these threshold issues. *Id.* Amici identified numerous threshold justiciability issues that would prevent the suit from advancing, including that the suit presented "significant Article III subject matter jurisdiction concerns" due to a lack of adversity between a sitting president seeking monetary damages for alleged harm to his personal interests from an executive agency that he controls. *Id.*

Beyond that basic issue, the claims asserted in *Trump v. IRS* were subject to numerous other obvious threshold defenses, many of which DOJ had already raised in other cases involving tax returns leaked by the same federal contractor. *Id.* (citing arguments DOJ raised in cases involving Littlejohn's leaks, including that plaintiffs' claims were barred by sovereign immunity, were time barred, and that plaintiffs failed to adequately plead actual damages). Despite these obvious defenses, DOJ never presented a single argument in defense of the United States; indeed, no DOJ attorney even made an appearance in the case. *Id.* Instead, days prior to the scheduled May 27th hearing on justiciability, DOJ executed a "settlement" agreement with the *Trump* plaintiffs.

*See* Settlement Agreement of May 18, 2026 (ECF 10-7) ("Settlement Agreement"). The Settlement Agreement incorporated into it an order issued by the Acting Attorney General on the same day. *See* Order of May 18, 2026 (ECF 10-8) ("May 18th AG Order"). In a later addendum to the Settlement Agreement, issued on May 19th, DOJ issued another order releasing President Trump, his family, and his affiliates from liability for any wrongdoing relating to any tax filings that were made prior to the purported settlement. *See* Order of May 19, 2026, ¶ C (ECF 10-11).

The Settlement Agreement, including the incorporated May 18th AG Order, created a new entity in the Executive Branch (the Fund) and authorized it to divert an astounding $1.776 billion in taxpayer money from the Treasury's Judgment Fund to compensate an ill-defined population of persons claiming to have been targeted "by Democrat elected officials, political and career federal employees, contractors, and agents" for "unlawful political, personal, and/or ideological reasons." Settlement Agreement ¶ II.C. The Fund's charter documents provide:

- The Fund shall consist of five "Members" appointed by the Attorney General and removable "without cause" by President Trump alone. Settlement Agreement ¶ IV.B;

- The Fund "shall have the power to determine its own [claims] procedures" and unfettered "discretion" to decide whether to make those "procedures public," *id.* ¶ IV.C;

- The "Fund shall have the power to issue formal apologies, issue monetary relief owed to claimants as a result of their legal rights, grant claims in whole or in part, deny claims in whole or in part, defer review of claims, and receive and request evidence or other support for claims, including requesting information from, or consulting with, federal agencies," *id.* ¶ IV.D;

- The Fund will provide the Attorney General, each quarter, a non-public "confidential written report" containing certain basic claim information, *id.* ¶ IV.E;

- The Fund's award determinations are final and not appealable or subject to judicial review, *id.* ¶ VI.B;

- Taxpayer money from the Judgment Fund will be used to capitalize the Fund with $1.776 billion to be deposited in an unidentified "Designated Account," and the United States is immune from any "liability whatsoever for the protection or safeguarding of those funds, regardless of bank failure, fraudulent transfers, or any other fraud or misuse of the funds," May 18th AG Order ¶ D;

- The Fund is authorized to use the $1.776 billion to issue awards to claimants and to pay for all functions "necessary to carry out the mission of" the Fund, *id.* ¶ E; and
- The President has discretion to determine how to handle any residual money remaining in the Fund after the Fund's termination on December 15, 2028, including transferring the balance to an agency other than the Treasury, Settlement Agreement ¶ IV.H.

CREW filed the instant lawsuit on May 22, 2026, to challenge the legality of the Fund. On May 28th, CREW moved for a temporary restraining order to halt any further operations of the Fund. *See* CREW's Mot. for Temp. Restraining Order ("TRO") (ECF 10). The following day, the U.S. District Court for the Eastern District of Virginia temporarily enjoined several defendants "from taking any further action pursuant to the creation or operation of the Anti-Weaponization Fund." Order at 1, *Floyd v. DOJ*, No. 26-cv-1399, ECF 31 (E.D. Va. May 29, 2026) (filed in this case at ECF 12-1).

In the face of mounting legal pressure and increasing, bipartisan political criticism of the Fund, on June 2d, the Acting Attorney General testified at a congressional oversight hearing that DOJ was "not moving forward with the Fund." House Appropriations Committee, Oversight Hearing – DOJ, at 40:30-41:00. However, he refused to commit to issuing a written rescission of the Fund's charter documents, and he confirmed that the Settlement Agreement and the May 19th AG Order would remain in effect. *Id.* at 41:38; at 51:18-51:40.

On June 23d, this Court rejected CREW's TRO motion, finding that the Acting Attorney General's testimony, which was repeated by defense counsel in this case and to which the Court applied the presumption of regularity, was sufficient to render CREW's motion for immediate injunctive relief moot or, in the alternative, unripe. Mem. Op. at 1-2 (ECF 20).

Meanwhile, on June 8th, the President nominated the Acting Attorney General to the position of Attorney General. *See* White House, Nomination Sent to the Senate (June 8, 2026), https://tinyurl.com/bdyypzvf. As part of a deal with Senate Republicans to secure his confirmation to that position, on August 2d, then-Acting Attorney General Blanche issued a written, unilateral rescission of the May 18th AG Order. *See* Order of August 2, 2026. He did not purport to rescind the Settlement Agreement, and the *Trump v. IRS* plaintiffs did not issue any written rescissions, amendments, or other statements regarding the Settlement Agreement or the May 18th AG Order that had been incorporated into the Settlement Agreement.

Separately, on July 13th, the *Trump v. IRS* court reopened that case to determine whether the parties had "ignored ethical norms, court rules, and legal authority to manipulate the judicial process" and "whether they did so to gild their efforts to gain unprecedented access to the public fisc with the patina of legitimacy." *Trump v. IRS*, 2026 WL 2015525, at *1. The Court ultimately answered those questions in the affirmative, holding that the case "was brought for an improper purpose—to gain the imprimatur of judicial legitimacy for a 'settlement' that had no viable basis in law or fact," *id* at *17, and that the "[p]laintiffs acted in bad faith and for an improper purpose by collusively filing a lawsuit with claims subject to multiple dispositive defenses solely to provide cover for a collusive settlement." *Id.* at *20 (cleaned up). In response to these improprieties, the *Trump v. IRS* court sanctioned several attorneys for the parties and prohibited the parties—including their representatives—from "referring to the purported 'settlement agreement,' or using, offering, admitting, or citing any of its provisions in any judicial, administrative, regulatory, arbitration, or any other official proceeding as evidence of a 'settlement' reached in" that case. *Id.* at *21. The *Trump v. IRS* plaintiffs are appealing those sanctions. *See* Notice of Appeal, *Trump v. IRS*, 26-cv-20609-KMW, ECF No. 113 (July 31, 2026).

## STANDARD OF REVIEW

Defendants move to dismiss the Complaint under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. To survive a motion to dismiss under Rule 12(b)(1), a plaintiff must establish that the court has subject matter jurisdiction over the claims asserted. *See Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015). In deciding a Rule 12(b)(1) motion, the court will "assume the truth of all material factual allegations in the complaint and 'construe the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged' and upon such facts determine jurisdictional questions." *Am. Nat'l Ins. Co. v. F.D.I.C.*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (cleaned up).

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff need only plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when the plaintiff pleads factual content that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556). When considering a Rule 12(b)(6) motion, a court must "accept the operative complaint's well-pleaded factual allegations as true and draw all reasonable inferences in the [plaintiff's] favor." *N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1249 (D.C. Cir. 2020). Factual disputes generally cannot be resolved on a motion to dismiss, as a court's "role is not to speculate about which factual allegations are likely to be proved after discovery." *Harris v. D.C. Water & Sewer Auth.*, 791 F.3d 65, 70 (D.C. Cir. 2015).

## ARGUMENT

### I. The Government Fails to Meet Its Heavy Burden of Demonstrating Mootness

The Supreme Court has recognized the general principle that "voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case,

i.e., does not make the case moot." *United States v. W. T. Grant Co.*, 345 U.S. 629, 632 (1953). Accordingly, voluntary cessation will not moot a case "unless it is *absolutely clear* that the allegedly wrongful behavior could not reasonably be expected to recur." *West Virginia v. EPA*, 597 U.S. 697, 720 (2022) (emphasis added). A party asserting mootness based on voluntary cessation must show that "(i) there is no reasonable expectation that the alleged violation will recur, and (ii) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." Mem Op. at 7 (citing *CREW v. Wheeler,* 352 F. Supp. 3d 1, 13 (D.D.C. 2019)).

This showing poses a "formidable burden," and it "holds for governmental defendants no less than for private ones." *FBI v. Fikre*, 601 U.S. 234, 241 (2024) (cleaned up); *accord Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.,* 528 U.S. 167, 189 (2000) ("The heavy burden of persuading the court . . . lies with the party asserting mootness."). The "demanding voluntary-cessation standard" applies with special force when "the facts . . . suggest" an "arguable manipulation of [the court's] jurisdiction." *Pub. Citizen, Inc. v. FERC*, 92 F.4th 1124, 1128 (D.C. Cir. 2024).

