**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**Citizens for Responsibility and Ethics in Washington**

Plaintiff,

v.

**Department of Justice, et al.**,

Defendants.

Case No. 1:26-cv-1789-RJL

# REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

# TABLE OF CONTENTS


Introduction ........ 1

Argument ........ 1

I. PLAINTIFF'S CLAIMS ARE NOT JUSTICIABLE ........ 1

A. This Case, is Beyond Any Reasonable Doubt, Moot ........ 1

B. Ripeness and Standing Have Always Been Lacking ........ 7

II. PLAINTIFF'S APA CLAIMS ARE DEFICIENT ........ 10

A. There Is No Final Agency Action ........ 11

B. Notice-and-Comment Would Not Have Applied In Any Event ........ 13

C. The Fund Would Survive Arbitrary-and-Capricious and Ultra Vires Review ........ 18

D. CREW Does Not Sufficiently Allege a Pattern or Practice Claim, and In Any Event Such a Claim is Not Properly Presented in this Lawsuit ........ 20

III. ANY REMAINING STATUTORY, CONSTITUTIONAL, OR OTHER CLAIM FOR RELIEF SHOULD BE DISMISSED ........ 21

Conclusion ........ 22

## INTRODUCTION

The last time the Parties were before this Court, it stated, "I'm not persuaded that such a live controversy exists." Dkt. 17 at 19. The Court continued, "I'm entitled to credit the government's affirmative representations, particularly when they have been orally repeated in court hearings, stated in formal court filings, and announced by senior officials. I'm expressly relying on these representations to deny the TRO today." *Id.* at 20. And the Court ended by giving "the Justice Department, however, a fair warning: Don't play possum with this Court." *Id.*

In the time since that hearing, all the events underscore that the Court was correct in its ruling. The Attorney General has now reiterated the prior statements under oath to the Senate, repeatedly in the media, and taken action to withdraw the Memo that Plaintiffs allege created the Fund and caused their harm.

## ARGUMENT

### I. PLAINTIFF'S CLAIMS ARE NOT JUSTICIABLE

Plaintiff's claims cannot go forward under Article III of the Constitution. The claims are, beyond a shadow of a doubt, moot. They have also always been unripe. And in any event, Plaintiff has not alleged a cognizable Article III injury and there is no "final agency action" for this Court to review. The Court should dismiss the case with prejudice.

#### A. This Case, is Beyond Any Reasonable Doubt, Moot.

This Court—twice—already concluded that claims challenging the Fund are moot, first when it denied Plaintiff's TRO, and then again when it denied the motion

for preliminary injunction and APA stay. Dkt. 20 at 6–12. In reaching those conclusions, the Court relied primarily on two categories of representations: (1) then-Acting Attorney General Blanche's statements to the House Appropriations Committee during an oversight hearing that "[w]e are not moving forward with the Fund, period," and that the Fund "was not moving forward ever," *id.* at 3, and (2) the Government's statements in its briefs that such claims were moot in light of the then-Acting Attorney General's statements. *Id.* at 9. The Court described the June representations as "unequivocal" and "weighty" because they were made to Congress and "under threat of contempt." *Id.* at 10. The Court also considered these representations in light of the "'presumption of regularity' that attaches to the official acts of public officers, which requires courts to presume, 'in the absence of clear evidence to the contrary . . . that they have properly discharged their official duties.'" *Id.* at 9 (quoting *People for the Ethical Treatment of Animals v. USDA*, 918 F.3d 151, 157 (D.C. Cir. 2019)).

The Attorney General's statements to the House Appropriations Committee, and the representations made to this Court based on those statements, were all made in early- to mid-June. It is now September. Between then and now, the Government's several additional representations have resoundingly conveyed a single message—the Fund is not moving forward. So if any presumption of regularity attached then, it should attach with even more force now. After this Court credited the Government's representations, the Attorney General testified under oath that the Fund "is a moot issue, meaning there is no weaponization fund. The weaponization fund is dead, it's