Defendants do not meet their "heavy burden" here for a number of reasons: (1) the government's purported rescission of the Fund is legally ineffective and the Fund can "move forward" at any moment; (2) the presumption of regularity does not attach in this case; (3) the defendants fail to address the "irrevocable eradication of effects" prong of the mootness showing and the effects of the Fund's establishment continue to exist; and (4) ample evidence confirms that defendants' actions were designed to manipulate the jurisdiction of the federal courts.

### A. Defendants Fail to Eliminate Any Reasonable Expectation that the Alleged Violation will Recur

In attempting to show that there is no reasonable expectation of recurrence of their unlawful conduct, defendants rely solely on the then-Acting Attorney General Blanche's June 2d testimony

regarding the future of the Fund. *See* Defs.' Mem. at 17.[1] Applying the presumption of regularity, this Court relied on that same testimony (and the statements of defendants' counsel parroting that testimony) to deny on mootness grounds CREW's motion for temporary injunctive relief. Mem. Op. at 7-10. But the government is not legally capable of unilaterally rescinding the Fund, and the steps it has taken—including leaving the Settlement Agreement in place—are insufficient to eliminate the possibility of the Fund's resumption at any moment.

The Settlement Agreement and May 18th AG Order comprise one integrated legal instrument. *See* Settlement Agreement ¶ IV.A ("An accompanying order of the Attorney General . . . shall be treated as incorporated herein."); *id.* ¶ VII ("This Settlement Agreement, including the accompanying orders by the Attorney General, constitutes the entire agreement of the Parties."). By its express terms, this integrated instrument can "be modified only with the written agreement of the Parties" in *Trump v. IRS*. *Id.* ¶ VIII. The *Trump v. IRS* parties have not issued a written modification of the Agreement. Defendants do not argue otherwise, and they take the position that the Settlement Agreement remains in force. *See* House Appropriations Committee, Oversight Hearing – DOJ, at 51:18-51:40 ("The only document I said we're not moving forward on today is the [May 18th AG Order] . . . there's still a settlement agreement and there's still the [May 19th AG Order]."). Accordingly, under the express terms of the Settlement Agreement, the June 2d testimony and the unilateral rescission of the May 18th AG Order have no legal effect. The only legally effective way for defendants to moot this case would be for the *Trump v. IRS* parties to rescind in writing all Fund-related provisions of the Settlement Agreement. *See* Settlement Agreement ¶ VIII. That has not occurred.

---

[1] Presumably, defendants would also have pointed to then-Acting Attorney General Blanche's rescission of the May 18th AG Order had that rescission occurred prior to the filing of the Motion to Dismiss. *See* Order of August 2, 2026).

The *Trump v. IRS* court recently recognized as much. The court held that DOJ's June 2d decision to halt the Fund "has not been memorialized or adopted by Plaintiffs or their lawyers." *Trump v. IRS,* 2026 WL 2015525, at *16. Instead, the Acting Attorney General purported to "speak for, and bind, both sides of th[e] matter," which is legally invalid because "a party may not unilaterally repudiate a settlement agreement once it is reached." *Id.* (cleaned up); *see also id.* ("It is 'hornbook law' requiring no citations of authority, except common sense, that a contract once entered into may not thereafter be unilaterally modified[.]") (cleaned up). The principle that one party "cannot unilaterally rescind [a] settlement agreement" applies with equal force in this circuit. *Perez*, 360 F. Supp. 2d at 15 (citing *Vill. of Kaktovik v. Watt*, 689 F.2d 222, 234 (D.C. Cir. 1982)).

Additional evidence makes clear that defendants cannot rule out the recurrence of the Fund's operations. Outside of pending litigation (which defendants argue cannot proceed on mootness grounds), no external constraints inhibit the eventual resumption of the Fund. Although then-Acting Attorney General Blanche testified that he intended to halt the Fund in perpetuity, and he subsequently issued a unilateral rescission of the May 18th AG Order, nothing prevents him or a successor from reversing course. And given defendants' position that the Settlement Agreement remains in effect, Attorney General Blanche or his successor could execute a decision to "move forward" with the Fund through the stroke of a pen. This possibility is not simply conjecture; the President has continuously and emphatically endorsed providing federal payouts to January 6th rioters and other political supporters who the President views as being victims of "lawfare." *See* Compl. ¶¶ 25-59. Resumption of the Fund aligns with that policy priority. Indeed, the day after then-Acting Attorney General Blanche issued a written rescission of the May 18th AG Order as part of a deal with Senate Republicans to facilitate his confirmation, the President stated that he "didn't look at" Blanche's statements about the future of the Fund, that he "do[es]n't know what

[Blanche and Senate Republicans] agreed," but that, because January 6th rioters "were treated so badly . . . I view that fund as a positive. And a lot of Republicans do, too." Jeremy Roebuck, *Blanche formally rescinds plan for 'weaponization' fund, in deal to advance AG nomination,* Wash. Post (Aug. 3, 2026), https://tinyurl.com/mrbkfun2. These statements are consistent with others the President has made, even *after* the June 2d testimony announcing a pause of the Fund, including that the Fund is not dead, *see* Pod Force One with Miranda Devine and New York Post, *Donald Trump Unleashed*, at 40:33-41:06 (YouTube June 3, 2026), https://tinyurl.com/ec3yavy8, that he "will always feel that [January 6th rioters] . . . should be paid back for what they were forced to endure," and that the "'Fund' . . . will not benefit me, but rather the great American Patriots who" were criminally charged for participating in an armed attack on the U.S. Capitol. President Donald J. Trump (@realDonaldTrump), Truth Social (Jul. 31, 2026, 7:03am ET), https://tinyurl.com/452h23jn. These statements should not be dismissed as simply "off-hand" remarks, *see* Mem. Op. at 10; they follow in a pattern of consistent, years-long support for the Fund and its underlying purpose of channeling federal payouts to January 6th rioters and other of the President's political supporters. *See* Compl. ¶¶ 40-59.

In addition to the President's continued support for the Fund, the government continues to defend the Fund's legality. *See, e.g.*, Defs.' Mem. at 10, 28-29. Because the defendants "continue[] to defend the legality of the [challenged action] . . . it is not clear why the [defendants] would necessarily refrain from [similar activity] in the future." *Knox v. Serv. Emps. Int'l Union, Loc. 1000*, 567 U.S. 298, 307 (2012).

**B. The Presumption of Regularity Does Not Attach Here**

In its earlier Opinion, the Court relied heavily on the presumption of regularity to credit defendants' statements that the Fund has been halted, that no Fund records were or ever will be created, and that no Fund activity occurred. Mem Op. at 1, 9. That presumption, however, applies

when an agency is acting in the regular course of business and in the absence of "clear evidence" that public officials have failed to "properly discharge[] their official duties." *Owlfeather-Gorbey v. Avery*, 119 F.4th 78, 86 (D.C. Cir. 2024); *see also Echevarria-N. v. Shinseki*, 437 F. App'x 941, 946 (Fed. Cir. 2011) ("[T]he presumption of regularity requires at least some evidence of the agency's regular course of business to support its invocation."); *Fed. Educ. Ass'n v. Trump*, 795 F. Supp. 3d 74, 90 (D.D.C. 2025) (gathering cases rejecting the application of the presumption of regularity to unprecedented Executive Branch activities, including "conduct that is so unusual and therefore irregular on its face"). This case concerns matters that are anything but the "regular course of business," and clear evidence confirms that government officials acted improperly in establishing the Fund.

The jurisdictional posture of *Trump v. IRS* and the terms of the Settlement Agreement are historically unprecedented. *See Trump v. IRS*, 2026 WL 2015525, at *1, *24 n.69 (noting that the suit raised "unprecedented jurisdictional questions" and the settlement agreement sought to provide the parties with "unprecedented access to the public fisc"). *Trump v. IRS* involved a sitting President suing federal agencies that he controls and agreeing to settle that non-adversarial lawsuit by creating a new federal entity with the power to dole out almost $2 billion in taxpayer money to persons with no legally cognizable interest in the lawsuit being settled. No one, including the defendants, can earnestly describe this fact pattern as the "regular course of business."

Indeed, DOJ did not handle the case in its regular course of business. In a typical civil case alleging government misconduct involving the leak of federal tax returns—including cases involving the same federal contractor's unauthorized leaks of other federal tax returns—DOJ attorneys have appeared on behalf of the government and advanced arguments to defend the interests of the United States. *See* Compl. ¶ 62, n.32 (gathering cases). In *Trump v. IRS*, that did

not happen. *See Trump v. IRS*, 2026 WL 2015525, at *11 (noting that DOJ's handling of the case "deviat[ed] from basic litigation strategies pursued in similar cases"). Not only did DOJ fail to appear, its Civil Division (which now includes the relevant sections of the former Tax Division that had defended other cases involving leaks by Charles Littlejohn) has *no records of the Trump v. IRS litigation at all*—meaning the government lawyers with the responsibility for and experience in handling this style of lawsuit were not assigned to the matter, and no records exist indicating they were even consulted about the case. *See id.* at *4 n.18 (noting DOJ's response to a FOIA request concerning *Trump v. IRS* stated there were no "responsive records within the Civil Division pertaining to" the case).