not moving forward." Senate Judiciary Committee, Nomination Hearing of the Honorable Todd Blanche to be Attorney General of the United States at 1:26:42–49. He made the same representation in written answers to Senators' Questions for the Record. *See, e.g.*, Questions for the Record, The Nomination of the Honorable Todd Blanche to be Attorney General of the United States, at 14 (July 17, 2026). As Plaintiffs concede, the Attorney General has now also rescinded the May 18 Order in writing. Opp. 10 n.1. And even more recently, in public statements to a group of reporters, the Attorney General stated: "The President said in the cabinet meeting that it's dead. … I keep on saying this over and over again, but I'm happy to say it one more time. I have testified under oath that it's dead. I have testified in front of the House, where I wasn't under oath, where I said it was dead … I'm not sure how I can further say that the Anti-Weaponization Fund doesn't exist." *The DOJ anti-weaponization fund doesn't exist*, FOX NEWS, at 00:02–44 (Aug. 12, 2026). Likewise, in briefs filed in two additional federal district courts, the Department has repeatedly stated the same. Motion to Dismiss, Dkt. 147 in Case No. 1:26-cv-01399-LMB-IDD (E.D. Va. Aug. 21, 2026) ("the Anti-Weaponization Fund … will not go forward."); *see also* Reply in Support of Motion to Dismiss, Dkt. 16 in Case No. 3:26-cv-03283-CAB-DDL (S.D. Cal. Aug. 28, 2026) ("There is not going to be a fund—at all.").

Plaintiff's argument regarding the presumption of regularity, Opp. at 12–14, is circular and not compelling. First, it argues that the presumption should not attach because its merits arguments are correct. Second, Plaintiff misunderstands the presumption. The presumption is applied, not only to the actions of government

officials discharging their duties (which is where their argument rests), but also to the sworn statements of the Attorney General to Congress and government counsel's representations in court filings and in open court to the same effect. Dkt. 20 at 9.

Plaintiff cannot will away the fact that the Government's additional representations only strengthened a pattern that this Court recognized in its initial rulings. *See* Opp. 17–18 (accusing the Government of "manipulat[ing] the jurisdiction of the federal courts"). Nor are Plaintiffs entitled to move the goalposts by vaguely complaining that government officials have expressed support for compensating individuals targeted by improper prosecution in appropriate circumstances. *See* Opp. 12. Plaintiffs' claim challenges a specific action—the creation of the Fund—and that is no longer happening. Compl., Prayer for Relief (1)–(11).

Plaintiff, ironically, appears to want the Fund to go forward just to keep this case alive. So it argues that the Attorney General's rescission of the Fund is ineffective, because the litigants in the Florida suit could try to enforce the Settlement Agreement. Opp. 9–11. For starters, that argument contradicts Plaintiff's contention that the Fund is illegal. It is "a bedrock principle of contract law" that "Contracts are void when they announce illegal terms." *Goodrich as trustee of Robert D. Goodrich revocable trust v. Bank of Am. N.A.*, 136 F.4th 347, 356 (D.C. Cir. 2025) (citing Restatement (Second) of Contracts § 178). Regardless, such a lawsuit would amount to a claim for specific performance, and courts may not order such relief against the federal government. *Am. Ass'n of Physics Tchrs., Inc. v. Nat'l Sci. Found.*, 804 F. Supp. 3d 45, 63 (D.D.C. 2025) ("[T]he Tucker Act provides money damages as

the exclusive remedy for contractual actions against the federal government, foreclosing courts from ordering specific performance."); *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967–68, 971 (D.C. Cir. 1982) (explaining that there is a "generally recognized rule that a plaintiff cannot maintain a contract action in either the district court or the Court of [Federal] Claims seeking specific performance of a contract" in "an action against the United States"); *Kanemoto v. Reno*, 41 F.3d 641, 644–45 (Fed. Cir. 1994) (same). In any event, the nature of the contemplated specific performance Plaintiff envisions would be akin to a writ of mandamus directed at the Attorney General. That would conflict with the vast body of case law suggesting that mandamus of cabinet officials is an extraordinary remedy reserved for the rarest of cases. *E.g.*, *In re Musk*, 169 F.4th 445, 448 (4th Cir. 2026).

Relatedly, the appellate proceedings in *Trump v. IRS* have absolutely no bearing on the mootness of Plaintiff's claim. The Judge's Order in the Florida matter did not purport to invalidate any part of the Settlement Agreement. *See Trump v. IRS*, 2026 WL 2015525, at *21 n.63 (S.D. Fla. July 13, 2026) ("[W]hether a private agreement between the Parties … is valid and enforceable or is a depredation of the Judgment Fund and an illegal conferral of immunity *is not before* this Court." (emphasis added)). So appealing it has no bearing on the Settlement Agreement or the non-existent Fund.