The obviously collusive nature of the lawsuit and the government's failure to defend itself led the *Trump v. IRS* court to conclude that "[t]here is nothing 'ordinary' about this case; it is the very definition of *sui generis*." *Id.* at *1. But *Trump v. IRS* was not just irregular, it was the result of impropriety. The suit "was brought for an improper purpose—to gain the imprimatur of judicial legitimacy for a 'settlement' that had no viable basis in law or fact." *Id.* at *17. The findings made in *Trump v. IRS* demonstrate the unprecedented nature of this case and provide clear evidence of impropriety relating to the establishment of the Fund. Those findings are sufficient to overcome any presumption of regularity that might otherwise attach to the government's conduct here.

### C. Defendants Have Not Irrevocably Eradicated the Effects of the Fund; Fund Records Exist, and a Court Order is Required to Ensure their Preservation

The Court's Memorandum Opinion concluded that defendants could satisfy the irrevocable eradication prong of the mootness test based on their representation that there "are not, and will never be," any Fund records. Mem. Op. at 10-11. Based on that statement, and applying the presumption of regularity, the Court found that no informational injury is possible here, and no judicial relief is available. *Id.* Defendants make similar representations in the instant motion. Defs.'

Mem. at 21. Defendants' representations, however, are conclusory, unsupported, and inaccurate; the Court's continued reliance on them would be misplaced.

As an initial matter, whether Fund records exist is a factual question that is inappropriate for resolution at this stage in the litigation. *See Harris*, 791 F.3d at 70. But if the Court were to engage that question, both publicly available evidence and simple logic confirm that Fund records came into existence following the establishment of the Fund on May 18th. For example:

- As alleged in the Complaint, Fund claimants have submitted claims to the Fund. Compl. ¶ 99. Press reporting further confirms the submission of claims to the Fund.[2] Records of those claims exist.

- The Settlement Agreement required the Attorney General to appoint five Fund members within 30 days of May 18th, one of whom would require congressional approval. Settlement Agreement ¶ IV.B. Fund records likely exist identifying candidates to serve as Fund members or identifying qualifications for eligibility to serve as a Fund member, and correspondence concerning the identification of Fund members likely exists from persons purporting to act on behalf of the Fund with others in the Executive Branch, with Congress, and with the *Trump v. IRS* parties.

- Fund records likely exist concerning the planned transfer of $1.776 billion in federal money from the Treasury Department to an unidentified "Designated Account," *see* May 18th AG Order ¶ C, including records identifying financial institutions that could potentially host the designated account and communications by persons purporting to act on behalf of the Fund with others in the Executive Branch regarding the planned transfer.

- Fund records likely exist concerning the June 2nd testimony that the Fund would not move forward and the effect of that testimony on the Fund's operations, including communications with the *Trump v. IRS* parties regarding the decision to suspend a centerpiece provision of the Settlement Agreement; assessments of the future viability of the Fund, including whether the Fund could resume operations in the future or reconstitute under alternative nomenclature; records reflecting consideration of alternate pathways for compensating Fund claimants; and correspondence from persons purporting to act on behalf of the Fund with persons in the Executive Branch, with Congress, with financial institutions, and with Fund member candidates concerning the status of the Fund.

---

[2] *See, e.g.*, Siladitya Ray, *Ex-Trump Official Seeks $2.7 Million Payout From President's $1.8 Billion 'Anti-Weaponization' Fund*, Forbes (May 20, 2026), https://tinyurl.com/3ydtvazb; Molly Beck & Clara Strecker, *Ex-Trump attorney Troupis seeks $3.2M from new 'weaponization' fund*, Milwaukee Journal Sentinel (May 26, 2026), https://archive.ph/th8CG; Ellie Quinlan Houghtaling, *The Worst People You Know Are Applying to Trump's Slush Fund*, The New Republic (May 21, 2026), https://tinyurl.com/44yby38y.

That DOJ may be in possession of some or all of these records, and that DOJ maintains its own records-related regulations, does not resolve CREW's claims. CREW alleges that the Fund is *not* a component of DOJ, but rather a "new agency—answerable only to the President." Compl. ¶¶ 4; 144-150. Because the Fund is answerable only to the President and the Attorney General lacks power to review Fund decisions, the Fund cannot legally be considered a DOJ component. *See* 28 U.S.C. § 509 (vesting all functions of DOJ in the Attorney General, with limited exceptions that do not include Fund operations). And even if the Fund were presumed to exist as a DOJ component, the records-related provisions of the Fund's charter documents conflict with DOJ's records regulations for the same reasons that they conflict with federal records laws. *See* Compl. ¶¶ 201-205; *infra*, Argument §§ IV.B.3, IV.D. A ruling from this Court providing declaratory relief on the nature of the Fund vis-à-vis the Executive Branch and requiring all Fund records be treated in accordance with applicable federal records law, *see* Compl., Prayer for Relief ¶ 1, is necessary to ensure the proper handling of Fund records.

Defendants attempt to downplay these issues by arguing that if Fund records existed (which they do), the Fund should be presumed to treat them in accordance with federal records laws because its charter documents generally "incorporate[] any applicable federal law, including law governing disclosure of information." Defs.' Mem. at 4. The Fund's charter documents do not directly mention federal records laws. They do, however, include specific provisions that directly contravene federal records laws, such as by providing the Fund unfettered discretion over its records retention and disclosure policies, by establishing the Fund without publicly disclosing those policies, and by predetermining that certain Fund records must be kept confidential. *See* Settlement Agreement at IV.C, IV.E; Compl. ¶¶ 158-162. A commonplace principle of legal interpretation is that the "the specific governs the general." *RadLAX Gateway Hotel, LLC v.*

*Amalgamated Bank*, 566 U.S. 639, 645 (2012). Thus, specific provisions of the Settlement Agreement that violate federal law cannot be saved by general platitudes about legal compliance. *See, e.g.*, *Shomberg v. United States*, 348 U.S. 540, 547–48 (1955) (refusing to "nullify" "clear legislative purpose" to give effect to a saving clause); *accord League of United Latin Am. Citizens v. EOP*, 780 F. Supp. 3d 135, 186 (D.D.C. 2025) (further citation omitted) ("Defendants' talismanic invocation of the Executive Order's saving clause cannot shield [the offending provisions] from review.").

Absent a ruling from this Court, Defendants may continue to mistreat Fund records as either legally non-existent, *see* Defs.' Mem. at 21, or as subject to the records-related provisions of Fund's charter documents, which facially violate federal law. *See* Compl. ¶¶ 158-162.

**D. Defendants' Actions Have Been Designed to Manipulate the Jurisdiction of the Courts**

Ample evidence makes clear that defendants' actions have been designed to manipulate the jurisdiction of the federal courts. The *Trump v. IRS* lawsuit, which defendants use to justify the establishment of the Fund, was "brought to manipulate the judicial process to pursue benefits unavailable in litigation." *Trump v. IRS*, 2026 WL 2015525, at *23. Defendants' decision to pause the Fund's operations did not result from their acknowledgment of the illegality of the Fund's establishment; it was an attempt to ease a growing political and legal maelstrom regarding the viability of the Fund and to facilitate Mr. Blanche's confirmation to the position of Attorney General. *See* Defs.' Mem. at 13 (noting that the announcement to pause the Fund was a reaction to the "political process"). The government continues to endorse the policy justification for the Fund—*i.e.*, providing federal payouts to January 6th rioters and other of the President's political allies; it continues to argue that the establishment of the Fund is legally valid and that the Settlement Agreement remains in effect; and Mr. Blanche has now secured his confirmation. Thus,

nothing prevents the government from reengaging in the currently ceased conduct if litigation challenging the Fund is dismissed on mootness grounds.

## II. This Matter is Ripe for Judicial Review

The ripeness inquiry requires evaluation of "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Texas v. United States*, 523 U.S. 296, 300-301 (1998) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967)). "It is well established that 'a purely legal claim in the context of a facial challenge . . . is presumptively reviewable.'" *Hearth, Patio & Barbecue Ass'n v. EPA*, 11 F.4th 791, 804 (D.C. Cir. 2021) (quoting *Cement Kiln Recycling Coal. v. EPA*, 493 F.3d 207, 215 (D.C. Cir. 2007)). "A case is ripe when it presents a concrete legal dispute [and] no further factual development is essential to clarify the issues . . .' and the issue 'has crystallized sufficiently for purposes of judicial review." *In re Al-Nashiri*, 47 F.4th 820, 826 (D.C. Cir. 2022) (quoting *Rio Grande Pipeline Co. v. FERC*, 178 F.3d 533, 540 (D.C. Cir. 1999)). This suit presents just such a case.