In another attempt to keep the case alive—despite having obtained the relief originally sought—Plaintiff asks the Court to ignore the Government's representation that "there are, and will not be, any … records" about the Fund, and

that even if any records did exist, the Government would be entitled to a presumption that they would be handled in accordance with federal law. Opp. 14–17. But as explained above, the Government has only strengthened its claim to the presumption of regularity and this Court's trust. *See Montgomery v. Comey*, 300 F. Supp. 3d 158, 168 (D.D.C. 2018) (dismissing claims premised on allegedly unlawful surveillance where the Court would otherwise have been required to disbelieve government's representations that data collection program would be conducted in accordance with relevant federal statutory requirements) (Leon, J.). Plaintiff cannot make conclusory allegations, unsupported by any well-pled facts, that the government will conduct its business in open violation of federal law simply to support jurisdiction. And in any event, the proper resolution regarding access to federal records is through the Freedom of Information Act ("FOIA") and the processes set forth there. Plaintiff's complaint does not plead a cognizable cause of action under FOIA because it does not plead it has been denied access to any records properly requested. Any attempt by Plaintiff to morph this case into a FOIA case should be rejected.

Finally, the fact that political negotiations arose from the interplay between the defunct Fund and the Attorney General's confirmation proceedings—and even more importantly, the fact that those political negotiations were seen through to a concrete conclusion—only further underscores that this case is properly characterized as moot. "[W]hen a high-profile dispute is "hashed out in the hurly-burly, the give and-take of the political process between the legislative and executive," that is reason

for the dispute to "not end[] up in court." *Trump v. Mazars USA, LLP*, 591 U.S. 848, 859 (2020) (internal quotation marks omitted).

**B. Ripeness and Standing Have Always Been Lacking.**

For Article III standing and ripeness purposes, Plaintiff's arguments about the Fund, its structure, the nature of the claims it would process, or the procedures through which it would process such claims, must be based on the actions Plaintiff claims are unlawful: "The May 18 Settlement Agreement and Order." Compl. ¶ 146.

The Settlement Agreement, executed on May 18, 2026, committed the Attorney General to "within 30 days" establish the Anti-Weaponization Fund. But that provision was still "subject to the terms and limitations described" in the remainder of the Agreement, including a host of future implementing actions (that never occurred). Settlement Agreement at 2. First, "within 30 days of the Effective Date," the Attorney General would issue "[a]n accompanying order" which would "establish funding and any other relevant requirements, rules, conditions, terms, and waivers." *Id.* Second, "[w]ithin 30 days of the Effective Date, the Attorney General" would "issue an order appointing the Members, including the Chair of The Anti-Weaponization Fund." *Id.* Third, there would be no quorum without at least three Members. *Id.* Fourth, the Fund's Members would have had "the power to determine its own procedures for submitting, receiving, processing, and granting or denying claims," including but not limited to "reasonable steps to protect private personal and financial information" and "controls and systems to avoid fraudulent claims." *Id.* at 2–4. The planned Fund was also designed to operate "consistent with law," with "the

validity of [remaining] provisions … not … impaired" if any provision were "found by a court to be invalid or unenforceable." Id. at 4–5. Most of that did not happen at all, and none of it happened in a way that stuck. On the same day the Settlement Agreement was signed, the Attorney General issued an accompanying Order (which, again, has been rescinded). May 18 Order at 1. That Order did not effectuate any transfer of any sum of money, did not establish any "rules, conditions, terms, [or] waivers," and did not appoint any Members, much less a Chair. Likewise, the Department of Justice's informational overview page referred to the Fund as an entity that would come into being at some point in the future, saying it "*will consist* of five members appointed by the Attorney General (AG)," with one member who "*will be chosen* in consultation with Congressional leadership," with funding that "*will come from* the judgment fund." Informational Overview Page (emphases added). In other words, no Fund Members or processes were ever established. Under a straightforward application of the Supreme Court's recent decision in *Trump v. California*, Plaintiff has always lacked Article III standing and its claims have never been ripe.