### A. The Issues Are Fit for Judicial Decision

CREW alleges that *the establishment* of the Fund is *facially inconsistent* with the Constitution and multiple federal statutes. These allegations pose purely legal issues that require no further factual development, including:

- Whether the establishment of the Fund violated separation of powers and exceeds the constitutional powers of the Executive, *see* Compl., Count I;
- Whether establishment of the Fund violated procedural or substantive provisions of the Administrative Procedure Act, *id.*, Counts II, V;
- Whether the establishment of the Fund violated the Judgment Fund statute, federal transparency statutes, and federal funding statutes, *id.*, Count III;

- Whether the Fund's structure violates CREW's First Amendment rights, *id.*, Count IV;
- Whether establishment of the Fund constitutes an ultra vires action, *id.*, Count VI; and
- Whether the Fund's records-related governance provisions are facially inconsistent with the requirements of the Freedom of Information Act, *id.*, Count VII.

These are legal questions that can be resolved through a review of the Fund's charter documents. Subsequent administrative proceedings are not necessary to elucidate these issues.

To avoid the logical conclusion that these legal questions are fit for review, defendants attempt to recast the Complaint as posing an as-applied challenge to future agency actions that have not yet occurred. Defs.' Mem. at 14-16. Defendants argue that the actual "conduct that [CREW] . . . is concerned about" is not the establishment of the Fund, but rather the appointment of individual Fund members, the adoption of claim submission procedures, the adjudication of individual claims made to the Fund, and the tendering of payments from the Fund to claimants. Defs.' Mem. at 15. This argument grossly mischaracterizes the Complaint. CREW is not challenging the adjudication of any individual claim or payment, the appointment of any individual Fund member, or the adoption of any specific claim submission procedure. CREW is challenging the establishment of the Fund. And defendants have routinely admitted that the establishment of the Fund is not a contingent future event; it is an event that occurred on May 18, 2026. *See* Defs.' Mem. at 2 ("On May 18, 2026, [DOJ] announced . . . the establishment of 'The Anti-Weaponization Fund[.]'"); Settlement Agreement ¶ II.D (providing an "Effective Date" of May 18, 2026); May 18th AG Order ¶ A ("The Settlement Agreement in [*Trump v. IRS*] has created the Anti-Weaponization Fund[.]"); Press Release, *Justice Department Announces Anti-Weaponization Fund*, DOJ (May 18, 2026) ("[T]he Attorney General established 'The Anti-Weaponization Fund[.]'"), https://perma.cc/V9TK-TPKW; DOJ, *Overview of the Department of Justice's Anti-*

*Weaponization Fund* (ECF 10-9) ("The Anti-Weaponization Fund was created[.]"); May 19th AG Order ¶ A ("The Settlement Agreement in [*Trump v. IRS*] has created the Anti-Weaponization Fund[.]").

**B. The Hardship Inquiry Counsels in Favor of Prompt Review**

In addition to the claims at issue being fit for judicial review, the defendants identify no significant interest in postponing review. The hardship prong of the ripeness test "is not an independent requirement divorced from the consideration of the institutional interests of the court and agency." *Payne Enters., Inc. v. United States*, 837 F.2d 486, 493 (D.C. Cir. 1988). Thus, the hardship prong is "largely irrelevant" in a case involving a challenge to an allegedly unlawful agency action where there is no "significant interest in postponing review." *Id.* Here, defendants take the position that the Fund "will not move forward." Defs.' Mem. at 3. Prompt adjudication of this case, therefore, will not interfere with any future administrative action. *See Bellion Spirits, LLC v. United States*, 7 F.4th 1201, 1209 (D.C. Cir. 2021) (holding that legal challenges "are fit for judicial decision" where "they involve final agency action and . . . judicial intervention would not inappropriately interfere with further administrative action") (cleaned up). Conversely, there is "little question regarding [a plaintiff's] interest in prompt consideration of allegedly unlawful agency action." *Payne Enters., Inc.*, 837 F.2d at 493. Thus, in this scenario, where prompt adjudication will not interfere with further agency activities, the hardship prong weighs in favor of review. *Id.*

Even if the Court were to further consider the hardship prong, it should find that the prong cuts against the defendants' ripeness argument. As discussed above, *supra*, Argument § I.C, postponing review heightens the possibility that Fund records will not be preserved or otherwise treated in a manner consistent with applicable federal records laws.

Postponing review would also perpetuate on-going constitutional and statutory violations. *See infra*, Argument §§ IV.B.3, IV.B.4. The Supreme Court has recognized that constitutional separation of powers violations, like the ones alleged in the Complaint, inflict a "here-and-now" injury that is ripe for adjudication, even if the government has not taken concrete steps to effectuate those violations. *See Bowsher v. Synar*, 478 U.S. 714, 727 & n.5 (1986) ("We reject appellants' argument that consideration of the effect of [an allegedly unconstitutional] provision is not 'ripe' until that provision is actually used."); *accord Seila L. LLC v. CFPB*, 591 U.S. 197, 212 (2020).

Postponing review would also inhibit CREW's mission of scrutinizing and informing the public about the legitimacy of the Executive Branch's activities, particularly with respect to the current Administration's attempts to provide federal payouts to persons who participated in the January 6th attack on the U.S. Capitol. CREW's core mission includes actively monitoring potentially unscrupulous activities relating to federal spending, and CREW is pursuing multiple projects designed to shed light on the provision of federal dollars to January 6th participants and other of the President's political allies. *See* Compl. ¶¶ 119-127. Postponing review of the legality of the Administration's attempts to channel federal money to the President's political supporters under an opaque claims adjudications process inhibits CREW's ability to review those activities and more robustly advocate for accountability, transparency, and integrity in government.

CREW's facial challenge to the establishment of the Fund presents a purely legal issue that "is presumptively reviewable." *Hearth, Patio & Barbecue Ass'n*, 11 F.4th at 804. Accordingly, the Court should reject the government's ripeness arguments.

## III. CREW Has Standing to Assert Its Claims

To establish Article III standing, a plaintiff must show (1) "injury in fact that is concrete, particularized, and actual or imminent," (2) "that the injury was likely caused by the defendant," and (3) "that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*,

594 U.S. 413, 423 (2021). "[F]uture injuries" satisfy standing where the threat of harm is "certainly impending, or there is a substantial risk that the harm will occur." *Dep't of Com. v. New York*, 588 U.S. 752, 767 (2019). "For purposes of standing," the Court must "assume the merits in favor of the plaintiff." *Ctr. for Biological Diversity v. U.S. Int'l Dev. Fin. Corp.*, 77 F.4th 679, 685 (D.C. Cir. 2023) ("*CBD*"). Here, CREW has demonstrated cognizable informational, constitutional, and procedural injuries traceable to Defendants' establishment of the Fund. Those injuries were caused by the establishment of the Fund, and an order of this Court will redress them.

### A. CREW Has Alleged Informational Injury

Informational injury is "sufficient to satisfy standing." *CBD*, 77 F.4th at 685 (citing, among others, *FEC v. Akins*, 524 U.S. 11, 24 (1998)). "To prove an informational injury, a plaintiff must show that (1) it has been deprived of information that, on its interpretation, a statute requires the government or a third party to disclose to it, and (2) it suffers, by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure." *Id.* (cleaned up). A plaintiff "need not receive a specific denial" of information from an agency "to sustain an informational injury." *Id.* at 686. Rather, "a plaintiff suffers an informational injury when an agency . . . adopts a rule that places a legally unsupported limit on its statutory reporting requirements," *id.* (citing *Waterkeeper All. v. EPA*, 853 F.3d 527, 533 (D.C. Cir. 2017)), or otherwise adopts a "'policy or practice' [that] 'will impair the [plaintiff's] lawful access to information in the future,'" *CREW v. DOJ*, 846 F.3d 1235, 1242 (D.C. Cir. 2017). CREW's Complaint satisfies this standard.

The Fund's charter documents—including the Settlement Agreement that inarguably remains in effect—are designed to evade disclosure and preservation obligations imposed by federal law. Compl. ¶¶ 158-162. Without any reasonable explanation, defendants arbitrarily and capriciously structured the Fund as wholly exempt from FOIA and the FRA. CREW routinely

submits FOIA requests to agencies, has several pending FOIA requests relating to the Fund, and will continue to submit FOIA requests to the Fund to shed light on its operations. *Id.* ¶¶ 120-122. But FOIA cannot provide adequate relief because the Fund purports to be governed by settlement provisions that conflict with FOIA. For example, the Fund's charter documents exempt it from the requirement to "publish in the Federal Register . . . the methods whereby, the public may obtain information, make submittals or requests, or obtain decisions." *See* 5 U.S.C. § 552(a)(1)(A). Nor do the charter documents require the Fund to comply with numerous other mandatory FOIA obligations or records preservation obligations. *See infra*, Argument §§ IV.B.3, IV.D. Courts have routinely recognized similar failures as imposing legally cognizable injuries to CREW and other plaintiffs. *See, e.g.*, *Am. Hist. Ass'n v. Trump*, 2026 WL 1412395, at *9 (D.D.C. May 20, 2026) ("*AHA*") (CREW and other plaintiffs "likely established a substantial risk of [informational] injury" where White House records policy was "silent" and did "not speak" to statutory preservation and disposal obligations); *CREW v. EOP*, 587 F. Supp. 2d 48, 61 (D.D.C. 2008) (CREW had standing to challenge "[in]adequate preservation guidelines" that risked records being "lost in the future, further shrinking the pool of records [it could] use in [its] work"); *CREW v. Cheney*, 593 F. Supp. 2d 194, 226-27 (D.D.C. 2009) (similar).