In *Trump v. California*, state plaintiffs challenged the constitutionality of several provisions in an executive order designed to maintain public confidence in federal elections. 606 U.S. ----, slip op. at 1 (2026). One challenged provision consisted of a directive from the President to the Secretary of Homeland Security to "take appropriate action to create and distribute State Citizenship Lists." *Id.* at 4. The Supreme Court explained that, as "an internal directive from the President to a

subordinate," the provision "imposes no obligations on the States, so they 'suffer no concrete harm from it.'" *Id.* (quoting *Trump v. New York*, 592 U.S. 125, 134 (2020)). The "true source of any injury," the Court explained, "would be the downstream action that the Secretary might take in the future to implement" the provision, which in any event could "be implemented only [t]o the extent feasible and consistent with applicable law." *Id.* (citations and quotation marks omitted).

This meant that, "to support the States' supposedly concrete injury," a federal court would have to accept an "*unduly long chain of inferences*" in a manner inconsistent with Article III's limitation on judicial power. *Id.* (emphasis added). "The District Court first had to speculate about whether it would be 'feasible' for the Secretary to create and transmit the Lists before the midterms." *Id.* (citation omitted). "Next, the court had to predict what 'action' the Secretary would deem 'appropriate' for implementing" the provision. *Id.* (citation omitted). "After all that, the court still had to estimate whether those actions would be taken in a manner substantially likely to harm the States." *Id.* at 4–5 (citation omitted). The Supreme Court explained that such "stacking" of "hypothetical on hypothetical to speculate that harm will eventually materialize" is "prohibit[ed]" by Article III. *Id.* at 5.

Another provision, which the Supreme Court also held the States lacked standing to challenge, "direct[ed] the Postal Service to issue a notice of proposed rulemaking." *Id.* at 7. The provision "order[ed] the Postal Service to initiate the process of proposing a rule that might bind the States in the future." *Id.* It was not itself "a proposed rule, let alone a final rule," and "impose[d] no legal requirements .

. . on anyone outside the Executive Branch." *Id.* Like the challenge to the citizenship list provision, here the District Court would have to engage in an impermissible "string of speculations to find this suit justiciable," first speculating "about whether the Postal Service would propose a rule," then speculating "about how the agency would weigh the comments it received," then speculating about "whether the agency would issue a final rule," then speculating "about what the final rule would say," and "[f]inally, after all that, . . . speculat[ing] about whether the text of a hypothetical final rule would harm the States." *Id.* at 7–8.

The same reasoning that led the Supreme Court to conclude that Article III jurisdiction was lacking—under both the standing and ripeness doctrines—applies with full force here. Plaintiff asks this Court to recognize Article III injury based on predictions about how the Fund *would have operated*, even though the Fund has never existed, none of its Members have ever been appointed, and no comprehensive procedures governing claims processing have ever been established. "Article III demands more certainty." *Id.* at 5. "To say the least, this case presents the paradigmatic example of a dispute with 'significant uncertainty' about whether the challenged framework will be implemented at all, and if so, in what form, on what timeline, and with what concrete consequences to the parties!" Dkt. 20 at 13–14.

## II. PLAINTIFF'S APA CLAIMS ARE DEFICIENT.

Because the jurisdictional issues are dispositive of this matter—and require the Court to dismiss this case for lack of jurisdiction—the Court need not reach the substantive issues presented. Nevertheless, should the Court reach and consider

these issues, the Court should conclude that the Complaint fails the Rule 12(b)(6) standard on the substance and should dismiss for these reasons as well.

**A. There is no Final Agency Action.**

Plaintiff has presented no "final agency action" for the Court to review, so it cannot obtain APA review and all its APA claims must fail as a result. Plaintiff complains about two documents: the Settlement Agreement and the now-rescinded May Order. Thus, the legal question before the Court is whether those instruments amount to final agency action. And the question is whether they "'mark the consummation of the agency's decision-making process'" and whether they have caused "'rights or obligations [to be] determined, or from which legal consequences will flow.'" *Safari Club Int'l v. Jewell*, 842 F.3d 1280, 1289 (D.C. Cir. 2016) (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)). The answer to both those questions is no.