These are precisely the "type of harm[s] Congress sought to prevent" through the passage of FOIA and other federal records statutes. *See CBD*, 77 F.4th at 685. FOIA's "core purpose," is to "contribute significantly to public understanding of the operations or activities of the government." *Dep't of Def. v. FLRA,* 510 U.S. 487, 495 (1994). This "basic policy . . . focuses on the citizens' right to be informed about what their government is up to," *id.*, which is "a structural necessity in a real democracy," *NARA v. Favish*, 541 U.S. 157, 172 (2004). CREW's planned review and dissemination of Fund records "is in furtherance of the purpose[s] for which Congress

enacted" FOIA, the FRA, and other federal transparency statutes, and those plans "fit[] squarely within Congress's goal[s] of providing increased transparency into the Executive Branch's [spending] decisions" and other operations. *CREW v. OMB*, 791 F. Supp. 3d at 47-48.

Additionally, because CREW's informational injuries result from defendants' usurpation of Congress's exclusive powers to create, structure, and fund federal agencies, *see infra*, Argument § IV.B.1, these injuries provide CREW standing to pursue its constitutional claims challenging the Fund's establishment and structure. *See Friends of Animals v. Jewell*, 824 F.3d 1033, 1040 (D.C. Cir. 2016) (plaintiff's informational standing allowed it to pursue constitutional separation of powers claim); *Consumers' Rsch. v. Consumer Prod. Safety Comm'n*, 91 F.4th 342, 350 (5th Cir. 2024) (same); *AHA*, 2026 WL 1412395, at *5-*12 (same, where CREW was a plaintiff).

**B. CREW Has Alleged First Amendment Injury**

As explained below, *see infra*, Argument § IV.B.4, the Fund's secrecy provisions shield from public scrutiny potentially unpopular activities, like providing federal payouts to January 6th rioters and other of the President's political allies, for the purpose of suppressing speech critical of the government by CREW and others. Compl. ¶¶ 175-183. The Fund's secretive structure deprives CREW of facts to enable its speech. *Id.* This concern is not merely speculative or prospective. As mentioned above, *supra*, Argument § I.C, Fund records exist, and the secrecy provisions of the Fund's charter documents shield those records from public disclosure. That the apparent purpose of those provisions is to suppress speech critical of the Trump-Vance Administration by limiting access to "facts" that are otherwise published "in compliance with a legal mandate" "render[s] [the Fund's structure] unconstitutional." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 566, 567-68, 570 (2011); *see also infra*, Argument § IV.B.4 (citing cases). CREW's "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury" for purposes of both standing and irreparable harm. *Elrod v. Burns*, 427 U.S. 347, 373 (1976).8

### C. CREW Has Alleged Procedural Injury

While a procedural violation alone does not confer standing, CREW has standing to "challenge an action taken without required procedural safeguards" if it can show that "the agency action affects [its] concrete interests in a personal way." *Mendoza v. Perez*, 754 F.3d 1002, 1010, 1013 (D.C. Cir. 2014). As outlined above, establishment of the Fund inflicts "concrete" informational and constitutional injuries to CREW. Based on these "injuri[es] to [its] concrete interests," *Mendoza*, 754 F.3d at 1011, CREW likewise has standing to challenge Defendants' notice-and-comment violations. *See infra*, Argument § IV.B.2.

### D. The Fund's Establishment Caused CREW's Injuries and the Court Is Capable of Redressing those Injuries

To satisfy Article III's causation requirement, a plaintiff must show a "causal nexus between the agency action and the asserted injury." *Freedom Republicans, Inc. v. FEC*, 13 F.3d 412, 418 (D.C. Cir. 1994). The causation showing "requires no more than de facto causality." *Block v. Meese*, 793 F.2d 1303, 1309 (D.C. Cir. 1986). Here, but for the unlawful creation of the Fund, including the adoption of records provisions that violate statutory disclosure and preservation obligations, CREW would not be suffering any of the injuries outlined above.

A Court order providing declaratory relief on the status of the Fund and its legality and enjoining defendants to treat all Fund records in accordance with applicable federal records law, see Compl., Prayer for Relief, would redress these injuries. See *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024) ("If a defendant's action causes an injury, enjoining the action . . . will typically redress that injury.").

With respect to CREW's notice-and-comment claim, "the normal standards for immediacy and redressability are relaxed"; CREW "need not show the agency action would have been different had it been consummated in a procedurally valid manner—the courts will assume

this portion of the causal link." *Mendoza*, 754 F.3d at 1010, 1012. Nevertheless, the significant national controversy sparked by the creation of the Fund and defendants' decision to pause the Fund in the face of intense public scrutiny provides substantial evidence that, had establishment of the Fund been subject to the notice-and-comment process, defendants' actions would have been different.

## IV. CREW Has Sufficiently Alleged Claims Upon Which Relief Can be Granted

Defendants largely fail to mount substantive challenges to the Complaint under Rule 12(b)(6), instead offering generalized arguments that several of the asserted claims are "difficult to understand," that the claims are "unclear," and that the 50-page Complaint, which includes 22 pages of factual allegations, is "conclusory" and generally "fail[s] to allege facts" sufficient to support the claims asserted. Defs.' Mem. at 29-30. Defendants' arguments fall woefully short of justifying dismissal.

### A. CREW Has Alleged an Equitable Constitutional Claim

Defendants primarily attack CREW's equitable constitutional claim as "unclear." Defs.' Mem. at 29. The claim is relatively straightforward. The constitution gives Congress the power of the purse and the power to create new federal entities. U.S. Const., art. I, § 8, cl. 1 (Spending Clause); *id.* § 9, cl. 7 (Appropriations Clause); *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 500 (2010) ("Congress has plenary control over the salary, duties, and even existence of executive offices."). CREW alleges that defendants unlawfully usurped those powers by establishing and authorizing funding for a new entity within the Executive Branch, empowering it to spend federal money, and providing the President discretion to redirect residual capital as he sees fit, all without congressional authorization. *See* Compl. ¶¶ 128-143. Federal courts have equitable power to enjoin this type of unconstitutional Executive Branch activity. *Free Enter. Fund*, 561 U.S. at 491, n.2.

The power of the purse, as reflected in the Appropriations Clause and the Spending Clause, is a "core congressional power." *Learning Res., Inc. v. Trump*, 146 S. Ct. 628, 639 (2026) (plurality opinion); *see also OPM v. Richmond*, 496 U.S. 414, 424 (1990) (the "straightforward and explicit command" of the Appropriations Clause means "that no money can be paid out of the Treasury unless it has been appropriated by an act of Congress"). These powers are an "important as a restraint on Executive Branch officers: If not for the Appropriations Clause, 'the executive would possess an unbounded power over the public purse of the nation; and might apply all its monied resources at his pleasure.'" *U.S. Dep't of Navy v. FLRA*, 665 F.3d 1339, 1347 (D.C. Cir. 2012) (Kavanaugh, J.).

Congress also exercises "plenary control over the salary, duties, and even existence of executive offices," which serves as an important check on Executive power. *Free Enter. Fund*, 561 U.S. at 500. "By keeping the ability to create offices out of the President's hands, the Founders ensured that no President could unilaterally create an army of officer positions to then fill with his supporters. Instead, our Constitution leaves it in the hands of the people's elected representatives [in Congress] to determine whether new executive offices should exist." *Trump v. United States*, 603 U.S. 593, 646 (2024) (Thomas, J., concurring); *accord id.* at 644-45 ("Before the President or a Department Head can appoint any officer, . . . the Constitution requires that the underlying office be 'established by Law,'" *i.e.*, by "the Constitution" or "by statute.").

In establishing the Fund, defendants arrogated Congress's exclusive powers to themselves. With no statutory authorization, defendants created and authorized funding for a new federal entity; created federal officer positions to be occupied by persons who answer only to the President; and empowered the Fund to speak on behalf of the United States and award billions in

appropriated federal funds to purported "victims" of "Lawfare and/or Weaponization." *See supra*, Argument § II.A. Those actions violate the constitutional separation of powers.

Defendants fail to grapple with any of these constitutional issues in their Motion. Instead, they argue that CREW's equitable constitutional claim must fail because the government entered into a large-value settlement agreement several years ago in a class action lawsuit—*Keepseagle vs. Vilsak*—and "[n]o one suggested" that the administrators who oversaw the settlement in that case "comprised an agency." Defs.' Mem. at 30. That argument is entirely immaterial to the case at hand. The legal validity of the *Keepseagle* settlement is not before this Court. Moreover, even assuming the facts of the *Keepseagle* settlement were congruent with the *Trump v. IRS* settlement (which they are not), the mere existence of that settlement does not authorize the Executive to engage in activities that violate the constitution. *See Medellin v. Texas*, 552 U.S. 491, 532 (2008) ("[P]ast [executive] practice does not, by itself, create power."); *Trump v. Slaughter*, 146 S. Ct. 2283, 2303-04 (2026) ("No branch may rely on adverse possession to claim power that the Constitution vests elsewhere."); *see also Trump v. IRS*, 2026 WL 2015525, at *12 (finding that *Keepseagle* stands in "stark contrast" to *Trump v. IRS* and rejecting the contention that *Keepseagle* serves "as the 'precedent' for the unprecedented establishment" of the Fund).