The Settlement Agreement cannot reasonably be read as the "consummation" of agency decision-making with respect to the creation of the Fund. At best, the Settlement Agreement determined how the Fund could be created in the future, and it conditioned the existence of the Fund on several future implementing actions. Settlement Agreement at 2. First, "within 30 days of the Effective Date," the Attorney General would issue an "accompanying order" which would "establish funding and any other relevant requirements, rules, conditions, terms, and waivers." *Id.* Second, within "30 days of the Effective Date, the Attorney General" would "issue an order appointing the Members, including the Chair of The Anti-Weaponization Fund," with

one member "chosen in consultation with congressional leadership." *Id.*[1] Third, there would be no quorum without at least three Members. *Id.* Fourth, the Fund's Members would have had "the power to determine its own procedures for submitting, receiving, processing, and granting or denying claims," including but not limited to "reasonable steps to protect private personal and financial information" and "controls and systems to avoid fraudulent claims." *Id.* at 2–4. The planned Fund was also designed to operate "consistent with law," with "the validity of [remaining] provisions . . . not . . . impaired" if any provision were "found by a court to be invalid or unenforceable." *Id.* at 4–5. Plaintiff's implausible reading of the Settlement Agreement, Opp. 29–30, cannot change the fact that the agreement left too much to be determined in the future to reasonably be considered a consummation of agency decision making.[2] Nor did the Attorney General's (now-rescinded) May Order supply the missing pieces. That order—enjoined before it was implemented and now withdrawn—would have allowed the process of establishing the Fund to begin, but it did not itself establish any "rules, conditions, terms, [or] waivers," and it did not appoint any Members, much less a Chair.[3] Plaintiff's selective reading of these documents ignores the fact

---

[1] Relatedly, the Settlement Agreement describes the Fund as "consisting of" its Members. Settlement Agreement at 2. So without Members, there could be no Fund.

[2] The language of the Settlement Agreement proves that the agreement itself could not create the Fund.

[3] Likewise, a website notice published by DOJ referred to the Fund as an entity that would come into being at some point in the future, saying it "*will consist* of five members appointed by the Attorney General (AG)," with one member who "*will be chosen* in consultation with Congressional leadership," with funding that "*will come* from the judgment fund." Press Release 26-512, Justice Department Announces Weaponization Fund, available at

that, at most, they outline a government policy or activity that would exist in the future. Opp. 29–30.

Likewise, the idea that these actions reflect a decision "by which rights or obligations have been determined," Opp. 29, conflicts with binding Supreme Court precedent. *See Trump v. California*, 609 U.S. ---, slip. op. at 4 (explaining that "an internal directive from the President to a subordinate" imposed "no obligations" on regulated parties); *see also id.* at 7 (explaining that the President's directive to a subordinate "to issue a notice of proposed rulemaking" was merely an order "to initiate the process of proposing a rule that might bind" regulated parties "in the future," so it did not itself impose any "legal requirements on" any regulated party). Indeed, the Fund would have been voluntary, and no rights or obligations would have been determined until it was set up, claims were accepted, evaluated, and potentially resolved through apology and payment. And the only individuals whose rights would have been affected are those who would have given up alternative remedial means for valid legal claims by opting to apply to the Fund.

The D.C. Circuit has also held in analogous situations that challenged agency action was not "final" under the APA. In *Delaware Valley Regional Center LLC v. Department of Homeland Security*, USCIS published statements within its Q&A and Policy Manual to specify that immigrants seeking to demonstrate their eligibility for infrastructure project visas must file an application. 106 F.4th 1195, 1205 (D.C. Cir. 2024) ("USCIS stated only that it requires regional centers and visa applicants to

---

https://www.justice.gov/opa/pr/justice-department-announces-anti-weaponization-fund (May 19, 2026).