### B. CREW Sufficiently Alleges that Establishment of the Fund Violated the APA

#### 1. Establishment of the Fund Constitutes Final Agency Action

Through the execution of the Settlement Agreement and issuance of the May 18th AG Order, defendants formally established the Fund and provided it significant and unreviewable authority to act on behalf of the United States. The Fund's establishment easily qualifies as "final agency action," and defendants' arguments to the contrary are entirely meritless.

Agency action is final if it (1) "mark[s] the consummation of the agency's decisionmaking process" and is not "of a merely tentative or interlocutory nature," and (2) is "one by which rights

or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (cleaned up). Both prongs of this test are satisfied here. *See, e.g.*, *Jafarzadeh v. Nielsen*, 321 F. Supp. 3d 19, 41 (D.D.C. 2018) (issuance of an agency memorandum creating a new administrative program constitutes final agency action).

First, the Settlement Agreement, including the incorporated May 18th AG Order, took effect on May 18, 2026. *See* Settlement Agreement ¶ II.C (providing the "Effective Date" of the Agreement). The Settlement Agreement consummated the government's decisionmaking process regarding resolution of *Trump v. IRS*, which included establishment of the Fund. Defendants have admitted on numerous occasions that the Fund "was established" on May 18, 2026. *See supra*, Argument § II.A (listing instances in which defendants acknowledged the formal establishment of the Fund).

Moreover, "[i]n evaluating the first *Bennett* prong, th[e] Court considers whether the action is informal, or only the ruling of a subordinate official, or tentative." *Soundboard Ass'n v. FTC*, 888 F.3d 1261, 1267 (D.C. Cir. 2018) (cleaned up). Entry into the Settlement Agreement and issuance of the May 18th AG Order were formal actions executed by senior officials—the Associate Attorney General and the Acting Attorney General, respectively. And those charter documents are not tentative in nature; as the Settlement Agreement makes clear, its purpose is to resolve the *Trump v. IRS* litigation "FOREVER and FINALLY." Settlement Agreement ¶ II.D.

Second, establishment of the Fund was clearly an action "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett*, 520 U.S. at 178. As explained above, *see supra* Background, the Fund's charter documents:

- Resolve the *Trump v. IRS* lawsuit;
- Create a new federal entity (the Fund) and five new federal offices;

- Empower office holders to issue formal apologies on behalf of United States, to adjudicate claims, and to award taxpayer money to claimants;
- Identify the class of persons eligible to submit claims to the Fund;
- Authorize use of separately appropriated federal dollars for capitalization of the Fund and authorize use of that money to cover the Fund's administrative operations;
- Empower the Fund to determine its own procedures and provide the Fund unfettered discretion on whether to make them public;
- Eliminate any legal right to an appeal or judicial review of award determinations;
- Provide the United States with immunity from legal liability relating to the safeguarding of money used to capitalize the fund;
- Provide a termination date for the Fund's operations; and
- Authorize the President to decide how any residual capital will be handled.

These provisions are legally consequential. Defendants fail to address *any* of them in their Motion.

Instead, defendants suggest that the Court should treat the creation of the Fund like a federal grant program, under which an agency's review of a grant *application* will generally be considered non-final until the agency issues a determination on the application. Defs.' Mem. at 26 (citing, *inter alia*, *Karst Env't Educ. & Prot., Inc. v. EPA*, 403 F. Supp. 2d 74, 81 (D.D.C. 2005)). That comparator is inapt. The Fund is not a federal grant program. Federal grant programs are authorized by statute; the Fund is not. *See South Dakota v. Dole*, 483 U.S. 203, 207 (1987). And CREW is not akin to grant applicant. It is not challenging a decision about the issuance of a payout from the Fund; it is challenging the establishment of the Fund. Moreover, federal courts frequently consider APA challenges to unlawful agency actions that occur during the implementation of federal grant programs, without awaiting a decision on a specific grant application. *See, e.g.*, *Illinois v. FEMA*, 801 F. Supp. 3d 75, 89 & n.6 (D.R.I. 2025) (holding that an agency's decision

to impose unlawful conditions on a federal grant program constitutes final agency action "even if the final decision to award the funds . . . is still pending" and gathering cases that have reached a similar conclusion).

### 2. Defendants Created the Fund Without Following the Required Notice-and-Comment Process

In arguing that establishment of the Fund should be considered exempt from the APA's notice-and-comment procedures, defendants fail to cite any legal authority or engage with the substance of the claims asserted in the Complaint. Defs.' Mem. at 27-28. Defendants instead make the general statement that the May 18th AG Order "contemplated a single fund" and "did not create any generally applicable policy." *Id.* But those conclusory statements fail to address the substantive effect of the Fund's establishment.

"[I]n determining whether a rule is subject to the APA's notice-and-comment" requirements under [5 U.S.C.] § 553(b), courts "ordinarily ask whether the rule is a legislative rule (which generally must go through notice-and-comment procedures) or an interpretive rule (which need not)." *City of Billings v. TSA*, 153 F.4th 46, 51 (D.C. Cir. 2025). "Legislative rules have the 'force and effect of law,' and usually bring about 'a substantive change in existing law or policy.'" *Id.* Interpretive rules merely "advise the public of the agency's construction of the statutes and rules which it administers." *Id.*

The Fund's charter documents do not merely advise the public about defendants' interpretation of an existing regulation; they establish an entirely new federal entity with unprecedented authorities. That action easily qualifies as "a substantive change in existing law or policy." *Mendoza*, 754 F.3d at 1021. Indeed, establishment of the Fund is a substantive departure from multiple DOJ policies. The Fund's secrecy provisions—which give the Fund unlimited discretion on whether to make the Fund's "procedures" public and provide only for a

"confidential" reports to the Attorney General—conflict with DOJ regulations providing that "in any civil matter in which the Department is representing the interests of the United States or its agencies, it will not enter into final settlement agreements . . . that are subject to confidentiality provisions," absent "rare circumstances" not present here. 28 C.F.R. §§ 50.23(a)-(b). DOJ policy also prohibits execution of settlements that require payments to "non-governmental third parties . . . that were neither victims nor parties to the lawsuit[]" being settled. *See* Mem. from the Attorney General, Reinstating the Prohibition on Improper Third-Party Settlements (Feb. 5, 2025), https://perma.cc/UQR3-QVBF. The Fund directly contradicts this policy by authorizing payments to "non-governmental third parties" who had no legal interest in *Trump v. IRS*.

Defendants also argue that the notice-and-comment review process should not apply here because subjecting settlement agreements to that process in every instance would create a resource drain. Defs.' Mem. at 28. This argument fails to account for the unprecedented nature of the "settlement" here. *See Trump v. IRS*, 2026 WL 2015525, at *17 (holding that the "'settlement' . . . had no viable basis in law or fact"). Typical settlement agreements—ones that do not create and empower new federal entities, authorize federal payouts to unrelated third-parties, or facially violate the constitution, federal law, and DOJ policy—would not be subject to notice-and-comment. The Fund's charter documents have the effect of a legislative rule, and the fact that they were issued under the guise of a "settlement agreement" cannot exempt them from the legal requirements of the APA. *See N.Y. Stock Exch. LLC v. SEC,* 2 F.4th 989, 994 (D.C. Cir. 2021) ("[A]n agency label does not determine the substantive legal standard under which we evaluate agency action").

### 3. Establishment of the Fund is Contrary to Federal Law

Defendants also fail to overcome CREW's claims that establishment of the Fund is contrary to law and exceeds defendants' lawful authority. *See* Compl. ¶¶ 151-174, 195-200. An "agency . .

. literally has no power to act . . . unless and until Congress authorizes it to do so by statute." *FEC v. Cruz*, 596 U.S. 289, 301 (2022) (cleaned up). By creating the Fund without statutory authorization and empowering it to act in violation of multiple federal statutes, Defendants acted "not in accordance with law," and "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. §§ 706(2)(A), (C). The Judgment Fund statute does not authorize the Fund, and the Fund's establishment violates a host of other federal transparency and funding statutes. *See* Compl. ¶¶ 155-174. Defendants fail to address these issues in their Motion.

**The Judgment Fund Statute.** Defendants have previously suggested that the Judgment Fund statute, 31 U.S.C. § 1304, authorizes the creation of the Fund. *See* May 18th AG Order ¶ G. But even a cursory reading of that statute confirms that is not the case. The statute authorizes payments from the Judgment Fund for certain "compromise settlements" authorized under 28 U.S.C. § 2414. *See* 31 U.S.C. § 1304(a)(3)(A). Section 2414 provides for payment of settlements "for defense of imminent litigation or suits against the United States" or "its agencies or officials," when they are "settled and paid in a manner similar to judgments in like causes." 28 U.S.C. § 2414. Settlement payments from the Judgment Fund thus require "settlement of claims arising under actual or imminent litigation." 31 C.F.R. § 256.1(a).