submit forms that demonstrate their eligibility for a new benefit. Thus, the statements in the Q&A and the Policy Manual…do not constitute 'final agency action.'") (quoting *Catawba Cnty. v. EPA*, 571 F.3d 20, 34 (D.C. Cir. 2009)). The plaintiffs in *Delaware Valley* sought eligibility for a newly created pool of EB-5 visas for investors. As in this case, the challenged statements in *Delaware Valley Regional Center* were about how the agency explained it would administer the first step of a drawn-out process. There was no definitive eligibility decision. Plaintiffs there attempted to "infer from USCIS's statements in the Q&A and the Policy Manual that the agency ha[d] categorically excluded" them "from consideration," but the D.C. Circuit rejected that argument, explaining that they had "not established that USCIS has adopted that interpretation." *Id.* at 1205. "[R]ather than anticipate that their applications will be rejected based on an unfavorable interpretation," the prospective applicants had to "file application[s]" first, and they would have had "the opportunity to litigate the issues they raise[d]" at that point. *Id.* at 1206. But before that, there was no final agency action. *Id.* Likewise here, Plaintiff's claims about the Fund depend on its premature judgment about how the Fund would have operated. But those predictions could only have been tested through actual operation of the Fund.

In another analogous decision, the D.C. Circuit held that an MOU between the IRS and DHS "outlining procedures that will govern requests … for addresses of persons subject to criminal investigation," was not a reviewable final agency action. *Centro de Trabajadores Unidos v. Bessent*, 167 F.4th 1218, 1224, 1235–36 (D.C. Cir. 2026). The D.C. Circuit made clear that finality depends on "the actual legal effect

(or lack thereof) of the agency action," as well as the agency's own "characterization of the guidance" and "whether the agency has applied the guidance as if it were binding." *Centro*, 167 F.4th at 1236. The Court explained that IRS "never characterized" the MOU "as a rule," nor did it rely "on the MOU to justify its actions," and the "MOU merely outline[d] the process through which ICE can request addresses from IRS." *Id.* As explained above, the challenged documents—which is the most important place for the Court to look to assess DOJ's characterizations of the Fund—referred to the Fund as something that would only exist in the future. And it is beyond any reasonable dispute that no government actor "has applied the guidance as if it were binding on regulated parties." *Id.*

### B. Notice-and-Comment Would Not Have Applied In Any Event.

Even if there were a final agency action for the Court to review here (there is not), notice-and-comment rulemaking would not have been required. Notice-and-comment rulemaking is required only for legislative rules. "An agency action that purports to impose legally binding obligations or prohibitions on regulated parties—and that would be the basis for an enforcement action for violations of those obligations or requirements—is a legislative rule." *Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243, 251 (D.C. Cir. 2014). In contrast, "agency action that merely explains how … it will exercise its broad enforcement discretion … is a general statement of policy." *Id.* at 252. Much like in the final agency action context, what matters is "the actual legal effect (or lack thereof) … on regulated entities." *McCarthy*, 758 F.3d at 252. The D.C. Circuit has also explained that "the agency's characterization of" the action in

question is a key factor courts should use to determine "what makes something a legislative rule." *Id.* at 251–52.

These considerations—which Plaintiffs ignore in their opposition—confirm that the challenged actions do not constitute a legislative rule. Here, there are no regulated entities at all. As explained above, participation in the Fund would have been entirely voluntary. Even in the hypothetical where the Fund was fully operational, it would not have required anyone to do anything. *Cf. Nat'l Ass'n of Reg. Utility Comm'rs v. FCC*, 746 F.2d 1492, 1495 (D.C. Cir. 1984) (describing the FCC's authority to "control entry into and exit from" the telecommunications industry, as well as "require just and reasonable rates").

From the very beginning, the Government characterized the Fund in terms of a plan that would have been implemented more concretely in the future. The Settlement Agreement provided that "The Anti Weaponization Fund [would have had] the power to determine its own procedures for submitting, receiving, processing, and granting or denying claims," Settlement Agreement at 2, and the May Order did nothing concrete on that topic. *See McCarthy*, 758 F.3d at 252–53 (explaining that a "Final Notice" issued by the EPA was not a legislative rule where "the document [was] devoid of relevant commands," notwithstanding the fact that the document "signal[ed] likely future permit denials by EPA" (emphasis added)); *see also id.* ("if so, those permit denials can be challenged at that time."). No legal consequences with any bearing on Plaintiff flowed from the challenged documents.