Here, the only "actual or imminent" claims being settled are those asserted in *Trump v. IRS*. But the Settlement Agreement *expressly disavows* that the Fund compensates for those claims. The *Trump v. IRS* plaintiffs will not "receive any monetary payment or damages of any kind," and the $1.776 billion capitalization amount "does *not* represent the value of any current claim by" the *Trump* plaintiffs, but rather "is based on the projected valuation of *future claimants' claims*." Settlement Agreement ¶¶ III.A, IV.A (emphasis added). No plausible reading of the Judgment Fund statute empowers DOJ and the Treasury to authorize nearly $1.8 billion from the Judgment

Fund to pay *wholly unrelated* "future" claims by *unidentified* "future claimants" who are not parties to the suit being settled.

**Federal Transparency Laws**. Establishment of the Fund directly contravenes multiple statutes designed to promote federal agency transparency and accountability, including the transparency provisions of the Judgment Fund statute, FOIA, and the FRA.

The transparency provisions of the Judgment Fund statute require the Secretary of the Treasury to make certain data "available to the public on a website," including the name of claimants who receive Judgment Fund payments and the facts giving rise to their claims. 31 U.S.C. § 1304(g). The Fund's charter documents unlawfully structure the Fund to categorically evade § 1304(d)'s public disclosure mandate. Instead of complying with § 1304(d), the Fund needs only to provide "confidential written report[s]" to the "Attorney General alone[.]" Settlement Agreement ¶ IV.E. These provisions facially violate 31 U.S.C. § 1304(g).

The Fund is also structured in a manner that violates multiple provisions of FOIA and the FRA. The Fund is an independent federal entity that qualifies as an "agency" under both statutes because it is an "establishment in the executive branch" that wields "substantial independent authority." *See CREW v. Off. of Admin.*, 566 F.3d 219, 222 (D.C. Cir. 2009); *see* 5 U.S.C. § 552(f)(1) (FOIA definition of agency); 44 U.S.C. § 2901(14) (FRA definition of agency). The test for agency status requires a "functional approach," *Cotton v. Heyman*, 63 F.3d 1115, 1121 (D.C. Cir. 1995), that examines the entity's "authority and operations." *CREW v. Off. Of Admin*, 566 F.3d at 225. The Fund's charter documents provide it with the "substantial independent authority" to dispense billions in taxpayer dollars, free from any federal review or oversight. This authority is sufficient to qualify the Fund as an "agency." *See CREW v. U.S. DOGE Serv.*, 769 F. Supp. 3d 8, 25 (D.D.C. 2025).

Despite being subject to the FOIA and FRA's requirements, the Fund is structurally noncompliant with both statutes. Compl. ¶ 160-162. For example, the FRA requires the Fund to "make and preserve records containing adequate and proper documentation of the organization, functions . . . and essential transactions of the agency," 44 U.S.C. § 3101, and to "establish and maintain an active, continuing program for the economical and efficient management of the records of the agency," *id.* § 3102; *see also id.* §§ 3103-3107; 36 C.F.R. Pt. 1220. Contrary to these requirements, the Fund's charter documents are entirely silent on records preservation obligations and provide no guidance in compliance with the FRA's mandates.

Separately, FOIA mandates that the Fund "publish in the Federal Register" information about itself including how the public "may obtain information, make submittals or requests, or obtain decisions," its "rules of procedure" and "substantive rules of general applicability," and its "statements of general policy." 5 U.S.C. § 552(a)(1). FOIA imposes multiple other requirements on the Fund. *See e.g., id.* § 552(a)(2) (requiring agencies to proactively make available "in an electronic format" several categories of records); *id.* § 552(a)(3)(A) (requiring agencies to make "records promptly available to any person" who submits a qualifying request); *id.* § 552(a)(4)(i) (requiring agencies to "promulgate regulations, pursuant to notice and receipt of public comment, specifying the schedule of fees applicable to the processing of requests under this section and establishing procedures" for waiver or reduction of fees). The Fund's charter documents are facially noncompliant with these non-discretionary requirements.

**Federal Funding Laws**. To protect its exclusive power of the purse, Congress has enacted a web of statutes that restrict federal agencies' use of appropriated funds. *See, e.g.*, 31 U.S.C. § 1532 (Transfer Statute); 31 U.S.C. § 1301(a) (Purpose Statute); 31 U.S.C. §§ 1341–1342

(Antideficiency Act); 31 U.S.C. § 3302(b) (Miscellaneous Receipts Act). The Fund's charter documents are facially noncompliant with all of them.

The Transfer statute prohibits the transfer of funds between agencies or accounts unless "authorized by law." 31 U.S.C. § 1532. Because no law permits a transfer of federal dollars to the Fund, authorizing that transfer violates the Transfer statute. Compl. ¶ 170.

The Purpose Statute provides that "[a]ppropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law." 31 U.S.C. § 1301(a). No statute provides that Judgment Fund dollars may be used for the purpose of capitalizing an independent entity for the payment of future claims to unidentified claimants. Nor does the Judgment Fund statute authorize payments to cover the operational expenses of the Fund. *See* May 18th AG Order ¶ E (authorizing payments of "per diems, administrative services, funds, facilities, staff, travel, and other support services as may be necessary to carry out the mission of the Anti-Weaponization Fund"). Obligating Judgment Fund dollars for these expenses violates the Purpose statute. Compl. ¶ 171.

The Miscellaneous Receipts Act codifies the principle that an agency may not augment the amount Congress appropriates without specific statutory authority by requiring that "an official or agent of the Government receiving money for the Government from any source shall deposit the money in the Treasury as soon as practicable without deduction for any charge or claim." 31 U.S.C. § 3302(b); U.S. Gov't Accountability Off., *GAO-06-382SP, Principles of Federal Appropriations Law* 6-166 (3d ed., Vol. II, Feb. 2006), available at https://tinyurl.com/ycxmkmsx. Congress has not appropriated any amount to the Fund, thus, authorizing the transfer of any federal capital to the Fund's "designated account" violates the Miscellaneous Receipts Act. Compl. ¶ 172.

The Antideficiency Act prohibits agency officials from obligating or expending more than Congress has appropriated and from accepting voluntary services. 31 U.S.C. §§ 1341-1342. Congress has not appropriated any amount to the Fund, thus, obligating federal dollars for use by the Fund and authorizing the acceptance of voluntary services from Fund members violates the Antideficiency Act. Compl. ¶ 173, May 18th AG Order ¶ E (providing that Fund members "shall serve as volunteers and gratuitous service providers, without any further compensation for their work on the Fund").

Defendants do not substantively engage with any of these statutory issues. *See* Defs.' Mem. at 28-29. Instead, in addition to referring back to their Rule 12(b)(1) arguments, defendants point to a provision in the Settlement Agreement that: "To be eligible for relief, a claimant must assert at least one legal claim stating that the claimant was a victim of Lawfare and/or Weaponization." Settlement Agreement ¶ V.C; Defs.' Mem. at 28. Defendants provide no explanation of how this provision excuses them from adhering to the requirements of federal law reflected in the Judgement Fund statute, the transparency statutes, and the funding statutes.

Defendants also refer again to the existence of the *Keepseagle* settlement. Defs.' Mem. at 28. As explained *supra*, Argument § IV.A, the existence of that settlement is immaterial to the legal issues presented here and does not excuse violations of federal law. Lastly, defendants again attempt to recast the Complaint as alleging harms based only on contingent future events. *Id.* at 29. But, as explained *supra*, Argument § II.A, the Complaint does not rest on contingent future events; it challenges the establishment of the Fund, an event that occurred on May 18, 2026.

**4. The Structure of the Fund Inhibits CREW's First Amendment Rights**

Defendants move to dismiss CREW's First Amendment claim based on a mischaracterization: that CREW is asserting a "genera[l] … constitutional right to government information." Defs.' Mem. 30 (citing *McBurney v. Young*, 569 U.S. 221, 232 (2013)). CREW's

claim is not so broad. Rather, CREW's claim is that the defendants are selectively avoiding disclosures that would otherwise be required by the Judgment Fund statute for the purpose of suppressing speech that is critical of the government.

"[R]estrictions on the disclosure of government-held information can facilitate or burden the expression of potential recipients and so transgress the First Amendment." *Sorrell*, 564 U.S. at 569 (citing *Los Angeles Police Dep't v. United Reporting Pub. Corp.*, 628 U.S. 32, 42 (1999) (Scalia, J., concurring)). "[O]nce" Congress "decides to make [disclosures] available to the public, there are no doubt limits to its freedom to decide how that [information] will be distributed." *Id.* Defendants structured the Fund to siphon certain government payouts that are likely to generate disfavored speech from the traditional claims process into the secretive Fund process whereby disclosure is entirely at the "discretion" of the Fund. *See* Settlement Agreement ¶ IV.C. When contrasted with the fact that the same claims could have been processed through established channels, which would implicate Judgment Fund disclosure obligations, it becomes evident that the Fund is "designed" to "impose[] burdens that are based on the content of speech and that are aimed at particular viewpoint." *Sorrell*, 564 U.S. at 565. In doing so, the defendants' only possible "purpose [is] to 'suppress speech.'" *Cf.* Defs.' Mem. 31.