*Gill v. United States Department of Justice*, 913 F.3d 1179 (9th Cir. 2019), is instructive. There, the federal government "sought to standardize the sharing of terrorism-related information through the adoption of a 'Functional Standard'" of suspicious activity potentially suggesting terrorism. *Id.* at 1182–83. The Ninth Circuit concluded that the decision to establish a new "Functional Standard" was "exempt from the notice and comment requirement" because while the Standard "aid[ed] agencies in determining whether an individual is engaged in suspicious activity, … the final decision to disseminate a [Suspicious Activity Report] rest[ed] in the analyst's discretion." *Id.* at 1187. In other words, the "significant discretion retained by agencies and their analysts in determining whether to disseminate information compel[led the] decision that the Functional Standard is not a legislative rule." *Id.* The Ninth Circuit relied on the Fifth Circuit's similarly instructive decision in *Professionals and Patients for Customized Care v. Shalala*, 56 F.3d 592 (5th Cir. 1995). In *Shalala*, the FDA promulgated a policy setting forth nine factors to help the agency determine whether to initiate an enforcement action against a pharmacy engaged in drug manufacturing. 56 F.3d at 593. The court concluded that the policy did not require notice-and-comment before it was promulgated, because the policy left relevant agency decisionmakers considerable discretion, "based on their own judgment," to "decide whether the pharmacy in question" would have been subject to the enforcement policy. *Id.* at 601.

Like the foundational policies in these cases, the Fund's commissioners—who, to be clear, were never appointed—would have exercised considerable discretion,

guided by the broad factors listed in the *Trump v. IRS* Settlement Agreement. That none of those eventualities came to pass just confirms dismissal is proper.

Throughout its opposition Plaintiff mischaracterizes the contents of the May 18 Order and Settlement Agreement, stating that such documents served as the "creation of the Fund." Opp. 30; *see also* Opp. 35. But whether an agency has issued a legislative rule is determined by the contents of the agency's action, rather than any self-serving label. *Azar v. Allina Health Servs.*, 587 U.S. 566, 575 (2019)). No party may manufacture the applicability or non-applicability of notice-and-comment through the mislabeling of agency action. *Allina*, 587 U.S. at 575. There was never a Fund, and no rules governing the operation of the Fund were ever established.

**C. The Fund Would Survive Arbitrary-and-Capricious and *Ultra Vires* Review.**

The arbitrary-and-capricious standard is deferential. Applying that standard, "a court asks not whether it agrees with the agency decision, but rather only whether the agency action was reasonable and reasonably explained." *S. Airways Express, LLC v. DOT*, 159 F.4th 50, 59 (D.C. Cir. 2025). Plaintiffs' own opposition confirms that standard is met here, even though they may disagree with the policy choice taken. On their own recounting of the facts, the Fund was announced to provide redress for those targeted by government abuse resembling, for instance, "abuse of the FACE Act," the "wrongful labeling of certain parents [as] domestic terrorists, and the IRS's targeting of groups based on improper ideological criteria." Opp. 36 (quoting Settlement Agreement at 1). A duly-elected Presidential administration has the right to determine that respect for the democratic will requires establishing a process

allowing the Government to atone for its past wrongs. Because the Fund was based on and modeled after previous settlement funds established by the government, it was not arbitrary or capricious. *See Keepseagle v. Vilsack*, 102 F. Supp. 3d 306, 309 (D.D.C. 2015); *Garcia v. Vilsack*, No. 00-2445 (D.D.C.); *Love v. Vilsack*, No. 00-2502 (D.D.C.); *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico on April 20, 2010*, No. 2:10-md-02179, Dkt. No. 1098 (E.D. La. Feb. 2, 2011).

For the same reasons it is not arbitrary or capricious, Plaintiff's *ultra vires* claims must fail. Plaintiff does not meaningfully explain its *ultra vires* theory—devoting a mere paragraph to the issue. Thus, the Court should hold that Plaintiff has abandoned its theory and dismiss the count on that basis alone. *Johnson v. Panetta*, 953 F. Supp. 2d 244, 250 (D.D.C. 2013) (quoting K*rupa v. Naleway*, 2010 WL 145784, *8 (N.D. Ill. January 12, 2010) ("perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are deemed waived.").