Defendants nevertheless contend that, regardless of their purpose, *Sorrell* and similar authority is limited to restraints on "conveying information that the speaker already possesses." *Id.* 31 (quoting *Sorrell*, 564 U.S. at 568). As the above-quoted language from *Sorrell* makes clear, however, the First Amendment is not so meager. Rather, defendants over-rely on a distinction the Court drew between the situation before it and the decision in *United Reporting* to deny a facial challenge, one the court recognized in passing before moving on to a "even more important" distinction." *Sorrell*, 564 U.S. at 568-69. Indeed, in reflecting on its first articulated distinction,

the Court recognized that the writings of "eight Justices" in *United Reporting* rejected the government- vs.- privately-held line. *Id.* In *United Reporting*, moreover, the plaintiffs eventually prevailed in their as-applied challenge to *government-held information*. *See* Consent Judgment, *United Reporting v. Cal. Highway Patrol*, 96-cv-0888-B (S.D. Cal. Aug. 14, 2001) (adjudging restraints on government disclosure violated the plaintiffs' First Amendment rights). Courts have also applied the rule of *United Reporting* in other cases involving government-held information. *See Zillow, Inc. v. Miller*, 126 F.4th 445, 458 (6th Cir. 2025) (concluding plaintiff could challenge fee structure for access to government-held property records as contrary to the First Amendment); *Boardman v. Inslee*, 978 F.3d 1092, 1107 (9th Cir. 2020) ("[W]hen the government selectively discloses information within its control, a First Amendment claim will lie if the government denies access to information 'based on an illegitimate criterion such as viewpoint"); *Fusaro v. Cogan*, 930 F.3d 241, 254–55 (4th Cir. 2019) (finding plaintiff pled First Amendment claim for discriminatory access to state voting records); *Lanphere & Urbaniak v. Colo.*, 21 F.3d 1508, 1512 (10th Cir. 1994) (considering First Amendment challenge to access to criminal justice records).

#### 5. Establishment of the Fund was Arbitrary and Capricious

Defendants offer one scant paragraph, with no legal citations, arguing that CREW has failed to "meaningfully challenge" the Fund's stated rationale or "allege facts to support why it is arbitrary." Defs.' Mem. at 29. The Complaint contains extensive allegations doing just that.

The APA requires courts to set aside agency action that is "not reasonable" or "reasonably explained.'" *Ohio v. EPA*, 603 U.S. 279, 292 (2024). "An agency violates this standard if it entirely fail[s] to consider an important aspect of the problem." *Carlson v. Postal Regul. Comm'n*, 938 F.3d 337, 344 (D.C. Cir. 2019) (cleaned up). CREW alleges that defendants failed to consider or explain several important issues with the establishment of the Fund. Compl. ¶¶ 184-194.

In establishing the Fund, defendants failed to explain why a $1.776 billion settlement was needed to resolve a lawsuit that lacked the adversity necessary to establish Article III jurisdiction. Compl. ¶ 187; *Trump v. IRS*, 2026 WL 2015525, at *13 ("[T]he extraordinary award fashioned by the Parties for claims that were never litigated, and have yet to be defined, on behalf of unidentified third parties whose future remedies bear no relationship to the claims in this case, indicates that real adverse interests were never before the Court."). They did not explain why DOJ declined to appear in *Trump v. IRS* and assert obvious legal defenses that it had pressed in similar cases. Compl. ¶ 188. They failed to adequately explain how they arrived at the $1.776 billion amount, which is admittedly unrelated to the claims in *Trump v. IRS*, and appears more likely to be an arbitrary nod to the country's founding date, rather than the result of a legitimate damage assessment. *Id.* ¶ 189. They failed to consider whether the Fund's charter documents run afoul of the Constitution's Domestic Emoluments Clause, U.S. Const. art. II, § 1, cl. 7, by conferring a benefit, gain, or advantage on the sitting President. *Id.* ¶ 190. They failed to consider whether authorizing federal payouts to convicted January 6th rioters violates the Fourteenth Amendment's prohibition on paying any debt incurred in aid of insurrection. *Id.* ¶ 191; U.S. Const. amend. XIV, § 4. And they disregarded, without explanation, controlling DOJ policies governing settlements. Compl. ¶ 191; *see supra*, Argument § IV.B.2.

Defendants decline to address *any* of these allegations in their Motion.

### C. Establishment of the Fund Constitutes *Ultra Vires* Action

Defendants do not substantively challenge CREW's *ultra vires* claim, stating only that it is "difficult to understand" and "bare-bones." Defs.' Mem. at 30. An *ultra vires* claim "rests on the longstanding principle that if an agency action is unauthorized by the statute under which [the agency] assumes to act, the agency has violate[d] the law and the courts generally have jurisdiction to grant relief." *Fed. Express Corp. v. Dep't of Com.*, 39 F.4th 756, 763 (D.C. Cir. 2022) (cleaned

up). Defendants have identified only the Judgment Fund statute as possibly authorizing the creation of the Fund. *See* May 18th AG Order ¶ G. But, as explained above, that statute does not authorize creation of the Fund or the use of federal dollars in the manner contemplated by the Fund's charter documents. *See supra*, Argument § IV.B.2. Creation of the Fund also runs afoul of multiple other federal laws, including FOIA, the FRA, and the APA. *See supra*, Argument § IV.B.3. As a result, because defendants have "stepped so plainly beyond the bounds of [their] statutory authority, or acted so clearly in defiance of it," they have acted in an *ultra vires* capacity. *Fed. Express Corp.*, 39 F.4th at 764.

**D. CREW Alleges a Policy or Practice Claim under FOIA**

Defendants do not assert a Rule 12(b)(6) challenge to CREW's FOIA policy or practice claim and therefore forfeit any such argument relating to that claim. *See World Wide Mins., Ltd. v. Republic of Kaz.*, 296 F.3d 1154, 1160 (D.C. Cir. 2002). Defendants mention CREW's FOIA claim in the context of their Rule 12(b)(1) challenge to CREW's standing, stating that CREW's "argument that the Fund must promulgate its own FOIA regulations is baseless" and that CREW is "familiar with [DOJ's] FOIA regulations[.]" Defs.' Mem. at 22. Even if the Court were to interpret these statements as presenting a Rule 12(b)(6) challenge, the statements misconstrue the FOIA claim and defendants' arguments must be rejected.

A plaintiff "may challenge an agency's 'policy or practice'" of violating FOIA "where it 'will impair the party's lawful access to information in the future.'" *CREW v. DOJ*, 846 F.3d 1235, 1242 (D.C. Cir. 2017) (quoting *Newport Aeronautical Sales v. Air Force*, 684 F.3d 160, 164 (D.C. Cir. 2012)). By establishing the Fund without taking any of the actions FOIA requires; by providing the Fund unfettered discretion to create its own records policies that need not be disclosed publicly; and by predetermining that required reporting about the Fund's activities must be kept confidential, defendants adopted policies that violate FOIA and impair CREW's "lawful

access to information in the future." *CREW*, 846 F.3d at 1242. And, as explained above, *see supra*, Argument § I.C, that DOJ has its own, separate FOIA regulations does not resolve CREW's FOIA claim. Nor is the claim resolved by the Settlement Agreement's "saving clause," which includes a general statement that the *Trump v. IRS* defendants should not act in a manner that is "inconsistent with federal law." Settlement Agreement ¶ IX; *supra*, Argument § I.C.

### E. Absent Other Relief, CREW Is Entitled to a Writ of Mandamus

Defendants' challenge to CREW's claim for mandamus relief rests entirely on their ripeness and mootness arguments. Defs.' Mem. at 30. For the reasons stated above, *supra*, Argument §§ I and II, this case remains ripe, and defendants' voluntary cessation of the Fund's operation is insufficient to moot CREW's claims. CREW has alleged that the FOIA and the FRA impose clear, non-discretionary duties on the Fund to take multiple actions to preserve and disclose federal records, and the Fund has entirely failed to comply with those duties. *See supra*, Argument § IV.B.3. Thus, absent alternative relief, mandamus relief is available to compel the Fund to comply with its non-discretionary duties under federal law. *See In re Aiken Cnty.*, 725 F.3d 255, 258 (D.C. Cir. 2013) (where federal law imposes on an agency a "clear duty to act," mandamus relief is warranted to "correct [a] transparent violation[]" of that duty if no other adequate means of redress are available).

## CONCLUSION

The Court should deny the Defendants' motion to dismiss.

Dated: September 14, 2026

Respectfully Submitted,

/s/ *Stephen J. Buckingham*
Kayvan Farchadi (D.C. Bar No. 1672753)
Nikhel S. Sus (D.C. Bar No. 1017937)
Stuart C. McPhail (D.C. Bar No. 1032529)
Stephen J. Buckingham (D.C. Bar No. 1562756)
CITIZENS FOR RESPONSIBILITY
AND ETHICS IN WASHINGTON
P.O. Box 14596
Washington, DC 20044
(202) 408-5565
kfarchadi@citizensforethics.org
nsus@citizensforethics.org
smcphail@citizensforethics.org
sbuckingham@citizensforethics.org