But even considering the merits, using the "Hail Mary pass" of judicial action to challenge that which has clear historical precedent fails the high bar needed to establish an ultra vires claim. *See* Dkt. 45, Memorandum Opinion denying Preliminary Injunction at 10, in *Tohono O'Odham Nation v. Mullin, et al.*, Case No. 1:26-cv-2127 (D.D.C. Aug. 14, 2026) (Leon, J.) ("As I have said before, 'ultra vires review is a high bar'—it is the ultimate 'Hail Mary pass.' *Nat'l Tr. for Historic Pres. v. Nat'l Park Serv.*, 827 F. Supp. 3d 93, 104 (D.D.C. 2026) (Leon, J.) (quoting *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025)").

**D. CREW Does Not Sufficiently Allege a Pattern or Practice Claim, and In Any Event Such a Claim is Not Properly Presented in this Lawsuit.**

Plaintiff attempts to claim that Defendants waived its challenge to its faulty FOIA Pattern or Practice Claim. That is not true. That claim is explicitly addressed on pages 22–23 of Plaintiff's Memorandum in Support of its motion. See Dkt. 22-1. Instead of taking the opportunity to brief an argument in support of its claim, CREW simply re-asserts, with zero support, conclusory statements that the government will act in defiance of federal law and departmental regulations.

To be clear, CREW lacks standing to bring its unripe policy or practice claim, which it has insufficiently pled. *See Cause of Action Inst. v. DOJ*, 999 F.3d 696, 704 (D.C. Cir. 2021) (plaintiff must have standing and ripeness to bring a policy or practice claim); see also *Payne Enters., Inc. v. United States*, 837 F.2d 486 (D.C. Cir. 1988). CREW offers nothing, beyond rampant speculation, that hypothetical future activities would have taken place outside the purview of FOIA. But any such adjudication of a FOIA request is premature as the Fund never existed and will not now exist; thus the policy or practice claim suffers from the same ripeness flaws as the Fund claims.

More fundamentally, CREW's complaint does not allege that any FOIA request has been denied, much less that they have exhausted administrative remedies such that any request is reviewable by this Court. And even if it did, Plaintiff does not connect the denial of a FOIA request to an unlawful policy or practice, nor do they make the required numerosity showing to find a policy or practice violation. *See Am. First L. Found. v. Coley*, Case No. 1:21-cv-03024 (D.D.C. Sept. 30, 2022) (Chutkan J.)

ECF No. 10 at 4 (finding "three is a 'small sample size' from which to infer a policy or 'persistent practice.' *Am. Ctr. for L. & Just. v. Fed. Bureau of Investigation*, 470 F. Supp. 3d 1, 7 (D.D.C. 2020); *see Judicial Watch*, 895 F.3d at 780 (requiring a plaintiff to allege 'a pattern . . . amounting to a persistent failure to adhere to FOIA's requirements'). Plaintiffs do not identify, and the court is not aware of, any case that has inferred a FOIA policy or practice violation from so few instances. To the contrary, judges in this district have dismissed claims derived from similar numbers."). Plaintiff here does not point to *one* FOIA claim denied, thus they fail to state a policy or practice claim.

## III. ANY REMAINING STATUTORY, CONSTITUTIONAL, OR OTHER CLAIM FOR RELIEF SHOULD BE DISMISSED.

The Court should reject Plaintiffs' request (Opp. 32–40) for advisory opinions on several weighty issues of constitutional and federal statutory law given that they have already received the relief sought in their Complaint.

The Court should also reject and dismiss the claim for Mandamus against the Attorney General. "Mandamus relief is a drastic and extraordinary remedy reserved for extraordinary cases." *In re Musk*, 169 F.4th 445, 448 (4th Cir. 2026) (citing *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 380 (2004)). "The party seeking mandamus must show a clear and indisputable right to the relief sought and that there are no other means of obtaining relief." Id. Plaintiff's 11 lines in its brief clearly fail to establish such an "indisputable right."

## CONCLUSION

For the reasons stated above, the Court should dismiss this case with prejudice.

Date: September 21, 2026

STANLEY E. WOODWARD, JR.
*Associate Attorney General*

*/s/* ANDREW J. BLOCK
Andrew J. Block
*Senior Counsel to the Associate Attorney General*
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530

*Counsel for Defendants*

**Certificate of Service**

I hereby certify that on September 21, 2026 I filed the foregoing document with the Clerk of Court using the Court's CM/ECF system, thereby serving all counsel who have appeared in this case.

*/s/ Andrew J. Block*
Andrew J. Block